UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AKMURAT O. DOE, et al.,

Plaintiffs,

v.

DONALD J. TRUMP, et al.,

Defendants.

Case No. 1:25-cv-13946-JEK

**ADMINISTRATIVE RECORD FOR POLICY MEMORANDUM, PM-602-0192**

**ADMINISTRATIVE RECORD FOR POLICY MEMORANDUM, PM-602-0194**

**ADMINISTRATIVE RECORD FOR POLICY ALERT PA-2025-26**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AKMURAT O. DOE, ET AL.,

PLAINTIFFS,

V.

DONALD J. TRUMP, ET AL.,

DEFENDANTS.

Case No. 1:25-cv-13946-JEK

**CERTFICATION OF ADMINISTRATIVE RECORD**

## INDEX AND THE CERTIFIED ADMINISTRATIVE RECORD

| | PM-602-0192 records (in chronological order) | | |
|---|---|---|---|
| **Document Number** | **Document Title** | **Beginning Bates Number** | **Ending Bates Number** |
| 1 | Policy Memorandum, PM-602-0192, Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries | 000001 | 000004 |
| 2 | Decision Memorandum, Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries | 000005 | 000008 |
| 3 | Delegation to the Bureau of Citizenship and Immigration Services | 000009 | 000014 |
| 4 | Executive Order 14161, Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats | 000015 | 000017 |
| 5 | Proclamation 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security | 000018 | 000026 |

1

| | | | |
|---|---|---|---|
| | and Public Safety Threats | | |
| 6 | DOJ Press Release: Press Release: Afghan National Pleads Guilty to Plotting Election Day Terror Attack in the United States | 000027 | 000030 |

| | | | |
|---|---|---|---|
| 7 | DHS Press Release, Terrorist Who Shot Two National Guard Members in D.C. Was Let into the Country by the Biden Administration's Operation Allies Welcome Program | 000031 | 000032 |
| 8 | USCIS Policy Manual, Volume 1, Part E, Chapter 8 – Discretionary Analysis | 000033 | 000055 |

2

I, James Kernochan, make the following declaration, as provided by Section 1746 of Title 28 of the United States Code. I am aware that this declaration will be filed in the above-captioned civil action with the United States District Court for the District of Massachusetts. I hereby certify that:

1. I am the Deputy Director of U.S. Citizenship and Immigration Services (USCIS), a component agency within the U.S. Department of Homeland Security (DHS). I have held this position since December 22, 2025. Previously, I served as Chief of Staff at the U.S. Customs and Border Protection from January 20, 2025.

2. I assist the Director in the overall administration and supervision of the agency. I provide executive oversight of USCIS operations, including the adjudication of immigration benefit applications and petitions; support the implementation of immigration laws, regulations, and policies; oversee operational components such as service centers and field offices; ensure compliance with applicable statutory and regulatory requirements; and exercise delegated authority on behalf of the Director.

3. I certify that, to the best of my knowledge, information, and belief that the documents listed in the accompanying administrative record index hereto constitute the nonprivileged documents and materials directly and indirectly considered by USCIS and that these documents constitute the administrative record the agency considered in issuing USCIS Policy Memorandum 602-0192 (PM-602-0192) (Dec. 2, 2025).

I certify under penalty of perjury that the foregoing is true and correct.

_____                    __2/6/26_____
James Kernochan                                                          Date
Deputy Director
U.S. Citizenship and Immigration Services
U.S. Department of Homeland Security

3

**INDEX**

| Document No. | Date | Document Title | Bates No. |
|---|---|---|---|
| 01 | 2025-12-02 | Policy Memorandum, PM-602-0192, Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries | CAR 000001 |
| 02 | 2025-11-29 | Decision Memorandum, Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries | CAR 000005 |
| 03 | 2003-06-05 | Delegation to the Bureau of Citizenship and Immigration Services | CAR 000009 |
| 04 | 2025-01-20 | Executive Order 14161, Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats | CAR 000015 |
| 05 | 2025-06-04 | Proclamation 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats | CAR 000018 |
| 06 | 2025-06-13 | DOJ Press Release: Press Release: Afghan National Pleads Guilty to Plotting Election Day Terror Attack in the United States | CAR 000027 |
| 07 | 2025-11-26 | DHS Press Release, Terrorist Who Shot Two National Guard Members in D.C. Was Let into the Country by the Biden Administration's Operation Allies Welcome Program | CAR 000031 |
| 08 | 2025-11-27 | USCIS Policy Manual, Volume 1, Part E, Chapter 8 - Discretionary Analysis | CAR 000033 |



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Camp Springs, MD 20588-0009

U.S. Citizenship
and Immigration
Services

December 2, 2025                                                    PM-602-0192

# Policy Memorandum

**SUBJECT:**   Hold and Review of all Pending Asylum Applications and all USCIS Benefit
Applications Filed by Aliens from High-Risk Countries[1]

**Purpose**

Effective immediately, this memorandum directs U.S. Citizenship and Immigration Services
(USCIS) personnel to:

1. Place a hold on all Forms I-589 (Application for Asylum and for Withholding of Removal),
regardless of the alien's country of nationality, pending a comprehensive review;
2. Place a hold on pending benefit requests[2] for aliens from countries listed in *Presidential
Proclamation (PP) 10949, Restricting the Entry of Foreign Nationals To Protect the United
States From Foreign Terrorists and Other National Security and Public Safety Threats*,[3]
pending a comprehensive review, regardless of entry date[4]; and
3. Conduct a comprehensive re-review of approved benefit requests for aliens from countries
listed in PP 10949 who entered the United States on or after January 20, 2021.[5]

This memorandum mandates that all aliens meeting these criteria undergo a thorough re-review
process, including a potential interview[6] and, if necessary, a re-interview, to fully assess all national
security and public safety threats along with any other related grounds of inadmissibility or
ineligibility.[7] An individualized, case-by-case review and assessment will be done of all relevant
information and facts. USCIS will also conduct a comprehensive review of all relevant policies,

---

[1] On June 4, 2025, the President issued Presidential Proclamation 10949, *Restricting the Entry of Foreign Nationals To
Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats.* Exercising
authority under section 212(f) of the Immigration and Nationality Act (INA), the proclamation imposes restrictions,
limitations, and exceptions on the entry of aliens from 19 high-risk countries. Under INA 212(f), the President may
suspend or restrict the entry of any aliens deemed detrimental to U.S. interests. See 90 FR 24497 (PDF) (June 4, 2025).
[2] The term "benefit request" in this memorandum does not include USCIS screening activities, including credible fear,
reasonable fear, safe third country, third country removal, and threshold screenings under the Asylum Cooperative
Agreements.
[3] This applies to aliens who list one of the 19 high-risk countries as their Country of Birth or Country of Citizenship.
[4] Including Form I-485 (Application to Register Permanent Residence or Adjust Status), Form I-90 (Application to
Replace Permanent Resident Card (Green Card)), Form N-470 (Application to Preserve Residence for Naturalization
Purposes), Form I-751, (Petition to Remove Conditions on Residence), and Form I-131 (Application for Travel
Documents, Parole Documents, and Arrival/Departure Records).
[5] Entered may include admitted, inspected, paroled, or entered without inspection.
[6] Interviews for this population shall not be waived under any circumstance. For benefit requests where an interview is
not required, the case review and evaluation will determine if the alien needs to appear at a USCIS office.
[7] See INA 212(a)(3)(A), (B), and (F) and 237(a)(4)(A) and (B).

www.uscis.gov

PM-602-0192: Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries
Page: 2

procedures, and operational guidance for compliance, accuracy, and needed improvements during this time.

This guidance outlines the adjudicative hold, procedural requirements, and processes for the re-review, interview, or re-interview of affected aliens. USCIS personnel are instructed to prioritize national security and public safety concerns and ensure compliance with all applicable laws and regulations during the adjudication process. All findings must be documented in accordance with established protocols to support any subsequent determinations or actions.

**Background**

On January 20, 2025, the President issued Executive Order (EO) 14161, titled *Protecting the United States from Foreign Terrorist and Other National Security and Public Safety Threats*. This order aims to safeguard U.S. citizens from aliens who may seek to commit terrorist acts, pose threats to national security, promote hateful ideologies, or exploit immigration laws for malicious purposes. EO 14161 underscores the importance of vigilance during the visa issuance process to ensure that individuals approved for admission into the United States do not intend to harm Americans or compromise U.S. national interests.

Recently, the United States has seen what a lack of screening, vetting, and prioritizing expedient adjudications can do to the American people. An Afghan national, Nasir Ahmad Tawhedi, planned a terrorist attack in the United States on Election Day 2024. Tawhedi pled guilty in federal court to conspiring and attempting to provide material support and resources to the Islamic State of Iraq and al-Sham (ISIS).[8] In another instance, an Afghan national, Rahmanullah Lakanwal, is suspected of planning and executing a terrorist attack in Washington, DC against two National Guard members,[9] one who was killed and another who remains critically injured. USCIS plays an instrumental role in preventing terrorists from seeking safe haven in the United States and ensuring that USCIS' screening and vetting and adjudications prioritize the safety of the American people and uphold all U.S. laws.

In light of identified concerns and the threat to the American people, USCIS has determined that a comprehensive re-review, potential interview, and re-interview of all aliens from high-risk countries of concern who entered the United States on or after January 20, 2021 is necessary. Lastly, USCIS may, when appropriate, extend this review and re-interview process to aliens who entered the United States outside of this timeframe.

USCIS remains committed to ensuring that all aliens from high-risk countries of concern that entered the United States do not present threats to national security or public safety. To address vulnerabilities during this process, and in order to conduct a comprehensive review of all policies, procedures, and guidance, USCIS has determined that it must implement an adjudicative hold on all pending asylum applications, regardless of the alien's country of nationality, as well as pending benefit requests filed by aliens from high-risk countries outlined in PP 10949. This hold will remain

---

[8] See *Afghan National Pleads Guilty to Plotting Election Day Terror Attack in the United States,* U.S. Department of Justice, June 13, 2025.

[9] See *Terrorist Who Shot Two National Guard Members in D.C. Was Let into the Country by the Biden Administration's Operation Allies Welcome Program*, U.S. Department of Homeland Security Press Release, November 26, 2025.

PM-602-0192: Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries
Page: 3

in effect until lifted by the USCIS Director through a subsequent memorandum. Any requests to lift the hold due to litigation or other extraordinary circumstances must receive approval from the USCIS Director or Deputy Director.[10]

**Guidance**

USCIS has determined the operational necessity to ensure that all asylum applicants and aliens from high-risk countries of concern who entered the United States do not pose a threat to national security or public safety. This effort ensures that USCIS exercises its full authority to investigate immigration benefit requests filed by aliens who may pose risks to the national security and public safety of the United States, as outlined in DHS Delegation of Authority 0150.1, issued June 5, 2003.

USCIS will conduct a thorough review on a case-by-case basis to assess benefit eligibility including whether:

1. The alien is listed in the Terrorist Screening Dataset (TSDS) as a Known or Suspected Terrorist (KST) under Tier 1 or Tier 2 classifications or is included in Tier 3 or Tier 4 of the TSDS with significant derogatory information related to the alien.
2. The alien is connected to prior, current, or planned involvement in, or association with, an activity, individual, or organization described in sections 212(a)(3)(A), (B), or (F), or 237(a)(4)(A) or (B) of the Immigration and Nationality Act (INA).
3. The alien is linked to prior, current, or planned involvement in, or association with, an activity, individual, or organization that may pose a risk of serious harm or danger to the community, including criminal conduct described in INA 101(a)(43), 212(a)(1)(A)(iii), 212(a)(2), 237(a)(2), or 237(a)(4)(A)(ii).
4. The alien is unable to establish their identity as outlined in PP 10949.[11]

This process ensures that USCIS exercises its full authority to protect national security and public safety while adhering to the provisions of the INA and applicable laws. USCIS has considered that this direction may result in delay to the adjudication of some pending applications and has weighed that consequence against the urgent need for the agency to ensure that applicants are vetted and screened to the maximum degree possible. Ultimately, USCIS has determined that the burden of processing delays that will fall on some applicants is necessary and appropriate in this instance, when weighed against the agency's obligation to protect and preserve national security.

Within 90 days of issuance of this memorandum, USCIS will prioritize a list for review, interview, re-interview, and referral to ICE and other law enforcement agencies as appropriate, and, in consultation with the Office of Policy and Strategy and the Fraud Detection and National Security Directorate, issue operational guidance.

**Use**

---

[10] Any request for an exemption to the adjudicative hold must be coordinated with the Office of Policy and Strategy.
[11] See USCIS Policy Manual, Volume 1, General Policies and Procedures, Part E, Adjudications, Chapter 8, Discretionary Analysis [1 USCIS-PM E.8].

PM-602-0192: Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries
Page: 4

This policy memorandum is intended solely for the guidance of USCIS personnel in the performance of their official duties, but it does not remove their discretion in making adjudicatory decisions. It may not be relied upon to create any right or benefit, substantive or procedural, enforceable under law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

PRE-DECISIONAL/DELIBERATIVE – FOR OFFICIAL USE ONLY

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Camp Springs, MD  20588-0009



U.S. Citizenship
and Immigration
Services

November 29, 2025

# Memorandum

TO:           Sarah M. Kendall, Associate Director
Field Operations Directorate

Ted Kim, Associate Director
Refugee, Asylum and International Operations Directorate

Carrie Selby, Acting Associate Director
Service Center Operations Directorate

Andrew Davidson, Acting Associate Director
Fraud Detection and National Security Directorate

Susan Dibbins, Chief
Administrative Appeals Office

Andrew Good, Chief
Office of Policy and Strategy

FROM:      Joesph B. Edlow
Director, U.S. Citizenship and Immigration Services

SUBJECT**:**     **Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries[1]**

**Purpose:** Effective immediately, this memorandum directs U.S. Citizenship and Immigration Services (USCIS) personnel to:

---

[1] On June 4, 2025, the President issued Presidential Proclamation 10949, *Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats.* Exercising authority under section 212(f) of the Immigration and Nationality Act (INA), the proclamation imposes restrictions, limitations, and exceptions on the entry of aliens from 19 high-risk countries. Under INA 212(f), the President may suspend or restrict the entry of any aliens deemed detrimental to U.S. interests. See 90 FR 24497 (PDF) (June 4, 2025).

PRE-DECISIONAL/DELIBERATIVE – FOR OFFICIAL USE ONLY

www.uscis.gov

PRE-DECISIONAL/DELIBERATIVE – FOR OFFICIAL USE ONLY

1. Place a hold on all Forms I-589 (Application for Asylum and for Withholding of Removal), regardless of the alien's country of nationality, pending a comprehensive review;
2. Place a hold on pending benefit requests[2] for aliens from countries listed in *Presidential Proclamation (PP) 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats*,[3] pending a comprehensive review, regardless of entry date[4]; and
3. Conduct a comprehensive re-review of approved benefit requests for aliens from countries listed in PP 10949 who entered the United States on or after January 20, 2021.[5]

This directive mandates that all aliens meeting these criteria undergo a thorough re-review process, including a potential interview[6] and, if necessary, a re-interview, to fully assess all national security and public safety threats along with any other related grounds of inadmissibility or ineligibility.[7] An individualized, case-by-case review and assessment will be done of all relevant information and facts. USCIS will also conduct a comprehensive review of all relevant policies, procedures, and operational guidance for compliance, accuracy, and needed improvements during this time.

This guidance outlines the adjudicative hold, procedural requirements, and processes for the re-review, interview, or re-interview of affected aliens. USCIS personnel are instructed to prioritize national security and public safety concerns and ensure compliance with all applicable laws and regulations during the adjudication process. All findings must be documented in accordance with established protocols to support any subsequent determinations or actions.

**Background:** On January 20, 2025, the President issued Executive Order (EO) 14161, titled *Protecting the United States from Foreign Terrorist and Other National Security and Public Safety Threats*. This order aims to safeguard U.S. citizens from aliens who may seek to commit terrorist acts, pose threats to national security, promote hateful ideologies, or exploit immigration laws for malicious purposes. EO 14161 underscores the importance of vigilance during the visa issuance process to ensure that individuals approved for admission into the United States do not intend to harm Americans or compromise U.S. national interests.

Recently, the United States has seen what a lack of screening, vetting, and prioritizing expedient adjudications can do to the American people. An Afghan national, Nasir Ahmad Tawhedi,

---

[2] The term "benefit request" in this memorandum does not include USCIS screening activities, including credible fear, reasonable fear, safe third country, third country removal, and threshold screenings under the Asylum Cooperative Agreements.

[3] This applies to aliens who list one of the 19 high-risk countries as their Country of Birth or Country of Citizenship.

[4] Including Form I-485 (Application to Register Permanent Residence or Adjust Status), Form I-90 (Application to Replace Permanent Resident Card (Green Card)), Form N-470 (Application to Preserve Residence for Naturalization Purposes), Form I-751, (Petition to Remove Conditions on Residence) and Form I-131 (Application for Travel Documents, Parole Documents, and Arrival/Departure Records).

[5] Entered may include admitted, inspected, paroled, or entered without inspection.

[6] Interviews for this population shall not be waived under any circumstance. For benefit requests where an interview is not required, the case review and evaluation will determine if the alien needs to appear at a USCIS office.

[7] See INA 212(a)(3)(A), (B), and (F) and 237(a)(4)(A) and (B).

PRE-DECISIONAL/DELIBERATIVE – FOR OFFICIAL USE ONLY

PRE-DECISIONAL/DELIBERATIVE – FOR OFFICIAL USE ONLY

planned a terrorist attack in the United States on Election Day 2024. Tawhedi pled guilty in federal court to conspiring and attempting to provide material support and resources to the Islamic State of Iraq and al-Sham (ISIS).[8] In another instance, an Afghan national, Rahmanullah Lakanwal, is suspected of planning and executing a terrorist attack in Washington, DC against two National Guard members[9], one who was killed and another who remains critically injured. USCIS plays an instrumental role in preventing terrorists from seeking safe haven in the United States and ensuring that our screening and vetting and adjudications prioritize the safety of the American people and uphold all of our laws.

In light of identified concerns and the threat to the American people, USCIS has determined that a comprehensive re-review, potential interview, and re-interview of all aliens from high-risk countries of concern who entered the United States on or after January 20, 2021 is necessary. Lastly, USCIS may, when appropriate, extend this review and re-interview process to aliens who entered the United States outside of this timeframe.

USCIS remains committed to ensuring that all aliens from high-risk countries of concern that entered the United States do not present threats to national security or public safety. To address vulnerabilities during this process, and in order to conduct a comprehensive review of all policies, procedures, and guidance, USCIS has determined that it must implement an adjudicative hold on all pending asylum applications, regardless of the alien's country of nationality, as well as pending benefit requests filed by aliens from high-risk countries outlined in PP 10949. This hold will remain in effect until lifted by the USCIS Director through a subsequent memorandum. Any requests to lift the hold due to litigation or other extraordinary circumstances must receive approval from the USCIS Director or Deputy Director.[10]

**Discussion:** USCIS has determined the operational necessity to ensure that all asylum applicants and aliens from high-risk countries of concern who entered the United States do not pose a threat to national security or public safety. This effort ensures that USCIS exercises its full authority to investigate immigration benefit requests filed by aliens who may pose risks to the national security and public safety of the United States, as outlined in DHS Delegation of Authority 0150.1, issued June 5, 2003.

USCIS will conduct a thorough review on a case-by-case basis to assess benefit eligibility including whether:

1. The alien is listed in the Terrorist Screening Dataset (TSDS) as a Known or Suspected Terrorist (KST) under Tier 1 or Tier 2 classifications or is included in Tier 3 or Tier 4 of the TSDS with significant derogatory information related to the alien.

---

[8] See *Afghan National Pleads Guilty to Plotting Election Day Terror Attack in the United States,* U.S. Department of Justice, June 13, 2025.
[9] See *Terrorist Who Shot Two National Guard Members in D.C. Was Let into the Country by the Biden Administration's Operation Allies Welcome Program*, Department of Homeland Security Press Release, November 26, 2025.
[10] Any request for an exemption to the adjudicative hold must be coordinated with the Office of Policy and Strategy.

PRE-DECISIONAL/DELIBERATIVE – FOR OFFICIAL USE ONLY

www.uscis.gov

PRE-DECISIONAL/DELIBERATIVE – FOR OFFICIAL USE ONLY

2. The alien is connected to prior, current, or planned involvement in, or association with, an activity, individual, or organization described in sections 212(a)(3)(A), (B), or (F), or 237(a)(4)(A) or (B) of the Immigration and Nationality Act (INA).

3. The alien is linked to prior, current, or planned involvement in, or association with, an activity, individual, or organization that may pose a risk of serious harm or danger to the community, including criminal conduct described in INA §§ 101(a)(43), 212(a)(1)(A)(iii), 212(a)(2), 237(a)(2), or 237(a)(4)(A)(ii).

4. The alien is unable to establish their identity as outlined in PP 10949.[11]

This process ensures that USCIS exercises its full authority to protect national security and public safety while adhering to the provisions of the INA and applicable laws. USCIS has considered that this direction may result in delay to the adjudication of some pending applications and has weighed that consequence against the urgent need for the agency to ensure that applicants are vetted and screened to the maximum degree possible. Ultimately, USCIS has determined that the burden of processing delays that will fall on some applicants is necessary and appropriate in this instance, when weighed against the agency's obligation to protect and preserve our national security.

Within 90 days of issuance of this memorandum, USCIS will prioritize a list for review, interview, re-interview, and referral to ICE and other law enforcement agencies as appropriate, and in consultation with the Office of Policy and Strategy and the Fraud Detection and National Security Directorate, issue operational guidance.

cc:
David Roy, Acting Chief Counsel, Office of the Chief Counsel

---

[11] See USCIS Policy Manual, Volume 1,General Policies and Procedures, Part E, Adjudications, Chapter 8, Discretionary Analysis [1 USCIS-PM E.8].

PRE-DECISIONAL/DELIBERATIVE – FOR OFFICIAL USE ONLY

www.uscis.gov

**Department of Homeland Security**
**Delegation Number: 0150.1**
**Issue Date: 06/05/2003**

# DELEGATION TO THE BUREAU OF CITIZENSHIP AND IMMIGRATION SERVICES

## I.   Purpose

This delegation vests in the Bureau of Citizenship and Immigration Services (BCIS) and through its highest ranking official to regional directors, asylum directors, district directors, service center directors, adjudication officers, asylum officers, immigration information officers, and other officers or employees of the BCIS the authorities described herein in order to accomplish the mission of the BCIS.  This delegation is made through, and the exercise of any authorities therein is subject to the authority, direction, and control of, the Deputy Secretary of the Department of Homeland Security.

## II.   Delegations

Pursuant to the authority vested in the Secretary of Homeland Security by law, including the Homeland Security Act of 2002, I hereby delegate to the Bureau of Citizenship and Immigration Services:

A.   Authority to establish policies for performing such functions as are transferred to the Director by section 451 of the Homeland Security Act of 2002 (Act) or otherwise vested in the Bureau by law.

B.   Authority to oversee the administration of such policies.

C.   Responsibility for advising the Deputy Secretary with respect to any policy or operation of the BCIS that may affect the Bureau of Customs and Border Protection (BCBP) or the Bureau of Immigration and Customs Enforcement (BICE) of the Department, including potentially conflicting policies or operations.

D.   Authority to establish national immigration services policies and priorities.

E.   Authority to meet regularly with the Citizenship and Immigration Services Ombudsman ("the Ombudsman") described in section 452 of Act and to establish procedures requiring a formal response to any recommendations submitted in the Ombudsman's annual report to Congress pursuant to section 451(a)(3)(F) of the Act.

1

Delegation # 0150.1

F.    Authority to design and implement in consultation with the Chief Human Capital Officer the managerial rotation program described in section 451(a)(4) of the Homeland Security Act of 2002.

G.    Authority to implement pilot initiatives for backlog elimination as described in section 451(a)(5) of the Homeland Security Act of 2002, including the authority to increase personnel, transfer personnel to focus on areas with the largest potential for backlog, and streamline paperwork.

H.    Authority under section 103(a)(1) of the Immigration and Nationality Act of 1952, as amended (INA), 8 U.S.C. §1103(a)(1), to administer the immigration laws (as defined in section 101(a)(17) of the INA).

I.    Authority to investigate alleged civil and criminal violations of the immigration laws, including but not limited to alleged fraud with respect to applications or determinations within the BCIS and make recommendations for prosecutions, or other appropriate action when deemed advisable.

J.    Authority to register and fingerprint aliens in the United States, and exercise other functions relating to registration and change of address, as provided by sections 262-266 of the INA, 8 U.S.C. §§1302-06.

K.    Authority, in consultation with the legislative affairs function of the Department of Homeland Security, to prepare reports on private bills pertaining to immigration matters under 28 C.F.R. §0.105(h).

L.    Authority to certify official Department of Homeland Security records relating to immigration matters.

M.    Authority to maintain such files and records systems as are necessary to carry out the functions of the BCIS.

N.    Authority to place aliens in removal proceeding by issuance of a Notice to Appear, and to cancel such Notice before jurisdiction vests with the Executive Office for Immigration Review of the Department of Justice (EOIR).

O.    Authority to parole an applicant for admission into the United States under section 212(d)(5) of the INA, 8 U.S.C. §1182(d)(5), and to issue advance parole documentation.

P.    Authority to grant voluntary departure under section 240B of the INA, 8 U.S.C. §1229c, and deferred action.

Q.    Authority to approve bonds issued pursuant to the immigration laws, to determine whether such bonds have been breached, and take appropriate action to protect the interests of the United States with respect to such bonds.

2

Delegation # 0150.1

R.     Authority to grant employment authorization under sections 214(a) or 274A(h)(3) of the INA (8 U.S.C. §§1184(a) and 1324A(h)(3)), 8 C.F.R. §274a.13, or other applicable law.

S.     Authority to interrogate aliens and issue subpoenas, administer oaths, take and consider evidence, and fingerprint and photograph aliens under sections 287(a), (b), and (f) of the INA, 8 U.S.C. §1357 and under section 235(d) of the INA, 8 U.S.C. §1225(d).

T.     Authority under the immigration laws, including but not limited to sections 207 and 208 of the INA (8 U.S.C. §1157 and §1158), to grant asylum and refugee status (and terminate such status), adjust status of refugees and asylees, make credible fear determinations, and approve withholding of removal under the Convention Against Torture.

U.     Authority to exercise appellate jurisdiction over the matters described in 8 C.F.R. §103.1(f)(3)(E)(iii) (as in effect on February 28, 2003).

V.     Authority under the immigration laws, including but not limited to sections 310 and 341 of the INA (8 U.S.C. §1421 and §1452), to grant applications for naturalization and certificates of citizenship (and revoke such naturalization), including administration of oaths, issuance of certificates, provision of citizenship materials and services to public schools to prepare naturalization candidates, supervision of courts designated under section 310 of the INA to administer oaths, and any other rights and responsibilities relating to the naturalization or citizenship of aliens.

W.     Authority under the immigration laws, including but not limited to sections 204 and 214 of the INA (8 U.S.C. §1154 and §1184), to accept and adjudicate nonimmigrant and immigrant visa petitions (whether family based, employment based, or other), including collection of appropriate fees, conduct of interviews, and appellate review of the BCIS decisions that do not fall within the jurisdiction of the EOIR.

X.     Authority to invalidate labor certifications under 8 C.F.R §214.2, 20 C.F.R. §655.209 and §656.30.

Y.     Authority to approve participation as a Regional Center and to terminate such participation under 8 C.F.R.§204.6(m) and to take other actions to administer the Immigrant Investor (EB-5) Program.

Delegation # 0150.1

Z.    Authority under the immigration laws to extend and change nonimmigrant status and to adjust the status of aliens to lawful residents (on a temporary or permanent basis) and to revoke such status, including determination of admissibility of aliens, authority to grant waivers of inadmissibility and permission to reapply for entry, and authority to conduct interviews (or waive interviews) regarding an alien's eligibility for an immigration benefit.

AA.    Authority to approve or deny, or withdraw approval of petitions for schools seeking approval for attendance by nonimmigrant students under 8 C.F.R. §214.3.

BB.    Authority under the immigration laws to accept, process and adjudicate any application for any immigration benefit or service not exclusively under the jurisdiction of the EOIR, ICE or CBP, including but not limited to the authority to approve, deny, transfer, revoke, rescind, or certify all existing and future immigration, naturalization and citizenship benefits.

CC.    Authority to station officers and employees of the BCIS in foreign countries as provided by section 103(a)(7) of the INA, 8 U.S.C. §1103(a)(7), and other applicable law, and to perform such other activities with respect to the international operations of the Department of Homeland Security as I may direct.

DD.    Authority to perform other functions or duties as I may direct.

The authority delegated herein may be exercised by the director, his deputy, or the highest ranking official in the Bureau.  In exercising the authority delegated herein, the BCIS shall be governed by the Homeland Security Act of 2002; all applicable federal laws, rules and regulations; and the policies, procedures, direction, authority and control of the Secretary, the Deputy Secretary, the Under Secretary for Management, or other officer authorized by the Secretary to prescribe such policies and procedures or exercise such authority, direction and control.  Nothing herein shall be construed to limit or detract from the authority of the Secretary under section 102(a)(2) and (3) of the Homeland Security Act and other applicable law.

# III.   Reservations

The above delegations of authority to the BCIS in no way limit the functions, rights, privileges, powers, and duties vested in the Commissioner of CBP or in the Assistant Secretary for ICE by law, including authority provided by the above listed statutes or any delegation from the Secretary of Homeland Security.

CAR 000012

Delegation # 0150.1

The BCIS is directed to coordinate, to the extent necessary and appropriate, his exercise of the authorities under this delegation with other officials to whom I have delegated authorities that complement, relate to, involve, or are concurrent with the authorities in this delegation. Specific reference in this delegation to coordination or consultation with other officials as to certain matters is not meant to limit the responsibility of the BCIS to coordinate or consult in other matters when appropriate. Delegation of an authority to the BCIS shall not be construed to mean that the authority may be exclusively exercised by the Director; in particular, reference is made to delegations of authority to the Commissioner of CBP and to the Assistant Secretary for ICE that are with respect to many authorities parallel to, concurrent with, or overlapping with this delegation.

Unless specifically provided therein, nothing in this delegation authorizes the BCIS to enforce immigration laws by inspection of aliens or vehicles, issuance or execution of warrants, detention or release of aliens on bond, removal of aliens from the United States, issuance of stays of removal, reinstatement of removal orders, or any other enforcement authority exclusively delegated to the Commissioner of CBP or the Assistant Secretary for ICE.

Nothing is this delegation is intended to grant or provide authority or jurisdiction over any determination or matter within the sole authority of the Executive Office for Immigration Review of the Department of Justice.

# IV.  Re-delegations

Unless otherwise proscribed by statute, Executive Order, or the terms of this delegation, the powers, authorities, responsibilities, and functions of the BCIS may be re-delegated in writing by the Director or the highest ranking official to appropriate subordinate officials of the BCIS, and may be successively re-delegated to other officers or employees of the BCIS qualified to exercise the authority. The Director or the highest ranking official also may re-delegate the authority contained in this delegation to the Commissioner of CBP or to Assistant Secretary for ICE, with their consent.

Officers and employees of the former Immigration and Naturalization Service (INS), including but not limited to the Examinations (Adjudications), Citizenship and International Affairs (including asylum and refugee) Programs of the former INS will, following their transfer to the BCIS, continue to exercise their authorities and responsibilities as they existed on February 28, 2003, unless modified or revoked by the BCIS or other authorized official. Asylum officers continue to be delegated responsibilities as described in 8 C.F.R. §103.1(g)(3)(ii) (as in effect on February 28, 2003) unless modified or revoked by the BCIS or other authorized official.

CAR 000013

Delegation # 0150.1

# V.    Authorities

Homeland Security Act, 116 Stat. 2135, Pub. L. 107-296 §§ 101, 102, 403, 441, 1502, 1706 (2002); 5 U.S.C. § 301; Immigration and Nationality Act of 1952, as amended, 8 U.S.C. 1101 et seq.; the "immigration laws," as defined by section 101(a)(17) of the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. 1101(a)(17).

# VI.    Credentials

Any badge, credential, seal, stamp or other such item or document that is valid at 11:59 p.m. on February 28, 2003, and that identifies an officer or employee of the INS, who is transferred to the BCIS, shall continue in effect as a badge, credential or other documentation identifying an officer or employee of the BCIS until its expiration, revocation, withdrawal, or replacement, whichever comes first.  The BCIS may authorize replacement, renewal, or new issuance of badges, credentials, seals, stamps or other such items or documents to BCIS officers or employees using Immigration and Naturalization Service identity and forms until BCIS forms are available.

# VII.  Office of Primary Interest

The Bureau of Citizenship and Immigration Services is the office with primary interest in this delegation.

# VIII. Cancellation

Delegation Number 0150 is rescinded.

# IX.    Effective Date and Time

This delegation of authority shall take effect at 12:00 midnight, March 1, 2003.


_Tom Ridge_

Secretary of Homeland Security


6

Delegation # 0150.1

8451

**Federal Register**

Vol. 90, No. 19

Thursday, January 30, 2025

# Presidential Documents

**Title 3—**

**The President**

Executive Order 14161 of January 20, 2025

## Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Policy and Purpose.* (a) It is the policy of the United States to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes.

(b) To protect Americans, the United States must be vigilant during the visa-issuance process to ensure that those aliens approved for admission into the United States do not intend to harm Americans or our national interests. More importantly, the United States must identify them before their admission or entry into the United States. And the United States must ensure that admitted aliens and aliens otherwise already present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid, or support designated foreign terrorists and other threats to our national security.

**Sec. 2**. *Enhanced Vetting and Screening Across Agencies.*

(a) The Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall promptly:

(i) identify all resources that may be used to ensure that all aliens seeking admission to the United States, or who are already in the United States, are vetted and screened to the maximum degree possible;

(ii) determine the information needed from any country to adjudicate any visa, admission, or other benefit under the INA for one of its nationals, and to ascertain whether the individual seeking the benefit is who the individual claims to be and that the individual is not a security or public-safety threat;

(iii) re-establish a uniform baseline for screening and vetting standards and procedures, consistent with the uniform baseline that existed on January 19, 2021, that will be used for any alien seeking a visa or immigration benefit of any kind; and

(iv) vet and screen to the maximum degree possible all aliens who intend to be admitted, enter, or are already inside the United States, particularly those aliens coming from regions or nations with identified security risks.

(b) Within 60 days of the date of this order, the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence shall jointly submit to the President, through the Assistant to the President for Homeland Security, a report:

(i) identifying countries throughout the world for which vetting and screening information is so deficient as to warrant a partial or full suspension on the admission of nationals from those countries pursuant to section 212(f) of the INA (8 U.S.C. 1182(f)); and

(ii) identifying how many nationals from those countries have entered or have been admitted into the United States on or since January 20,

**8452**    **Federal Register** / Vol. 90, No. 19 / Thursday, January 30, 2025 / Presidential Documents

2021, and any other information the Secretaries and Attorney General deem relevant to the actions or activities of such nationals since their admission or entry to the United States.

(c) Whenever information is identified that would support the exclusion or removal of any alien described in subsection 2(b), the Secretary of Homeland Security shall take immediate steps to exclude or remove that alien unless she determines that doing so would inhibit a significant pending investigation or prosecution of the alien for a serious criminal offense or would be contrary to the national security interests of the United States.

**Sec. 3**. *Additional Measures to Protect the Nation.* As soon as possible, but no later than 30 days from the date of this order, the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall also:

(a) Evaluate and adjust all existing regulations, policies, procedures, and provisions of the Foreign Service Manual, or guidance of any kind pertaining to each of the grounds of inadmissibility listed in sections 212(a)(2)–(3) of the INA (8 U.S.C. 1182(a)(2)–(3)), to ensure the continued safety and security of the American people and our constitutional republic;

(b) Ensure that sufficient safeguards are in place to prevent any refugee or stateless individual from being admitted to the United States without undergoing stringent identification verification beyond that required of any other alien seeking admission or entry to the United States;

(c) Evaluate all visa programs to ensure that they are not used by foreign nation-states or other hostile actors to harm the security, economic, political, cultural, or other national interests of the United States;

(d) Recommend any actions necessary to protect the American people from the actions of foreign nationals who have undermined or seek to undermine the fundamental constitutional rights of the American people, including, but not limited to, our Citizens' rights to freedom of speech and the free exercise of religion protected by the First Amendment, who preach or call for sectarian violence, the overthrow or replacement of the culture on which our constitutional Republic stands, or who provide aid, advocacy, or support for foreign terrorists;

(e) Ensure the devotion of adequate resources to identify and take appropriate action for offenses described in 8 U.S.C. 1451;

(f) Evaluate the adequacy of programs designed to ensure the proper assimilation of lawful immigrants into the United States, and recommend any additional measures to be taken that promote a unified American identity and attachment to the Constitution, laws, and founding principles of the United States; and

(g) Recommend any additional actions to protect the American people and our constitutional republic from foreign threats.

**Sec. 4**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

CAR 000016

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20 2025.*

[FR Doc. 2025–02009
Filed 1–29–25; 8:45 am]
Billing code 3395–F4–P

CAR 000017

Federal Register / Vol. 90, No. 110 / Tuesday, June 10, 2025 / Presidential Documents    24497

# Presidential Documents

Proclamation 10949 of June 4, 2025

## Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats

**By the President of the United States of America**

**A Proclamation**

During my first Administration, I restricted the entry of foreign nationals into the United States, which successfully prevented national security threats from reaching our borders and which the Supreme Court upheld. In Executive Order 14161 of January 20, 2025 (Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats), I stated that it is the policy of the United States to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes.

I also stated that the United States must be vigilant during the visa-issuance process to ensure that those aliens approved for admission into the United States do not intend to harm Americans or our national interests. More importantly, the United States must identify such aliens before their admission or entry into the United States. The United States must ensure that admitted aliens and aliens otherwise already present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid, or support designated foreign terrorists or other threats to our national security.

I directed the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to identify countries throughout the world for which vetting and screening information is so deficient as to warrant a full or partial suspension on the admission of nationals from those countries pursuant to section 212(f) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f). After completing that process, the Secretary of State determined that a number of countries remain deficient with regards to screening and vetting. Many of these countries have also taken advantage of the United States in their exploitation of our visa system and their historic failure to accept back their removable nationals.

As President, I must act to protect the national security and national interest of the United States and its people. I remain committed to engaging with those countries willing to cooperate to improve information-sharing and identity-management procedures, and to address both terrorism-related and public-safety risks. Nationals of some countries also pose significant risks of overstaying their visas in the United States, which increases burdens on immigration and law enforcement components of the United States, and often exacerbates other risks related to national security and public safety.

Some of the countries with inadequacies face significant challenges to reform efforts. Others have made important improvements to their protocols and procedures, and I commend them for these efforts. But until countries with identified inadequacies address them, members of my Cabinet have recommended certain conditional restrictions and limitations. I have considered and largely accepted those recommendations and impose the limitations

CAR 000018

**24498**  **Federal Register** / Vol. 90, No. 110 / Tuesday, June 10, 2025 / Presidential Documents

set forth below on the entry into the United States by the classes of foreign nationals identified in sections 2 and 3 of this proclamation.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in this proclamation, the immigrant and nonimmigrant entry into the United States of persons described in sections 2 and 3 of this proclamation would be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1**. *Policy and Purpose.* (a) It is the policy of the United States to protect its citizens from terrorist attacks and other national security or public-safety threats. Screening and vetting protocols and procedures associated with visa adjudications and other immigration processes play a critical role in implementing that policy. These protocols enhance our ability to detect foreign nationals who may commit, aid, or support acts of terrorism, or otherwise pose a safety threat, and they aid our efforts to prevent such individuals from entering the United States.

(b) Information-sharing and identity-management protocols and practices of foreign governments are important for the effectiveness of the screening and vetting protocols and procedures of the United States. Governments manage the identity and travel documents of their nationals and residents. They also control the circumstances under which they provide information about their nationals to other governments, including information about known or suspected terrorists and criminal-history information. It is, therefore, the policy of the United States to take all necessary and appropriate steps to encourage foreign governments to improve their information-sharing and identity-management protocols and practices and to regularly share their identity and threat information with the immigration screening and vetting systems of the United States.

(c) Section 2(b) of Executive Order 14161 directed the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, within 60 days of the date of that order, to jointly submit to the President, through the Assistant to the President for Homeland Security, a report identifying countries throughout the world for which vetting and screening information is so deficient as to warrant a full or partial suspension on the entry or admission of nationals from those countries pursuant to section 212(f) of the INA (8 U.S.C. 1182(f)).

(d) On April 9, 2025, the Secretary of State, with the Assistant to the President for Homeland Security, presented the report described in subsection (c) of this section, recommending that entry restrictions and limitations be placed on foreign nationals of several countries. The report identified countries for which vetting and screening information is so deficient as to warrant a full suspension of admissions and countries that warrant a partial suspension of admission.

(e) In evaluating the recommendations from the Secretary of State and in determining what restrictions to impose for each country, I consulted with the Secretary of State, the Secretary of Defense, the Attorney General, the Secretary of Homeland Security, appropriate Assistants to the President, the Director of National Intelligence, and the Director of the Central Intelligence Agency. I considered foreign policy, national security, and counterterrorism goals. And I further considered various factors, including each country's screening and vetting capabilities, information sharing policies, and country-specific risk factors—including whether each country has a significant terrorist presence within its territory, its visa-overstay rate, and its cooperation with accepting back its removable nationals.

CAR 000019

I also considered the different risks posed by aliens admitted on immigrant visas and those admitted on nonimmigrant visas. Persons admitted on immigrant visas become lawful permanent residents of the United States. Such persons may present national security or public-safety concerns that may be distinct from those admitted as nonimmigrants. The United States affords lawful permanent residents more enduring rights than it does to nonimmigrants. Lawful permanent residents are more difficult to remove than nonimmigrants, even after national security concerns arise, which increases the costs and aggravates the dangers of errors associated with admitting such individuals. And although immigrants are generally subject to more extensive vetting than nonimmigrants, such vetting is far less reliable when the country from which someone seeks to emigrate maintains inadequate identity-management or information-sharing policies or otherwise poses risks to the national security of the United States.

I reviewed these factors and assessed these goals, with a particular focus on crafting country-specific restrictions. This approach was designed to encourage cooperation with the subject countries in recognition of each country's unique circumstances. The restrictions and limitations imposed by this proclamation are, in my judgment, necessary to prevent the entry or admission of foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States. The restrictions and limitations imposed by this proclamation are necessary to garner cooperation from foreign governments, enforce our immigration laws, and advance other important foreign policy, national security, and counterterrorism objectives.

(f) After reviewing the report described in subsection (d) of this section, and after accounting for the foreign policy, national security, and counterterrorism objectives of the United States, I have determined to fully restrict and limit the entry of nationals of the following 12 countries: Afghanistan, Burma, Chad, Republic of the Congo, Equatorial Guinea, Eritrea, Haiti, Iran, Libya, Somalia, Sudan, and Yemen. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants.

(g) I have determined to partially restrict and limit the entry of nationals of the following 7 countries: Burundi, Cuba, Laos, Sierra Leone, Togo, Turkmenistan, and Venezuela. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants.

(h) Sections 2 and 3 of this proclamation describe some of the identity-management or information-sharing inadequacies that led me to impose restrictions. These inadequacies are sufficient to justify my finding that unrestricted entry of nationals from the named countries would be detrimental to the interests of the United States. Publicly disclosing additional details on which I relied in making these determinations, however, would cause serious damage to the national security of the United States, and many such details are classified.

**Sec. 2**. *Full Suspension of Entry for Nationals of Countries of Identified Concern.* The entry into the United States of nationals of the following countries is hereby suspended and limited, as follows, subject to the categorical exceptions and case-by-case waivers described in section 5 of this proclamation:

(a) *Afghanistan*

(i) The Taliban, a Specially Designated Global Terrorist (SDGT) group, controls Afghanistan. Afghanistan lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. According to the Fiscal Year 2023 Department of Homeland Security (DHS) Entry/Exit Overstay Report ("Overstay Report"), Afghanistan had a business/tourist (B–1/B–2) visa overstay rate of 9.70 percent and a student (F), vocational (M), and exchange visitor (J) visa overstay rate of 29.30 percent.

(ii) The entry into the United States of nationals of Afghanistan as immigrants and nonimmigrants is hereby fully suspended.

(b) *Burma*

(i) According to the Overstay Report, Burma had a B–1/B–2 visa overstay rate of 27.07 percent and an F, M, and J visa overstay rate of 42.17 percent. Additionally, Burma has historically not cooperated with the United States to accept back their removable nationals.

(ii) The entry into the United States of nationals of Burma as immigrants and nonimmigrants is hereby fully suspended.

(c) *Chad*

(i) According to the Overstay Report, Chad had a B–1/B–2 visa overstay rate of 49.54 percent and an F, M, and J visa overstay rate of 55.64 percent. According to the Fiscal Year 2022 Overstay Report, Chad had a B–1/B–2 visa overstay rate of 37.12 percent. The high visa overstay rate for 2022 and 2023 is unacceptable and indicates a blatant disregard for United States immigration laws.

(ii) The entry into the United States of nationals of Chad as immigrants and nonimmigrants is hereby fully suspended.

(d) *Republic of the Congo*

(i) According to the Overstay Report, the Republic of the Congo had a B–1/B–2 visa overstay rate of 29.63 percent and an F, M, and J visa overstay rate of 35.14 percent.

(ii) The entry into the United States of nationals of the Republic of the Congo as immigrants and nonimmigrants is hereby fully suspended.

(e) *Equatorial Guinea*

(i) According to the Overstay Report, Equatorial Guinea had a B–1/B–2 visa overstay rate of 21.98 percent and an F, M, and J visa overstay rate of 70.18 percent.

(ii) The entry into the United States of nationals of Equatorial Guinea as immigrants and nonimmigrants is hereby fully suspended.

(f) *Eritrea*

(i) The United States questions the competence of the central authority for issuance of passports or civil documents in Eritrea. Criminal records are not available to the United States for Eritrean nationals. Eritrea has historically refused to accept back its removable nationals. According to the Overstay Report, Eritrea had a B–1/B–2 visa overstay rate of 20.09 percent and an F, M, and J visa overstay rate of 55.43 percent.

(ii) The entry into the United States of nationals of Eritrea as immigrants and nonimmigrants is hereby fully suspended.

(g) *Haiti*

(i) According to the Overstay Report, Haiti had a B–1/B–2 visa overstay rate of 31.38 percent and an F, M, and J visa overstay rate of 25.05 percent. Additionally, hundreds of thousands of illegal Haitian aliens flooded into the United States during the Biden Administration. This influx harms American communities by creating acute risks of increased overstay rates, establishment of criminal networks, and other national security threats. As is widely known, Haiti lacks a central authority with sufficient availability and dissemination of law enforcement information necessary to ensure its nationals do not undermine the national security of the United States.

(ii) The entry into the United States of nationals of Haiti as immigrants and nonimmigrants is hereby fully suspended.

(h) *Iran*

(i) Iran is a state sponsor of terrorism. Iran regularly fails to cooperate with the United States Government in identifying security risks, is the source of significant terrorism around the world, and has historically failed to accept back its removable nationals.

(ii) The entry into the United States of nationals of Iran as immigrants and nonimmigrants is hereby suspended.

(i) *Libya*

(i) There is no competent or cooperative central authority for issuing passports or civil documents in Libya. The historical terrorist presence within Libya's territory amplifies the risks posed by the entry into the United States of its nationals.

(ii) The entry into the United States of nationals of Libya as immigrants and nonimmigrants is hereby fully suspended.

(j) *Somalia*

(i) Somalia lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. Somalia stands apart from other countries in the degree to which its government lacks command and control of its territory, which greatly limits the effectiveness of its national capabilities in a variety of respects. A persistent terrorist threat also emanates from Somalia's territory. The United States Government has identified Somalia as a terrorist safe haven. Terrorists use regions of Somalia as safe havens from which they plan, facilitate, and conduct their operations. Somalia also remains a destination for individuals attempting to join terrorist groups that threaten the national security of the United States. The Government of Somalia struggles to provide governance needed to limit terrorists' freedom of movement. Additionally, Somalia has historically refused to accept back its removable nationals.

(ii) The entry into the United States of nationals of Somalia as immigrants and nonimmigrants is hereby fully suspended.

(k) *Sudan*

(i) Sudan lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. According to the Overstay Report, Sudan had a B–1/B–2 visa overstay rate of 26.30 percent and an F, M, and J visa overstay rate of 28.40 percent.

(ii) The entry into the United States of nationals of Sudan as immigrants and nonimmigrants is hereby fully suspended.

(l) *Yemen*

(i) Yemen lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. The government does not have physical control over its own territory. Since January 20, 2025, Yemen has been the site of active United States military operations.

(ii) The entry into the United States of nationals of Yemen as immigrants and nonimmigrants is hereby fully suspended.

**Sec. 3.** *Partial Suspension of Entry for Nationals of Countries of Identified Concern.*

(a) *Burundi*

(i) According to the Overstay Report, Burundi had a B–1/B–2 visa overstay rate of 15.35 percent and an F, M, and J visa overstay rate of 17.52 percent.

(ii) The entry into the United States of nationals of Burundi as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Burundi to the extent permitted by law.

(b) *Cuba*

(i) Cuba is a state sponsor of terrorism. The Government of Cuba does not cooperate or share sufficient law enforcement information with the United States. Cuba has historically refused to accept back its removable nationals. According to the Overstay Report, Cuba had a B–1/B–2 visa overstay rate of 7.69 percent and an F, M, and J visa overstay rate of 18.75 percent.

(ii) The entry into the United States of nationals of Cuba as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Cuba to the extent permitted by law.

(c) *Laos*

(i) According to the Overstay Report, Laos had a B–1/B–2 visa overstay rate of 34.77 percent and an F, M, and J visa overstay rate of 6.49 percent. Laos has historically failed to accept back its removable nationals.

(ii) The entry into the United States of nationals of Laos as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Laos to the extent permitted by law.

(d) *Sierra Leone*

(i) According to the Overstay Report, Sierra Leone had a B–1/B–2 visa overstay rate of 15.43 percent and an F, M, and J visa overstay rate of 35.83 percent. Sierra Leone has historically failed to accept back its removable nationals.

(ii) The entry into the United States of nationals of Sierra Leone as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Sierra Leone to the extent permitted by law.

(e) *Togo*

(i) According to the Overstay Report, Togo had a B–1/B–2 visa overstay rate of 19.03 percent and an F, M, and J visa overstay rate of 35.05 percent.

(ii) The entry into the United States of nationals of Togo as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Togo to the extent permitted by law.

(f) *Turkmenistan*

(i) According to the Overstay Report, Turkmenistan had a B–1/B–2 visa overstay rate of 15.35 percent and an F, M, and J visa overstay rate of 21.74 percent.

(ii) The entry into the United States of nationals of Turkmenistan as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Turkmenistan to the extent permitted by law.

(g) *Venezuela*

(i) Venezuela lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. Venezuela has historically refused to accept back its removable nationals. According to the Overstay Report, Venezuela had a B–1/B–2 visa overstay rate of 9.83 percent.

(ii) The entry into the United States of nationals of Venezuela as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Venezuela to the extent permitted by law.

**Sec. 4**. *Scope and Implementation of Suspensions and Limitations.* (a) *Scope.* Subject to the exceptions set forth in subsection (b) of this section and

any exceptions made pursuant to subsections (c) and (d) of this section, the suspensions of and limitations on entry pursuant to sections 2 and 3 of this proclamation shall apply only to foreign nationals of the designated countries who:

(i) are outside the United States on the applicable effective date of this proclamation; and

(ii) do not have a valid visa on the applicable effective date of this proclamation.

(b) *Exceptions.* The suspension of and limitation on entry pursuant to sections 2 and 3 of this proclamation shall not apply to:

(i) any lawful permanent resident of the United States;

(ii) any dual national of a country designated under sections 2 and 3 of this proclamation when the individual is traveling on a passport issued by a country not so designated;

(iii) any foreign national traveling with a valid nonimmigrant visa in the following classifications: A–1, A–2, C–2, C–3, G–1, G–2, G–3, G–4, NATO–1, NATO–2, NATO–3, NATO–4, NATO–5, or NATO–6;

(iv) any athlete or member of an athletic team, including coaches, persons performing a necessary support role, and immediate relatives, traveling for the World Cup, Olympics, or other major sporting event as determined by the Secretary of State;

(v) immediate family immigrant visas (IR–1/CR–1, IR–2/CR–2, IR–5) with clear and convincing evidence of identity and family relationship (*e.g.,* DNA);

(vi) adoptions (IR–3, IR–4, IH–3, IH–4);

(vii) Afghan Special Immigrant Visas;

(viii) Special Immigrant Visas for United States Government employees; and

(ix) immigrant visas for ethnic and religious minorities facing persecution in Iran.

(c) Exceptions to the suspension of and limitation on entry pursuant to sections 2 and 3 of this proclamation may be made for certain individuals for whom the Attorney General finds, in her discretion, that the travel by the individual would advance a critical United States national interest involving the Department of Justice, including when individuals must be present to participate in criminal proceedings as witnesses. These exceptions shall be made only by the Attorney General, or her designee, in coordination with the Secretary of State and the Secretary of Homeland Security.

(d) Exceptions to the suspension of and limitation on entry pursuant to sections 2 and 3 of this proclamation may be made case-by-case for individuals for whom the Secretary of State finds, in his discretion, that the travel by the individual would serve a United States national interest. These exceptions shall be made by only the Secretary of State or his designee, in coordination with the Secretary of Homeland Security or her designee.

**Sec. 5**. *Adjustments to and Removal of Suspensions and Limitations.* (a) The Secretary of State shall, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director for National Intelligence, devise a process to assess whether any suspensions and limitations imposed by sections 2 and 3 of this proclamation should be continued, terminated, modified, or supplemented. Within 90 days of the date of this proclamation, and every 180 days thereafter, the Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall submit a report to the President, through the Assistant to the President for Homeland Security, describing his assessment and recommending whether any suspensions and limitations imposed by sections 2 and 3 of this proclamation should be continued, terminated, modified, or supplemented.

CAR 000024

(b) The Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall immediately engage each of the countries identified in sections 2 and 3 of this proclamation on measures that must be taken to comply with United States screening, vetting, immigration, and security requirements.

(c) Additionally, and in light of recent events, the Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall provide me an update to the review of the practices and procedures of Egypt to confirm the adequacy of its current screening and vetting capabilities.

Sec. 6. *Enforcement.* (a) The Secretary of State and the Secretary of Homeland Security shall consult with appropriate domestic and international partners, including countries and organizations, to ensure efficient, effective, and appropriate implementation of this proclamation.

(b) In implementing this proclamation, the Secretary of State and the Secretary of Homeland Security shall comply with all applicable laws and regulations.

(c) No immigrant or nonimmigrant visa issued before the applicable effective date of this proclamation shall be revoked pursuant to this proclamation.

(d) This proclamation shall not apply to an individual who has been granted asylum by the United States, to a refugee who has already been admitted to the United States, or to an individual granted withholding of removal or protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment of Punishment (CAT). Nothing in this proclamation shall be construed to limit the ability of an individual to seek asylum, refugee status, withholding of removal, or protection under the CAT, consistent with the laws of the United States.

Sec. 7. *Severability.* It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the national security, foreign policy, and counterterrorism interests of the United States. Accordingly:

(a) if any provision of this proclamation, or the application of any provision of this proclamation to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) if any provision of this proclamation, or the application of any provision of this proclamation to any person or circumstance, is held to be invalid because of the lack of certain procedural requirements, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

Sec. 8. *Effective Date.* This proclamation is effective at 12:01 a.m. eastern daylight time on June 9, 2025.

Sec. 9. *General Provisions.* (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable by law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this fourth day of June, in the year of our Lord two thousand twenty-five, and of the Independence of the United States of America the two hundred and forty-ninth.

[FR Doc. 2025–10669

Filed 6–9–25; 11:15 am]

Billing code 3395–F4–P



**PRESS RELEASE**

# Afghan National Pleads Guilty to Plotting Election Day Terror Attack in the United States

Friday, June 13, 2025

**For Immediate Release**

Office of Public Affairs

Nasir Ahmad Tawhedi, 27, a native and citizen of Afghanistan, pleaded guilty today in federal court in Oklahoma City to two terrorism-related offenses: conspiring and attempting to provide material support and resources to the Islamic State of Iraq and al-Sham (ISIS), a designated foreign terrorist organization, and receiving, attempting to receive, and conspiring to receive firearms and ammunition in furtherance of a federal crime of terrorism.

"By pledging allegiance to ISIS and plotting an attack against innocent Americans on Election Day, this defendant endangered lives and gravely betrayed the nation that gave him refuge," said Attorney General Pamela Bondi. "Today's guilty plea guarantees he will be held accountable, stripped of his immigration status, and permanently removed from the United States, and shows the Justice Department has zero tolerance for those who exploit our freedoms to spread violence."

"The defendant admits he planned and obtained firearms to carry out a violent terror attack on Election Day in 2024, a plot that was detected and disrupted through the good work of the FBI and our partners," said FBI Director Kash Patel. "Let this serve as notice to anyone who tries to conduct attacks in our homeland for ISIS or any other terror group: we will find you and you'll face American justice. I want to commend the FBI teams and our partners for their hard work and success in executing the mission."

"Through incredible law enforcement effort and coordination, a violent terrorist attack on American soil was thwarted, and those responsible are being held accountable," said U.S. Attorney Robert J. Troester for the Western District of Oklahoma. "I commend the outstanding work by the FBI, our law enforcement partners, and prosecutors to diligently discover, thoroughly investigate, and

completely foil this terror plot. These guilty pleas serve as an emphatic reminder that the Department of Justice and its law enforcement partners will aggressively pursue those who attempt to harm Americans through terrorist acts."

"Thanks to outstanding work by the Oklahoma City Joint Terrorism Task Force, the defendant's plan to kill innocent Americans in a terrorist attack on Election Day was stopped," said Special Agent in Charge Doug Goodwater of the FBI Oklahoma City Field Office. "The FBI is grateful to all who stand beside us in our fight against terrorism. Together, we will continue to safeguard our communities from those who conspire against the United States."

According to court documents, Tawhedi admitted that between June 2024 and October 2024 he conspired with at least one other individual to purchase two AK-47 rifles, 500 rounds of ammunition, and 10 magazines, with the intent to carry out a mass-casualty attack on or around Election Day, Nov. 5, 2024, on behalf of ISIS.  According to a criminal complaint affidavit filed in the case, Tawhedi communicated with an ISIS facilitator about his plan to purchase firearms for use in the terror plot, including asking the individual whether 500 rounds of ammunition would be sufficient.

Tawhedi and his co-conspirator, Abdullah Haji Zada, were arrested on Oct. 7, 2024, after purchasing the firearms and ammunition from an undercover FBI employee.  Zada, 18, pleaded guilty in April 2025 to the firearms offense in connection with his role in the terror plot and is awaiting sentencing. Zada, who was 17 at the time of his arrest, entered his guilty plea as an adult and will be sentenced as an adult.

At sentencing, Tawhedi faces a maximum penalty 20 years in prison for the material support charge and up to 15 years in prison for the firearms charge. Zada faces up to 15 years in federal prison. Upon completion of any sentence, Tawhedi and Zada will be permanently removed from the United States and barred from reentry under stipulated judicial orders of removal to Afghanistan. A federal district court judge will determine any sentence after considering the U.S. Sentencing Guidelines and other statutory factors.

The FBI Oklahoma City Field Office's Joint Terrorism Task Force, which includes Homeland Security Investigations, U.S. Immigration and Customs Enforcement, U.S. Citizenship and Immigration Services, U.S. Marshals Service, Oklahoma State Bureau of Investigation, the Edmond Police Department, the Moore Police Department, the Oklahoma City Police Department, the Oklahoma City Community College Police Department, and the Oklahoma City University Police Department, is investigating the case.

Assistant U.S. Attorneys Jessica L. Perry and Matt Dillon for the Western District of Oklahoma; Assistant U.S. Attorney Everett McMillian, who previously served in the National Security Division's Counterterrorism Section; and Trial Attorney Jennifer Levy of the Counterterrorism Section are prosecuting the case. Trial Attorney Mark Stoneman of the Money Laundering and Asset Recovery Section, who previously served as an Assistant U.S. Attorney for the Western District of Oklahoma, also assisted with the prosecution.

*Updated June 13, 2025*

**Topics**

| COUNTERTERRORISM | NATIONAL SECURITY |

**Components**

[Office of the Attorney General](#) | [Federal Bureau of Investigation (FBI)](#) | [National Security Division (NSD)](#) | [USAO - Oklahoma, Western](#)

Press Release Number: 25-617

# Related Content

---

**PRESS RELEASE**

**Brooklyn Man Sentenced to 15 Years in Prison for Murder-for-Hire Plot and Stalking a Journalist and Prominent Critic of the Iranian Government**

Convicted murderer Carlisle Rivera, also known as "Pop," was sentenced to 15 years in prison for his participation in a murder-for-hire plot directed by the Government of Iran targeting Masih...

**PRESS RELEASE**

**Investigation into International "ATM Jackpotting" Scheme and Tren de Aragua results in Additional Indictment and 87 Total Charged Defendants**

A federal grand jury in the District of Nebraska returned an additional indictment Thursday charging 31 individuals for their roles in a large conspiracy to deploy malware and steal millions...

**PRESS RELEASE**

**Maryland Man Indicted on Unlawful Transmission and Retention of Classified National Defense Information Charges**

Today, a federal grand jury indicted a Laurel, Maryland man on five counts of unlawfully transmitting and one count of unlawfully retaining classified national defense information, in violation of 18...

CAR 000029

✉ **Office of Public Affairs**

U.S. Department of Justice

950 Pennsylvania Avenue, NW

Washington DC 20530

📞 Office of Public Affairs Direct Line

202-514-2007

Department of Justice Main Switchboard

202-514-2000

Case 1:25-cv-13946-JEK   Document 78   Filed 04/21/26   Page 35 of 288

| INFO | 2026 winter storm resources: One-stop shop for information, resources and tips on how to stay safe during and after the winter storm. |
|------|----------------------------------------------------------------------------------------------------------------------------------------|

U.S. Department of Homeland Security

# Terrorist Who Shot Two National Guard Members in D.C. Was Let into the Country by the Biden Administration's Operation Allies Welcome Program

**Release Date:** November 26, 2025

*This terrorist is one of thousands of unvetted Afghan nationals let into the country under the Biden Administration's Operation Allies Welcome program*

WASHINGTON – The Department of Homeland Security (DHS) released immigration history of Rahmanullah Lakanwal a criminal alien from Afghanistan who shot two national guard members in a terror attack in Washington D.C.

> *"The suspect who shot our brave National Guardsmen is an Afghan national who was one of the many unvetted, mass paroled into the United States under Operation Allies Welcome on September 8, 2021, under the Biden Administration. I will not utter this depraved individual's name. He should be starved of the glory he so desperately wants," said **Secretary Noem**. "These men and women of the National Guard are mothers, fathers, sisters, daughters, children of God, carrying out the same basic public safety and immigration laws enshrined in law for decades. Those politicians and media who continue to vilify our men and women in uniform need to take a long hard look in the mirror. Bryon and I will be praying hard for these two National Guardsmen, their families, and every American who puts on a uniform to defend our freedom."*

The Biden Administration let this terrorist into the country as part of their Operation Allies Welcome program on September 8, 2021. This program let in thousands of unvetted Afghan nationals including terrorists into our country.

CAR 000031

We will keep the public apprised as more information becomes available.

*###*

## Topics

HOMELAND SECURITY ENTERPRISE (/TOPICS/HOMELAND-SECURITY-ENTERPRISE)     SECRETARY OF HOMELAND SECURITY (/TOPICS/SECRETARY-HOMELAND-SECURITY)

## Keywords

SECRETARY KRISTI NOEM (/KEYWORDS/SECRETARY-KRISTI-NOEM)     ALIEN (/KEYWORDS/ALIEN)     CRIME (/KEYWORDS/CRIME)

OPERATION ALLIES WELCOME (/KEYWORDS/OPERATION-ALLIES-WELCOME)     TARGETED VIOLENCE (/KEYWORDS/TARGETED-VIOLENCE)

TERRORISM (/KEYWORDS/TERRORISM)

Last Updated: 11/28/2025

CAR 000032

[^ 99] If the derogatory information is disclosed during an interview, the officer records the information and the benefit requestor's rebuttal. See Section D, Types of Evidence, Subsection 2, Testimonial Evidence [1 USCIS-PM E.6(D)(2)].

[^ 100] See 8 CFR 103.2(b)(16). A determination of statutory eligibility must be based only on information contained in the record of proceeding that is disclosed to the benefit requestor, except as provided in 8 CFR 103.2(b)(16)(iv). See 8 CFR 103.2(b)(16)(ii).

[^ 101] Any attempts to explain or reconcile such inconsistencies, absent competent objective evidence pointing to where the truth lies, will not suffice. See *Matter of Ho*, 19 I&N Dec. 582 (BIA 1988).

[^ 102] For example, a benefit requestor's tax return statement submitted with the Form I-130 that USCIS uses as evidence of a lack of a qualifying spousal relationship.

[^ 103] For example, records such as marriage certificates or personal financial statements submitted with a previous spousal petition.

[^ 104] USCIS is not required to disclose derogatory information of which the benefit requestor is aware. See 8 CFR 103.2(b)(16). See Section F, Requests for Evidence and Notices of Intent to Deny [1 USCIS-PM E.6(F)]. However, USCIS may disclose derogatory information that the benefit requestor may be aware of to ensure the benefit requestor has sufficient opportunity to rebut information used in an adverse decision.

[^ 105] For example, officers may provide a copy of the source document containing derogatory information, such as a lease agreement, in instances where the document contains no privileged or confidential information, or information that is otherwise prohibited from disclosure.

[^ 106] USCIS must not provide screenshots of information obtained from DHS or other third agency systems absent permission from the data owner. If an adverse decision is based primarily on derogatory information that originates from such systems, any disclosure must be in a detailed summary statement and is subject to the terms and conditions of applicable data sharing agreements, such as the agreement between USCIS and DOS on disclosure authorization requirements.

## Chapter 7 - Interviews [Reserved]

## Chapter 8 - Discretionary Analysis

Many immigration benefits require the requestor[1] to demonstrate that the request merits a favorable exercise of discretion in order to receive the benefit.[2] For these benefits, a discretionary analysis is a separate, additional component of adjudicating the benefit request. Whether to favorably exercise discretion is typically assessed after an officer has determined that the requestor meets all applicable threshold eligibility requirements.

The discretionary analysis involves the review of all relevant, specific facts and circumstances in an individual case. However, there are limitations on how the officer may exercise discretion; the officer may not

exercise discretion arbitrarily, inconsistently, or in reliance on biases or assumptions.

In some contexts, there are regulations and case law that outline certain factors that officers must review and use as a guide in making a discretionary determination. However, there is no exhaustive list of factors that officers must consider. To perform a discretionary analysis, officers must weigh all positive factors present in a particular case against any negative factors in the totality of the record.[3] The analysis must be comprehensive, specific to the case, and based on all relevant facts known at the time of adjudication. For complex or difficult cases, officers should consult with supervisors and local counsel.

## A. Applicability

Congress generally provides discretionary authority explicitly in the statutory language that governs an immigration benefit. In some instances, however, discretionary authority is less explicit and must be inferred from the statutory language. Executive agencies may also outline their discretionary authority explicitly in regulations.[4]

Many immigration benefit requests are filed under provisions of law that require the favorable exercise of discretion to administer the benefit.[5] In these cases, the benefit requestor has the burden of demonstrating eligibility for the benefit sought and that USCIS should favorably exercise discretion.[6] Where an immigration benefit is discretionary, meeting the statutory and regulatory requirements alone does not entitle the requestor to the benefit sought.

Certain immigration benefits are not discretionary.[7] In these cases, if the requestor properly filed and meets the eligibility requirements then USCIS must approve the benefit request. There is no discretionary analysis as part of the adjudication, and these requests cannot be denied as a matter of discretion.

The following table provides a non-exhaustive overview of immigration benefits and whether discretion is involved in the adjudication of such benefits.

Immigration Benefits Involving Discretionary Review

| Benefit Type | Discretion Involved (Yes or No) |
|---|---|
| Petition to classify an alien as a nonimmigrant worker[8] | No (with some exceptions) |
| Petition to classify an alien as a fiancé(e) of a U.S. citizen[9] | Yes |
| Application to extend or change nonimmigrant status[10] | Yes |
| Advance permission to enter as a nonimmigrant[11] | Yes |

CAR 000034

| Benefit Type | Discretion Involved (Yes or No) |
|---|---|
| Initial Parole Document (for aliens who are currently outside the United States) also referred to as "humanitarian parole"[12] | Yes |
| International entrepreneur parole[13] | Yes |
| Temporary protected status[14] | Yes |
| Refugee status[15] | Yes (with some exceptions)[16] |
| Asylum[17] | Yes |
| Petition to classify an alien as a family-based immigrant[18] | No (with some exceptions) |
| Petition to classify an alien as an employment-based immigrant[19] | No (with one exception)[20] |
| Petition to classify an alien as an immigrant investor[21] | No (with some exceptions)[22] |
| Applications by an existing or prospective Regional Center[23] | No (with some exceptions)[24] |
| Adjustment of status[25] | Yes (with some exceptions)[26] |
| Registration[27] | Yes |
| Recognition as an American Indian born in Canada[28] | No |
| Waivers of inadmissibility[29] | Yes |
| Consent to reapply for admission after deportation or removal[30] | Yes |
| Employment authorization[31] | Yes (with some exceptions) |
| Removal of conditions on permanent residence[32] | No (with some exceptions)[33] |
| Naturalization[34] | No |
| Application for a Certificate of Citizenship[35] | No |

[Redaction - Start]

Officers are reminded to follow regulations and specific guidance applicable to the underlying eligibility category, as reflected in standard operating procedures (SOPs) and training materials. For example, specific regulations at 8 CFR 208.13(b)(1)(i)-(ii) govern portions of the discretionary analysis for asylum applications. The RAIO Training Module on Discretion (PDF) provides further information. In cases affected by special circumstances outlined in operational guidance, officers should consult with their supervisors before deciding if the negative factors in a particular case are significant enough to warrant an unfavorable exercise of discretion.

[Redaction - End]

## B. Overview of Discretion

### 1. Definition

The Board of Immigration Appeals (BIA) has described the exercise of discretion as:

- A balancing of the negative factors evidencing the alien's undesirability as a permanent resident with the social and humane considerations presented on his or her behalf to determine whether relief appears in the best interests of this country.[36]
- A matter of administrative grace where the applicant has the burden of showing that discretion should be exercised in his or her favor.[37]
- A consideration of negative factors and the need for the applicant to offset such factors by showing unusual or even outstanding equities.[38]

These characterizations imply that the exercise of discretion cannot be arbitrary, inconsistent, or dependent on intangible or imagined circumstances.

In short, discretion is defined as the ability or power to exercise sound judgment in decision-making. While the discretionary analysis gives the officer some autonomy in the way in which he or she decides a particular case after all applicable eligibility requirements are established, that autonomy may only be exercised within the confines of certain legal restrictions. These restrictions define the scope of the officer's discretionary authority.[39]

### 2. Adjudicative Discretion

There are two broad types of discretion that may be exercised in the context of immigration law: prosecutorial (or enforcement) discretion[40] and adjudicative discretion. The scope of discretion is defined by what type of discretionary decision is being made. This chapter only discusses the exercise of adjudicative discretion.

Adjudicative discretion requires an officer to decide whether to exercise discretion favorably when adjudicating a request for an immigration benefit. This decision is guided by the applicable statutes,

regulations, and policies that outline the eligibility requirements for the benefit and the facts present in the case at issue. The U.S. Supreme Court has referred to adjudicative discretion as merit-deciding discretion.[41]

In general, an officer may exercise favorable adjudicative discretion to approve a benefit request when the requestor has met the applicable eligibility requirements and negative factors impacting discretion are not present.[42] An exercise of discretion to grant a benefit may also be appropriate when the requestor has met the eligibility requirements for the benefit, and the positive factors outweigh the negative factors. An exercise of discretion to deny, rather than to grant, may likewise be appropriate when the requestor has met the requirements of the request, but negative factors found in the course of the adjudication outweigh the positive factors.

### 3. Who Exercises Discretion

Congress expressly granted discretion to the Secretary of Homeland Security in deciding when to grant certain immigration benefits. For example, the Immigration and Nationality Act (INA) states: "The Secretary of Homeland Security or the Attorney General, in the Secretary's or the Attorney General's discretion and under such regulations as the Secretary or the Attorney General may prescribe, may adjust to the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum . . . ."[43]

The Secretary's discretionary power is delegated to the officer, through DHS and USCIS. Therefore, when an officer exercises discretion in adjudicating a request for an immigration benefit, the officer is exercising discretion on behalf of the Secretary of Homeland Security.

In many cases, the INA still refers to the Attorney General's discretion because the statutory text has not been changed to reflect the creation of DHS and the transfer of many functions from the U.S. Department of Justice (DOJ) to DHS.[44] If USCIS has adjudicative authority over the benefit, the statute should be read as conferring the power to exercise discretion on the Secretary of Homeland Security.[45]

### 4. Discretion

*Eligibility Threshold*

For discretionary benefits, there is never discretion to grant an immigration benefit if the benefit requestor has not first met all applicable threshold eligibility requirements.

It is legally permissible to deny an application as a matter of discretion without determining whether the requestor is otherwise eligible for the benefit.[46] However, the record is essentially incomplete if USCIS denies an application, petition, or request in its exercise of discretion without making a determination concerning eligibility.

Therefore, as a matter of policy, officers should generally make a specific determination regarding eligibility before addressing the exercise of discretion. Where denying the benefit request is appropriate, the officer should generally include in the denial letter his or her determination on all eligibility requirements, including

but not limited to discretionary grounds, if applicable, so that the reasons for the ultimate denial are clearly reflected in the record.

*Lack of Negative Factors*

An alien's threshold eligibility for the benefit sought is generally also a positive factor. Therefore, absent any negative factors, USCIS ordinarily exercises discretion positively.[47] Generally, if there are no negative factors to weigh against that positive factor, denial of the benefit would be an inappropriate use of discretion.

## C. Adjudicating Discretionary Benefits

When adjudicating a discretionary benefit, the officer should first determine whether the requestor meets all threshold eligibility requirements. For example, in adjudicating an application for adjustment of status under INA 245(a), the officer should first determine:

- Whether the applicant was inspected and admitted or paroled or has an approved petition as a VAWA self-petitioner;
- Is eligible to receive an immigrant visa;
- Is admissible to the United States for permanent residence; and
- Has an immigrant visa immediately available to him or her at the time he or she files the adjustment application.[48]

If the officer finds that the requestor does not meet the eligibility requirements but may be eligible for a waiver, exemption, or other form of relief, the officer should determine whether the requestor qualifies for a waiver, exemption, or other form of relief. Not all applications are concurrently filed, and in some instances, applicants must file a separate waiver application or application for relief and have that application approved before the applicant qualifies for the benefit.

If the officer finds that the requestor meets the eligibility requirements because of an approved waiver, exemption, or other form of relief, the officer must then determine whether the request should be granted as a matter of discretion. If the officer finds that the requestor does not meet all applicable eligibility requirements, the officer can still include a discretionary analysis in the denial. The discretionary determination is the final step in the adjudication of a benefit request. Adding a discretionary analysis to a denial is useful if an appellate body on review disagrees with the officer's conclusion that the requestor failed to meet the threshold eligibility requirements. In such a situation, the discretionary denial may still stand.

## 1. Basic Adjudication Steps

Officers should generally follow a three-step process when adjudicating a benefit request involving a discretionary analysis.

| Basic Adjudication Steps Involving Discretion | |
|---|---|
| **Step One** | Fact finding |
| **Step Two** | Determine whether requestor meets the threshold eligibility requirements |
| **Step Three** | Conduct discretionary analysis |

*Fact Finding*[49]

Fact finding refers to the process of gathering and assessing evidence. The focus of fact finding should be to obtain credible evidence relevant to a requestor's eligibility for the benefit, including the discretionary determination. If a requestor is interviewed, the officer should elicit information pertinent to fact finding during the interview. As part of fact finding, officers should evaluate relevant information present in the record. Depending on the benefit sought, such information might include, but is not limited to:

- Immigration history;
- Family ties in the United States;
- Any serious medical conditions;
- Any criminal history;
- Other connections to the community; or
- Information indicating a public safety or national security concern.

Background information may be relevant for eligibility determinations and to the exercise of discretion.

For discretionary benefits, the benefit requestor has the burden of showing that a favorable exercise of discretion is warranted through the submission of evidence.[50] In cases where negative factors are present, the officer may ask the requestor directly why he or she warrants a favorable exercise of discretion. The officer should document any response, or lack thereof, in the record.

*Determining Whether Requestor First Meets Threshold Eligibility Requirements*

The discretionary analysis is the final step in the adjudication. Generally, the officer should first determine whether the requestor meets all threshold eligibility requirements before beginning the discretionary analysis. If the officer determines the requestor has not met the eligibility requirements for the benefit sought, the officer may deny the request without completing a discretionary analysis. However, an officer may include a discretionary analysis if a discretionary denial would be warranted even if the requestor had met the threshold statutory and regulatory requirements.

In the process of determining whether the requestor has met the eligibility requirements for the benefit sought, the officer might find that certain facts related to threshold eligibility for the specific benefit may also be relevant to the discretionary determination.

For example, if an officer finds that an adjustment applicant was convicted of a crime, the applicant might be inadmissible. The criminal conviction may also affect the discretionary analysis.

*Conducting Discretionary Analysis*

The act of exercising discretion involves the weighing of positive and negative factors and considering the totality of the circumstances in the specific case. In the immigration context, the goal is to assess whether, based on the totality of the circumstances, the alien warrants a favorable exercise of discretion.[51]

## 2. Identifying Discretionary Factors

Any facts related to the alien's identity, conduct, character, family or other ties to the United States, immigration status, or any other humanitarian concerns may be appropriate factors to consider in the exercise of discretion. An alien's conduct can include how he or she entered the United States and what he or she has done since arrival, such as employment, schooling, or any evidence of criminal activity.

Whether the alien has family members living in the United States also is relevant to the discretionary analysis. Ties to the United States may include owning real estate or a business; the conduct of that business (including maintenance of such business in compliance with the law) may also be relevant to the discretionary analysis. Humanitarian concerns may include, but are not limited to, health issues.

Precedent case law provides guidance on how to consider evidence and weigh the positive and negative factors present in a case. These precedent decisions and USCIS guidance provide a framework to assist officers in making discretionary decisions that are reasonable and fair.[52]

*Factors That May Be Considered*

There are a number of factors or factual circumstances that are generally considered when conducting a discretionary analysis. Factors may include, but are not limited to:

- Extent to which identity can be established and aliases are disclosed;
- Contribute to the good order and happiness of the United States;
- Ties to family members in the United States and the closeness of the underlying relationships;[53]
- Hardship due to an adverse decision;[54]
- Value and service to the community;[55]
- Length of lawful residence in the United States and any immigration status held during that residence, including the age at which residence in the United States began;[56]
- Service in the U.S. armed forces;[57]
- History of employment;[58]
- Property or business ties in the United States;[59]
- History of taxes paid;
- Nature and underlying circumstances of any inadmissibility grounds at issue, the seriousness of the violations, and eligibility for a waiver of inadmissibility or other form of relief;[60]
- Likelihood that lawful permanent resident (LPR) status will ensue soon;

- Evidence regarding respect for law and order, good character, and intent to hold family responsibilities (for example, affidavits from family, friends, and responsible community representatives);[61]
- Criminal history (in the United States and abroad) and extent of rehabilitation and reform;[62]
- Community service, not including any instances imposed by the courts;
- Existence of an unexecuted administratively final removal, deportation, or exclusion order;[63]
- Public safety or national security concerns;[64]
- Moral depravity or criminal tendencies reflected by a single serious crime or an ongoing or continuing criminal record, with attention to the nature, scope, seriousness, and recent occurrence of criminal activity.[65]
- Findings of juvenile delinquency;[66]
- Compliance with immigration laws, including lawful entry into the United States;[67]
- Whether the alien has endorsed, promoted, supported, or otherwise espoused anti-American views or the views of a terrorist organization or group (including in social media content by, or involving an alien). This includes organizations who support or promote anti-American ideologies or activities, antisemitic terrorism, antisemitic terrorist organizations, antisemitic ideologies, or has engaged in physical harassment of any person in furtherance of the organization or group;[68]

[Redaction - Start]

This also includes antisemitic terrorism and antisemitic terrorist organizations such as Hamas, Palestinian Islamic Jihad, Hezbollah, or Ansar Allah "the Houthis." Upon identifying such a case, officers must notify and consult with their supervisory chain of command, and their local Fraud Detection and National Security point of contact.

[Redaction - End]

- In the case of an alien who was admitted or paroled into the United States, whether the application for admission or parole violated the laws, regulations, and policies in place at the time;[69]
- Relevant country-specific facts and circumstances, such as insufficient vetting and screening information;[70]
- Previous instances of fraud or false testimony in dealings with USCIS or any government agency;
- Marriage to a U.S. citizen or LPR for the primary purpose of circumventing immigration laws;[71]
- Conduct after admission as a nonimmigrant, where such conduct is inconsistent with the nonimmigrant status (for example, engaging in unlawful employment or unauthorized academic study) or with representations made to consular officers or DHS officers when applying for admission (for example, failing to engage in the activities for which they sought admission); and
- Other indicators of character.[72]

This is a non-exhaustive list of factors; the officer may consider any relevant fact in the discretionary analysis.

*Country-Specific Facts and Circumstances*

On June 4, 2025, the President issued Presidential Proclamation 10949, *Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats*, to exercise his authority under INA 212(f) and impose certain restrictions, limitations, and exceptions on the entry of aliens from 19 countries: Afghanistan, Burma, Burundi, Chad, Republic of Congo, Cuba, Equatorial Guinea, Eritrea, Haiti, Iran, Laos, Libya, Sierra Leone, Somalia, Sudan, Togo, Turkmenistan, Venezuela, and Yemen.[73] The Proclamation fully or partially restricts the entry or admission of aliens from those 19 countries who were outside the United States on or after June 9, 2025, and who do not have a valid visa on or after June 9, 2025. The reasons for the restrictions are country-specific and specified in the Proclamation.

The Proclamation's categorical ineligibility for entry or admission does not apply to adjustment of status, extension of stay, change of status, or other discretionary benefits made by applicants physically present in the United States. However, USCIS may considers on a case-by-case basis country-specific facts and circumstances, such as those outlined in the Proclamation, as a significant negative factor when making an individual assessment in weighing discretion, with certain exceptions.[74]

For example, certain countries (including but not limited to Afghanistan, Eritrea, Libya, Somalia, Sudan, Yemen, and Venezuela) lack a competent or central authority for issuing passports and civil documents among other concerns, which directly relates to USCIS' ability to meaningfully assess eligibility for benefit requests including identity, and therefore whether an alien warrants a favorable exercise of discretion.[75]

Where country-specific concerns relate to a high rate of overstay, such data may impact an officer's determination of likelihood that a particular individual may overstay, coupled with other case-specific facts and circumstances. For example, if an alien's conduct after admission as a nonimmigrant is inconsistent with the nonimmigrant status, and the alien is from a country with a high rate of overstay, then the officer may conclude that the alien's conduct should be considered as a significantly negative factor.

The mere fact that an individual is from a country subject to INA 212(f) restrictions on entry or admission, however, is not by itself a significant negative factor. USCIS considers relevant country-specific facts and circumstances such as those outlined in the Proclamation[76] on a case-by-case basis in the totality of the circumstances, considering the relevance of those facts to the benefit request being adjudicated and the alien requesting the benefit. USCIS weighs all relevant positive and negative factors when making these discretionary determinations.

[Redaction - Start]

Officers should consult with their supervisory chains of command before issuing a discretionary denial where country-specific factors such as those outlined in the Proclamation would warrant a denial but the case may also fall under an exception. See, for example, Section 4(b)-(d) of Presidential Proclamation 10949, 90 FR 24497, 24503 (June 4, 2025).

[Redaction - End]

CAR 000042

*Anti-American Views or Views of a Terrorist Organization*

USCIS considers circumstances where an alien has endorsed, promoted, supported, or otherwise espoused anti-American views or the views of a terrorist organization or group, including terrorist organizations who support or promote antisemitic terrorism, antisemitic terrorist organizations, and antisemitic ideologies, as mentioned above, to be overwhelmingly negative factors in any applicable case involving USCIS discretionary analysis. Accordingly, USCIS enforces all relevant immigration laws to the maximum degree, including the use of discretion, to deny the benefit request involving such circumstances.

[Redaction - Start]

While engaging in the conduct cited above at any time is an overwhelmingly negative discretionary factor in the exercise of discretion, the officer should assign particular focus to aliens who engaged in on-campus anti-American and antisemitic activities that occurred on or after October 7, 2023.

This includes, in particular, aliens who file the following particular benefit requests:

Petition for a Nonimmigrant Worker (Form I-129) for the following categories:

- Petitions filed by any college, university, technical school, or similar educational institution where USCIS determines that significant antisemitic activity in violation of Executive Order 14188, Additional Measures to Combat Anti-Semitism, 90 FR 8847 (Jan. 29, 2025), has occurred.

Application to Register Permanent Residence or Adjust Status (Form I-485) for the following categories:

- Applications where, upon review, the officer has reason to believe the alien was studying, teaching, working, or otherwise affiliated with a college, university, technical school, or similar educational institution at any point after the October 7, 2023 Hamas attacks, regardless of whether the alien was engaged in this activity pursuant to an F1 or other nonimmigrant visa.

Application to Extend/Change Nonimmigrant Status (Form I-539) for the following category:

- Reinstatement of F-1 nonimmigrant status.

Application for Employment Authorization (Form I-765) for the following category:

- (c)(3)(A), F-1 student, pre-completion Optional Practical Training.

In addition, on February 20, 2025, the United States designated Tren de Aragua (TdA) as a Foreign Terrorist Organization. On March 14, 2025, the President issued Presidential Proclamation 10903, "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren De Aragua." In furtherance of the proclamation, USCIS officers must not approve any petition, application, or benefit request, under any circumstances, where an activity, association, or nexus with a known or suspected TdA member has been identified.

USCIS officers may continue to process cases with a known or suspected TdA member other than a grant or approval (such as denials or referrals). However, officers should consult with their supervisory chains of command to coordinate notification with U.S. Immigration and Customs Enforcement (ICE) prior to taking any adjudicative action and provide any relevant information ICE deems appropriate. USCIS will take all actions necessary to support law enforcement at all levels with their actions in support of the provisions of the proclamation.

Evidence of a nexus to TdA (or any other terrorist organization), which includes any unresolved evidence that tends to suggest an alien's involvement or association with TdA, is an overwhelmingly negative factor in any discretionary analysis.

When compelling circumstances exist, necessary vetting, deconfliction, and administrative investigative actions have been completed, and USCIS determines the approval of the benefit does not pose a threat to national security or public safety, the benefit may be approved only following approval from the USCIS Senior Leadership Review Board.

[Redaction - End]

## 3. Weighing Factors

The act of exercising discretion involves weighing both positive and negative factors and considering the totality of the circumstances in the case before making a decision. Whether a favorable exercise of discretion is warranted is case-specific and depends on the evidence of positive and negative factors submitted by the requestor. As the negative factors grow more serious, a favorable exercise of discretion may not be warranted without the existence of unusual or outstanding equities in the case.[77]

*Totality of the Circumstances: Evaluating the Case-Specific Considerations for Each Factor*

An officer must consider the totality of the facts and circumstances of each individual case involving discretionary benefit requests. To do so, officers should ensure discretionary factors are considered in the context of all factors in the case.

There is no formula for determining the weight to be given a specific positive or negative factor. Officers should not attempt to assign numbers or points to a specific factor to determine if one factor is more or less favorable than another. Officers should consider each factor separately and then all the factors as a whole. The negative and positive factors should be balanced against each other and then evaluated cumulatively. [78] The weight given to each factor may vary depending on the facts of a particular case as well as the relationship of the factor to other factors in the analysis.

Discretionary factors are often interrelated. Officers must therefore determine whether each particular factor is positive or negative and how it affects the other factors under consideration. Some factors are generally given more weight than others. A small number of positive factors may overcome a larger number of negative factors, and vice versa, depending on the specific factors.

For example, when weighing the positive and negative factors, the officer should not consider the various factors individually, in isolation from one another.[79] When considering each factor individually, without considering how all the factors relate to each other, it becomes difficult to weigh the positive and negative factors properly.

Once the officer has weighed each factor individually, the officer should consider all the factors cumulatively to determine whether the unfavorable factors outweigh the favorable ones. If, after weighing all the factors, the officer determines that the positive factors outweigh the negative factors, then the requestor merits a favorable exercise of discretion. If the negative factors outweigh the positive factors, then the officer may decline to favorably exercise discretion and deny the benefit request. There may be instances where the gravity of a negative factor is of such significance that the factor by itself weighs heavily against a favorable exercise of discretion.[80]

Cases that are denied on the basis of an unfavorable exercise of discretion must include an officer's explanation of why USCIS is not exercising discretion in the requestor's favor.[81] The denial notice must clearly set forth the positive and negative factors considered and explain why the negative factors outweigh the positive factors.

## 4. Supervisory Review[82]

Officers should discuss complex or difficult cases with their supervisors, as needed, particularly those involving criminality or national security issues, regardless of whether the outcome is favorable or unfavorable to the applicant. As appropriate, supervisors may raise issues with USCIS local counsel.

Sometimes a case, especially when coupled with government errors or delay and compelling humanitarian factors, may justify an exercise of discretion resulting in an extraordinarily favorable outcome for the applicant. Officers considering such action should carefully confirm the availability of such action under the law, weigh the factors as in every discretionary decision, consult with supervisors or counsel, and make a record of the analysis and consultation.

## D. Documenting Discretionary Determinations

When issuing a decision that involves a discretionary determination, a careful explanation of the officer's findings and analysis (communicating the positive and negative factors considered and how the officer weighed these factors) helps ensure that the decision is legally sufficient and appropriate. The discretionary determination gives the officer authority to ultimately approve a benefit or form of relief or deny a benefit or form of relief when the applicant otherwise meets eligibility requirements. Officers, however, cannot exercise that authority arbitrarily or capriciously.

*Favorable Exercise of Discretion*

If no negative factors are present, the officer may provide a simple statement in the file noting the absence of negative factors (for example, comments indicating that the applicant is eligible, that there are no negative

factors, and that therefore USCIS grants the benefit in the exercise of discretion).

If an officer grants a benefit in the exercise of discretion where negative factors are present but the positive factors outweigh the negative factors, the file should contain a record of the officer's deliberations. The officer should clearly annotate the favorable factors in the file. The officer should also annotate the file regarding any consultations that supported the approval in complex or difficult cases. In some situations, the file annotation may be the only record or documentation for other officers to understand the reasons for the decision.

The officer should indicate the rationale for the decision in a clear manner so that it is easily understandable to others reviewing the file. This may include the officer addressing the discretionary issues in the written decision or by making an annotation in the file.

*Unfavorable Exercise of Discretion*[83]

If negative factors outweigh the positive factors and USCIS denies the benefit request, the written decision must contain an analysis of the factors considered in exercising discretion, where possible.[84]

Negative factors must never be analyzed in a generalized way. The decision must address negative factors on an individualized basis, applying the totality of the circumstances to the specific facts of the case. The decision should specify both the positive and negative factors that the officer identified and considered in support of the decision and should explain how the officer weighted the different factors. The denial notice should set forth the rationale for the decision so that the officer's deliberation may be understood by the requestor as well as any administrative reviewer (such as the Administrative Appeals Office or immigration judge) and the federal courts.

*Articulating Analysis Separately for Discretion and Threshold Eligibility Requirements*

In cases involving the negative exercise of discretion, officers should generally articulate clearly the legal analysis of whether the applicant meets the threshold eligibility requirements and then, separately, the discretionary analysis.

*Denying Benefit Requests as a Matter of Discretion*

If the officer denies a benefit request as a matter of discretion, the officer generally must, in the written notice to the requestor:[85]

- Indicate the decision to deny was made as a matter of discretion;
- Identify, specifically, each positive factor presented by the facts of the case;
- Identify, specifically, each negative factor;
- Explain the relative decisional weight given to each negative and positive factor; and
- Explain the cumulative weight given to the negative and positive factors, and reason for the outcome.

CAR 000046

By including the appropriate articulation of discretionary determinations in USCIS decision-making, officers enhance the quality of adjudications and provide appropriate explanation to the requestor.

## Footnotes

[^ 1] For purposes of this Policy Manual part, the term requestor means the person, organization, or business requesting an immigration benefit from USCIS. This may include an applicant or petitioner, depending on the request.

[^ 2] See *Matter of Patel (PDF)*, 17 I&N Dec. 597 (BIA 1980). See the program-specific Policy Manual part to determine whether the adjudication of a benefit request requires the exercise of discretion.

[^ 3] See Section C, Adjudicating Discretionary Benefits, Subsection 3, Weighing Factors [1 USCIS-PM E.8(C)(3)].

[^ 4] For example, see *Kucana v. Holder*, 558 U.S. 233 (2010) (comparing discretion provided in statutory language against regulations promulgated by the U.S. Department of Justice).

[^ 5] See, for example, INA 245(a) (adjustment of status).

[^ 6] See INA 291. See *Matter of Patel (PDF)*, 17 I&N Dec. 597 (BIA 1980). See *Matter of Leung (PDF)*, 16 I&N Dec. 12 (BIA 1976). See *Matter of Arai (PDF)*, 13 I&N Dec. 494 (BIA 1970).

[^ 7] See, for example, INA 316 (naturalization).

[^ 8] See Petition for a Nonimmigrant Worker (Form I-129). See INA 101(a)(15). See INA 214 and 8 CFR 214.

[^ 9] See Petition for Alien Fiancé(e) (Form I-129F). See INA 101(a)(15)(K). See INA 214(d) and INA 214(r). See 8 CFR 214.2(k).

[^ 10] See Application to Extend/Change Nonimmigrant Status (Form I-539). See INA 214 and 8 CFR 214.

[^ 11] See Application for Advance Permission to Enter as a Nonimmigrant (Form I-192). See INA 212(d)(3)(A).

[^ 12] See Application for Travel Documents, Parole Documents, and Arrival/Departure Records (Form I-131). See INA 212(d)(5)(A).

[^ 13] See INA 212(d)(5)(A). See 8 CFR 212.19. See Volume 3, Humanitarian Protection and Parole, Part G, International Entrepreneur Parole [3 USCIS-PM G].

[^ 14] See Application for Temporary Protected Status (Form I-821). See INA 244 and 8 CFR 244.

[^ 15] See Refugee/Asylee Relative Petition (Form I-730). See INA 207 and 8 CFR 207.

[^ 16] Except for following-to-join refugee adjudications. See 8 CFR 207.7.

[^ 17] See Application for Asylum and for Withholding of Removal (Form I-589). See INA 208 and 8 CFR 208. See *Matter of Pula (PDF)*, 19 I&N Dec. 467, 471 (BIA 1987).

[^ 18] See Petition for Alien Relative (Form I-130). See INA 203(a) and INA 204(a)(1)(A)-(D). See 8 CFR 204.

[^ 19] See Immigrant Petition for Alien Workers (Form I-140). See INA 203(b) and INA 204(a)(1)(E)-(G). See 8 CFR 204.5.

[^ 20] The national interest waiver element of a petition seeking classification under INA 203(b)(2)(B) is discretionary. See *Mousavi v. USCIS*, 828 Fed. Appx. 130, 133 (3rd Cir. 2020). See *Poursina v. USCIS*, 936 F.3d 868, 870-72 (9th Cir. 2019). See *Matter of Dhanasar*, 26 I&N Dec. 884, 889 n. 9 (AAO 2016). For specific information on applying discretion in national interest waiver petitions, see Volume 6, Immigrants, Part F, Employment-Based Classifications, Chapter 5, Advanced Degree or Exceptional Ability, Section D, National Interest Waiver of Job Offer [6 USCIS-PM F.5(D)].

[^ 21] See Immigrant Petition by Standalone Investor (Form I-526) or Immigrant Petition by Regional Center Investor (Form I-526E). See INA 203(b)(5) and INA 204(a)(1)(H). See 8 CFR 204.6.

[^ 22] Exceptions include threats to the national interest, fraud, deceit, misrepresentation, and criminal misuse. See INA 203(b)(5)(N)(i) and INA 203(b)(5)(O)(i). See Volume 6, Immigrants, Part G, Investors, Chapter 8, Sanctions and Discretionary Determinations [6 USCIS-PM G.8].

[^ 23] See Application for Regional Center Designation (Form I-956) and Application for Approval of an Investment in a Commercial Enterprise (Form I-956F).

[^ 24] Exceptions include threats to the national interest, fraud, deceit, misrepresentation, and criminal misuse. See INA 203(b)(5)(N)(i) and INA 203(b)(5)(O)(i). See Volume 6, Immigrants, Part G, Investors, Chapter 8, Sanctions and Discretionary Determinations [6 USCIS-PM G.8].

[^ 25] See Application to Register Permanent Residence or Adjust Status (Form I-485). For more information on how to conduct a discretionary analysis in the context of an adjustment application, see Volume 7, Adjustment of Status, Part A, Adjustment of Status Policies and Procedures, Chapter 10, Legal Analysis and Use of Discretion [7 USCIS-PM A.10].

[^ 26] See, for example, INA 245(a) and INA 209(b). Exceptions include adjustment of status based on Nicaraguan Adjustment and Central American Relief Act of 1997 (NACARA), Title II of Pub. L. 105-100 (PDF), 111 Stat. 2160, 2193 (November 19, 1997); refugee-based adjustment under INA 209(a)(2); adjustment of status based on Haitian Refugee Immigration Fairness Act of 1998 (HRIFA), Section 902 of Division A, Title IX of Pub. L. 105-277 (PDF), 112 Stat. 2681, 2681-538 (October 21, 1998); adjustment of status based on Liberian Refugee Immigration Fairness (LRIF) law, Section 7611 of the National Defense Authorization Act for Fiscal Year 2020, Pub. L. 116-92 (PDF), 113 Stat. 1198, 2309 (December 20, 2019).

[^ 27] See Application to Register Permanent Residence or Adjust Status (Form I-485). See INA 249. See 8 CFR 249. For more information, see Volume 7, Adjustment of Status, Part O, Registration [7 USCIS-PM O].

[^ 28] See INA 289 and 8 CFR 289.

[^ 29] See Application for Waiver of Grounds of Inadmissibility (Form I-601). See Application for Provisional Unlawful Presence Waiver (Form I-601A). See Application by Refugee for Waiver of Inadmissibility Grounds (Form I-602). See, for example, INA 209(c), INA 212(a)(9)(B)(v), INA 212(a)(9)(C)(iii), and INA 212(g)-(i). For more information on how to conduct a discretionary analysis in the context of a waiver application, see Volume 9, Waivers and Other Forms of Relief, Part A, Waiver Policies and Procedures, Chapter 5, Discretion [9 USCIS-PM A.5]. [Redaction - Start] Additional guidance for officers adjudicating refugee claims is available in International and Refugee Affairs Division (IRAD) materials. [Redaction - End]

[^ 30] See Application for Permission to Reapply for Admission into the United States After Deportation or Removal (Form I-212). See INA 212(a)(9)(A)(iii) and INA 212(a)(9)(C)(ii).

[^ 31] See Application for Employment Authorization (Form I-765). See INA 274A. See 8 CFR 274a.12. For more information, see Volume 10, Employment Authorization [10 USCIS-PM].

[^ 32] See Petition to Remove Conditions on Residence (Form I-751). See Petition by Investor to Remove Conditions on Permanent Resident Status (Form I-829). See INA 216 and INA 216A. See 8 CFR 216.

[^ 33] When a family-based conditional permanent resident files a Petition to Remove Conditions on Residence (Form I-751) as a waiver request based on termination of marriage, battery or extreme cruelty, or extreme hardship, it is a discretionary decision. See INA 216(c)(4).

[^ 34] See Application for Naturalization (Form N-400). See INA 316. For more information, see Volume 12, Citizenship and Naturalization [12 USCIS-PM].

[^ 35] See Application for Certificate of Citizenship (Form N-600). See INA 301, INA 309 and INA 320. For more information, see Volume 12, Citizenship and Naturalization, Part K, Certificates of Citizenship and Naturalization [12 USCIS-PM K].

[^ 36] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 300 (BIA 1996).

[^ 37] See *Matter of Patel (PDF)*, 17 I&N Dec. 597 (BIA 1980) (adjustment of status). See *Von Pervieux v. INS*, 572 F.2d 114, 118 (3rd Cir. 1978). See *Ameeriar v. INS*, 438 F.2d 1028, 1030 (3rd Cir. 1971). See *Matter of Marques (PDF)*, 16 I&N Dec. 314 (BIA 1977).

[^ 38] See *Matter of Ortiz-Prieto (PDF)*, 11 I&N Dec. 317 (BIA 1965).

[^ 39] See Subsection 4, Discretion [1 USCIS-PM E.8(B)(4)].

[^ 40] Prosecutorial discretion is a decision to enforce or not enforce the law against someone. Prosecutorial discretion is exercised when an agency makes a decision with respect to enforcing the law. USCIS, along with

other DHS agencies such as U.S. Immigration and Customs Enforcement and U.S. Customs and Border Protection, has the authority to exercise prosecutorial discretion related to immigration enforcement actions it may take, particularly in the context of initiating removal proceedings through the issuance of a non-mandatory Notice to Appear. Prosecutorial discretion does not decrease USCIS' commitment to enforcing the immigration laws. Rather, it is a means to use agency resources in a way that best accomplishes the mission of administering and enforcing the immigration laws of the United States.

[^ 41] See *INS v. Doherty (PDF)*, 502 U.S. 314 (1992).

[^ 42] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970) ("In the absence of adverse factors, adjustment will ordinarily be granted, still as a matter of discretion."). See *Matter of Pula (PDF)*, 19 I&N Dec. 467, 474 (BIA 1987) ("In the absence of any adverse factors, however, asylum should be granted in the exercise of discretion.").

[^ 43] See INA 209(b).

[^ 44] As of March 1, 2003, in accordance with Section 1517 of the Homeland Security Act of 2002 (HSA), Pub. L. 107-296 (PDF), 116 Stat. 2135, 2311 (November 25, 2002), any reference to the Attorney General in a provision of the INA describing functions that were transferred from the Attorney General or other DOJ official to DHS by the HSA "shall be deemed to refer to the Secretary" of Homeland Security. See 6 U.S.C. 557 (codifying Section 1517 of the HSA).

[^ 45] See 6 U.S.C. 275.

[^ 46] See *INS v. Abudu (PDF)*, 485 U.S. 94, 105 (1988). See *INS v. Bagamasbad (PDF)*, 429 U.S. 24, 26 (1976). See *INS v. Rios-Pineda (PDF)*, 471 U.S. 444 (1985).

[^ 47] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970). See *Matter of Lam (PDF)*, 16 I&N Dec. 432 (BIA 1978).

[^ 48] See INA 245(a). See Volume 7, Adjustment of Status, Part B, 245(a) Adjustment, Chapter 2, Eligibility Requirements [7 USCIS-PM B.2].

[^ 49] See Chapter 6, Evidence [1 USCIS-PM E.6].

[^ 50] See 8 CFR 103.2(b)(1).

[^ 51] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 586-587 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990).

[^ 52] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970). See *Matter of Lam (PDF)*, 16 I&N Dec. 432, 434 (BIA 1978). See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 53] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970). See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301-302 (BIA 1996) (". . . if the alien has relatives in the United States, the quality of their relationship must be considered in determining the weight to be awarded this equity.").

[^ 54] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970). See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 55] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990).

[^ 56] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970). See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584-85 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996). Residence must be lawful to be considered a positive factor. See *Matter of Lee (PDF)*, 17 I&N Dec. 275, 278 (Comm. 1978).

[^ 57] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 58] See *Matter of Lam (PDF)*, 16 I&N Dec. 432, 434 (BIA 1978). See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301-302 (BIA 1996) (". . . if the alien has a history of employment, it is important to consider the type of employment and its length and stability.").

[^ 59] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 60] See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 61] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990).

[^ 62] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996). However, reformation is not an absolute prerequisite to a favorable exercise of discretion. Rather, the discretionary analysis must be conducted on a case-by-case basis, with rehabilitation a factor to be considered in the exercise of discretion. See *Matter of Edwards (PDF)*, 20 I&N Dec.

191, 196 (BIA 1990) (considering rehabilitation a significant factor in view of the nature and extent of the respondent's criminal history, which spanned 10 years).

[^ 63] USCIS generally does not exercise discretion favorably to grant adjustment where the adjustment applicant has an unexecuted removal order. For information on the effect of an unexecuted removal order of an arriving alien on adjustment of status, see Volume 7, Adjustment of Status, Part A, Adjustment of Status Policies and Procedures, Chapter 10, Legal Analysis and Use of Discretion, Section B, Discretion, Subsection 2, Issues and Factors to Consider [7 USCIS-PM A.10(B)(2)].

[^ 64] See Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens, PM-602-0187, issued February 28, 2025.

[^ 65] The officer should not go behind the record of conviction to reassess an alien's ultimate guilt or innocence, but rather inquire into the circumstances surrounding the commission of the crime in order to determine whether a favorable exercise of discretion is warranted. See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 197 (BIA 1990).

[^ 66] USCIS considers findings of juvenile delinquency on a case-by-case basis, based on the totality of the evidence, to determine whether a favorable exercise of discretion is warranted. Therefore, an adjustment applicant must disclose all arrests and charges. If any arrest or charge was disposed of as a matter of juvenile delinquency, the alien must include the court or other public record that establishes this disposition. See Volume 7, Adjustment of Status, Part A, Adjustment of Status Policies and Procedures, Chapter 4, Documentation, Section A, Initial Evidence, Subsection 7, Certified Copies of Arrest Records and Court Dispositions [7 USCIS-PM A.4(A)(7)]. For more information, see Volume 7, Adjustment of Status, Part B, 245(a) Adjustment [7 USCIS-PM B] and Part F, Special Immigrant-Based Adjustment, Chapter 7, Special Immigrant Juveniles, Section C, Eligibility Requirements, Subsection 4, Admissibility and Waiver Requirements [7 USCIS-PM F.7(C)(4)].

[^ 67] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584 (BIA 1978). See *Matter of Lee (PDF)*, 17 I&N Dec. 275, 278 (Comm. 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996). However, the BIA found that a record of immigration violations standing alone does not conclusively support a finding of lack of good moral character. Further, how recent the deportation was can only be considered when there is a finding of a poor moral character based on moral turpitude in the conduct and attitude of an alien which evinces a callous conscience. In such circumstances, there must be a measurable reformation of character over a period of time in order to properly assess an alien's ability to assimilate into society. In all other instances, when the cause for deportation has been removed and the alien now appears eligible for issuance of a visa, the time factor should not be considered. See *Matter of Lee (PDF)*, 17 I&N Dec. 275 (Comm. 1978).

[^ 68] USCIS uses the definitions at INA 313(a) when identifying and determining anti-American organizations, views, activities, and ideologies.

[^ 69] This includes compliance with any requirements announced by DHS for any parole program or process, including whether the alien had knowledge of any false or fraudulent information. For example, in certain circumstances, DHS required a financial sponsor to submit an approvable Declaration of Financial Support (Form I-134) or Online Request to Be a Supporter and Declaration of Financial Support (Form I-134A) as a condition of an alien being authorized parole. An officer adjudicating an alien's pending immigration benefit request involving discretion may determine that the alien's prior application for parole was not in accordance with the policies in place at the time if the Form I-134 or Form I-134A relied upon by DHS to authorize parole contained false information or was accompanied by supporting evidence that contained false or fraudulent information.

[^ 70] Insufficient vetting and screening information may involve insufficient identity documents or inability to rely on documentation or information provided by the specified countries for identity purposes or determining criminal history or ties to criminal or terrorist organizations. For more information, see Presidential Proclamation 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats, 90 FR 24497 (PDF) (June 4, 2025).

[^ 71] Although this factor could lead to a statutory denial under INA 204(c).

[^ 72] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 73] See INA 212(f) ("Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate."). See 90 FR 24497 (PDF) (June 4, 2025).

[^ 74] For a list of exceptions, see Section 4(b)-(d) of Presidential Proclamation 10949, 90 FR 24497, 24503 (PDF) (June 4, 2025).

[^ 75] For additional reciprocity information by country, see U.S. Department of State's U.S. Visa: Reciprocity and Civil Documents by Country webpage.

[^ 76] USCIS acknowledges that the President has issued other proclamations exercising authority under INA 212(f), and that this Proclamation may also be amended or reissued. To the extent that this Proclamation is amended or reissued, or the President further exercises his authority under INA 212(f), USCIS will consider any country-specific facts and circumstances outlined therein when making discretionary determinations for immigration benefit requests.

[^ 77] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales*

*(PDF)*, 21 I&N Dec. 296, 301 (BIA 1996). For example, USCIS generally does not favorably exercise discretion in certain cases involving violent or dangerous crimes except in extraordinary circumstances. See 8 CFR 212.7(d). For more information, see Volume 9, Waivers and Other Forms of Relief, Part A, Waiver Policies and Procedures, Chapter 5, Discretion, Section C, Cases Involving Violent or Dangerous Crimes [9 USCIS-PM A.5(C)]. See Volume 7, Adjustment of Status, Part A, Adjustment of Status Policies and Procedures, Chapter 10, Legal Analysis and Use of Discretion, Section B, Discretion, Subsection 2, Issues and Factors to Consider [7 USCIS-PM A.10(B)(2)]. Another example relates to applicants seeking adjustment based on U nonimmigrant status: Depending on the nature of the adverse factors, applicants may be *required to clearly demonstrate that denial of adjustment would result in exceptional and extremely unusual hardship. Even if the applicant makes such a showing, however, USCIS may still find favorable exercise of discretion is not warranted in certain cases. See 8 CFR 245.24(d)(11).*

[^ 78] See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 200 (BIA 1990) (concurring opinion).

[^ 79] See *Matter of Pula (PDF)*, 19 I&N Dec. 467, 473-74 (BIA 1987).

[^ 80] See, for example, 8 CFR 212.7(d) (In adjudicating an application for a waiver of a criminal ground of inadmissibility involving a violent or dangerous crime, "depending on the gravity of the alien's underlying criminal offense, a showing of extraordinary circumstances might still be insufficient to warrant a favorable exercise of discretion . . . .") For more information on discretion in the context of waivers of inadmissibility, see Volume 9, Waivers and Other Forms of Relief, Part A, Waiver Policies and Procedures, Chapter 5, Discretion [9 USCIS-PM A.5].

[^ 81] See 8 CFR 103.3(a).

[^ 82] Supervisory review is required in certain situations. The law provides for outcomes that may be extraordinarily favorable for the applicant but uphold principles of fairness and equity. See *Munoz v. Ashcroft*, 339 F.3d 950 (9th Cir. 2003) (stating, "It is true that equitable tolling is available in INA cases, as there is a 'presumption, read into every federal statute of limitation, that filing deadlines are subject to equitable tolling [and that] the same rebuttable presumption of equitable tolling . . . applies in suits against private defendants and . . . in suits against the United States'", but concluding that the April 1, 1990 (asylum application deadline to qualify under the Nicaraguan Adjustment and Central American Relief Act, Title II of Pub. L. 105-100 (PDF), 111 Stat. 2160 (November 19, 1997)) is a statute of repose that cannot be subject to equitable tolling). See *Mohawk Power Corp. v. Federal Power Commission*, 379 F.2d 153, 160 (D.C. Cir. 1967) ("Conceptions of equity are not a special province of the courts but may properly be invoked by administrative agencies seeking to achieve 'the necessities of control in an increasingly complex society without sacrifice of fundamental principles of fairness and justice.'").

[^ 83] These analytical steps amplify guidance concerning denial notices, and do not replace them.

[^ 84] See 8 CFR 103.3(a). In some cases, the officer may not be able to fully reveal negative discretionary factors if they are classified. Additionally, an exception may be made for denial letters issued to applicants

for admissions as a refugee under the U.S. Refugee Admissions Program, which contain only summary reasons for denials and are not required to contain detailed analysis of the basis for negative decisions.

[^ 85] See 8 CFR 103.3(a). In some cases, the officer may not be able to fully reveal negative discretionary factors if they are classified. Additionally, an exception may be made for denial letters issued to applicants for admissions as a refugee under the U.S. Refugee Admissions Program, which contain only summary reasons for denials and are not required to contain detailed analysis of the basis for negative decisions.

## Chapter 9 - Rendering a Decision

### A. Approvals

If the requestor properly filed the benefit request and the officer determines that the requestor meets all eligibility requirements, then the officer may approve the request. Upon approval, the officer updates all relevant electronic systems to reflect the approval.

### B. Denials[1]

If, after evaluating all evidence submitted (including in response to a Request for Evidence (RFE) or Notice of Intent to Deny (NOID), if applicable), the officer determines the requestor is ineligible for the benefit sought, the officer denies the benefit request.[2] Upon denial of a request, the officer updates all relevant electronic systems and issues a written decision informing the requestor of the reason(s) for denial.[3]

If the denial notice is returned as undeliverable, USCIS verifies the mailing address and places the notice, including the original mailing envelope, in the appropriate file as evidence of service of the decision.[4]

Written decisions should use plain language that the requestor can understand. When applicable, the decision includes guidance on the procedures for filing appeals and motions, including instructions for where to find the appropriate forms.[5]

#### 1. Denials Based on Lack of Legal Basis

Generally, if a benefit request does not have a legal basis for approval, and the officer determines there is no possibility additional evidence could establish a legal basis for approval, the officer should issue a denial without first issuing an RFE or NOID.

This includes any filing in which the benefit requestor has no legal basis for the benefit sought or submits a request for an inactive or terminated program. For example, this includes family-based petitions filed for family members based on claimed relationships under categories not provided by statute (such as a grandparent filing a petition for a grandchild).

#### 2. Abandonment Denials[6]

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

<table>
<tr><td>

AKMURAT O. DOE, *et al.*,<br>
    Plaintiffs,<br>
v.<br>
DONALD J. TRUMP, *et al.*,<br>
    Defendants.

</td><td>

Case No. 1:25-cv-13946-JEK

</td></tr>
</table>

INDEX AND THE CERTIFIED ADMINISTRATIVE RECORD FOR
POLICY ALERT PA-2025-26

| Document No. | Date | Document Title | Beginning Bates No. | Ending Bates No. |
|---|---|---|---|---|
| 01 | 06/10/2025 | Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats | CAR-000001 | CAR-000009 |
| 02 | 10/14/2025 | Presidential Proclamation 10949 and Other Applications of Section 212(f) of the INA: Impacts to USCIS' Exercise of Adjudicative Discretion | CAR-000010 | CAR-000013 |
| 03 | 11/27/2025 | USCIS Policy Manual 20251127-internal-Volume 1, Part E, Chapter 8 | CAR-000014 | CAR-000036 |
| 04 | 11/27/2025 | USCIS Policy Manual 20251127-internal-Volume 7, Part A, Chapter 10 | CAR-000037 | CAR-000048 |
| 05 | 11/27/2025 | USCIS Policy Manual 20251127-internal-Volume 9, Part A, Chapter 5 | CAR-000049 | CAR-000054 |
| 06 | 11/27/2025 | USCIS Policy Manual 20251127-internal-Volume 10, Part A, Chapter 4 | CAR-000055 | CAR-000071 |

1

| 07 | 11/27/2025 | Policy Alert: Impact of INA 212(f) on USCIS' Adjudication of Discretionary Benefits | CAR-000072 | CAR-000073 |

2

I, Nathaniel Stiefel, make the following declaration, as provided by Section 1746 of Title 28 of the United States Code.  I am aware that this declaration will be filed in the above-captioned civil action with the United States District Court for the District of Massachusetts.  I hereby certify that:

1. I am the Deputy Chief for the Office of Policy and Strategy (OP&S), of U.S. Citizenship and Immigration Services (USCIS), a component agency within the U.S. Department of Homeland Security (DHS).  I have held this position since May 2025. Since 2006, I have served in a variety of roles at USCIS, including my current role, which I also held prior to my appointment as the Deputy Ombudsman within the DHS Office of the Citizenship and Immigration Services Ombudsman. I also previously served as Deputy Chief of the USCIS Office of Citizenship.

2. OP&S leads the development, coordination, and governance of immigration policy and the regulatory development process for USCIS to ensure compliance with leadership's policy goals.

3. I certify that, to the best of my knowledge, information, and belief that the documents listed in the accompanying administrative record index hereto constitute the nonprivileged documents and materials directly and indirectly considered by USCIS and that these documents constitute the administrative record the agency considered in issuing Policy Alert "Impact of INA 212(f) on USCIS' Adjudication of Discretionary Benefits (PA-2025-26) (Nov. 27, 2025).

I certify under penalty of perjury that the foregoing is true and correct.


_____          April 17, 2026
                                                   _____

Nathaniel Stiefel                                          Date
Deputy Chief
Office of Policy and Strategy
U.S. Citizenship and Immigration Services
U.S. Department of Homeland Security
Camp Springs, MD


3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

AKMURAT O. DOE, *et al.,*

    Plaintiffs,

v.

DONALD J. TRUMP, *et al.,*

    Defendants.

Case No. 1:25-cv-13946-JEK

**INDEX AND THE CERTIFIED ADMINISTRATIVE RECORD**

|  | PM-602-0194 records (in chronological order) | | |
|---|---|---|---|
| **Document Number** | **Document Title** | **Beginning Bates Number** | **Ending Bates Number** |
| 1 | Executive Order 14161, Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats | 000001 | 000003 |
| 2 | USCIS Policy Manual, Volume 1, Part E, Chapter 8 - Discretionary Analysis | 000004 | 000025 |
| 3 | USCIS Policy Manual, Volume 11, Part B, Chapter 2 - Replacement of Permanent Resident Card | 000026 | 000034 |
| 4 | Delegation to the Bureau of Citizenship and Immigration Services | 000035 | 000040 |
| 5 | Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries | 000041 | 000044 |

1

| 6 | Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries | 000045 | 000049 |
|---|---|---|---|

| 7 | Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries | 000050 | 000055 |
|---|---|---|---|
| 8 | Proclamation 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats | 000056 | 000064 |
| 9 | Proclamation 10998, Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States | 000065 | 000077 |

2

I, James Kernochan, make the following declaration, as provided by Section 1746 of Title 28 of the United States Code. I am aware that this declaration will be filed in the above-captioned civil action with the United States District Court for the District of Massachusetts. I hereby certify that:

1. I am the Deputy Director of U.S. Citizenship and Immigration Services (USCIS), a component agency within the U.S. Department of Homeland Security (DHS). I have held this position since December 22, 2025. Previously, I served as Chief of Staff at the U.S. Customs and Border Protection from January 20, 2025.

2. I assist the Director in the overall administration and supervision of the agency. I provide executive oversight of USCIS operations, including the adjudication of immigration benefit applications and petitions; support the implementation of immigration laws, regulations, and policies; oversee operational components such as service centers and field offices; ensure compliance with applicable statutory and regulatory requirements; and exercise delegated authority on behalf of the Director.

3. I certify that, to the best of my knowledge, information, and belief that the documents listed in the accompanying administrative record index hereto constitute the nonprivileged documents and materials directly and indirectly considered by USCIS and that these documents constitute the administrative record the agency considered in issuing USCIS Policy Memorandum 602-0194 (PM-602-0194) (Jan. 1, 2026).

I certify under penalty of perjury that the foregoing is true and correct.

_____          _____

James Kernochan                                                            Date
Deputy Director
U.S. Citizenship and Immigration Services
U.S. Department of Homeland Security

3

# Ex. 1

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

DORCAS INT'L INST. OF R.I., *et al.*,

    Plaintiffs,

      v.

U.S. CITIZENSHIP AND
IMMIGRATION SERVS., *et al.*,

    Defendants.

Civil Action No.
26-cv-132-JJM-PA

### INDEX AND THE CERTIFIED ADMINISTRATIVE RECORD FOR
### POLICY ALERT PA-2025-26

| Document No. | Date | Document Title | Beginning Bates No. | Ending Bates No. |
|---|---|---|---|---|
| 01 | 06/10/2025 | Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats | CAR-000001 | CAR-000009 |
| 02 | 10/14/2025 | Presidential Proclamation 10949 and Other Applications of Section 212(f) of the INA: Impacts to USCIS' Exercise of Adjudicative Discretion | CAR-000010 | CAR-000013 |
| 03 | 11/27/2025 | USCIS Policy Manual 20251127-internal-Volume 1, Part E, Chapter 8 | CAR-000014 | CAR-000036 |
| 04 | 11/27/2025 | USCIS Policy Manual 20251127-internal-Volume 7, Part A, Chapter 10 | CAR-000037 | CAR-000048 |
| 05 | 11/27/2025 | USCIS Policy Manual 20251127-internal-Volume 9, Part A, Chapter 5 | CAR-000049 | CAR-000054 |
| 06 | 11/27/2025 | USCIS Policy Manual 20251127-internal-Volume 10, Part A, Chapter 4 | CAR-000055 | CAR-000071 |

| 07 | 11/27/2025 | Policy Alert: Impact of INA 212(f) on USCIS' Adjudication of Discretionary Benefits | CAR-000072 | CAR-000073 |

I, Nathaniel Stiefel, make the following declaration, as provided by Section 1746 of Title 28 of the United States Code. I am aware that this declaration will be filed in the above-captioned civil action with the United States District Court for the Northern District of California. I hereby certify that:

1. I am the Deputy Chief for the Office of Policy and Strategy (OP&S), of U.S. Citizenship and Immigration Services (USCIS), a component agency within the U.S. Department of Homeland Security (DHS). I have held this position since May 2025. Since 2006, I have served in a variety of roles at USCIS, including my current role, which I also held prior to my appointment as the Deputy Ombudsman within the DHS Office of the Citizenship and Immigration Services Ombudsman. I also previously served as Deputy Chief of the USCIS Office of Citizenship.

2. OP&S leads the development, coordination, and governance of immigration policy and the regulatory development process for USCIS to ensure compliance with leadership's policy goals.

3. I certify that, to the best of my knowledge, information, and belief that the documents listed in the accompanying administrative record index hereto constitute the nonprivileged documents and materials directly and indirectly considered by USCIS and that these documents constitute the administrative record the agency considered in issuing Policy Alert "Impact of INA 212(f) on USCIS' Adjudication of Discretionary Benefits" (PA-2025-26) (Nov. 27, 2025).

I certify under penalty of perjury that the foregoing is true and correct.

NATHANIEL I STIEFEL
Digitally signed by NATHANIEL I STIEFEL
Date: 2026.03.25 15:58:33 -04'00'

_____          _____

Nathaniel Stiefel                                                        Date
Deputy Chief, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
U.S. Department of Homeland Security

3

# Presidential Documents

Proclamation 10949 of June 4, 2025

## Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats

### By the President of the United States of America

### A Proclamation

During my first Administration, I restricted the entry of foreign nationals into the United States, which successfully prevented national security threats from reaching our borders and which the Supreme Court upheld. In Executive Order 14161 of January 20, 2025 (Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats), I stated that it is the policy of the United States to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes.

I also stated that the United States must be vigilant during the visa-issuance process to ensure that those aliens approved for admission into the United States do not intend to harm Americans or our national interests. More importantly, the United States must identify such aliens before their admission or entry into the United States. The United States must ensure that admitted aliens and aliens otherwise already present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid, or support designated foreign terrorists or other threats to our national security.

I directed the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to identify countries throughout the world for which vetting and screening information is so deficient as to warrant a full or partial suspension on the admission of nationals from those countries pursuant to section 212(f) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f). After completing that process, the Secretary of State determined that a number of countries remain deficient with regards to screening and vetting. Many of these countries have also taken advantage of the United States in their exploitation of our visa system and their historic failure to accept back their removable nationals.

As President, I must act to protect the national security and national interest of the United States and its people. I remain committed to engaging with those countries willing to cooperate to improve information-sharing and identity-management procedures, and to address both terrorism-related and public-safety risks. Nationals of some countries also pose significant risks of overstaying their visas in the United States, which increases burdens on immigration and law enforcement components of the United States, and often exacerbates other risks related to national security and public safety.

Some of the countries with inadequacies face significant challenges to reform efforts. Others have made important improvements to their protocols and procedures, and I commend them for these efforts. But until countries with identified inadequacies address them, members of my Cabinet have recommended certain conditional restrictions and limitations. I have considered and largely accepted those recommendations and impose the limitations

set forth below on the entry into the United States by the classes of foreign nationals identified in sections 2 and 3 of this proclamation.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in this proclamation, the immigrant and nonimmigrant entry into the United States of persons described in sections 2 and 3 of this proclamation would be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1**. *Policy and Purpose.* (a) It is the policy of the United States to protect its citizens from terrorist attacks and other national security or public-safety threats. Screening and vetting protocols and procedures associated with visa adjudications and other immigration processes play a critical role in implementing that policy. These protocols enhance our ability to detect foreign nationals who may commit, aid, or support acts of terrorism, or otherwise pose a safety threat, and they aid our efforts to prevent such individuals from entering the United States.

(b) Information-sharing and identity-management protocols and practices of foreign governments are important for the effectiveness of the screening and vetting protocols and procedures of the United States. Governments manage the identity and travel documents of their nationals and residents. They also control the circumstances under which they provide information about their nationals to other governments, including information about known or suspected terrorists and criminal-history information. It is, therefore, the policy of the United States to take all necessary and appropriate steps to encourage foreign governments to improve their information-sharing and identity-management protocols and practices and to regularly share their identity and threat information with the immigration screening and vetting systems of the United States.

(c) Section 2(b) of Executive Order 14161 directed the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, within 60 days of the date of that order, to jointly submit to the President, through the Assistant to the President for Homeland Security, a report identifying countries throughout the world for which vetting and screening information is so deficient as to warrant a full or partial suspension on the entry or admission of nationals from those countries pursuant to section 212(f) of the INA (8 U.S.C. 1182(f)).

(d) On April 9, 2025, the Secretary of State, with the Assistant to the President for Homeland Security, presented the report described in subsection (c) of this section, recommending that entry restrictions and limitations be placed on foreign nationals of several countries. The report identified countries for which vetting and screening information is so deficient as to warrant a full suspension of admissions and countries that warrant a partial suspension of admission.

(e) In evaluating the recommendations from the Secretary of State and in determining what restrictions to impose for each country, I consulted with the Secretary of State, the Secretary of Defense, the Attorney General, the Secretary of Homeland Security, appropriate Assistants to the President, the Director of National Intelligence, and the Director of the Central Intelligence Agency. I considered foreign policy, national security, and counterterrorism goals. And I further considered various factors, including each country's screening and vetting capabilities, information sharing policies, and country-specific risk factors—including whether each country has a significant terrorist presence within its territory, its visa-overstay rate, and its cooperation with accepting back its removable nationals.

I also considered the different risks posed by aliens admitted on immigrant visas and those admitted on nonimmigrant visas. Persons admitted on immigrant visas become lawful permanent residents of the United States. Such persons may present national security or public-safety concerns that may be distinct from those admitted as nonimmigrants. The United States affords lawful permanent residents more enduring rights than it does to nonimmigrants. Lawful permanent residents are more difficult to remove than nonimmigrants, even after national security concerns arise, which increases the costs and aggravates the dangers of errors associated with admitting such individuals. And although immigrants are generally subject to more extensive vetting than nonimmigrants, such vetting is far less reliable when the country from which someone seeks to emigrate maintains inadequate identity-management or information-sharing policies or otherwise poses risks to the national security of the United States.

I reviewed these factors and assessed these goals, with a particular focus on crafting country-specific restrictions. This approach was designed to encourage cooperation with the subject countries in recognition of each country's unique circumstances. The restrictions and limitations imposed by this proclamation are, in my judgment, necessary to prevent the entry or admission of foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States. The restrictions and limitations imposed by this proclamation are necessary to garner cooperation from foreign governments, enforce our immigration laws, and advance other important foreign policy, national security, and counterterrorism objectives.

(f) After reviewing the report described in subsection (d) of this section, and after accounting for the foreign policy, national security, and counterterrorism objectives of the United States, I have determined to fully restrict and limit the entry of nationals of the following 12 countries: Afghanistan, Burma, Chad, Republic of the Congo, Equatorial Guinea, Eritrea, Haiti, Iran, Libya, Somalia, Sudan, and Yemen. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants.

(g) I have determined to partially restrict and limit the entry of nationals of the following 7 countries: Burundi, Cuba, Laos, Sierra Leone, Togo, Turkmenistan, and Venezuela. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants.

(h) Sections 2 and 3 of this proclamation describe some of the identity-management or information-sharing inadequacies that led me to impose restrictions. These inadequacies are sufficient to justify my finding that unrestricted entry of nationals from the named countries would be detrimental to the interests of the United States. Publicly disclosing additional details on which I relied in making these determinations, however, would cause serious damage to the national security of the United States, and many such details are classified.

**Sec. 2**. *Full Suspension of Entry for Nationals of Countries of Identified Concern.* The entry into the United States of nationals of the following countries is hereby suspended and limited, as follows, subject to the categorical exceptions and case-by-case waivers described in section 5 of this proclamation:

(a) *Afghanistan*

(i) The Taliban, a Specially Designated Global Terrorist (SDGT) group, controls Afghanistan. Afghanistan lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. According to the Fiscal Year 2023 Department of Homeland Security (DHS) Entry/Exit Overstay Report (''Overstay Report''), Afghanistan had a business/tourist (B–1/B–2) visa overstay rate of 9.70 percent and a student (F), vocational (M), and exchange visitor (J) visa overstay rate of 29.30 percent.

(ii) The entry into the United States of nationals of Afghanistan as immigrants and nonimmigrants is hereby fully suspended.

CAR-000003

(b) *Burma*

(i) According to the Overstay Report, Burma had a B–1/B–2 visa overstay rate of 27.07 percent and an F, M, and J visa overstay rate of 42.17 percent. Additionally, Burma has historically not cooperated with the United States to accept back their removable nationals.

(ii) The entry into the United States of nationals of Burma as immigrants and nonimmigrants is hereby fully suspended.

(c) *Chad*

(i) According to the Overstay Report, Chad had a B–1/B–2 visa overstay rate of 49.54 percent and an F, M, and J visa overstay rate of 55.64 percent. According to the Fiscal Year 2022 Overstay Report, Chad had a B–1/B–2 visa overstay rate of 37.12 percent. The high visa overstay rate for 2022 and 2023 is unacceptable and indicates a blatant disregard for United States immigration laws.

(ii) The entry into the United States of nationals of Chad as immigrants and nonimmigrants is hereby fully suspended.

(d) *Republic of the Congo*

(i) According to the Overstay Report, the Republic of the Congo had a B–1/B–2 visa overstay rate of 29.63 percent and an F, M, and J visa overstay rate of 35.14 percent.

(ii) The entry into the United States of nationals of the Republic of the Congo as immigrants and nonimmigrants is hereby fully suspended.

(e) *Equatorial Guinea*

(i) According to the Overstay Report, Equatorial Guinea had a B–1/B–2 visa overstay rate of 21.98 percent and an F, M, and J visa overstay rate of 70.18 percent.

(ii) The entry into the United States of nationals of Equatorial Guinea as immigrants and nonimmigrants is hereby fully suspended.

(f) *Eritrea*

(i) The United States questions the competence of the central authority for issuance of passports or civil documents in Eritrea. Criminal records are not available to the United States for Eritrean nationals. Eritrea has historically refused to accept back its removable nationals. According to the Overstay Report, Eritrea had a B–1/B–2 visa overstay rate of 20.09 percent and an F, M, and J visa overstay rate of 55.43 percent.

(ii) The entry into the United States of nationals of Eritrea as immigrants and nonimmigrants is hereby fully suspended.

(g) *Haiti*

(i) According to the Overstay Report, Haiti had a B–1/B–2 visa overstay rate of 31.38 percent and an F, M, and J visa overstay rate of 25.05 percent. Additionally, hundreds of thousands of illegal Haitian aliens flooded into the United States during the Biden Administration. This influx harms American communities by creating acute risks of increased overstay rates, establishment of criminal networks, and other national security threats. As is widely known, Haiti lacks a central authority with sufficient availability and dissemination of law enforcement information necessary to ensure its nationals do not undermine the national security of the United States.

(ii) The entry into the United States of nationals of Haiti as immigrants and nonimmigrants is hereby fully suspended.

(h) *Iran*

(i) Iran is a state sponsor of terrorism. Iran regularly fails to cooperate with the United States Government in identifying security risks, is the source of significant terrorism around the world, and has historically failed to accept back its removable nationals.

(ii) The entry into the United States of nationals of Iran as immigrants and nonimmigrants is hereby suspended.

(i) *Libya*

(i) There is no competent or cooperative central authority for issuing passports or civil documents in Libya. The historical terrorist presence within Libya's territory amplifies the risks posed by the entry into the United States of its nationals.

(ii) The entry into the United States of nationals of Libya as immigrants and nonimmigrants is hereby fully suspended.

(j) *Somalia*

(i) Somalia lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. Somalia stands apart from other countries in the degree to which its government lacks command and control of its territory, which greatly limits the effectiveness of its national capabilities in a variety of respects. A persistent terrorist threat also emanates from Somalia's territory. The United States Government has identified Somalia as a terrorist safe haven. Terrorists use regions of Somalia as safe havens from which they plan, facilitate, and conduct their operations. Somalia also remains a destination for individuals attempting to join terrorist groups that threaten the national security of the United States. The Government of Somalia struggles to provide governance needed to limit terrorists' freedom of movement. Additionally, Somalia has historically refused to accept back its removable nationals.

(ii) The entry into the United States of nationals of Somalia as immigrants and nonimmigrants is hereby fully suspended.

(k) *Sudan*

(i) Sudan lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. According to the Overstay Report, Sudan had a B–1/B–2 visa overstay rate of 26.30 percent and an F, M, and J visa overstay rate of 28.40 percent.

(ii) The entry into the United States of nationals of Sudan as immigrants and nonimmigrants is hereby fully suspended.

(l) *Yemen*

(i) Yemen lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. The government does not have physical control over its own territory. Since January 20, 2025, Yemen has been the site of active United States military operations.

(ii) The entry into the United States of nationals of Yemen as immigrants and nonimmigrants is hereby fully suspended.

**Sec. 3.** *Partial Suspension of Entry for Nationals of Countries of Identified Concern.*

(a) *Burundi*

(i) According to the Overstay Report, Burundi had a B–1/B–2 visa overstay rate of 15.35 percent and an F, M, and J visa overstay rate of 17.52 percent.

(ii) The entry into the United States of nationals of Burundi as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Burundi to the extent permitted by law.

(b) *Cuba*

(i) Cuba is a state sponsor of terrorism. The Government of Cuba does not cooperate or share sufficient law enforcement information with the United States. Cuba has historically refused to accept back its removable nationals. According to the Overstay Report, Cuba had a B–1/B–2 visa overstay rate of 7.69 percent and an F, M, and J visa overstay rate of 18.75 percent.

**24502** **Federal Register** / Vol. 90, No. 110 / Tuesday, June 10, 2025 / Presidential Documents

(ii) The entry into the United States of nationals of Cuba as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Cuba to the extent permitted by law.

(c) *Laos*

(i) According to the Overstay Report, Laos had a B–1/B–2 visa overstay rate of 34.77 percent and an F, M, and J visa overstay rate of 6.49 percent. Laos has historically failed to accept back its removable nationals.

(ii) The entry into the United States of nationals of Laos as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Laos to the extent permitted by law.

(d) *Sierra Leone*

(i) According to the Overstay Report, Sierra Leone had a B–1/B–2 visa overstay rate of 15.43 percent and an F, M, and J visa overstay rate of 35.83 percent. Sierra Leone has historically failed to accept back its removable nationals.

(ii) The entry into the United States of nationals of Sierra Leone as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Sierra Leone to the extent permitted by law.

(e) *Togo*

(i) According to the Overstay Report, Togo had a B–1/B–2 visa overstay rate of 19.03 percent and an F, M, and J visa overstay rate of 35.05 percent.

(ii) The entry into the United States of nationals of Togo as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Togo to the extent permitted by law.

(f) *Turkmenistan*

(i) According to the Overstay Report, Turkmenistan had a B–1/B–2 visa overstay rate of 15.35 percent and an F, M, and J visa overstay rate of 21.74 percent.

(ii) The entry into the United States of nationals of Turkmenistan as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Turkmenistan to the extent permitted by law.

(g) *Venezuela*

(i) Venezuela lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. Venezuela has historically refused to accept back its removable nationals. According to the Overstay Report, Venezuela had a B–1/B–2 visa overstay rate of 9.83 percent.

(ii) The entry into the United States of nationals of Venezuela as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Venezuela to the extent permitted by law.

**Sec. 4**. *Scope and Implementation of Suspensions and Limitations.* (a) *Scope.* Subject to the exceptions set forth in subsection (b) of this section and

CAR-000006

any exceptions made pursuant to subsections (c) and (d) of this section, the suspensions of and limitations on entry pursuant to sections 2 and 3 of this proclamation shall apply only to foreign nationals of the designated countries who:

(i) are outside the United States on the applicable effective date of this proclamation; and

(ii) do not have a valid visa on the applicable effective date of this proclamation.

(b) *Exceptions.* The suspension of and limitation on entry pursuant to sections 2 and 3 of this proclamation shall not apply to:

(i) any lawful permanent resident of the United States;

(ii) any dual national of a country designated under sections 2 and 3 of this proclamation when the individual is traveling on a passport issued by a country not so designated;

(iii) any foreign national traveling with a valid nonimmigrant visa in the following classifications: A–1, A–2, C–2, C–3, G–1, G–2, G–3, G–4, NATO–1, NATO–2, NATO–3, NATO–4, NATO–5, or NATO–6;

(iv) any athlete or member of an athletic team, including coaches, persons performing a necessary support role, and immediate relatives, traveling for the World Cup, Olympics, or other major sporting event as determined by the Secretary of State;

(v) immediate family immigrant visas (IR–1/CR–1, IR–2/CR–2, IR–5) with clear and convincing evidence of identity and family relationship (*e.g.,* DNA);

(vi) adoptions (IR–3, IR–4, IH–3, IH–4);

(vii) Afghan Special Immigrant Visas;

(viii) Special Immigrant Visas for United States Government employees; and

(ix) immigrant visas for ethnic and religious minorities facing persecution in Iran.

(c) Exceptions to the suspension of and limitation on entry pursuant to sections 2 and 3 of this proclamation may be made for certain individuals for whom the Attorney General finds, in her discretion, that the travel by the individual would advance a critical United States national interest involving the Department of Justice, including when individuals must be present to participate in criminal proceedings as witnesses. These exceptions shall be made only by the Attorney General, or her designee, in coordination with the Secretary of State and the Secretary of Homeland Security.

(d) Exceptions to the suspension of and limitation on entry pursuant to sections 2 and 3 of this proclamation may be made case-by-case for individuals for whom the Secretary of State finds, in his discretion, that the travel by the individual would serve a United States national interest. These exceptions shall be made by only the Secretary of State or his designee, in coordination with the Secretary of Homeland Security or her designee.

**Sec. 5**. *Adjustments to and Removal of Suspensions and Limitations.* (a) The Secretary of State shall, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director for National Intelligence, devise a process to assess whether any suspensions and limitations imposed by sections 2 and 3 of this proclamation should be continued, terminated, modified, or supplemented. Within 90 days of the date of this proclamation, and every 180 days thereafter, the Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall submit a report to the President, through the Assistant to the President for Homeland Security, describing his assessment and recommending whether any suspensions and limitations imposed by sections 2 and 3 of this proclamation should be continued, terminated, modified, or supplemented.

CAR-000007

(b) The Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall immediately engage each of the countries identified in sections 2 and 3 of this proclamation on measures that must be taken to comply with United States screening, vetting, immigration, and security requirements.

(c) Additionally, and in light of recent events, the Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall provide me an update to the review of the practices and procedures of Egypt to confirm the adequacy of its current screening and vetting capabilities.

Sec. 6. *Enforcement.* (a) The Secretary of State and the Secretary of Homeland Security shall consult with appropriate domestic and international partners, including countries and organizations, to ensure efficient, effective, and appropriate implementation of this proclamation.

(b) In implementing this proclamation, the Secretary of State and the Secretary of Homeland Security shall comply with all applicable laws and regulations.

(c) No immigrant or nonimmigrant visa issued before the applicable effective date of this proclamation shall be revoked pursuant to this proclamation.

(d) This proclamation shall not apply to an individual who has been granted asylum by the United States, to a refugee who has already been admitted to the United States, or to an individual granted withholding of removal or protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment of Punishment (CAT). Nothing in this proclamation shall be construed to limit the ability of an individual to seek asylum, refugee status, withholding of removal, or protection under the CAT, consistent with the laws of the United States.

Sec. 7. *Severability.* It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the national security, foreign policy, and counterterrorism interests of the United States. Accordingly:

(a) if any provision of this proclamation, or the application of any provision of this proclamation to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) if any provision of this proclamation, or the application of any provision of this proclamation to any person or circumstance, is held to be invalid because of the lack of certain procedural requirements, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

Sec. 8. *Effective Date.* This proclamation is effective at 12:01 a.m. eastern daylight time on June 9, 2025.

Sec. 9. *General Provisions.* (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable by law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

CAR-000008

IN WITNESS WHEREOF, I have hereunto set my hand this fourth day of June, in the year of our Lord two thousand twenty-five, and of the Independence of the United States of America the two hundred and forty-ninth.

[FR Doc. 2025–10669
Filed 6–9–25; 11:15 am]
Billing code 3395–F4–P

FOR OFFICIAL USE ONLY



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Camp Springs, MD 20588-0009

**U.S. Citizenship and Immigration Services**

October 14, 2025

## Memorandum

| | |
|---|---|
| TO: | Sarah Kendall, Associate Director<br>Field Operations Directorate |

☒ Close Hold
(Limit review to
senior leadership)

Carrie Selby, Associate Director
Service Center Operations Directorate

Ted Kim, Associate Director
Refugee, Asylum and International Operations Directorate

Andrew Davidson, Associate Director (A)
Fraud Detection and National Security Directorate

Susan Dibbins, Chief
Administrative Appeals Office

FROM: Joseph B. Edlow
Director, U.S. Citizenship and Immigration Services

SUBJECT: **Presidential Proclamation 10949 and Other Applications of Section 212(f) of the INA: Impacts to USCIS' Exercise of Adjudicative Discretion**

---

**Purpose:** Effective immediately, this memorandum directs USCIS to consider adverse country-specific factors in Presidential Proclamation 10949 (PP 10949) *Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats*[1] as significant negative discretionary factors when adjudicating all discretionary benefit requests filed by aliens from these countries, given the insufficient vetting and screening information which limits USCIS' ability to assess the risks these aliens pose to the United States. This guidance specifically addresses PP 10949, but all past and future proclamations applying section 212(f) of the Immigration and Nationality Act (INA) that are still in effect will be addressed in an equivalent manner.

---

[1] *See* 90 FR 24497 (June 4, 2025).

FOR OFFICIAL USE ONLY

PRE-DECISIONAL/DELIBERATIVE – FOR OFFICIAL USE ONLY

**Background:** On June 4, 2025, the President issued Proclamation 10949, *Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and other National Security and Public Safety Threats*, suspending the entry or admission of aliens from nineteen countries due to insufficient vetting and screening information as well as other country-specific reasons. There is a full entry or admission restriction of aliens from twelve countries which includes, both immigrant and nonimmigrants, from Afghanistan, Burma, Chad, Republic of Congo, Equatorial Guinea, Eritrea, Haiti, Iran, Libya, Somalia, Sudan, and Yemen. There is a partial restriction on the entry or admission of aliens from seven additional countries which includes immigrants and B-1, B-2, B-1/B-2, F, M, and J nonimmigrant visas from Burundi, Cuba, Laos, Sierra Leone, Togo, Turkmenistan, and Venezuela. The reasons for the restrictions are country-specific and specified in the Proclamation.

USCIS has assessed the specific terms of the Proclamation as they relate to USCIS' adjudication of any discretionary immigration benefit request, including but not limited to adjustment of status (AOS), extension of status (EOS), and change of status (COS).[2]

PP 10949 only applies to aliens who both 1) are outside the United States on June 9, 2025, and 2) do not hold a valid visa on June 9, 2025.[3] Since USCIS can only adjust the status of an alien who is physically present in the United States, aliens from the 19 countries who are present in the United States and are seeking adjustment of status are not categorically ineligible for adjustment of status based on the restrictions in PP 10949. Similarly, aliens present in the United States as nonimmigrants who are seeking EOS or COS are not categorically ineligible for those benefits due to PP 10949.[4]

However, when adjudicating an AOS, EOS, or COS application or petition, or any other discretionary benefit, once the applicant or petitioner has demonstrated that they meet all threshold eligibility criteria, USCIS makes a separate discretionary determination, in which USCIS assesses whether the applicant or petitioner demonstrated he or she warrants a favorable exercise of discretion.[5] In doing so, USCIS weighs all relevant positive and negative factors and considers the totality of the circumstances in the specific case.[6]

**Discussion:** USCIS has broad authority to deny discretionary benefit requests when adverse factors outweigh positive factors based on the totality of the circumstances. Therefore, when determining whether an alien from one of the designated countries, either fully or partially restricted from entry and admission, warrants a favorable exercise of discretion, USCIS will

---

[2] Form I-730, following-to-join asylee petitions filed on behalf of domestic beneficiaries shall be considered within the discretionary framework outlined in this memo.

[3] Section 4b. of PP 10949 provides for certain exceptions to the suspension and limitation on entry of citizens and nationals of the 19 listed countries. If an exception is present in a case, an adjudicator may factor it into the discretionary analysis.

[4] See INA §§ 214(a)(1) and 248(a).

[5] USCIS Policy Manual, Volume 1, Part E, Chapter 8 Discretionary Analysis, found at https://www.uscis.gov/policy-manual/volume-1-part-e-chapter-8; see also *Matter of Patel (PDF)*, 17 I&N Dec. 597 (BIA 1980).

[6] *See Matter of Marin*, 13 I&N Dec. 581, 585 (NIA 1978) (in making a decision as to whether to favorably exercise discretion, adjudicator must balance all positive and negative factors).

PRE-DECISIONAL/DELIBERATIVE – FOR OFFICIAL USE ONLY

PRE-DECISIONAL/DELIBERATIVE – FOR OFFICIAL USE ONLY

review all relevant factors in the alien's individual case, which will include the country-specific facts and circumstances set forth in PP 10949 such as insufficient vetting and screening information. USCIS will treat relevant country-specific facts and circumstances set forth in PP 10949 as a significant negative discretionary factor in the totality of the circumstances. For example, the countries: Afghanistan, Eritrea, Libya, Somalia, Sudan, Yemen, and Venezuela lack a competent or central authority for issuing passports and civil documents among other concerns which may directly relate to USCIS' ability to meaningfully assess eligibility for benefit requests and, at a minimum, is worthy of USCIS consideration when exercising discretion.

USCIS will consider insufficient vetting and screening information as well as other country-specific factors as significant negative factors when performing the discretionary analysis. USCIS adjudicates many discretionary benefit requests and will include the insufficient screening and vetting, and other country-specific information cited in the President's Proclamation, as part of its adjudicative discretionary determinations consistent with law.

Benefit requests denied on the basis of an unfavorable exercise of discretion must include analysis containing the positive and negative factors considered and why the negative factors outweigh the positive factors in the decision.[7] As directed in this memo, this discretionary analysis should take into account the extraordinary nature of the President's decision to exercise his authority under section 212(f) of the INA to bar entire classes of aliens from entry, with some exceptions.

**Authorities:** A non-exhaustive list of legal, regulatory, and policy authorities relevant to this decision include:

- INA § 103(a)(1) – Authority to Administer and Enforce the INA
- INA § 204 – Procedure for Granting Immigrant Status
- INA § 214 – Admission of Nonimmigrants
- INA § 215(a) – Travel Control of Citizens and Aliens, Restrictions and Prohibitions
- INA § 212(a)(3) – Inadmissible Aliens, Security Related Grounds
- INA § 212(f) – Inadmissible Aliens, Suspension of Entry or Imposition of Restrictions by President
- INA § 245(a) – Adjustment of Status
- INA § 248 – Change of Nonimmigrant Status
- 8 CFR 103.2(b)(16)(i)-(iv) – Inspection of evidence
- 8 CFR 214 – Nonimmigrant Classes
- 8 CFR 248.1(a)- Change of Nonimmigrant Classification, Eligibility
- Presidential Proclamation 10949 – Restricting The Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats

The above authorities list is not exhaustive. This memo applies to all discretionary adjudicative decisions.

---

[7] 8 CFR 103.2.

PRE-DECISIONAL/DELIBERATIVE – FOR OFFICIAL USE ONLY

PRE-DECISIONAL/DELIBERATIVE – FOR OFFICIAL USE ONLY

**Decision/Action:** Effective immediately, USCIS will consider the above referenced country-specific factors found in PP 10949 as significant negative discretionary factors when adjudicating all discretionary benefit requests filed aliens from those countries.

Within 30 days of issuance of this memorandum, USCIS adjudicative directorates and program offices, in consultation with Fraud Detection and National Security Directorate (FDNS) will provide implementation guidance to officers. The Office of Policy & Strategy (OP&S), in consultation with FDNS, will update the USCIS Policy Manual to reflect this policy decision within 30 days.

cc:    Andrew Good, Chief, Office of Policy & Strategy
       David Roy, Acting Chief Counsel, Office of Chief Counsel

PRE-DECISIONAL/DELIBERATIVE – FOR OFFICIAL USE ONLY

[^ 99] If the derogatory information is disclosed during an interview, the officer records the information and the benefit requestor's rebuttal. See Section D, Types of Evidence, Subsection 2, Testimonial Evidence [1 USCIS-PM E.6(D)(2)].

[^ 100] See 8 CFR 103.2(b)(16). A determination of statutory eligibility must be based only on information contained in the record of proceeding that is disclosed to the benefit requestor, except as provided in 8 CFR 103.2(b)(16)(iv). See 8 CFR 103.2(b)(16)(ii).

[^ 101] Any attempts to explain or reconcile such inconsistencies, absent competent objective evidence pointing to where the truth lies, will not suffice. See *Matter of Ho*, 19 I&N Dec. 582 (BIA 1988).

[^ 102] For example, a benefit requestor's tax return statement submitted with the Form I-130 that USCIS uses as evidence of a lack of a qualifying spousal relationship.

[^ 103] For example, records such as marriage certificates or personal financial statements submitted with a previous spousal petition.

[^ 104] USCIS is not required to disclose derogatory information of which the benefit requestor is aware. See 8 CFR 103.2(b)(16). See Section F, Requests for Evidence and Notices of Intent to Deny [1 USCIS-PM E.6(F)]. However, USCIS may disclose derogatory information that the benefit requestor may be aware of to ensure the benefit requestor has sufficient opportunity to rebut information used in an adverse decision.

[^ 105] For example, officers may provide a copy of the source document containing derogatory information, such as a lease agreement, in instances where the document contains no privileged or confidential information, or information that is otherwise prohibited from disclosure.

[^ 106] USCIS must not provide screenshots of information obtained from DHS or other third agency systems absent permission from the data owner. If an adverse decision is based primarily on derogatory information that originates from such systems, any disclosure must be in a detailed summary statement and is subject to the terms and conditions of applicable data sharing agreements, such as the agreement between USCIS and DOS on disclosure authorization requirements.

## Chapter 7 - Interviews [Reserved]

## Chapter 8 - Discretionary Analysis

Many immigration benefits require the requestor[1] to demonstrate that the request merits a favorable exercise of discretion in order to receive the benefit.[2] For these benefits, a discretionary analysis is a separate, additional component of adjudicating the benefit request. Whether to favorably exercise discretion is typically assessed after an officer has determined that the requestor meets all applicable threshold eligibility requirements.

The discretionary analysis involves the review of all relevant, specific facts and circumstances in an individual case. However, there are limitations on how the officer may exercise discretion; the officer may not

exercise discretion arbitrarily, inconsistently, or in reliance on biases or assumptions.

In some contexts, there are regulations and case law that outline certain factors that officers must review and use as a guide in making a discretionary determination. However, there is no exhaustive list of factors that officers must consider. To perform a discretionary analysis, officers must weigh all positive factors present in a particular case against any negative factors in the totality of the record.[3] The analysis must be comprehensive, specific to the case, and based on all relevant facts known at the time of adjudication. For complex or difficult cases, officers should consult with supervisors and local counsel.

## A. Applicability

Congress generally provides discretionary authority explicitly in the statutory language that governs an immigration benefit. In some instances, however, discretionary authority is less explicit and must be inferred from the statutory language. Executive agencies may also outline their discretionary authority explicitly in regulations.[4]

Many immigration benefit requests are filed under provisions of law that require the favorable exercise of discretion to administer the benefit.[5] In these cases, the benefit requestor has the burden of demonstrating eligibility for the benefit sought and that USCIS should favorably exercise discretion.[6] Where an immigration benefit is discretionary, meeting the statutory and regulatory requirements alone does not entitle the requestor to the benefit sought.

Certain immigration benefits are not discretionary.[7] In these cases, if the requestor properly filed and meets the eligibility requirements then USCIS must approve the benefit request. There is no discretionary analysis as part of the adjudication, and these requests cannot be denied as a matter of discretion.

The following table provides a non-exhaustive overview of immigration benefits and whether discretion is involved in the adjudication of such benefits.

Immigration Benefits Involving Discretionary Review

| Benefit Type | Discretion Involved (Yes or No) |
|---|---|
| Petition to classify an alien as a nonimmigrant worker[8] | No (with some exceptions) |
| Petition to classify an alien as a fiancé(e) of a U.S. citizen[9] | Yes |
| Application to extend or change nonimmigrant status[10] | Yes |
| Advance permission to enter as a nonimmigrant[11] | Yes |

| Benefit Type | Discretion Involved (Yes or No) |
| --- | --- |
| Initial Parole Document (for aliens who are currently outside the United States) also referred to as "humanitarian parole"[12] | Yes |
| International entrepreneur parole[13] | Yes |
| Temporary protected status[14] | Yes |
| Refugee status[15] | Yes (with some exceptions)[16] |
| Asylum[17] | Yes |
| Petition to classify an alien as a family-based immigrant[18] | No (with some exceptions) |
| Petition to classify an alien as an employment-based immigrant[19] | No (with one exception)[20] |
| Petition to classify an alien as an immigrant investor[21] | No (with some exceptions)[22] |
| Applications by an existing or prospective Regional Center[23] | No (with some exceptions)[24] |
| Adjustment of status[25] | Yes (with some exceptions)[26] |
| Registration[27] | Yes |
| Recognition as an American Indian born in Canada[28] | No |
| Waivers of inadmissibility[29] | Yes |
| Consent to reapply for admission after deportation or removal[30] | Yes |
| Employment authorization[31] | Yes (with some exceptions) |
| Removal of conditions on permanent residence[32] | No (with some exceptions)[33] |
| Naturalization[34] | No |
| Application for a Certificate of Citizenship[35] | No |

[Redaction - Start]

Officers are reminded to follow regulations and specific guidance applicable to the underlying eligibility category, as reflected in standard operating procedures (SOPs) and training materials. For example, specific regulations at 8 CFR 208.13(b)(1)(i)-(ii) govern portions of the discretionary analysis for asylum applications. The RAIO Training Module on Discretion (PDF) provides further information. In cases affected by special circumstances outlined in operational guidance, officers should consult with their supervisors before deciding if the negative factors in a particular case are significant enough to warrant an unfavorable exercise of discretion.

[Redaction - End]

## B. Overview of Discretion

### 1. Definition

The Board of Immigration Appeals (BIA) has described the exercise of discretion as:

- A balancing of the negative factors evidencing the alien's undesirability as a permanent resident with the social and humane considerations presented on his or her behalf to determine whether relief appears in the best interests of this country.[36]
- A matter of administrative grace where the applicant has the burden of showing that discretion should be exercised in his or her favor.[37]
- A consideration of negative factors and the need for the applicant to offset such factors by showing unusual or even outstanding equities.[38]

These characterizations imply that the exercise of discretion cannot be arbitrary, inconsistent, or dependent on intangible or imagined circumstances.

In short, discretion is defined as the ability or power to exercise sound judgment in decision-making. While the discretionary analysis gives the officer some autonomy in the way in which he or she decides a particular case after all applicable eligibility requirements are established, that autonomy may only be exercised within the confines of certain legal restrictions. These restrictions define the scope of the officer's discretionary authority.[39]

### 2. Adjudicative Discretion

There are two broad types of discretion that may be exercised in the context of immigration law: prosecutorial (or enforcement) discretion[40] and adjudicative discretion. The scope of discretion is defined by what type of discretionary decision is being made. This chapter only discusses the exercise of adjudicative discretion.

Adjudicative discretion requires an officer to decide whether to exercise discretion favorably when adjudicating a request for an immigration benefit. This decision is guided by the applicable statutes,

CAR-000017

regulations, and policies that outline the eligibility requirements for the benefit and the facts present in the case at issue. The U.S. Supreme Court has referred to adjudicative discretion as merit-deciding discretion.[41]

In general, an officer may exercise favorable adjudicative discretion to approve a benefit request when the requestor has met the applicable eligibility requirements and negative factors impacting discretion are not present.[42] An exercise of discretion to grant a benefit may also be appropriate when the requestor has met the eligibility requirements for the benefit, and the positive factors outweigh the negative factors. An exercise of discretion to deny, rather than to grant, may likewise be appropriate when the requestor has met the requirements of the request, but negative factors found in the course of the adjudication outweigh the positive factors.

## 3. Who Exercises Discretion

Congress expressly granted discretion to the Secretary of Homeland Security in deciding when to grant certain immigration benefits. For example, the Immigration and Nationality Act (INA) states: "The Secretary of Homeland Security or the Attorney General, in the Secretary's or the Attorney General's discretion and under such regulations as the Secretary or the Attorney General may prescribe, may adjust to the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum . . . ."[43]

The Secretary's discretionary power is delegated to the officer, through DHS and USCIS. Therefore, when an officer exercises discretion in adjudicating a request for an immigration benefit, the officer is exercising discretion on behalf of the Secretary of Homeland Security.

In many cases, the INA still refers to the Attorney General's discretion because the statutory text has not been changed to reflect the creation of DHS and the transfer of many functions from the U.S. Department of Justice (DOJ) to DHS.[44] If USCIS has adjudicative authority over the benefit, the statute should be read as conferring the power to exercise discretion on the Secretary of Homeland Security.[45]

## 4. Discretion

*Eligibility Threshold*

For discretionary benefits, there is never discretion to grant an immigration benefit if the benefit requestor has not first met all applicable threshold eligibility requirements.

It is legally permissible to deny an application as a matter of discretion without determining whether the requestor is otherwise eligible for the benefit.[46] However, the record is essentially incomplete if USCIS denies an application, petition, or request in its exercise of discretion without making a determination concerning eligibility.

Therefore, as a matter of policy, officers should generally make a specific determination regarding eligibility before addressing the exercise of discretion. Where denying the benefit request is appropriate, the officer should generally include in the denial letter his or her determination on all eligibility requirements, including

but not limited to discretionary grounds, if applicable, so that the reasons for the ultimate denial are clearly reflected in the record.

*Lack of Negative Factors*

An alien's threshold eligibility for the benefit sought is generally also a positive factor. Therefore, absent any negative factors, USCIS ordinarily exercises discretion positively.[47] Generally, if there are no negative factors to weigh against that positive factor, denial of the benefit would be an inappropriate use of discretion.

## C. Adjudicating Discretionary Benefits

When adjudicating a discretionary benefit, the officer should first determine whether the requestor meets all threshold eligibility requirements. For example, in adjudicating an application for adjustment of status under INA 245(a), the officer should first determine:

- Whether the applicant was inspected and admitted or paroled or has an approved petition as a VAWA self-petitioner;
- Is eligible to receive an immigrant visa;
- Is admissible to the United States for permanent residence; and
- Has an immigrant visa immediately available to him or her at the time he or she files the adjustment application.[48]

If the officer finds that the requestor does not meet the eligibility requirements but may be eligible for a waiver, exemption, or other form of relief, the officer should determine whether the requestor qualifies for a waiver, exemption, or other form of relief. Not all applications are concurrently filed, and in some instances, applicants must file a separate waiver application or application for relief and have that application approved before the applicant qualifies for the benefit.

If the officer finds that the requestor meets the eligibility requirements because of an approved waiver, exemption, or other form of relief, the officer must then determine whether the request should be granted as a matter of discretion. If the officer finds that the requestor does not meet all applicable eligibility requirements, the officer can still include a discretionary analysis in the denial. The discretionary determination is the final step in the adjudication of a benefit request. Adding a discretionary analysis to a denial is useful if an appellate body on review disagrees with the officer's conclusion that the requestor failed to meet the threshold eligibility requirements. In such a situation, the discretionary denial may still stand.

## 1. Basic Adjudication Steps

Officers should generally follow a three-step process when adjudicating a benefit request involving a discretionary analysis.

CAR-000019

| Basic Adjudication Steps Involving Discretion | |
|---|---|
| **Step One** | Fact finding |
| **Step Two** | Determine whether requestor meets the threshold eligibility requirements |
| **Step Three** | Conduct discretionary analysis |

*Fact Finding*[49]

Fact finding refers to the process of gathering and assessing evidence. The focus of fact finding should be to obtain credible evidence relevant to a requestor's eligibility for the benefit, including the discretionary determination. If a requestor is interviewed, the officer should elicit information pertinent to fact finding during the interview. As part of fact finding, officers should evaluate relevant information present in the record. Depending on the benefit sought, such information might include, but is not limited to:

- Immigration history;
- Family ties in the United States;
- Any serious medical conditions;
- Any criminal history;
- Other connections to the community; or
- Information indicating a public safety or national security concern.

Background information may be relevant for eligibility determinations and to the exercise of discretion.

For discretionary benefits, the benefit requestor has the burden of showing that a favorable exercise of discretion is warranted through the submission of evidence.[50] In cases where negative factors are present, the officer may ask the requestor directly why he or she warrants a favorable exercise of discretion. The officer should document any response, or lack thereof, in the record.

*Determining Whether Requestor First Meets Threshold Eligibility Requirements*

The discretionary analysis is the final step in the adjudication. Generally, the officer should first determine whether the requestor meets all threshold eligibility requirements before beginning the discretionary analysis. If the officer determines the requestor has not met the eligibility requirements for the benefit sought, the officer may deny the request without completing a discretionary analysis. However, an officer may include a discretionary analysis if a discretionary denial would be warranted even if the requestor had met the threshold statutory and regulatory requirements.

In the process of determining whether the requestor has met the eligibility requirements for the benefit sought, the officer might find that certain facts related to threshold eligibility for the specific benefit may also be relevant to the discretionary determination.

For example, if an officer finds that an adjustment applicant was convicted of a crime, the applicant might be inadmissible. The criminal conviction may also affect the discretionary analysis.

CAR-000020

*Conducting Discretionary Analysis*

The act of exercising discretion involves the weighing of positive and negative factors and considering the totality of the circumstances in the specific case. In the immigration context, the goal is to assess whether, based on the totality of the circumstances, the alien warrants a favorable exercise of discretion.[51]

## 2. Identifying Discretionary Factors

Any facts related to the alien's identity, conduct, character, family or other ties to the United States, immigration status, or any other humanitarian concerns may be appropriate factors to consider in the exercise of discretion. An alien's conduct can include how he or she entered the United States and what he or she has done since arrival, such as employment, schooling, or any evidence of criminal activity.

Whether the alien has family members living in the United States also is relevant to the discretionary analysis. Ties to the United States may include owning real estate or a business; the conduct of that business (including maintenance of such business in compliance with the law) may also be relevant to the discretionary analysis. Humanitarian concerns may include, but are not limited to, health issues.

Precedent case law provides guidance on how to consider evidence and weigh the positive and negative factors present in a case. These precedent decisions and USCIS guidance provide a framework to assist officers in making discretionary decisions that are reasonable and fair.[52]

*Factors That May Be Considered*

There are a number of factors or factual circumstances that are generally considered when conducting a discretionary analysis. Factors may include, but are not limited to:

- Extent to which identity can be established and aliases are disclosed;
- Contribute to the good order and happiness of the United States;
- Ties to family members in the United States and the closeness of the underlying relationships;[53]
- Hardship due to an adverse decision;[54]
- Value and service to the community;[55]
- Length of lawful residence in the United States and any immigration status held during that residence, including the age at which residence in the United States began;[56]
- Service in the U.S. armed forces;[57]
- History of employment;[58]
- Property or business ties in the United States;[59]
- History of taxes paid;
- Nature and underlying circumstances of any inadmissibility grounds at issue, the seriousness of the violations, and eligibility for a waiver of inadmissibility or other form of relief;[60]
- Likelihood that lawful permanent resident (LPR) status will ensue soon;

CAR-000021

- Evidence regarding respect for law and order, good character, and intent to hold family responsibilities (for example, affidavits from family, friends, and responsible community representatives);[61]
- Criminal history (in the United States and abroad) and extent of rehabilitation and reform;[62]
- Community service, not including any instances imposed by the courts;
- Existence of an unexecuted administratively final removal, deportation, or exclusion order;[63]
- Public safety or national security concerns;[64]
- Moral depravity or criminal tendencies reflected by a single serious crime or an ongoing or continuing criminal record, with attention to the nature, scope, seriousness, and recent occurrence of criminal activity.[65]
- Findings of juvenile delinquency;[66]
- Compliance with immigration laws, including lawful entry into the United States;[67]
- Whether the alien has endorsed, promoted, supported, or otherwise espoused anti-American views or the views of a terrorist organization or group (including in social media content by, or involving an alien). This includes organizations who support or promote anti-American ideologies or activities, antisemitic terrorism, antisemitic terrorist organizations, antisemitic ideologies, or has engaged in physical harassment of any person in furtherance of the organization or group;[68]

[Redaction - Start]

This also includes antisemitic terrorism and antisemitic terrorist organizations such as Hamas, Palestinian Islamic Jihad, Hezbollah, or Ansar Allah "the Houthis." Upon identifying such a case, officers must notify and consult with their supervisory chain of command, and their local Fraud Detection and National Security point of contact.

[Redaction - End]

- In the case of an alien who was admitted or paroled into the United States, whether the application for admission or parole violated the laws, regulations, and policies in place at the time;[69]
- Relevant country-specific facts and circumstances, such as insufficient vetting and screening information;[70]
- Previous instances of fraud or false testimony in dealings with USCIS or any government agency;
- Marriage to a U.S. citizen or LPR for the primary purpose of circumventing immigration laws;[71]
- Conduct after admission as a nonimmigrant, where such conduct is inconsistent with the nonimmigrant status (for example, engaging in unlawful employment or unauthorized academic study) or with representations made to consular officers or DHS officers when applying for admission (for example, failing to engage in the activities for which they sought admission); and
- Other indicators of character.[72]

This is a non-exhaustive list of factors; the officer may consider any relevant fact in the discretionary analysis.

*Country-Specific Facts and Circumstances*

On June 4, 2025, the President issued Presidential Proclamation 10949, *Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats*, to exercise his authority under INA 212(f) and impose certain restrictions, limitations, and exceptions on the entry of aliens from 19 countries: Afghanistan, Burma, Burundi, Chad, Republic of Congo, Cuba, Equatorial Guinea, Eritrea, Haiti, Iran, Laos, Libya, Sierra Leone, Somalia, Sudan, Togo, Turkmenistan, Venezuela, and Yemen.[73] The Proclamation fully or partially restricts the entry or admission of aliens from those 19 countries who were outside the United States on or after June 9, 2025, and who do not have a valid visa on or after June 9, 2025. The reasons for the restrictions are country-specific and specified in the Proclamation.

The Proclamation's categorical ineligibility for entry or admission does not apply to adjustment of status, extension of stay, change of status, or other discretionary benefits made by applicants physically present in the United States. However, USCIS may considers on a case-by-case basis country-specific facts and circumstances, such as those outlined in the Proclamation, as a significant negative factor when making an individual assessment in weighing discretion, with certain exceptions.[74]

For example, certain countries (including but not limited to Afghanistan, Eritrea, Libya, Somalia, Sudan, Yemen, and Venezuela) lack a competent or central authority for issuing passports and civil documents among other concerns, which directly relates to USCIS' ability to meaningfully assess eligibility for benefit requests including identity, and therefore whether an alien warrants a favorable exercise of discretion.[75]

Where country-specific concerns relate to a high rate of overstay, such data may impact an officer's determination of likelihood that a particular individual may overstay, coupled with other case-specific facts and circumstances. For example, if an alien's conduct after admission as a nonimmigrant is inconsistent with the nonimmigrant status, and the alien is from a country with a high rate of overstay, then the officer may conclude that the alien's conduct should be considered as a significantly negative factor.

The mere fact that an individual is from a country subject to INA 212(f) restrictions on entry or admission, however, is not by itself a significant negative factor. USCIS considers relevant country-specific facts and circumstances such as those outlined in the Proclamation[76] on a case-by-case basis in the totality of the circumstances, considering the relevance of those facts to the benefit request being adjudicated and the alien requesting the benefit. USCIS weighs all relevant positive and negative factors when making these discretionary determinations.

[Redaction - Start]

Officers should consult with their supervisory chains of command before issuing a discretionary denial where country-specific factors such as those outlined in the Proclamation would warrant a denial but the case may also fall under an exception. See, for example, Section 4(b)-(d) of Presidential Proclamation 10949, 90 FR 24497, 24503 (June 4, 2025).

[Redaction - End]

CAR-000023

*Anti-American Views or Views of a Terrorist Organization*

USCIS considers circumstances where an alien has endorsed, promoted, supported, or otherwise espoused anti-American views or the views of a terrorist organization or group, including terrorist organizations who support or promote antisemitic terrorism, antisemitic terrorist organizations, and antisemitic ideologies, as mentioned above, to be overwhelmingly negative factors in any applicable case involving USCIS discretionary analysis. Accordingly, USCIS enforces all relevant immigration laws to the maximum degree, including the use of discretion, to deny the benefit request involving such circumstances.

[Redaction - Start]

While engaging in the conduct cited above at any time is an overwhelmingly negative discretionary factor in the exercise of discretion, the officer should assign particular focus to aliens who engaged in on-campus anti-American and antisemitic activities that occurred on or after October 7, 2023.

This includes, in particular, aliens who file the following particular benefit requests:

Petition for a Nonimmigrant Worker (Form I-129) for the following categories:

- Petitions filed by any college, university, technical school, or similar educational institution where USCIS determines that significant antisemitic activity in violation of Executive Order 14188, Additional Measures to Combat Anti-Semitism, 90 FR 8847 (Jan. 29, 2025), has occurred.

Application to Register Permanent Residence or Adjust Status (Form I-485) for the following categories:

- Applications where, upon review, the officer has reason to believe the alien was studying, teaching, working, or otherwise affiliated with a college, university, technical school, or similar educational institution at any point after the October 7, 2023 Hamas attacks, regardless of whether the alien was engaged in this activity pursuant to an F1 or other nonimmigrant visa.

Application to Extend/Change Nonimmigrant Status (Form I-539) for the following category:

- Reinstatement of F-1 nonimmigrant status.

Application for Employment Authorization (Form I-765) for the following category:

- (c)(3)(A), F-1 student, pre-completion Optional Practical Training.

In addition, on February 20, 2025, the United States designated Tren de Aragua (TdA) as a Foreign Terrorist Organization. On March 14, 2025, the President issued Presidential Proclamation 10903, "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren De Aragua." In furtherance of the proclamation, USCIS officers must not approve any petition, application, or benefit request, under any circumstances, where an activity, association, or nexus with a known or suspected TdA member has been identified.

USCIS officers may continue to process cases with a known or suspected TdA member other than a grant or approval (such as denials or referrals). However, officers should consult with their supervisory chains of command to coordinate notification with U.S. Immigration and Customs Enforcement (ICE) prior to taking any adjudicative action and provide any relevant information ICE deems appropriate. USCIS will take all actions necessary to support law enforcement at all levels with their actions in support of the provisions of the proclamation.

Evidence of a nexus to TdA (or any other terrorist organization), which includes any unresolved evidence that tends to suggest an alien's involvement or association with TdA, is an overwhelmingly negative factor in any discretionary analysis.

When compelling circumstances exist, necessary vetting, deconfliction, and administrative investigative actions have been completed, and USCIS determines the approval of the benefit does not pose a threat to national security or public safety, the benefit may be approved only following approval from the USCIS Senior Leadership Review Board.

[Redaction - End]

## 3. Weighing Factors

The act of exercising discretion involves weighing both positive and negative factors and considering the totality of the circumstances in the case before making a decision. Whether a favorable exercise of discretion is warranted is case-specific and depends on the evidence of positive and negative factors submitted by the requestor. As the negative factors grow more serious, a favorable exercise of discretion may not be warranted without the existence of unusual or outstanding equities in the case.[77]

*Totality of the Circumstances: Evaluating the Case-Specific Considerations for Each Factor*

An officer must consider the totality of the facts and circumstances of each individual case involving discretionary benefit requests. To do so, officers should ensure discretionary factors are considered in the context of all factors in the case.

There is no formula for determining the weight to be given a specific positive or negative factor. Officers should not attempt to assign numbers or points to a specific factor to determine if one factor is more or less favorable than another. Officers should consider each factor separately and then all the factors as a whole. The negative and positive factors should be balanced against each other and then evaluated cumulatively. [78] The weight given to each factor may vary depending on the facts of a particular case as well as the relationship of the factor to other factors in the analysis.

Discretionary factors are often interrelated. Officers must therefore determine whether each particular factor is positive or negative and how it affects the other factors under consideration. Some factors are generally given more weight than others. A small number of positive factors may overcome a larger number of negative factors, and vice versa, depending on the specific factors.

CAR-000025

For example, when weighing the positive and negative factors, the officer should not consider the various factors individually, in isolation from one another.[79] When considering each factor individually, without considering how all the factors relate to each other, it becomes difficult to weigh the positive and negative factors properly.

Once the officer has weighed each factor individually, the officer should consider all the factors cumulatively to determine whether the unfavorable factors outweigh the favorable ones. If, after weighing all the factors, the officer determines that the positive factors outweigh the negative factors, then the requestor merits a favorable exercise of discretion. If the negative factors outweigh the positive factors, then the officer may decline to favorably exercise discretion and deny the benefit request. There may be instances where the gravity of a negative factor is of such significance that the factor by itself weighs heavily against a favorable exercise of discretion.[80]

Cases that are denied on the basis of an unfavorable exercise of discretion must include an officer's explanation of why USCIS is not exercising discretion in the requestor's favor.[81] The denial notice must clearly set forth the positive and negative factors considered and explain why the negative factors outweigh the positive factors.

## 4. Supervisory Review[82]

Officers should discuss complex or difficult cases with their supervisors, as needed, particularly those involving criminality or national security issues, regardless of whether the outcome is favorable or unfavorable to the applicant. As appropriate, supervisors may raise issues with USCIS local counsel.

Sometimes a case, especially when coupled with government errors or delay and compelling humanitarian factors, may justify an exercise of discretion resulting in an extraordinarily favorable outcome for the applicant. Officers considering such action should carefully confirm the availability of such action under the law, weigh the factors as in every discretionary decision, consult with supervisors or counsel, and make a record of the analysis and consultation.

## D. Documenting Discretionary Determinations

When issuing a decision that involves a discretionary determination, a careful explanation of the officer's findings and analysis (communicating the positive and negative factors considered and how the officer weighed these factors) helps ensure that the decision is legally sufficient and appropriate. The discretionary determination gives the officer authority to ultimately approve a benefit or form of relief or deny a benefit or form of relief when the applicant otherwise meets eligibility requirements. Officers, however, cannot exercise that authority arbitrarily or capriciously.

*Favorable Exercise of Discretion*

If no negative factors are present, the officer may provide a simple statement in the file noting the absence of negative factors (for example, comments indicating that the applicant is eligible, that there are no negative

factors, and that therefore USCIS grants the benefit in the exercise of discretion).

If an officer grants a benefit in the exercise of discretion where negative factors are present but the positive factors outweigh the negative factors, the file should contain a record of the officer's deliberations. The officer should clearly annotate the favorable factors in the file. The officer should also annotate the file regarding any consultations that supported the approval in complex or difficult cases. In some situations, the file annotation may be the only record or documentation for other officers to understand the reasons for the decision.

The officer should indicate the rationale for the decision in a clear manner so that it is easily understandable to others reviewing the file. This may include the officer addressing the discretionary issues in the written decision or by making an annotation in the file.

*Unfavorable Exercise of Discretion*[83]

If negative factors outweigh the positive factors and USCIS denies the benefit request, the written decision must contain an analysis of the factors considered in exercising discretion, where possible.[84]

Negative factors must never be analyzed in a generalized way. The decision must address negative factors on an individualized basis, applying the totality of the circumstances to the specific facts of the case. The decision should specify both the positive and negative factors that the officer identified and considered in support of the decision and should explain how the officer weighted the different factors. The denial notice should set forth the rationale for the decision so that the officer's deliberation may be understood by the requestor as well as any administrative reviewer (such as the Administrative Appeals Office or immigration judge) and the federal courts.

*Articulating Analysis Separately for Discretion and Threshold Eligibility Requirements*

In cases involving the negative exercise of discretion, officers should generally articulate clearly the legal analysis of whether the applicant meets the threshold eligibility requirements and then, separately, the discretionary analysis.

*Denying Benefit Requests as a Matter of Discretion*

If the officer denies a benefit request as a matter of discretion, the officer generally must, in the written notice to the requestor:[85]

- Indicate the decision to deny was made as a matter of discretion;
- Identify, specifically, each positive factor presented by the facts of the case;
- Identify, specifically, each negative factor;
- Explain the relative decisional weight given to each negative and positive factor; and
- Explain the cumulative weight given to the negative and positive factors, and reason for the outcome.

CAR-000027

By including the appropriate articulation of discretionary determinations in USCIS decision-making, officers enhance the quality of adjudications and provide appropriate explanation to the requestor.

## Footnotes

[^ 1] For purposes of this Policy Manual part, the term requestor means the person, organization, or business requesting an immigration benefit from USCIS. This may include an applicant or petitioner, depending on the request.

[^ 2] See *Matter of Patel (PDF)*, 17 I&N Dec. 597 (BIA 1980). See the program-specific Policy Manual part to determine whether the adjudication of a benefit request requires the exercise of discretion.

[^ 3] See Section C, Adjudicating Discretionary Benefits, Subsection 3, Weighing Factors [1 USCIS-PM E.8(C)(3)].

[^ 4] For example, see *Kucana v. Holder*, 558 U.S. 233 (2010) (comparing discretion provided in statutory language against regulations promulgated by the U.S. Department of Justice).

[^ 5] See, for example, INA 245(a) (adjustment of status).

[^ 6] See INA 291. See *Matter of Patel (PDF)*, 17 I&N Dec. 597 (BIA 1980). See *Matter of Leung (PDF)*, 16 I&N Dec. 12 (BIA 1976). See *Matter of Arai (PDF)*, 13 I&N Dec. 494 (BIA 1970).

[^ 7] See, for example, INA 316 (naturalization).

[^ 8] See Petition for a Nonimmigrant Worker (Form I-129). See INA 101(a)(15). See INA 214 and 8 CFR 214.

[^ 9] See Petition for Alien Fiancé(e) (Form I-129F). See INA 101(a)(15)(K). See INA 214(d) and INA 214(r). See 8 CFR 214.2(k).

[^ 10] See Application to Extend/Change Nonimmigrant Status (Form I-539). See INA 214 and 8 CFR 214.

[^ 11] See Application for Advance Permission to Enter as a Nonimmigrant (Form I-192). See INA 212(d)(3)(A).

[^ 12] See Application for Travel Documents, Parole Documents, and Arrival/Departure Records (Form I-131). See INA 212(d)(5)(A).

[^ 13] See INA 212(d)(5)(A). See 8 CFR 212.19. See Volume 3, Humanitarian Protection and Parole, Part G, International Entrepreneur Parole [3 USCIS-PM G].

[^ 14] See Application for Temporary Protected Status (Form I-821). See INA 244 and 8 CFR 244.

[^ 15] See Refugee/Asylee Relative Petition (Form I-730). See INA 207 and 8 CFR 207.

[^ 16] Except for following-to-join refugee adjudications. See 8 CFR 207.7.

CAR-000028

[^ 17] See Application for Asylum and for Withholding of Removal (Form I-589). See INA 208 and 8 CFR 208. See *Matter of Pula (PDF)*, 19 I&N Dec. 467, 471 (BIA 1987).

[^ 18] See Petition for Alien Relative (Form I-130). See INA 203(a) and INA 204(a)(1)(A)-(D). See 8 CFR 204.

[^ 19] See Immigrant Petition for Alien Workers (Form I-140). See INA 203(b) and INA 204(a)(1)(E)-(G). See 8 CFR 204.5.

[^ 20] The national interest waiver element of a petition seeking classification under INA 203(b)(2)(B) is discretionary. See *Mousavi v. USCIS*, 828 Fed. Appx. 130, 133 (3rd Cir. 2020). See *Poursina v. USCIS*, 936 F.3d 868, 870-72 (9th Cir. 2019). See *Matter of Dhanasar*, 26 I&N Dec. 884, 889 n. 9 (AAO 2016). For specific information on applying discretion in national interest waiver petitions, see Volume 6, Immigrants, Part F, Employment-Based Classifications, Chapter 5, Advanced Degree or Exceptional Ability, Section D, National Interest Waiver of Job Offer [6 USCIS-PM F.5(D)].

[^ 21] See Immigrant Petition by Standalone Investor (Form I-526) or Immigrant Petition by Regional Center Investor (Form I-526E). See INA 203(b)(5) and INA 204(a)(1)(H). See 8 CFR 204.6.

[^ 22] Exceptions include threats to the national interest, fraud, deceit, misrepresentation, and criminal misuse. See INA 203(b)(5)(N)(i) and INA 203(b)(5)(O)(i). See Volume 6, Immigrants, Part G, Investors, Chapter 8, Sanctions and Discretionary Determinations [6 USCIS-PM G.8].

[^ 23] See Application for Regional Center Designation (Form I-956) and Application for Approval of an Investment in a Commercial Enterprise (Form I-956F).

[^ 24] Exceptions include threats to the national interest, fraud, deceit, misrepresentation, and criminal misuse. See INA 203(b)(5)(N)(i) and INA 203(b)(5)(O)(i). See Volume 6, Immigrants, Part G, Investors, Chapter 8, Sanctions and Discretionary Determinations [6 USCIS-PM G.8].

[^ 25] See Application to Register Permanent Residence or Adjust Status (Form I-485). For more information on how to conduct a discretionary analysis in the context of an adjustment application, see Volume 7, Adjustment of Status, Part A, Adjustment of Status Policies and Procedures, Chapter 10, Legal Analysis and Use of Discretion [7 USCIS-PM A.10].

[^ 26] See, for example, INA 245(a) and INA 209(b). Exceptions include adjustment of status based on Nicaraguan Adjustment and Central American Relief Act of 1997 (NACARA), Title II of Pub. L. 105-100 (PDF), 111 Stat. 2160, 2193 (November 19, 1997); refugee-based adjustment under INA 209(a)(2); adjustment of status based on Haitian Refugee Immigration Fairness Act of 1998 (HRIFA), Section 902 of Division A, Title IX of Pub. L. 105-277 (PDF), 112 Stat. 2681, 2681-538 (October 21, 1998); adjustment of status based on Liberian Refugee Immigration Fairness (LRIF) law, Section 7611 of the National Defense Authorization Act for Fiscal Year 2020, Pub. L. 116-92 (PDF), 113 Stat. 1198, 2309 (December 20, 2019).

[^ 27] See Application to Register Permanent Residence or Adjust Status (Form I-485). See INA 249. See 8 CFR 249. For more information, see Volume 7, Adjustment of Status, Part O, Registration [7 USCIS-PM O].

[^ 28] See INA 289 and 8 CFR 289.

[^ 29] See Application for Waiver of Grounds of Inadmissibility (Form I-601). See Application for Provisional Unlawful Presence Waiver (Form I-601A). See Application by Refugee for Waiver of Inadmissibility Grounds (Form I-602). See, for example, INA 209(c), INA 212(a)(9)(B)(v), INA 212(a)(9)(C)(iii), and INA 212(g)-(i). For more information on how to conduct a discretionary analysis in the context of a waiver application, see Volume 9, Waivers and Other Forms of Relief, Part A, Waiver Policies and Procedures, Chapter 5, Discretion [9 USCIS-PM A.5]. [Redaction - Start] Additional guidance for officers adjudicating refugee claims is available in International and Refugee Affairs Division (IRAD) materials. [Redaction - End]

[^ 30] See Application for Permission to Reapply for Admission into the United States After Deportation or Removal (Form I-212). See INA 212(a)(9)(A)(iii) and INA 212(a)(9)(C)(ii).

[^ 31] See Application for Employment Authorization (Form I-765). See INA 274A. See 8 CFR 274a.12. For more information, see Volume 10, Employment Authorization [10 USCIS-PM].

[^ 32] See Petition to Remove Conditions on Residence (Form I-751). See Petition by Investor to Remove Conditions on Permanent Resident Status (Form I-829). See INA 216 and INA 216A. See 8 CFR 216.

[^ 33] When a family-based conditional permanent resident files a Petition to Remove Conditions on Residence (Form I-751) as a waiver request based on termination of marriage, battery or extreme cruelty, or extreme hardship, it is a discretionary decision. See INA 216(c)(4).

[^ 34] See Application for Naturalization (Form N-400). See INA 316. For more information, see Volume 12, Citizenship and Naturalization [12 USCIS-PM].

[^ 35] See Application for Certificate of Citizenship (Form N-600). See INA 301, INA 309 and INA 320. For more information, see Volume 12, Citizenship and Naturalization, Part K, Certificates of Citizenship and Naturalization [12 USCIS-PM K].

[^ 36] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 300 (BIA 1996).

[^ 37] See *Matter of Patel (PDF)*, 17 I&N Dec. 597 (BIA 1980) (adjustment of status). See *Von Pervieux v. INS*, 572 F.2d 114, 118 (3rd Cir. 1978). See *Ameeriar v. INS*, 438 F.2d 1028, 1030 (3rd Cir. 1971). See *Matter of Marques (PDF)*, 16 I&N Dec. 314 (BIA 1977).

[^ 38] See *Matter of Ortiz-Prieto (PDF)*, 11 I&N Dec. 317 (BIA 1965).

[^ 39] See Subsection 4, Discretion [1 USCIS-PM E.8(B)(4)].

[^ 40] Prosecutorial discretion is a decision to enforce or not enforce the law against someone. Prosecutorial discretion is exercised when an agency makes a decision with respect to enforcing the law. USCIS, along with

other DHS agencies such as U.S. Immigration and Customs Enforcement and U.S. Customs and Border Protection, has the authority to exercise prosecutorial discretion related to immigration enforcement actions it may take, particularly in the context of initiating removal proceedings through the issuance of a non-mandatory Notice to Appear. Prosecutorial discretion does not decrease USCIS' commitment to enforcing the immigration laws. Rather, it is a means to use agency resources in a way that best accomplishes the mission of administering and enforcing the immigration laws of the United States.

[^ 41] See *INS v. Doherty (PDF)*, 502 U.S. 314 (1992).

[^ 42] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970) ("In the absence of adverse factors, adjustment will ordinarily be granted, still as a matter of discretion."). See *Matter of Pula (PDF)*, 19 I&N Dec. 467, 474 (BIA 1987) ("In the absence of any adverse factors, however, asylum should be granted in the exercise of discretion.").

[^ 43] See INA 209(b).

[^ 44] As of March 1, 2003, in accordance with Section 1517 of the Homeland Security Act of 2002 (HSA), Pub. L. 107-296 (PDF), 116 Stat. 2135, 2311 (November 25, 2002), any reference to the Attorney General in a provision of the INA describing functions that were transferred from the Attorney General or other DOJ official to DHS by the HSA "shall be deemed to refer to the Secretary" of Homeland Security. See 6 U.S.C. 557 (codifying Section 1517 of the HSA).

[^ 45] See 6 U.S.C. 275.

[^ 46] See *INS v. Abudu (PDF)*, 485 U.S. 94, 105 (1988). See *INS v. Bagamasbad (PDF)*, 429 U.S. 24, 26 (1976). See *INS v. Rios-Pineda (PDF)*, 471 U.S. 444 (1985).

[^ 47] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970). See *Matter of Lam (PDF)*, 16 I&N Dec. 432 (BIA 1978).

[^ 48] See INA 245(a). See Volume 7, Adjustment of Status, Part B, 245(a) Adjustment, Chapter 2, Eligibility Requirements [7 USCIS-PM B.2].

[^ 49] See Chapter 6, Evidence [1 USCIS-PM E.6].

[^ 50] See 8 CFR 103.2(b)(1).

[^ 51] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 586-587 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990).

[^ 52] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970). See *Matter of Lam (PDF)*, 16 I&N Dec. 432, 434 (BIA 1978). See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 53] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970). See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301-302 (BIA 1996) (". . . if the alien has relatives in the United States, the quality of their relationship must be considered in determining the weight to be awarded this equity.").

[^ 54] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970). See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 55] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990).

[^ 56] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970). See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584-85 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996). Residence must be lawful to be considered a positive factor. See *Matter of Lee (PDF)*, 17 I&N Dec. 275, 278 (Comm. 1978).

[^ 57] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 58] See *Matter of Lam (PDF)*, 16 I&N Dec. 432, 434 (BIA 1978). See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301-302 (BIA 1996) (". . . if the alien has a history of employment, it is important to consider the type of employment and its length and stability.").

[^ 59] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 60] See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 61] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990).

[^ 62] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996). However, reformation is not an absolute prerequisite to a favorable exercise of discretion. Rather, the discretionary analysis must be conducted on a case-by-case basis, with rehabilitation a factor to be considered in the exercise of discretion. See *Matter of Edwards (PDF)*, 20 I&N Dec.

191, 196 (BIA 1990) (considering rehabilitation a significant factor in view of the nature and extent of the respondent's criminal history, which spanned 10 years).

[^ 63] USCIS generally does not exercise discretion favorably to grant adjustment where the adjustment applicant has an unexecuted removal order. For information on the effect of an unexecuted removal order of an arriving alien on adjustment of status, see Volume 7, Adjustment of Status, Part A, Adjustment of Status Policies and Procedures, Chapter 10, Legal Analysis and Use of Discretion, Section B, Discretion, Subsection 2, Issues and Factors to Consider [7 USCIS-PM A.10(B)(2)].

[^ 64] See Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens, PM-602-0187, issued February 28, 2025.

[^ 65] The officer should not go behind the record of conviction to reassess an alien's ultimate guilt or innocence, but rather inquire into the circumstances surrounding the commission of the crime in order to determine whether a favorable exercise of discretion is warranted. See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 197 (BIA 1990).

[^ 66] USCIS considers findings of juvenile delinquency on a case-by-case basis, based on the totality of the evidence, to determine whether a favorable exercise of discretion is warranted. Therefore, an adjustment applicant must disclose all arrests and charges. If any arrest or charge was disposed of as a matter of juvenile delinquency, the alien must include the court or other public record that establishes this disposition. See Volume 7, Adjustment of Status, Part A, Adjustment of Status Policies and Procedures, Chapter 4, Documentation, Section A, Initial Evidence, Subsection 7, Certified Copies of Arrest Records and Court Dispositions [7 USCIS-PM A.4(A)(7)]. For more information, see Volume 7, Adjustment of Status, Part B, 245(a) Adjustment [7 USCIS-PM B] and Part F, Special Immigrant-Based Adjustment, Chapter 7, Special Immigrant Juveniles, Section C, Eligibility Requirements, Subsection 4, Admissibility and Waiver Requirements [7 USCIS-PM F.7(C)(4)].

[^ 67] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584 (BIA 1978). See *Matter of Lee (PDF)*, 17 I&N Dec. 275, 278 (Comm. 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996). However, the BIA found that a record of immigration violations standing alone does not conclusively support a finding of lack of good moral character. Further, how recent the deportation was can only be considered when there is a finding of a poor moral character based on moral turpitude in the conduct and attitude of an alien which evinces a callous conscience. In such circumstances, there must be a measurable reformation of character over a period of time in order to properly assess an alien's ability to assimilate into society. In all other instances, when the cause for deportation has been removed and the alien now appears eligible for issuance of a visa, the time factor should not be considered. See *Matter of Lee (PDF)*, 17 I&N Dec. 275 (Comm. 1978).

[^ 68] USCIS uses the definitions at INA 313(a) when identifying and determining anti-American organizations, views, activities, and ideologies.

[^ 69] This includes compliance with any requirements announced by DHS for any parole program or process, including whether the alien had knowledge of any false or fraudulent information. For example, in certain circumstances, DHS required a financial sponsor to submit an approvable Declaration of Financial Support (Form I-134) or Online Request to Be a Supporter and Declaration of Financial Support (Form I-134A) as a condition of an alien being authorized parole. An officer adjudicating an alien's pending immigration benefit request involving discretion may determine that the alien's prior application for parole was not in accordance with the policies in place at the time if the Form I-134 or Form I-134A relied upon by DHS to authorize parole contained false information or was accompanied by supporting evidence that contained false or fraudulent information.

[^ 70] Insufficient vetting and screening information may involve insufficient identity documents or inability to rely on documentation or information provided by the specified countries for identity purposes or determining criminal history or ties to criminal or terrorist organizations. For more information, see Presidential Proclamation 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats, 90 FR 24497 (PDF) (June 4, 2025).

[^ 71] Although this factor could lead to a statutory denial under INA 204(c).

[^ 72] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 73] See INA 212(f) ("Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate."). See 90 FR 24497 (PDF) (June 4, 2025).

[^ 74] For a list of exceptions, see Section 4(b)-(d) of Presidential Proclamation 10949, 90 FR 24497, 24503 (PDF) (June 4, 2025).

[^ 75] For additional reciprocity information by country, see U.S. Department of State's U.S. Visa: Reciprocity and Civil Documents by Country webpage.

[^ 76] USCIS acknowledges that the President has issued other proclamations exercising authority under INA 212(f), and that this Proclamation may also be amended or reissued. To the extent that this Proclamation is amended or reissued, or the President further exercises his authority under INA 212(f), USCIS will consider any country-specific facts and circumstances outlined therein when making discretionary determinations for immigration benefit requests.

[^ 77] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales*

*(PDF)*, 21 I&N Dec. 296, 301 (BIA 1996). For example, USCIS generally does not favorably exercise discretion in certain cases involving violent or dangerous crimes except in extraordinary circumstances. See 8 CFR 212.7(d). For more information, see Volume 9, Waivers and Other Forms of Relief, Part A, Waiver Policies and Procedures, Chapter 5, Discretion, Section C, Cases Involving Violent or Dangerous Crimes [9 USCIS-PM A.5(C)]. See Volume 7, Adjustment of Status, Part A, Adjustment of Status Policies and Procedures, Chapter 10, Legal Analysis and Use of Discretion, Section B, Discretion, Subsection 2, Issues and Factors to Consider [7 USCIS-PM A.10(B)(2)]. Another example relates to applicants seeking adjustment based on U nonimmigrant status: Depending on the nature of the adverse factors, applicants may be required to clearly demonstrate that denial of adjustment would result in exceptional and extremely unusual hardship. Even if the applicant makes such a showing, however, USCIS may still find favorable exercise of discretion is not warranted in certain cases. See 8 CFR 245.24(d)(11).

[^ 78] See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 200 (BIA 1990) (concurring opinion).

[^ 79] See *Matter of Pula (PDF)*, 19 I&N Dec. 467, 473-74 (BIA 1987).

[^ 80] See, for example, 8 CFR 212.7(d) (In adjudicating an application for a waiver of a criminal ground of inadmissibility involving a violent or dangerous crime, "depending on the gravity of the alien's underlying criminal offense, a showing of extraordinary circumstances might still be insufficient to warrant a favorable exercise of discretion . . . .") For more information on discretion in the context of waivers of inadmissibility, see Volume 9, Waivers and Other Forms of Relief, Part A, Waiver Policies and Procedures, Chapter 5, Discretion [9 USCIS-PM A.5].

[^ 81] See 8 CFR 103.3(a).

[^ 82] Supervisory review is required in certain situations. The law provides for outcomes that may be extraordinarily favorable for the applicant but uphold principles of fairness and equity. See *Munoz v. Ashcroft*, 339 F.3d 950 (9th Cir. 2003) (stating, "It is true that equitable tolling is available in INA cases, as there is a 'presumption, read into every federal statute of limitation, that filing deadlines are subject to equitable tolling [and that] the same rebuttable presumption of equitable tolling . . . applies in suits against private defendants and . . . in suits against the United States'", but concluding that the April 1, 1990 (asylum application deadline to qualify under the Nicaraguan Adjustment and Central American Relief Act, Title II of Pub. L. 105-100 (PDF), 111 Stat. 2160 (November 19, 1997)) is a statute of repose that cannot be subject to equitable tolling). See *Mohawk Power Corp. v. Federal Power Commission*, 379 F.2d 153, 160 (D.C. Cir. 1967) ("Conceptions of equity are not a special province of the courts but may properly be invoked by administrative agencies seeking to achieve 'the necessities of control in an increasingly complex society without sacrifice of fundamental principles of fairness and justice.'").

[^ 83] These analytical steps amplify guidance concerning denial notices, and do not replace them.

[^ 84] See 8 CFR 103.3(a). In some cases, the officer may not be able to fully reveal negative discretionary factors if they are classified. Additionally, an exception may be made for denial letters issued to applicants

for admissions as a refugee under the U.S. Refugee Admissions Program, which contain only summary reasons for denials and are not required to contain detailed analysis of the basis for negative decisions.

[^ 85] See 8 CFR 103.3(a). In some cases, the officer may not be able to fully reveal negative discretionary factors if they are classified. Additionally, an exception may be made for denial letters issued to applicants for admissions as a refugee under the U.S. Refugee Admissions Program, which contain only summary reasons for denials and are not required to contain detailed analysis of the basis for negative decisions.

## Chapter 9 - Rendering a Decision

### A. Approvals

If the requestor properly filed the benefit request and the officer determines that the requestor meets all eligibility requirements, then the officer may approve the request. Upon approval, the officer updates all relevant electronic systems to reflect the approval.

### B. Denials[1]

If, after evaluating all evidence submitted (including in response to a Request for Evidence (RFE) or Notice of Intent to Deny (NOID), if applicable), the officer determines the requestor is ineligible for the benefit sought, the officer denies the benefit request.[2] Upon denial of a request, the officer updates all relevant electronic systems and issues a written decision informing the requestor of the reason(s) for denial.[3]

If the denial notice is returned as undeliverable, USCIS verifies the mailing address and places the notice, including the original mailing envelope, in the appropriate file as evidence of service of the decision.[4]

Written decisions should use plain language that the requestor can understand. When applicable, the decision includes guidance on the procedures for filing appeals and motions, including instructions for where to find the appropriate forms.[5]

#### 1. Denials Based on Lack of Legal Basis

Generally, if a benefit request does not have a legal basis for approval, and the officer determines there is no possibility additional evidence could establish a legal basis for approval, the officer should issue a denial without first issuing an RFE or NOID.

This includes any filing in which the benefit requestor has no legal basis for the benefit sought or submits a request for an inactive or terminated program. For example, this includes family-based petitions filed for family members based on claimed relationships under categories not provided by statute (such as a grandparent filing a petition for a grandchild).

#### 2. Abandonment Denials[6]

CAR-000036

[^ 30] The analysis of the marriage should be the same as the analysis conducted when determining whether to remove conditions to permanent residence under INA 216.

[^ 31] See INA 204(l)(1).

[^ 32] See INA 204(l)(1).

[^ 33] See Section B, Effect on Adjustment Application, Subsection 1, Admissibility and Waivers [7 USCIS-PM A.9(B)(1)].

## Chapter 10 - Legal Analysis and Use of Discretion

### A. Burden of Proof and Standard of Proof

In matters involving immigration benefits, the applicant always has the burden of proving that he or she is eligible to receive the immigration benefit sought.[1]

The standard of proof applied in adjustment of status proceedings should not be confused with the burden of proof.[2] The standard of proof relates to the persuasiveness of the evidence necessary to meet the eligibility requirements for a particular benefit. If the applicant is unable to prove his or her eligibility for the immigration benefit by a preponderance of the evidence, the officer may request additional evidence or deny the application.[3]

In the adjustment of status context, the standard of proof is generally a preponderance of the evidence, proving a claimed fact is more likely than not to be true.[4] However, in cases in which admissibility is required, if the officer determines that the applicant may be inadmissible, the applicant must demonstrate that he or she is clearly and beyond doubt entitled to be admitted and is not inadmissible.[5]

Certain adjustment of status provisions are non-discretionary. That is, if the applicant satisfies all statutory and regulatory eligibility requirements, USCIS must approve the application without considering whether the applicant warrants a favorable exercise of discretion. The following table is a non-exhaustive list of non-discretionary adjustment provisions.

| Non-Discretionary Adjustment of Status Provisions |
|---|
| Nicaraguan Adjustment and Central American Relief Act of 1997 (NACARA)[6] |
| Refugee adjustment[7] |
| Haitian Refugee Immigration Fairness Act of 1998 (HRIFA)[8] |
| Liberian Refugee Immigration Fairness (LRIF)[9] |

### B. Adjustment of Status Applications Involving Discretion

Most adjustment of status applicants may only be granted lawful permanent resident (LPR) status in the discretion of USCIS.[10] That is, even if the applicant meets all of the other statutory and regulatory requirements, USCIS only approves the application if the applicant demonstrates that he or she warrants a favorable exercise of discretion. The following table is a non-exhaustive list of discretionary adjustment case types.

| Adjustment of Status Provisions Involving Discretion |
| --- |
| Family-based, employment-based, and diversity visa adjustment |
| Special immigrant-based adjustment (EB-4) |
| Trafficking victim-based adjustment[11] |
| Crime victim-based adjustment[12] |
| Asylee adjustment[13] |
| Cuban Adjustment Act[14] |
| Former Soviet Union, Indochinese, or Iranian parolees (Lautenberg parolees) |
| Diplomats or high-ranking officials unable to return home (Section 13 of the Act of September 11, 1957)[15] |

### 1. Determining Whether Favorable Exercise of Discretion is Warranted

The favorable exercise of discretion and the approval of a discretionary adjustment of status application is a matter of administrative grace, which means that the application is worthy of favorable consideration.[16]

An alien who meets the other eligibility requirements contained in the law is not automatically entitled to adjustment of status. The alien still has the burden of proving that he or she warrants a favorable exercise of discretion.[17] To determine whether adjustment is warranted, an alien should supply information that is relevant and material.[18]

An officer must first determine whether the alien otherwise meets the statutory and regulatory eligibility requirements. For example, in adjudicating an application for adjustment of status under INA 245(a), the officer first determines if the alien is barred from applying for adjustment, is eligible to receive an immigrant visa, is admissible to the United States, and if a visa number (if required) is immediately available. Even where an immigration violation does not result in a bar to adjustment, an officer may still consider the violation as a negative factor in the exercise of discretion.

If the officer finds that the alien otherwise meets the eligibility requirements, the officer then determines whether the application should be approved as a matter of discretion. Given the significant privileges, rights, and responsibilities granted to LPRs, an officer must consider and weigh all relevant evidence in the record, taking into account the totality of the circumstances to determine whether the alien is suitable for permanent residence and approval of an alien's adjustment of status application is in the best interest of the United States.[19]

If the officer finds that the alien's positive factors outweigh the negative factors such that the alien's adjustment is warranted and in the interest of the United States, the officer generally may exercise favorable discretion and approve the application.[20] If the officer finds that the alien's negative factors outweigh the positive factors, such that a favorable exercise of discretion is not warranted in the alien's case, the officer must deny the application.[21]

With certain exceptions, USCIS considers relevant country-specific facts and circumstances, such as insufficient vetting and screening information that limit USCIS' ability to assess the risks aliens from certain countries pose to the United States, as a significant negative factor in its discretionary analysis.[22]

USCIS also considers circumstances where an alien has endorsed, promoted, supported, or otherwise espoused the views of an anti-American or terrorist organization or group, including those who support or promote antisemitic terrorism, antisemitic terrorist organizations, and antisemitic ideologies, to be an overwhelmingly negative factor in any applicable case involving USCIS discretionary analysis. Accordingly, USCIS enforces all relevant immigration laws to the maximum degree, including the use of discretion, to deny the benefit request involving such cases.[23]

[Redaction - Start]

Officers should review the guidance in Volume 1, General Policies and Procedures, Part E, Adjudications, Chapter 8, Discretionary Analysis [1 USCIS-PM E.8], which addresses, in particular, discretionary analysis involving:

- Relevant country-specific facts and circumstances such as those outlined in Presidential Proclamation 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats, 90 FR 24497 (June 4, 2025), which fully or partially restricted the entry or admission of aliens from Afghanistan, Burma, Burundi, Chad, Republic of Congo, Cuba, Equatorial Guinea, Eritrea, Haiti, Iran, Laos, Libya, Sierra Leone, Somalia, Sudan, Togo, Turkmenistan, Venezuela, and Yemen, under the President's INA 212(f) authority; and
- An alien who has endorsed, promoted, supported, or otherwise espoused the views of an anti-American or terrorist organization or group (including in social media content by, or involving an alien). This includes organizations who support or promote anti-American ideologies and activities, as defined at INA 313. This also includes organizations who support or promote antisemitic terrorism, antisemitic terrorist organizations, and antisemitic ideologies. While engaging in this conduct at any time is an overwhelmingly negative discretionary factor in the exercise of discretion, the officer assigns particular focus to aliens who engaged in on-campus antisemitic activities that occurred on or after October 7, 2023.

[Redaction - End]

**2. Issues and Factors to Consider in the Totality of the Circumstances**

The following table provides a non-exhaustive list of factors or factual circumstances that officers generally should consider in exercising discretion with respect to an application for adjustment of status to that of LPR.

Non-Exhaustive List of Issues and Factors to Consider Related to the Exercise of Discretion in Adjustment Applications

| Issue | Positive Factors | Negative Factors |
|---|---|---|
| Eligibility Requirements | • Meeting the eligibility requirements for adjustment of status.[24] | • Not meeting the eligibility requirements may still be considered as part of a discretionary analysis.[25] |
| Family and Community Ties | • Family ties to the United States and the closeness of the underlying relationships.[26]<br>• Hardship to the applicant or close relatives if the adjustment application is denied.[27]<br>• Length of lawful residence in the United States, status held and conduct during that residence, particularly if the applicant began his or her residency at a young age.[28] | • Absence of close family, community, and residence ties.[29] |
| Immigration Status and History | • Compliance with immigration laws and the conditions of any immigration status held.<br>• Approved humanitarian-based immigrant or nonimmigrant petition, waiver of inadmissibility, or other form of relief and the underlying humanitarian, hardship, or other factors that resulted in the approval.[30] | • Violations of immigration laws and the conditions of any immigration status held.[31]<br>• Current or previous instances of fraud or false testimony in dealings with USCIS or any government agency.[32]<br>• Unexecuted exclusion, deportation, or removal orders.[33] |
| Business, Employment, and Skills | • Property, investment, or business ties in the United States.[34] | • History of unemployment or underemployment.[36] |

CAR-000040

| Issue | Positive Factors | Negative Factors |
|---|---|---|
| | • Employment history, including type, length, and stability of the employment.[35]<br>• Education, specialized skills, and training obtained from an educational institution in the United States relevant to current or prospective employment and earning potential in the United States. | • Unauthorized employment in the United States.[37]<br>• Employment or income from illegal activity or sources, including, but not limited to, income gained illegally from drug sales, illegal gambling, prostitution, or alien smuggling.[38] |
| Community Standing and Moral Character | • Respect for law and order, and good moral character (in the United States and abroad) demonstrated by a lack of a criminal record and evidence of good standing in the community.<br>• Honorable service in the U.S. armed forces or other evidence of value and service to the community.[39]<br>• Compliance with tax laws.<br>• Current or past cooperation with law enforcement authorities.<br>• Demonstration of reformed or rehabilitated criminal conduct, where applicable.[40]<br>• Community service beyond any imposed by the courts. | • Moral depravity or criminal tendencies (in the United States and abroad) reflected by a single serious crime or an active or long criminal record, including the nature, seriousness, and recent occurrence of criminal violations.[41]<br>• Lack of reformation of character or rehabilitation.[42]<br>• Public safety or national security concerns.[43]<br>• Failure to meet tax obligations.<br>• Failure to pay child support.<br>• Failure to comply with any applicable civil court orders. |
| Other | • Absence of significant undesirable or negative factors and other indicators of good moral character in the United States and abroad.[44] | • Other indicators adversely reflecting the applicant's character and undesirability as an LPR of this country.[45] |

**3. Proper Use of Discretion Relative to Adjustment of Status**

CAR-000041

The exercise of discretion does not mean the decision can be arbitrary, inconsistent, or dependent on intangible or imagined circumstances. At the same time, the exercise of discretion does not involve a calculation or bright line test that is outcome determinative.[46]

The officer should review the entire record and give appropriate weight to the negative and positive factors relative to the privileges, rights, and responsibilities of LPR status. Once the officer has weighed each factor, the officer should consider all of the factors cumulatively to determine whether the positive factors outweigh the negative ones. If the officer determines that the positive factors outweigh the negative factors, the officer may find that the applicant warrants a favorable exercise of discretion. As negative factors grow more serious though, a favorable exercise of discretion may not be warranted without additional offsetting favorable factors, which in some cases may have to involve the existence of unusual or outstanding equities.[47]

Officers should discuss discretionary decisions that involve complex or unusual facts with their supervisors, as needed, particularly those involving criminality or national security issues, regardless of whether the outcome is favorable or unfavorable to the applicant.[48] As appropriate, supervisors may raise issues and consult USCIS counsel.

## C. Summary of Adjudication Involving Discretion

The following tables provide a general guideline for how eligibility requirements and discretion play a role in the decision on an adjustment application.[49]

Summary of Adjudication Involving Discretion

| Has Applicant Otherwise Met Eligibility Requirements? | Does Applicant Warrant a Favorable Exercise of Discretion? | Decision |
|---|---|---|
| Yes | Yes, the positive factors outweigh the negative factors. | **Approve** the application. Eligibility requirements are met, including that a favorable exercise of discretion is warranted. |
| Yes | No, the negative factors outweigh the positive factors. | **Deny** the application. Eligibility requirements are otherwise met but a favorable exercise of discretion is not warranted.<br><br>The officer should explain the reasons why USCIS is not exercising discretion in the applicant's favor. The officer should clearly set forth the positive and negative factors considered and why the negative factors outweigh the positive factors. |

| Has Applicant Otherwise Met Eligibility Requirements? | Does Applicant Warrant a Favorable Exercise of Discretion? | Decision |
|---|---|---|
| No | No, even if the positive factors outweigh the negative factors. | **Deny** the application. Eligibility requirements are not met.<br><br>The officer should explain the reasons why the applicant has not met the eligibility requirements. Even if the positive factors outweigh the negative factors, discretion cannot be used to approve an application if the applicant does not meet the other statutory or regulatory requirements. |
| No | No, the negative factors outweigh the positive factors. | **Deny** the application. Eligibility requirements are not met and a favorable exercise of discretion is not warranted.<br><br>It is generally preferable to describe both the statutory and discretionary reasons for the denial, but an officer is not required to discuss the discretionary grounds where the other statutory or regulatory that are the basis for the denial grounds are clear.<br><br>If the determination on other statutory or regulatory eligibility requirements might be overturned (for example, where there is an unsettled area of law), an officer should also explain the discretionary basis for denying the case. (Officers may consult with USCIS counsel for additional guidance in a specific case.)<br><br>The officer should explain the reasons why USCIS is not exercising discretion in favor of the applicant. The officer should clearly describe the positive and negative factors considered and why the negative factors outweigh the positive factors. |

**Footnotes**

---

[^ 1] See INA 291. See *Matter of Arthur (PDF)*, 16 I&N Dec. 558 (BIA 1978). See *Matter of Rivero-Diaz (PDF)*, 12 I&N Dec. 475 (BIA 1967).

[^ 2] The person who bears the burden of proof must submit evidence to satisfy the applicable standard of proof.

[^ 3] See 8 CFR 103.2(b)(8)(ii). See 8 CFR 103.2(b)(8)(iii).

[^ 4] See *Matter of Chawathe (PDF)*, 25 I&N Dec. 369, 375 (AAO 2010).

[^ 5] See *Matter of Bett (PDF)*, 26 I&N Dec. 437, 440 (BIA 2014).

[^ 6] See Title II of Pub. L. 105-100 (PDF), 111 Stat. 2160, 2193 (November 19, 1997).

[^ 7] See INA 209(a)(2).

[^ 8] See Division A, Section 902 of Pub. L. 105-277 (PDF), 112 Stat. 2681, 2681-538 (October 21, 1998).

[^ 9] See Section 7611 of the National Defense Authorization Act for Fiscal Year 2020, Pub. L. 116-92 (PDF), 113 Stat. 1198, 2309 (December 20, 2019).

[^ 10] The exercise of discretion in individual cases is described as a balancing of negative factors evidencing an alien's undesirability as a permanent resident with the social and humane considerations present on his or her behalf to determine whether relief appears in the best interest of this country. See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Moralez (PDF)*, 21 I&N Dec. 296, 300 (BIA 1996). For general guidance on discretion, see Volume 1, General Policies and Procedures, Part E, Adjudication, Chapter 8, Discretionary Analysis [1 USCIS-PM E.8]. See INA 245(a).

[^ 11] See INA 245(l). See 8 CFR 245.23(e)(3).

[^ 12] See INA 245(m). See 8 CFR 245.24(d)(10)-(11).

[^ 13] See INA 209(b).

[^ 14] See Pub. L. 89-732 (PDF) (November 2, 1966).

[^ 15] See Pub. L. 85-316 (PDF) (September 11, 1957).

[^ 16] See *Von Pervieux v. INS*, 572 F.2d 114, 118 (3rd Cir. 1978). See *Ameeriar v. INS*, 438 F.2d 1028, 1030 (3rd Cir. 1971). See *Matter of Marques (PDF)*, 16 I&N Dec. 314 (BIA 1977).

[^ 17] See *Matter of Arai (PDF)*, 13 I&N Dec. 494 (BIA 1970). See *Matter of Ortiz-Prieto (PDF)*, 11 I&N Dec. 317 (BIA 1965).

[^ 18] See *Matter of Marques (PDF)*, 16 I&N Dec. 314 (BIA 1977). See *Matter of Mariani (PDF)*, 11 I&N Dec. 210 (BIA 1965). See *Matter of De Lucia (PDF)*, 11 I&N Dec. 565 (BIA 1966). See *Matter of Francois (PDF)*, 10 I&N Dec. 168 (BIA 1963). See *Matter of Pires Da Silva (PDF)*, 10 I&N Dec. 191 (BIA 1963).

[^ 19] See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Moralez (PDF)*, 21 I&N Dec. 296, 300 (BIA 1996). For general guidance on discretion, see Volume 1, General Policies and Procedures, Part E, Adjudication, Chapter 8, Discretionary Analysis [1 USCIS-PM E.8].

[^ 20] See *Matter of Arai (PDF)*, 13 I&N Dec. 494 (BIA 1970). See *Matter of Lam (PDF)*, 16 I&N Dec. 432 (BIA 1978).

[^ 21] Before making a final decision, the officer may ask the alien directly why he or she warrants a favorable exercise of discretion. The officer documents the response, or lack thereof, in the record. See Volume 1, General Policies and Procedures, Part E, Adjudication, Chapter 8, Discretionary Analysis, Section D, Documenting Discretionary Determinations [1 USCIS-PM E.8(D)]. See Volume 7, Part A, Adjustment of Status Policies and Procedures, Chapter 11, Decision Procedures [7 USCIS-PM A.11].

[^ 22] For more information, see Volume 1, General Policies and Procedures, Part E, Adjudications, Chapter 8, Discretionary Analysis [1 USCIS-PM E.8].

[^ 23] See Volume 1, General Policies and Procedures, Part E, Adjudications, Chapter 8, Discretionary Analysis [1 USCIS-PM E.8]. For a list of factors that should be considered in the discretionary analysis, see Volume 1, General Policies and Procedures, Part E, Adjudications, Chapter 8, Discretionary Analysis, Section C, Adjudicating Discretionary Benefits, Subsection 2, Identifying Discretionary Factors [1 USCIS-PM E.8(C)(2)].

[^ 24] In the process of determining whether the applicant has otherwise met the eligibility requirements for adjustment of status, the officer might find that certain facts related to eligibility may be relevant to a discretionary decision. See *Matter of Mendez-Moralez (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996) (In the context of waivers of inadmissibility requiring a showing of extreme hardship: ". . . those found eligible for relief under section 212(h)(1)(B) will by definition have already established extreme hardship to qualified family members, which would be a factor favorable to the alien in exercising discretion.").

[^ 25] In cases where USCIS has determined that the applicant has not met the statutory or regulatory requirements for adjustment of status, officers may still add a discretionary analysis to a denial. See Volume 1, General Policies and Procedures, Part E, Adjudication, Chapter 8, Discretionary Analysis, Section C, Adjudicating Discretionary Benefits [1 USCIS-PM E.8(C)].

[^ 26] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970). See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Moralez (PDF)*, 21 I&N Dec. 296, 301-302 (BIA 1996) (". . . if the

alien has relatives in the United States, the quality of their relationship must be considered in determining the weight to be awarded this equity.")

[^ 27] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970). See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Moralez (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 28] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970). See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584-85 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Moralez (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996). Residence must be lawful to be considered a positive factor. See *Matter of Lee (PDF)*, 17 I&N Dec. 275, 278 (Comm. 1978).

[^ 29] Based on the totality of the circumstances, the absence of family, community, and residence ties, by itself, may not warrant an unfavorable exercise of discretion, but officers consider the lack of sufficient equities to offset other negative factors when making discretionary decisions that are in the best interest of the United States. See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 587 (BIA 1978).

[^ 30] See *Matter of Mendez-Moralez (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 31] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584 (BIA 1978). See *Matter of Lee (PDF)*, 17 I&N Dec. 275, 278 (Comm. 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Moralez (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996). However, the Board of Immigration Appeals (BIA) found that a record of immigration violations standing alone does not conclusively support a finding of lack of good moral character. Further, how recent the violation was can only be considered when there is a finding of a poor moral character based on moral turpitude in the conduct and attitude of a person which evinces a callous conscience. In such circumstances, there must be a measurable reformation of character over a period of time in order to properly assess an applicant's ability to assimilate into society. In all other instances, when the cause for deportation has been removed and the person now appears eligible for issuance of a visa, the time factor should not be considered. See *Matter of Lee (PDF)*, 17 I&N Dec. 275 (Comm. 1978).

[^ 32] Fraud or false testimony may be considered as a matter of discretion regardless of materiality.

[^ 33] In cases where a removal order does not impact eligibility or jurisdiction over adjustment of status, for example, where a removal order has been issued to an "arriving alien" but not executed, USCIS generally does not exercise favorable discretion. The USCIS officer may consult with the local U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) office concerning the merits and equities of the case and whether the removal order might be withdrawn. If ICE withdraws or rescinds the removal order or obtains a withdrawal or rescission of the removal order from the Executive Office for Immigration Review (EOIR), USCIS adjudicates the case as appropriate. If the removal order is not withdrawn or rescinded, the removal order should be considered a significant adverse factor and any denial of adjustment may include the grounds cited in the removal order.

[^ 34] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584-85 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Moralez* (PDF), 21 I&N Dec. 296, 301 (BIA 1996).

[^ 35] See *Matter of Mendez-Moralez (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 36] In *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978), the BIA considered that a history of stable employment is a positive factor used to determine whether discretion should be favorably exercised. Conversely, officers should consider a history of long unemployment or underemployment, absent any disabilities or age in relation to employability, as a factor to determine whether or not approving the adjustment of status application is in the best interest of the United States.

[^ 37] Even if an exemption applies to an applicant who would otherwise be barred from adjustment of status, the officer may consider unauthorized employment in the totality of the circumstances.

[^ 38] This includes employment that is illegal under federal law even when state laws have decriminalized such conduct, including employment in the marijuana industry. Illegal industries under federal law include, but are not limited to, possession, manufacture or production, or distribution or dispensing of marijuana. See 21 U.S.C. 841(a) ("unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."). See 21 U.S.C. 844 (simple possession). See 21 U.S.C. 802(15) (defining manufacture) and 8 U.S.C. 802(22) (defining production).

[^ 39] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Moralez (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 40] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Moralez (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996). However, reformation is not an absolute prerequisite to a favorable exercise of discretion. Rather, the discretionary analysis must be conducted on a case-by-case basis, with rehabilitation a factor to be considered in the exercise of discretion. See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 196 (BIA 1990) (considering rehabilitation a significant factor in view of the nature and extent of the respondent's criminal history, which spanned 10 years).

[^ 41] The officer should not go behind the record of conviction to reassess an alien's ultimate guilt or innocence, but rather inquire into the circumstances surrounding the commission of the crime in order to determine whether a favorable exercise of discretion is warranted. See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 197 (BIA 1990).

[^ 42] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 196 (BIA 1990). See *Matter of Mendez-Moralez (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 43] See Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens, PM-602-0187, issued February 28, 2025.

[^ 44] See *Matter of Mendez-Moralez (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 45] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Mendez-Moralez (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 46] For a full discussion on weighing discretionary factors, see Volume 1, General Policies and Procedures, Part E, Adjudication, Chapter 8, Discretionary Analysis, Section C, Adjudicating Discretionary Benefits, Subsection 3, Weighing Factors [1 USCIS-PM E.8(C)(3)].

[^ 47] See *Matter of Arai (PDF)*, 17 I&N Dec. 494, 496 (BIA 1970). See *Matter of Patel (PDF)*, 17 I&N Dec. 597, 601 (BIA 1980). For example, USCIS generally does not favorably exercise discretion in certain cases involving violent or dangerous crimes except in extraordinary circumstances. Another example relates to applicants seeking adjustment based on T or U nonimmigrant status: Depending on the nature of the adverse factors, applicants may be required to clearly demonstrate that denial of adjustment would result in exceptional and extremely unusual hardship. Even if the applicant makes such a showing, however, USCIS may still find favorable exercise of discretion is not warranted in certain cases. See 8 CFR 245.23(e)(3). See 8 CFR 245.24(d)(11).

[^ 48] For more information, see Volume 1, General Policies and Procedures, Part E, Adjudication, Chapter 8, Discretionary Analysis, Section C, Adjudicating Discretionary Benefits, Subsection 4, Supervisory Review [1 USCIS-PM E.8(C)(4)].

[^ 49] For a full discussion on writing discretionary decisions, see Volume 1, General Policies and Procedures, Part E, Adjudication, Chapter 8, Discretionary Analysis, Section D, Documenting Discretionary Determinations [1 USCIS-PM E.8(D)].

# Chapter 11 - Decision Procedures

## A. Approvals

If the adjustment application is properly filed, the applicant meets all eligibility requirements, a visa number is immediately available, and the applicant is admissible to the United States, then an officer may approve the application. [Redaction - Start] Immediately prior to approval, an officer should re-run the TECS checks to confirm that no criminal issues have arisen since the last check and that the applicant remains eligible for adjustment. [Redaction - End]

### 1. Effective Date of Permanent Residence

For the majority of adjustment cases, the effective date of permanent residence is the date the adjustment application is approved. Certain sections of law, however, allow for the date of admission to roll back to an earlier date.

[^ 7] See *Matter of J-F-D- (PDF)*, 10 I&N Dec. 694 (Reg. Comm. 1963). See *Matter of Martinez-Torres (PDF)*, 10 I&N Dec. 776 (Reg. Comm. 1964).

[^ 8] See 8 CFR 103.2(b).

## Chapter 5 - Discretion

If the applicant meets all other statutory and regulatory requirements of the waiver, the officer must determine whether to approve the waiver as a matter of discretion.[1] Meeting the other statutory and regulatory requirements alone does not entitle the applicant to relief.[2]

The discretionary determination is the final step in the adjudication of a waiver application. The applicant bears the burden of proving that he or she merits a favorable exercise of discretion.[3]

### A. Discretionary Factors

The officer must weigh the social and humanitarian considerations against the adverse factors present in the alien's case.[4] The approval of a waiver as a matter of discretion depends on whether the favorable factors in the alien's case outweigh the unfavorable ones.[5]

With certain exceptions, USCIS considers relevant country-specific facts and circumstances, such as insufficient vetting and screening information that limit USCIS' ability to assess the risks aliens from certain countries pose to the United States, as a significant negative factor in its discretionary analysis.[6]

USCIS also considers circumstances where an alien has endorsed, promoted, supported, or otherwise espoused the views of an anti-American or terrorist organization or group, including those who support or promote antisemitic terrorism, antisemitic terrorist organizations, and antisemitic ideologies, to be an overwhelmingly negative factor in any applicable case involving USCIS discretionary analysis. Accordingly, USCIS enforces all relevant immigration laws to the maximum degree, including the use of discretion, to deny the benefit request involving such cases.[7]

The following table provides some of the factors relevant to the waiver adjudication.

Non-Exhaustive List of Factors that May Be Relevant in the Discretionary Analysis

| Category | Favorable Factors | Unfavorable Factors |
|---|---|---|
| **Waiver Eligibility** | • Meeting certain other statutory requirements of the waiver, including a finding of extreme hardship to a qualifying family member, if applicable.[8] | Not applicable – Not meeting the statutory requirements of the waiver results in a waiver denial. A discretionary analysis is not necessary. |

| Category | Favorable Factors | Unfavorable Factors |
|---|---|---|
|  | • Eligibility for waiver of other inadmissibility grounds. |  |
| **Family and Community Ties** | • Family ties to the United States and the closeness of the underlying relationships.<br>• Hardship to the applicant or to non-qualifying lawful permanent residents (LPRs) or U.S. citizen relatives or employers.<br>• Length of lawful residence in the United States and status held during that residence, particularly where the applicant began residency at a young age.<br>• Significant health concerns that affect the qualifying relative.<br>• Difficulties the qualifying relative would be likely to face if the qualifying relative moves abroad with the applicant due to country conditions, inability to adapt, restrictions on residence, or other factors that may be claimed.<br>• Honorable service in the U.S. armed forces or other evidence of value and service to the community.<br>• Property or business ties in the United States. | • Absence of community ties. |
| **Criminal History, Moral Character**<br><br>**(or both)** | • Respect for law and order, and good moral character, which may be evidenced by affidavits from family, friends, and responsible community representatives.<br>• Reformation of character and rehabilitation. | • Moral depravity or criminal tendencies reflected by an ongoing or continuing criminal record, particularly the nature, scope, seriousness, and recent occurrence of criminal activity.<br>• Repeated or serious violations of immigration laws, which evidence a |

CAR-000050

| Category | Favorable Factors | Unfavorable Factors |
|---|---|---|
| | • Community service beyond any imposed by the courts.<br>• Considerable passage of time since deportation or removal. | disregard for U.S. law.<br>• Lack of reformation of character or rehabilitation.<br>• Previous instances of fraud or false testimony in dealings with USCIS or any government agency.<br>• Marriage to a U.S. citizen or LPR for the primary purpose of circumventing immigration laws.<br>• Nature and underlying circumstances of the inadmissibility ground at issue, and the seriousness of the violation.<br>• Public safety or national security concerns |
| Other | • Absence of significant undesirable or negative factors. | • Other indicators of an applicant's bad character and undesirability as a permanent resident of this country. |

[Redaction - Start]

Officers should review the guidance in Volume 1, General Policies and Procedures, Part E, Adjudications, Chapter 8, Discretionary Analysis [1 USCIS-PM E.8], which addresses, in particular, discretionary analysis in circumstances involving:

- Relevant country-specific facts and circumstances such as those outlined in Presidential Proclamation 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats, 90 FR 24497 (June 4, 2025), which fully or partially restricted the entry or admission of aliens from Afghanistan, Burma, Burundi, Chad, Republic of Congo, Cuba, Equatorial Guinea, Eritrea, Haiti, Iran, Laos, Libya, Sierra Leone, Somalia, Sudan, Togo, Turkmenistan, Venezuela, and Yemen, under the President's INA 212(f) authority; and
- An alien who has endorsed, promoted, supported, or otherwise espoused the views of an anti-American or terrorist organization or group (including in social media content by, or involving an alien). This includes organizations who support or promote anti-American ideologies and activities, as defined at INA 313. This also includes organizations who support or promote antisemitic terrorism, antisemitic terrorist organizations, and antisemitic ideologies. USCIS considers such factors to be an overwhelmingly negative factor for the USCIS discretionary analysis, including in requests for adjustment of status, change of status, and reinstatement of F-1 nonimmigrant status. While engaging in this conduct at any time is an overwhelmingly negative discretionary factor in the exercise of

discretion, the officer assigns particular focus to aliens who engaged in on-campus antisemitic activities that occurred on or after October 7, 2023.

[Redaction - End]

## B. Discretionary Determination

When making a discretionary determination, the officer should review the entire record and give the appropriate weight to each adverse and favorable factor. Once the officer has weighed each factor, the officer should consider all of the factors cumulatively to determine whether the favorable factors outweigh the unfavorable ones. If the officer determines that the positive factors outweigh the negative factors, then the applicant merits a favorable exercise of discretion.

*Example*

A lengthy and stable marriage is generally a favorable factor in the discretionary analysis. On the other hand, the weight given to any possible hardship to the spouse that may occur upon separation may be diminished if the parties married after the commencement of removal proceedings with knowledge of an impending removal.[9]

*Example*

In general, when reviewing an applicant's employment history, an officer may consider the type, length, and stability of the employment.[10]

*Example*

In general, when reviewing an applicant's history of physical presence in the United States, the officer may favorably consider residence of long duration in this country, as well as residence in the United States while the applicant was of young age.[11]

*Example*

When looking at the applicant's presence in the United States, the officer should evaluate the nature of the presence. For example, a period of residency during which the applicant was imprisoned may diminish the significance of that period of residency.[12]

## C. Cases Involving Violent or Dangerous Crimes

If an alien is inadmissible on criminal grounds involving a violent or dangerous crime, an officer may not exercise favorable discretion unless the applicant has established, in addition to the other statutory and regulatory requirements of the waiver that:

- The case involves extraordinary circumstances; or

CAR-000052

- The denial would result in exceptional and extremely unusual hardship.[13]

Extraordinary circumstances involve considerations such as national security or foreign policy interests. Exceptional and extremely unusual hardship is substantially beyond the ordinary hardship that would be expected as a result of denial of admission, but it does not need to be so severe as to be considered unconscionable.[14] Depending on the gravity of the underlying criminal offense, a showing of extraordinary circumstances may still be insufficient to warrant a favorable exercise of discretion.[15]

## Footnotes

[^ 1] If the applicant does not meet another statutory requirement of the waiver, USCIS denies the waiver and a discretionary analysis is not necessary. However, an officer may still include a discretionary analysis if the applicant's conduct is so egregious that a discretionary denial would be warranted even if the applicant had met the other statutory and regulatory requirements. Adding a discretionary analysis to a denial is also useful if an appellate body on review disagrees with the officer's conclusion that the applicant failed to meet the statutory requisites for the waiver. For more information on exercising discretion generally, see Volume 1, General Policies and Procedures, Part E, Adjudications, Chapter 8, Discretionary Analysis [1 USCIS-PM E.8].

[^ 2] See *Reyes-Cornejo v. Holder,* 734 F.3d 636 (7th Cir. 2013). See *Matter of Cervantes-Gonzalez (PDF),* 22 I&N Dec. 560 (BIA 1999). See *Matter of Mendez-Moralez (PDF),* 21 I&N Dec. 296 (BIA 1996).

[^ 3] See *Matter of De Lucia (PDF),* 11 I&N Dec. 565 (BIA 1966). See *Matter of T-S-Y-,* 7 I&N Dec. 582 (BIA 1957).

[^ 4] See *Matter of Mendez-Moralez (PDF),* 21 I&N Dec. 296 (BIA 1996). Discretionary factors may also include emergencies and other unforeseen circumstances. See Volume 1, General Policies and Procedures, Part H, Emergencies or Unforeseen Circumstances, Chapter 2, Emergencies or Unforeseen Circumstances-Related Flexibilities [1 USCIS-PM H.2].

[^ 5] See *Matter of Mendez-Moralez (PDF),* 21 I&N Dec. 296 (BIA 1996) (relating to a criminal waiver under INA 212(h)(1)(B)). See *Matter of Marin (PDF),* 16 I&N Dec. 581 (BIA 1978) (relating to an INA 212(c) waiver). See *Matter of Tijam,* 22 I&N Dec. 408 (BIA 1998) (relating to a fraud or misrepresentation finding (INA 212(a)(6)(C)(i)) and the discretionary waiver under former INA 241(a)(1)(H) [renumbered as INA 237(a)(1)(H) by IIRIRA]).

[^ 6] For more information, see Volume 1, General Policies and Procedures, Part E, Adjudications, Chapter 8, Discretionary Analysis [1 USCIS-PM E.8].

[^ 7] See Volume 1, General Policies and Procedures, Part E, Adjudications, Chapter 8, Discretionary Analysis [1 USCIS-PM E.8]. For a list of factors that should be considered in the discretionary analysis, see Volume 1, General Policies and Procedures, Part E, Adjudications, Chapter 8, Discretionary Analysis, Section C, Adjudicating Discretionary Benefits, Subsection 2, Identifying Discretionary Factors [1 USCIS-PM E.8(C)(2)].

CAR-000053

[^ 8] In particular, if a finding of extreme hardship is a statutory eligibility requirement, the finding of extreme hardship permits, but does not require, a favorable exercise of discretion. Once extreme hardship is found, extreme hardship becomes a factor that weighs in favor of granting relief as a matter of discretion.

[^ 9] See *Matter of Mendez-Moralez (PDF),* 21 I&N Dec. 296 (BIA 1996). See *Ghassan v. INS,* 972 F.2d 631 (5th Cir. 1992).

[^ 10] See *Matter of Mendez-Moralez (PDF),* 21 I&N Dec. 296 (BIA 1996).

[^ 11] See *Diaz-Resendez v. INS,* 960 F.2d 493 (5th Cir. 1992).

[^ 12] See *Douglas v. INS,* 28 F.3d 241 (2nd Cir. 1994).

[^ 13] See INA 212(h). See 8 CFR 212.7(d). See *Matter of Jean (PDF),* 23 I&N Dec. 373 (A.G. 2002) (relating to a waiver of inadmissibility granted in connection with INA 209(c), refugee or asylee adjustment of status).

[^ 14] See *Matter of Monreal,* 23 I&N Dec. 56 (BIA 2001).

[^ 15] See 8 CFR 212.7(d).

# Chapter 6 - Validity of an Approved Waiver

## A. Extent of Waiver Validity

In general, an approved waiver is only valid for the grounds of inadmissibility specified in the application. Furthermore, a waiver is only valid for those crimes, events, incidents, or conditions specified in the waiver application. If an alien is later found inadmissible for a separate crime, event, incident or condition not already included in the approved waiver application, the alien is required to file another waiver application.

## B. Length of Waiver Validity

A waiver's validity depends on the underlying immigration benefit connected to the approved waiver.

## 1. Certain Nonimmigrants[1]

An inadmissible applicant seeking to enter the United States as a nonimmigrant generally needs to obtain advance permission to enter the United States as a nonimmigrant.[2] Advance permission to enter as a nonimmigrant[3] despite inadmissibility is referred to as a nonimmigrant waiver. Customs and Border Protection (CBP) generally adjudicates this waiver, which is temporary if approved.[4] This temporary permission does not ordinarily carry over to other benefit categories, such as other nonimmigrant categories, immigrant categories, visas, or adjustment of status.

## 2. Temporary Protected Status Holders[5]

[^ 89] See 8 CFR 274a.12(c)(22).

[^ 90] See Title XI of Pub. L. 106-553 (PDF) (December 21, 2000). See 8 CFR 274a.12(c)(24).

[^ 91] See 8 CFR 274a.12(c)(25).

[^ 92] See 8 CFR 274a.12(c)(26).

[^ 93] See INA 204(a)(1)(K). See INA 204(a)(1)(D)(i)(II). See INA 204(a)(1)(D)(i)(IV). See Title IV of the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322 (PDF), 108 Stat. 1796, 1902 (September 13, 1994) as amended by Title V of the Victims of Trafficking and Violence Protection Act of 2000, Pub. L. 106-386 (PDF), 114 Stat. 1464, 1518 (October 28, 2000) and Title VIII of the Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. 109-162 (PDF), 119 Stat. 2960, 3053 (January 5, 2006) (providing self-petitioners eligibility for employment authorization).

[^ 94] See 8 CFR 274a.12(c)(34). See 8 CFR 212.19(h)(3).

[^ 95] See 8 CFR 274a.12(c)(35).

[^ 96] See 8 CFR 274a.12(c)(36).

# Chapter 3 - Documentation and Evidence [Reserved]

# Chapter 4 - Adjudication

## A. General

Once USCIS accepts the Application for Employment Authorization (Form I-765), USCIS reviews the application for completeness and submission of the required initial evidence.[1] In reviewing the Form I-765, USCIS ensures that the fee was paid, a fee waiver was granted, or a fee exemption applies. USCIS also reviews the application to determine the applicant's identity, current immigration status, and employment authorization eligibility category.

If an alien fails to specify the employment authorization eligibility category on the application, USCIS reviews the file to determine the proper category. If USCIS is unable to determine the category, USCIS may issue a Request for Evidence (RFE) to provide the applicant the opportunity to specify the proper category.

If the alien is eligible for employment authorization, which may include, if applicable, meriting a favorable exercise of discretion USCIS approves the application and issues an Employment Authorization Document (EAD) on Form I-766.

With certain exceptions, USCIS considers relevant country-specific facts and circumstances, such as insufficient vetting and screening information that limit USCIS' ability to assess the risks aliens from certain countries pose to the United States, as a significant negative factor in its discretionary analysis.[2]

[Redaction - Start]

Officers should consult with their supervisory chains of command before issuing a discretionary denial where country-specific factors would warrant a denial but the case falls under an excepted category.

[Redaction - End]

In applicable cases, USCIS also considers circumstances where an alien has endorsed, promoted, supported, or otherwise espoused the views of an anti-American or terrorist organization or group, including those who support or promote antisemitic terrorism, antisemitic terrorist organizations, and antisemitic ideologies, to be an overwhelmingly negative factor in any applicable case involving USCIS discretionary analysis. Accordingly, USCIS enforces all relevant immigration laws to the maximum degree, including the use of discretion, to deny the benefit request involving such cases.[3]

[Redaction - Start]

While engaging in conduct endorsing, promoting, supporting, or otherwise espousing the views of an anti-American or terrorist organization or group is at any time an overwhelmingly negative discretionary factor in the exercise of discretion, the officer should assign particular focus to aliens who engaged in on-campus antisemitic activities that occurred on or after October 7, 2023.

This includes, in particular, aliens who file the following benefit requests:

Application for Employment Authorization (Form I-765) for the following categories:

- (c)(3)(A), F-1 student, pre-completion Optional Practical Training
- (c)(3)(B), F-1 student, post-completion Optional Practical Training
- (c)(3)(C), F-1 student, 24-month extension for STEM students
- (c)(6), M-1 student, Practical Training
- (c)(26), Spouse of an H-1B nonimmigrant

[Redaction - End]

## B. Determining Identity and Eligibility

There are two elements common to all eligibility categories that USCIS must consider when adjudicating Form I-765: identity and eligibility verification. Additionally, applications filed under 8 CFR 274a.12(c), with limited exceptions, are considered in the exercise of discretion.[4]

### 1. Identity Verification

To grant employment authorization, and issue an EAD, or both, USCIS must verify the applicant's identity. USCIS may therefore require an applicant to appear at a USCIS Application Support Center to provide biometrics.[5]

CAR-000056

## 2. Eligibility Verification

USCIS must verify that the applicant meets the requirements of one of the categories eligible for employment authorization, an EAD, or both and has submitted evidence establishing eligibility.[6] The specific type of evidence varies by eligibility category. In general, supporting evidence to establish eligibility includes, but is not limited to:

- Visa(s) issued to applicant;
- Arrival-Departure Record (Form I-94);[7]
- Documents to establish a qualifying relationship; and
- Documents that establish a qualifying pending or approved application, such as a Notice of Action (Form I-797).

Generally, USCIS issues written notices in the form of an RFE or Notice of Intent to Deny (NOID) to request missing initial[8] or additional evidence.[9]

## C. Decision

### 1. Approval

Once USCIS determines the applicant has established identity and eligibility for employment authorization including, if applicable, warranting a favorable exercise of discretion, USCIS approves Form I-765 and orders production of the EAD.[10]

The approval of Form I-765 does not grant the applicant an immigration status; it simply provides authorization to work and accompanying evidence of such authorization, or evidence of authorization to work where an alien is already authorized to work by virtue of the applicant's immigration status or circumstance.

*Validity Period*

Employment authorization and EAD validity periods are generally determined based on the eligibility category that is granted. USCIS determines validity periods as established by regulations, policy, or Federal Register Notices. When requests for employment authorization, an EAD, or both are based upon an underlying period of admission or status, the validity period generally coincides with that authorized period of admission or status. When USCIS calculates the validity dates based on a set number of years, USCIS issues the EAD with the length of time allowed, minus 1 day.

The below charts illustrate the maximum validity period that may be granted for requests for initial employment authorization, EAD, or both and requests to renew employment authorization, EAD, or both. For employment authorization incident to status, the validity period is assigned to the document issued evidencing an alien's authorization to work in the United States and does not limit the period of employment authorization while the alien maintains status.[11]

Employment Authorization Incident to Status

| Category 8 CFR 274a.12 | Purpose | Maximum Initial Validity Period | Maximum Renewal Validity Period |
|---|---|---|---|
| (a)(2) | Lawful temporary resident | 43 months[12] | 2 years |
| (a)(3) | Admitted as a refugee[13] | 5 years | 5 years |
| (a)(4) | Paroled as a refugee[14] | Duration of parole, not to exceed 5 years | Duration of parole, not to exceed 5 years |
| (a)(5) | Granted asylum[15] | 5 years | 5 years |
| (a)(6) | K-1 fiance(e) or K-2 child | Period of authorized stay[16] | Remainder of 90-day period of admission |
| (a)(7) | Parent and child of N-8 or N-9 nonimmigrant[17] | 1 year | 1 year |
| (a)(8) | Citizen of Micronesia, the Marshall Islands or Palau | 5 years | 5 years |
| (a)(9) | K-3 spouse or K-4 dependent | 2 years[18] | 2 years[19] |
| (a)(10) | Granted withholding of deportation or removal | 5 years | 5 years |
| (a)(11) | Deferred extended voluntary departure or deferred enforced departure | Variable[20] | Variable[21] |
| (a)(12) | Temporary protected status (TPS) [22] | Variable, length of TPS designation, or any TPS renewals and TPS extensions | Variable, length of TPS designation, or any TPS renewals and TPS extensions |
| (a)(13) | Granted voluntary departure under Family Unity Program of IMMACT 90[23] | 2 years[24] | 2 years[25] |
| (a)(14) | Legal Immigration Family Equity (LIFE) Act Family Unity grantee[26] | Variable, not to exceed 2 years[27] | Variable, not to exceed 2 years[28] |
| (a)(15) | V-1, V-2, or V-3 nonimmigrant | Duration of V-1, V-2, and V-3 status, not to exceed 2 years | Duration of V-1, V-2, and V-3 status, not to exceed 2 years[29] |

CAR-000058

| Category 8 CFR 274a.12 | Purpose | Maximum Initial Validity Period | Maximum Renewal Validity Period |
|---|---|---|---|
| (a)(16) | Victims of human trafficking (T-1 nonimmigrant) | Duration of T-1 nonimmigrant status[30] | Duration of T-1 nonimmigrant status[31] |
| (a)(17) | Spouse of E1, E-2, and E-3 | Duration of E-1, E-2, and E-3 status | Duration of E-1, E-2, and E-3 status |
| (a)(18) | Spouse of L-1 nonimmigrant | Variable, up to end date of L-2 status, not to exceed principal's L-1 status | Variable, up to end date of L-2 status, not to exceed principal's L-1 status |
| (a)(19) | Victims of qualifying criminal activity (U-1 nonimmigrant) | Duration of U-1 nonimmigrant status[32] | Duration of U-1 nonimmigrant status[33] |
| (a)(20) | Family members of victims of qualifying criminal activity (U-2, U-3, U-4, or U-5 nonimmigrant) [34] | Duration of U-2, U-3, U-4, or U-5 nonimmigrant status | Duration of U-2, U-3, U-4, or U-5 nonimmigrant status[35] |

Aliens Who Must Apply for Employment Authorization

| Category 8 CFR 274a.12 | Purpose | Maximum Initial Validity Period | Maximum Renewal Validity Period |
|---|---|---|---|
| (c)(1) | Dependent of a diplomat or foreign government official (A-1 or A-2)[36] | 3 years or tour of duty end date on Form I-566, whichever is less | 3 years or tour of duty end date on Form I-566, whichever is less |
| (c)(2) | Dependent of Taipei Economic and Cultural Representative Office (TECRO) (E-1)[37] | 3 years or end of principal E-1 status, whichever is less | 3 years or end of principal E-1 status, whichever is less |
| (c)(3)(A) | Student pre-completion Optional Practical Training (OPT) | Variable, 12 months, date recommended by Designated School Official (DSO), or date | Renewal not authorized |

Historical Version

| Category 8 CFR 274a.12 | Purpose | Maximum Initial Validity Period | Maximum Renewal Validity Period |
|---|---|---|---|
| | | course of study ends, whichever is earlier | |
| (c)(3)(B) | Student post-completion OPT | Variable, up to 12 months | Renewal not authorized |
| (c)(3)(C) | Student STEM OPT | 24 months[38] | Renewal not authorized |
| (c)(3)(ii) | Off-campus employment – qualifying international organization | Variable, up to 12 months[39] | Variable, up to 12 months |
| (c)(3)(iii) | Off-campus employment – student severe economic hardship under 8 CFR 214.2(f)(9)(ii)(C) | Variable, up to 1 year[40] | Variable, up to 1 year[41] |
| (c)(3)(iii) | Off-campus employment – student severe economic hardship under 8 CFR 214.2(f)(9)(ii)(A) (special student relief) | Variable[42] | Variable[43] |
| (c)(4) | Spouse or unmarried child, son or daughter of an employee of an international organization (G-1, G-3, or G-4)[44] | 3 years or tour of duty end date on Form I-566, whichever is less | 3 years or tour of duty end date on Form I-566, whichever is less |
| (c)(5) | Dependent spouse or minor child of a J-1 exchange visitor | 2 years or end of principal J-1 status, whichever is less | 2 years or end of principal J-1 status, whichever is less |
| (c)(6) | Nonacademic or vocational student (M-1) post-completion OPT | 6 months, not to exceed recommendation on Certificate of Eligibility for Nonimmigrant Student Status (Form I-20) or 1 month for each 4 months of completed full-time studies, whichever is earlier[45] | Renewal not authorized |

Historical Version

| Category<br><br>8 CFR<br>274a.12 | Purpose | Maximum Initial Validity Period | Maximum Renewal Validity Period |
|---|---|---|---|
| (c)(7) | Dependent of NATO-1 through NATO-7 employee | 3 years, not to exceed tour of duty listed on Form I-566 | 3 years, not to exceed tour of duty listed on Form I-566 |
| (c)(8) | Pending application for asylum or withholding of deportation or removal | 5 years | 5 years |
| (c)(9) | Pending application for adjustment of status under INA 245[46] | 5 years | 5 years |
| (c)(10) | Pending application for suspension of deportation, cancellation of removal, or relief under the Nicaraguan Adjustment and Central American Relief Act (NACARA) [47] | 5 years | 5 years |
| (c)(11) | Parole[48] | Variable, to end date of the parole period | Variable, to end date of the parole period |
| (c)(12) | Spouse of E-2 CNMI investor[49] | End of principal E-2 CNMI Investor status not to exceed 2 years | End of principal E-2 CNMI Investor status not to exceed 2 years |
| (c)(14) | Deferred action (non-Deferred Action for Childhood Arrivals (DACA)) | Variable, end date of deferred action period[50] | Variable, end date of deferred action period[51] |
| (c)(16) | Applicant for creation of record of lawful admission | 1 year | 1 year |
| (c)(17) (i) | Domestic employee of nonimmigrant employer[52] | 1 year or validity of B-1, whichever is less | 1 year or validity of B-1, whichever is less |
| (c)(17) (ii) | Domestic employee of U.S. citizen abroad[53] | 1 year or validity of B-1, whichever is less | 1 year or validity of B-1, whichever is |

| Category<br>8 CFR 274a.12 | Purpose | Maximum Initial Validity Period | Maximum Renewal Validity Period |
|---|---|---|---|
| | | | less |
| (c)(17)(iii) | B-1 foreign airline employee[54] | 1 year or validity of B-1, whichever is less | 1 year or validity of B-1, whichever is less |
| (c)(18) | Final order of removal with order of supervision[55] | 1 year | 1 year |
| (c)(19) | Application for TPS pending[56] | Variable, length of TPS designation, or any TPS renewals and TPS extensions | Variable, length of TPS designation, or any TPS renewals and TPS extensions |
| (c)(20) | Pending application under INA 210 | 1 year | 1 year |
| (c)(21) | S nonimmigrant law enforcement witness or informant[57] | Variable, up to 3 years[58] | Variable, up to 3 years |
| (c)(22) | Pending application under INA 245A | 1 year | 1 year |
| (c)(24) | Pending application for LIFE Act Legalization[59] | 1 year | 1 year |
| (c)(25) | Family members of victims of human trafficking (T-2, T-3, T-4, T-5, or T-6 nonimmigrant) | Duration of T-2, T-3, T-4, T-5, or T-6 nonimmigrant status | Duration of T-2, T-3, T-4, T-5, or T-6 nonimmigrant status |
| (c)(26) | H-4 nonimmigrant spouse of a H-1B nonimmigrant | Variable, up to end date of H-4 status, not to exceed principal's H-1B status | Variable, up to end date of H-4 status, not to exceed principal's H-1B status |
| (c)(27) | Abused spouse of A nonimmigrant[60] | 2 years | 2 years |

CAR-000062

| Category 8 CFR 274a.12 | Purpose | Maximum Initial Validity Period | Maximum Renewal Validity Period |
|---|---|---|---|
| (c)(28) | Abused spouse of E nonimmigrant[61] | 2 years | 2 years |
| (c)(29) | Abused spouse of G nonimmigrant[62] | 2 years | 2 years |
| (c)(30) | Abused spouse of H nonimmigrant[63] | 2 years | 2 years |
| (c)(31) | Violence Against Women Act (VAWA) self-petitioner | 2 years | 2 years |
| (c)(33) | Granted DACA[64] | Variable, 2 years or end date of deferred action period, whichever is earlier | Variable, 2 years or end date of deferred action period, whichever is earlier |
| (c)(34) | Spouse of entrepreneur parolee under 8 CFR 212.19(h)(3) | Variable, up to end date of parole | Variable, up to end date of parole |
| (c)(35) | Form I-140 beneficiary with compelling circumstances | 1 year | 1 year |
| (c)(36) | Dependents of (c)(35) | 1 year | 1 year |
| (c)(37) | CNMI long-term residents | 5 years | 5 years |

USCIS considers various factors when establishing validity periods for EADs, including the validity period of the underlying immigration status or circumstance, anticipated adjudication timeframes for pending immigration benefits, and the periodic need to reevaluate eligibility for employment authorization, EAD, or both, and to ensure that such aliens continue to pose no known security risk to the United States.

The validity date of the initial EAD begins on the date of approval. Generally, the same applies to Form I-765 renewal requests.

*Validity Period for Replacements*

USCIS approves a replacement EAD for the same validity dates and category as the original EAD.

*Validity Period for Age Outs*

CAR-000063

For certain categories[65] where the applicant is a dependent child and will reach the age of 21 during the established validity period, USCIS provides an EAD expiration date that is the day before the applicant's 21st birthday.

## 2. Denial

If USCIS cannot verify the applicant's identity, the applicant fails to establish eligibility (including, if applicable, failing to warrant a favorable exercise of discretion) or abandons the application, USCIS denies the application. When USCIS denies Form I-765, USCIS notifies the applicant in writing of the decision and the reasons for denial.[66] There is no appeal from a denial of a Form I-765. However, an applicant may submit a motion to reopen or reconsider.[67] Furthermore, denial of Form I-765 does not preclude the applicant from filing again if eligibility for employment authorization can be established.

[Redaction - Start]

*Security Checks*

An officer must ensure that all security checks are completed, valid, and resolved, in accordance with the USCIS National Background Identity and Security Checks Operating Procedures (NaBISCOP) Handbook prior to completing adjudication.

[Redaction - End]

## D. Early Filing

If an applicant files for a renewal EAD more than 180 days before the current EAD expires and USCIS approves such request, USCIS generally does not backdate or postdate the renewal EAD in relation to the current EAD's validity period.

## E. Automatic Termination and Revocation on Notice

Employment authorization automatically terminates if the applicant is no longer eligible due to certain circumstances outlined in the regulations.[68] No further action or notice by USCIS is necessary in the case of automatic termination.[69]

A notice of intent to revoke (NOIR)[70] is necessary upon a determination that:

- The statement of material facts contained in the application was not true and correct;
- The applicant violated the terms and conditions of the approved application;
- The basis for the EAD is no longer valid;[71] or
- USCIS approved the application in error.

A response with countervailing evidence may be submitted within 15 days from the date of service of the NOIR.

## F. Withdrawing Application

An applicant may withdraw Form I-765 at any time before USCIS makes a final decision on the application. [72] Any request to withdraw must be made in writing to the USCIS office listed on the receipt notice for Form I-765. The applicant or an authorized representative with a properly filed Notice of Entry of Appearance as Attorney or Accredited Representative (Form G-28) must sign the withdrawal request.

## G. Motion to Reopen or Reconsider

An applicant may submit a motion to reopen or a motion to reconsider by filing a Notice of Appeal or Motion (Form I-290B) within 30 days of the denial (33 days if denial notice was mailed to the applicant). Motions to reopen or reconsider are typically adjudicated by the same office that adjudicated Form I-765. USCIS issues a written decision on a motion to reopen or reconsider.

An officer denies a motion if the applicant does not meet the motion requirements or has not submitted evidence to overcome the denial grounds. The written denial explains why the motion did not overcome the denial grounds.

An officer approves a motion and reopens the Form I-765 if the applicant meets the motion requirements and has submitted evidence to overcome all reasons for the original denial.[73]

If USCIS reopens the case, an officer may approve the Form I-765 or issue a new denial. In all cases where USCIS denies the application for reasons not contained in the original decision, USCIS first issues a NOID to provide the applicant with an opportunity to review and rebut the additional denial grounds.[74]

When USCIS reopens the case but ultimately denies the Form I-765, the 30-day period during which the applicant may file a new motion restarts.

## H. Effect of Motion or Appeal on Underlying Application or Petition

The applicant is eligible to apply for employment authorization in cases where the applicant's eligibility for employment authorization is based on an underlying application so long as that application remains pending. Generally, in cases where USCIS denies the underlying application, the applicant remains eligible for employment authorization if the applicant timely appeals or submits a motion to reopen the decision, and the appeal or motion remains pending. If USCIS grants a motion to reopen or an appeal on the underlying application, the applicant is eligible for employment authorization if all other requirements are met.

If an applicant appeals an unfavorable decision from an application for relief from removal from the immigration judge (IJ) to the Board of Immigration Appeals (BIA), the application for relief from removal is considered pending. If the BIA sustains the IJ's decision, however, the denial becomes administratively final, and the application may no longer serve as a basis for employment authorization.

# I. Automatic Extensions of Employment Authorization Documents

Aliens in certain employment eligibility categories who file Form I-765, to renew their EADs, may receive automatic extensions of their expiring EAD.[75]

## Footnotes

[^ 1] For a list of required initial evidence, see Instructions for Form I-765 and the Checklist of Required Initial Evidence for Form I-765 webpage.

[^ 2] For more information, see Volume 1, General Policies and Procedures, Part E, Adjudications, Chapter 8, Discretionary Analysis [1 USCIS-PM E.8].

[^ 3] See Volume 1, General Policies and Procedures, Part E, Adjudications, Chapter 8, Discretionary Analysis [1 USCIS-PM E.8]. For a list of factors that should be considered in the discretionary analysis, See Volume 1, General Policies and Procedures, Part E, Adjudications, Chapter 8, Discretionary Analysis, Section C, Adjudicating Discretionary Benefits, Subsection 2, Identifying Discretionary Factors [1 USCIS-PM E.8(C)(2)].

[^ 4] See 8 CFR 274a.13(a)(1). See Volume 1, General Policies and Procedures, Part E, Adjudications, Chapter 8, Discretionary Analysis [1 USCIS-PM E.8]. For a list of factors that should be considered in the discretionary analysis, See Volume 1, General Policies and Procedures, Part E, Adjudications, Chapter 8, Discretionary Analysis, Section C, Adjudicating Discretionary Benefits, Subsection 2, Identifying Discretionary Factors [1 USCIS-PM E.8(C)(2)].

[^ 5] See 8 CFR 103.2(b)(9). For further guidance on biometrics, see Volume 1, General Policies and Procedures, Part C, Biometrics Collection and Security Checks [1 USCIS-PM C].

[^ 6] See 8 CFR 103.2(b)(1).

[^ 7] CBP implemented an electronic, automated I-94 process whereby CBP issues an electronic Form I-94. See Arrival/Departure Forms: I-94 and I-94W webpage for more information.

[^ 8] See 8 CFR 103.2(b)(1).

[^ 9] For further guidance on evidence, see Volume 1, General Policies and Procedures, Part E, Adjudications, Chapter 6, Evidence [1 USCIS-PM E.6].

[^ 10] With limited exceptions, applications under 8 CFR 274a.12(c) are granted in the discretion of USCIS. See 8 CFR 274a.13(a)(1). In such cases, USCIS also determines whether the application should be granted in the exercise of discretion.

[^ 11] See 8 CFR 274a.12(a).

[^ 12] Initial EAD validity period starts the day of adjudication of Application for Status as a Temporary Resident Under Section 245A of the Immigration and Nationality Act (Form I-687).

[^ 13] See INA 207.

[^ 14] See INA 207.

[^ 15] See INA 208.

[^ 16] See INA 101(a)(15)(K)(i).

[^ 17] See INA 101(a)(27)(I).

[^ 18] Validity period for EADs within this category is to expiration date of Arrival-Departure Record (Form I-94) or to the end of Application to Extend/Change Nonimmigrant Status (Form I-539) validity period not to exceed 2 years.

[^ 19] Extension of stay is granted in 2-year intervals awaiting approval of Petition for Alien Relative (Form I-130).

[^ 20] Based on Presidential declaration.

[^ 21] Based on Presidential declaration.

[^ 22] See INA 244A(b).

[^ 23] Initial EAD is automatically issued upon approval of Application for Family Unity Benefits (Form I-817). Applicants filing under this category should only file Form I-765 if seeking a replacement EAD that was lost, stolen, mutilated, or destroyed, or that contain an error. For more information on how to request a replacement, see Volume 11, Travel and Identity Documents, Part A, Secure Identity Documents Policies and Procedures, Chapter 3, Reissuance of Secure Identity Documents [11 USCIS-PM A.3].

[^ 24] All Form I-817 validity period.

[^ 25] All Form I-817 validity period.

[^ 26] Initial and renewal EADs are automatically issued upon approval of Application for Family Unity Benefits (Form I-817). Applicants filing under this category should only file Form I-765 if seeking a replacement EAD that was lost, stolen, mutilated, or destroyed, or that contain an error. For more information on how to request a replacement, see Volume 11, Travel and Identity Documents, Part A, Secure Identity Documents Policies and Procedures, Chapter 3, Reissuance of Secure Identity Documents [11 USCIS-PM A.3].

[^ 27] See Section 1504 of the LIFE Act Amendments of 2000, Pub. L. 106-554 (PDF), 114 Stat. 2763, 2763A-325 (December 21, 2000). See 8 CFR 245a.34(c).

[^ 28] See Section 1504 of the LIFE Act Amendments of 2000, Pub. L. 106-554 (PDF), 114 Stat. 2763, 2763A-325 (December 21, 2000). See 8 CFR 245a.34(c).

[^ 29] If visa is extended.

[^ 30] Initial EAD is automatically issued upon approval of the Application for T Nonimmigrant Status (Form I-914). Applicants filing under this category should only file Form I-765 if seeking a replacement EAD that was lost, stolen, mutilated, or destroyed, or that contain an error. For more information on how to request a replacement, see Volume 11, Travel and Identity Documents, Part A, Secure Identity Documents Policies and Procedures, Chapter 3, Reissuance of Secure Identity Documents [11 USCIS-PM A.3].

[^ 31] Renewal EAD issuance is based on an approved Application to Extend/Change Nonimmigrant Status (Form I-539) extending T-1 nonimmigrant status.

[^ 32] If the alien is in the United States, the initial EAD is automatically issued upon approval of the Petition for U Nonimmigrant Status (Form I-918). Applicants filing under this category should only file Form I-765 if Form I-918 was approved while the applicant was residing outside of the United States, has been lawfully admitted to the United States as a U-1 nonimmigrant, and now seeks to obtain an EAD as evidence of employment authorization. U-1 nonimmigrants may also file Form I-765 if seeking a replacement EAD that was lost, stolen, mutilated, or destroyed, or that contain an error. For more information on how to request a replacement, see Volume 11, Travel and Identity Documents, Part A, Secure Identity Documents Policies and Procedures, Chapter 3, Reissuance of Secure Identity Documents [11 USCIS-PM A.3].

[^ 33] Renewal EAD issuance is based on an approved Application to Extend/Change Nonimmigrant Status (Form I-539) extending U nonimmigrant status.

[^ 34] Derivative U nonimmigrants are employment authorized incident to status, however an EAD is not automatically issued. If a derivative U nonimmigrant seeks to obtain an EAD as evidence of employment authorization, the derivative may file Form I-765.

[^ 35] Renewal EAD issuance is based on an approved Application to Extend/Change Nonimmigrant Status (Form I-539) extending U nonimmigrant status.

[^ 36] See 8 CFR 214.2(a)(2).

[^ 37] See 8 CFR 214.2(e).

[^ 38] No more than two lifetime OPT extensions may be authorized.

[^ 39] Validity period may not exceed program end date.

[^ 40] See 8 CFR 214.2(f)(9)(ii)(D). Employment authorization is not to exceed the recommendation from the designated school official (DSO) or the student's program end date. However, USCIS may grant special

student relief (SSR) applicants employment authorization for periods longer than 1 year, dependent on the validity period of the Federal Register notice.

[^ 41] See 8 CFR 214.2(f)(9)(ii)(D). Renewal of the employment authorization is not to exceed the recommendation from the DSO or the F-1 student's program end date.

[^ 42] By notice in the Federal Register, USCIS may grant SSR applicants employment authorization for the duration of the Federal Register notice, although this period of authorization is not to exceed the F-1 student's academic program end date. For more information on SSR, see Volume 2, Nonimmigrants, Part F, Students (F, M), Chapter 6, Employment, Section C, Severe Economic Hardship Due to Emergent Circumstances [2 USCIS-PM F.6(C)].

[^ 43] By notice in the Federal Register, USCIS may grant SSR applicants employment authorization for the duration of the Federal Register notice, not to exceed the F-1 student's academic program end date. For more information on SSR, see Volume 2, Nonimmigrants, Part F, Students (F, M), Chapter 6, Employment, Section C, Severe Economic Hardship Due to Emergent Circumstances [2 USCIS-PM F.6(C)].

[^ 44] See 8 CFR 214.2(g), and who presents an endorsement from an authorized representative from DOS.

[^ 45] The alien may be employed only in an occupation or vocation directly related to the alien's course of study as recommended by the endorsement of the designated school official on Form I-20.

[^ 46] Certain other types of adjustment applicants may also apply for employment authorization under the (c)(9) category, such as applicants seeking to adjust under the Cuban Adjustment Act, Pub. L. 89-732 (PDF) (November 2, 1966), as amended, and applicants seeking to adjust status under other public laws. For more information, see the Form I-765 instructions and USCIS.gov.

[^ 47] Includes two types of applicants who may be eligible for employment authorization: an applicant who filed an Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105-100 (NACARA) (Form I-881) and the application remains pending with the asylum office or with Executive Office for Immigration Review (EOIR), and an applicant who filed an Application for Suspension of Deportation (Form EOIR-40), or Application for Cancellation of Removal and Adjustment of Status for Certain Nonpermanent Residents (Form EOIR-42B) directly with EOIR.

[^ 48] See INA 212(d)(5)(A). See 8 CFR 212.5. However, DHS has decided as a matter of policy to provide the benefit of employment authorization incident to parole akin to what is normally accorded to refugees (as well as a no-fee initial and replacement of an initial Employment Authorization Document) to certain Afghan parolees and certain Ukrainian parolees so that they receive similar treatment as refugees, which aligns with the spirit of legislation that states that certain Afghan parolees and certain Ukrainian parolees "shall be eligible for . . . other benefits available to refugees . . . ." See Section 2502(b) of the Extending Government Funding and Delivering Emergency Assistance Act, Pub. L. 117-43 (PDF), 135 Stat. 344, 377 (September 30, 2021), amended by Section 1501 of Division M of the Consolidated Appropriations Act of 2023, Pub. L. 117-328 (PDF), 136 Stat. 4459, 5189 (December 29, 2022), and Section 401(b) of the Additional Ukraine

Supplemental Appropriations Act, Pub. L. 117-128 (PDF), 136 Stat. 1211, 1218 (May 21, 2022). Consequently, individuals covered by these circumstances are employment authorized incident to parole. For more information on employment eligibility for aliens, see Chapter 2, Eligibility Requirements [10 USCIS-PM A.2].

[^ 49] CNMI refers to the Commonwealth of the Northern Mariana Islands. This category includes a spouse of a long-term investor in the CNMI other than an E-2 CNMI investor who obtained such status based on a foreign retiree investment certificate. See 8 CFR 214.2(e)(23).

[^ 50] Generally, the alien must establish an economic necessity for employment, see 8 CFR 274a.12(c)(14). However, principal petitioners for U nonimmigrant status and their qualifying family members living in the United States do not need to submit proof of economic necessity to receive a bona fide determination EAD under category (c)(14) as there is a presumption of economic necessity. See U Nonimmigrant Status Bona Fide Determination Process FAQs.

[^ 51] Generally, the alien must establish an economic necessity for employment, see 8 CFR 274a.12(c)(14). However, principal petitioners for U nonimmigrant status and their qualifying family members living in the United States do not need to submit proof of economic necessity to receive a bona fide determination EAD under category (c)(14) as there is a presumption of economic necessity. See U Nonimmigrant Status Bona Fide Determination Process FAQs.

[^ 52] Includes a nonimmigrant visitor for business (B-1) who is a personal or domestic employee of an alien admitted as a nonimmigrant. See 8 CFR 214.2(b), (e), (f), (h), (i), (j), (l), (m), (o), (p), (q), (r) or under INA 214(e).

[^ 53] Includes a B-1 nonimmigrant who is the domestic employee of a U.S. citizen who has a permanent foreign home or is stationed in a foreign country, and who is temporarily visiting the United States.

[^ 54] Includes a B-1 nonimmigrant who is an employee of a foreign airline engaged in international transport.

[^ 55] Includes an alien with a final order of deportation or removal, and who is released on an order of supervision. See INA 241(a)(3).

[^ 56] See INA 244.

[^ 57] Includes a principal nonimmigrant witness or informant in S classification and qualified dependent family members.

[^ 58] Evidentiary requirements and validity time frame is determined by law enforcement agency (LEA) need.

[^ 59] See Section 1104 of the LIFE Act Amendments, Pub. L. 106-554 (PDF), 114 Stat. 2763, 2763A-325 (December 21, 2000).

[^ 60] Initial and renewal requests for employment authorization under this category are adjudicated on Application for Employment Authorization for Abused Nonimmigrant Spouse (Form I-765V).

[^ 61] Initial and renewal requests for employment authorization under this category are adjudicated on Form I-765V.

[^ 62] Initial and renewal requests for employment authorization under this category are adjudicated on Form I-765V.

[^ 63] Initial and renewal requests for employment authorization under this category are adjudicated on Form I-765V.

[^ 64] This covers the eligibility category for employment authorization based on a grant of deferred action. See 8 CFR 274a.12(c)(14). The (c)(33) code is used to distinguish DACA from other forms of deferred action.

[^ 65] See 8 CFR 274a.12(c)(5) and 8 CFR 274a.12(c)(35).

[^ 66] See 8 CFR 103.3.

[^ 67] See Section G, Motion to Reopen or Reconsider [10 USCIS-PM A.4(G)]. See Notice of Appeal or Motion (Form I-290B). See 8 CFR 103.5.

[^ 68] See 8 CFR 274a.14.

[^ 69] See 8 CFR 274a.14(a)(2).

[^ 70] See 8 CFR 274a.14(b).

[^ 71] For example, for a Form I-765 filed on the basis of an Application to Register Permanent Residence or Adjust Status (Form I-485), and USCIS denied the Form I-485.

[^ 72] See 8 CFR 103.2(b)(6).

[^ 73] See 8 CFR 103.5.

[^ 74] See 8 CFR 103.2(b)(16). Generally, USCIS issues a statutory denial without prior issuance of a Request for Evidence (RFE) or a NOID on any application, petition, or request that does not have any basis upon which the applicant may be approved.

[^ 75] For more information on automatic EAD extension requirements, see 5.0 Automatic Extensions of Employment Authorization and/or Employment Authorization Documents (EADs) in Certain Circumstances in the USCIS Handbook for Employers M-274. For eligible automatic extension EAD categories, see the Automatic Employment Authorization (EAD) Extension webpage.

# Chapter 5 - Reserved



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Camp Springs, MD 20588-0009

**U.S. Citizenship and Immigration Services**

November 27, 2025                                          PA-2025-26

# Policy Alert

SUBJECT:   Impact of INA 212(f) on USCIS' Adjudication of Discretionary Benefits

**Purpose**

U.S. Citizenship and Immigration Services (USCIS) is issuing policy guidance in the USCIS Policy Manual addressing the President's recent exercise of his authority under section 212(f) of the Immigration and Nationality Act (INA) through Presidential Proclamation 10949, "Restricting the Entry of Foreign Nationals To Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats"[1] (PP 10949) and its impact on USCIS adjudications.

**Background**

INA 212(f) authorizes the President to, by proclamation, suspend the entry of all aliens or any class of aliens, or impose on the entry of aliens any restrictions he may deem appropriate. On June 4, 2025, the President issued PP 10949 to exercise his INA 212(f) authority and suspend the entry or admission of aliens from nineteen countries.[2] With certain exceptions,[3] PP 10949 applies to aliens who are outside of the United States on or after June 9, 2025 and who do not have a valid visa on or after June 9, 2025.

Effective immediately, USCIS will consider relevant country-specific facts and circumstances such as those outlined in PP 10949 as part of its adjudication of discretionary benefit requests. Discretionary benefit requests that USCIS adjudicates include, but are not limited to, certain adjustment of status applications, extension of nonimmigrant stay, and change of nonimmigrant status. USCIS is now updating its guidance to explain how INA 212(f) and PP 10949 impact USCIS' exercise of discretion.

This guidance, contained in Volume 1 of the Policy Manual, applies to requests pending or filed on or after the publication date. The guidance contained in the Policy Manual is controlling and supersedes any related prior guidance.

**Policy Highlights**

---

[1] See 90 FR 24497 (June 4, 2025).
[2] See 90 FR 24497 (June 4, 2025) (imposing a partial or full suspension of and limitation on entry on aliens from the following countries, based on a finding that such entry would be detrimental to the interests of the United States for country-specific reasons: Afghanistan, Burma, Burundi, Chad, Republic of Congo, Cuba, Equatorial Guinea, Eritrea, Haiti, Iran, Laos, Libya, Sierra Leone, Somalia, Sudan, Togo, Turkmenistan, Venezuela, and Yemen).
[3] The Proclamation also includes certain exceptions to the suspension of and limitation on entry (for example, lawful permanent residents and certain immigrant and nonimmigrant categories are excepted). See Section 4(b)-(d) of PP 10949, 90 FR 24497, 24503 (June 4, 2025).

PA-2025-26: Impact of INA 212(f) on USCIS' Adjudication of Discretionary Benefits
Page: 2

- Provides that, with certain exceptions, USCIS considers any relevant country-specific factors such as those specified in PP 10949 as significant negative factors in the adjudication of discretionary benefit requests.

- Provides country-specific factors that include but are not limited to insufficient vetting and screening information that limits USCIS' ability to assess the risks posed by aliens from the countries identified in PP 10949.

**Summary of Changes**

Affected Section: Volume 1 > Part E > Chapter 8, Discretionary Analysis

- Revises table in Section A (Applicability).

- In Section C (Adjudicating Discretionary Benefits), revises Subsection 2 (Identifying Discretionary Factors) throughout.

Affected Section: Volume 7 > Part A > Chapter 10 > Section B, Adjustment of Status Applications Involving Discretion

- Revises fifth paragraph and adds new paragraph six in Subsection 1 (Determining Whether Favorable Exercise of Discretion is Warranted).

Affected Section: Volume 9 > Part A > Chapter 5 > Section A, Discretionary Factors

- Revises first paragraph and adds new second and third paragraphs.

Affected Section: Volume 10 > Part A > Chapter 4 > Section A, General

- Adds new fourth paragraph.

USCIS may also make other minor technical, stylistic, and conforming changes consistent with this update.

**Citation**

Volume 1: General Policies and Procedures, Part E, Adjudications, Chapter 8, Discretionary Analysis [1 USCIS-PM E.8].

Volume 7: Adjustment of Status, Part A, Adjustment of Status Policies and Procedures, Chapter 10, Legal Analysis and Use of Discretion [7 USCIS-PM A.10].

Volume 9: Waivers and Other Forms of Relief, Part A, Waiver Policies and Procedures, Chapter 5, Discretion [9 USCIS-PM A.5].

Volume 10: Employment Authorization, Part A, Employment Authorization Policies and Procedures, Chapter 4, Adjudication [10 USCIS-PM A.4].

# Ex. 2

CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
SARAH E. BALKISSOON (CABN 327066)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-6474
Fax: (415) 436-6748
sarah.balkissoon@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ZAHRA SHOKRI VARNIAB and ASHKAN POURABHARI LANGOUDI, <br><br> Plaintiffs, <br><br> v. <br><br> JOSEPH B. EDLOW, in his official capacity as Director of U.S. Citizenship and Immigration Services; KRISTI NOEM, in her official capacity as Secretary of U.S. Department of Homeland Security; and PAMELA BONDI, in her official capacity as Attorney General, <br><br> Defendants. | Case No. 5:25-cv-10602-SVK |

**CERTIFIED ADMINISTRATIVE RECORD**

**USCIS POLICY MEMORANDUM PM-602-0192**

CERTIFIED ADMINISTRATIVE RECORD FOR USCIS POLICY MEMORANDUM PM-602-0192
NO. 5:25-cv-10602-SVK

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

ZAHRA SHOKRI VARNIAB and ASHKAN
POURABHARI LANGOUDI,

             Plaintiffs,

     v.

JOSEPH B. EDLOW, in his official capacity as
Director of U.S. Citizenship and Immigration
Services; KRISTI NOEM, in her official capacity
as Secretary of U.S. Department of Homeland
Security; and PAMELA BONDI, in her official
capacity as Attorney General,

             Defendants.

Case No. 5:25-cv-10602-SVK

**CERTFICATION OF ADMINISTRATIVE
RECORD**

## INDEX AND THE CERTIFIED ADMINISTRATIVE RECORD

| PM-602-0192 records (in chronological order) | | | |
|---|---|---|---|
| Document Number | Document Title | Beginning Bates Number | Ending Bates Number |
| 1 | Policy Memorandum, PM-602-0192, Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries | 000001 | 000004 |
| 2 | Decision Memorandum, Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries | 000005 | 000008 |
| 3 | Delegation to the Bureau of Citizenship and Immigration Services | 000009 | 000014 |
| 4 | Executive Order 14161, Protecting the United States From Foreign Terrorists and Other National | 000015 | 000017 |

1

| | | | |
|---|---|---|---|
| | Security and Public Safety Threats | | |
| 5 | Proclamation 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats | 000018 | 000026 |
| 6 | DOJ Press Release: Press Release: Afghan National Pleads Guilty to Plotting Election Day Terror Attack in the United States | 000027 | 000030 |

| | | | |
|---|---|---|---|
| 7 | DHS Press Release, Terrorist Who Shot Two National Guard Members in D.C. Was Let into the Country by the Biden Administration's Operation Allies Welcome Program | 000031 | 000032 |
| 8 | USCIS Policy Manual, Volume 1, Part E, Chapter 8 – Discretionary Analysis | 000033 | 000055 |

I, James Kernochan, make the following declaration, as provided by Section 1746 of Title 28 of the United States Code. I am aware that this declaration will be filed in the above-captioned civil action with the United States District Court for the Northern District of California. I hereby certify that:

1. I am the Deputy Director of U.S. Citizenship and Immigration Services (USCIS), a component agency within the U.S. Department of Homeland Security (DHS). I have held this position since December 22, 2025. Previously, I served as Chief of Staff at the U.S. Customs and Border Protection from January 20, 2025.

2. I assist the Director in the overall administration and supervision of the agency. I provide executive oversight of USCIS operations, including the adjudication of immigration benefit applications and petitions; support the implementation of immigration laws, regulations, and policies; oversee operational components such as service centers and field offices; ensure compliance with applicable statutory and regulatory requirements; and exercise delegated authority on behalf of the Director.

3. I certify that, to the best of my knowledge, information, and belief that the documents listed in the accompanying administrative record index hereto constitute the nonprivileged documents and materials directly and indirectly considered by USCIS and that these documents constitute the administrative record the agency considered in issuing USCIS Policy Memorandum 602-0192 (PM-602-0192) (Dec. 2, 2025).

I certify under penalty of perjury that the foregoing is true and correct.

_____

James Kernochan
Deputy Director
U.S. Citizenship and Immigration Services
U.S. Department of Homeland Security

2/3/26
_____

Date

3

**INDEX**

| Document No. | Date | Document Title | Bates No. |
|---|---|---|---|
| 01 | 2025-12-02 | Policy Memorandum, PM-602-0192, Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries | CAR 000001 |
| 02 | 2025-11-29 | Decision Memorandum, Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries | CAR 000005 |
| 03 | 2003-06-05 | Delegation to the Bureau of Citizenship and Immigration Services | CAR 000009 |
| 04 | 2025-01-20 | Executive Order 14161, Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats | CAR 000015 |
| 05 | 2025-06-04 | Proclamation 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats | CAR 000018 |
| 06 | 2025-06-13 | DOJ Press Release: Press Release: Afghan National Pleads Guilty to Plotting Election Day Terror Attack in the United States | CAR 000027 |
| 07 | 2025-11-26 | DHS Press Release, Terrorist Who Shot Two National Guard Members in D.C. Was Let into the Country by the Biden Administration's Operation Allies Welcome Program | CAR 000031 |
| 08 | 2025-11-27 | USCIS Policy Manual, Volume 1, Part E, Chapter 8 - Discretionary Analysis | CAR 000033 |



U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
*Office of the Director*
Camp Springs, MD 20588-0009

**U.S. Citizenship and Immigration Services**

December 2, 2025                                                    PM-602-0192

# Policy Memorandum

**SUBJECT:**   Hold and Review of all Pending Asylum Applications and all USCIS Benefit
Applications Filed by Aliens from High-Risk Countries[1]

**Purpose**

Effective immediately, this memorandum directs U.S. Citizenship and Immigration Services
(USCIS) personnel to:

1. Place a hold on all Forms I-589 (Application for Asylum and for Withholding of Removal),
   regardless of the alien's country of nationality, pending a comprehensive review;
2. Place a hold on pending benefit requests[2] for aliens from countries listed in *Presidential
   Proclamation (PP) 10949, Restricting the Entry of Foreign Nationals To Protect the United
   States From Foreign Terrorists and Other National Security and Public Safety Threats*,[3]
   pending a comprehensive review, regardless of entry date[4]; and
3. Conduct a comprehensive re-review of approved benefit requests for aliens from countries
   listed in PP 10949 who entered the United States on or after January 20, 2021.[5]

This memorandum mandates that all aliens meeting these criteria undergo a thorough re-review
process, including a potential interview[6] and, if necessary, a re-interview, to fully assess all national
security and public safety threats along with any other related grounds of inadmissibility or
ineligibility.[7] An individualized, case-by-case review and assessment will be done of all relevant
information and facts. USCIS will also conduct a comprehensive review of all relevant policies,

---

[1] On June 4, 2025, the President issued Presidential Proclamation 10949, *Restricting the Entry of Foreign Nationals To
Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats.* Exercising
authority under section 212(f) of the Immigration and Nationality Act (INA), the proclamation imposes restrictions,
limitations, and exceptions on the entry of aliens from 19 high-risk countries. Under INA 212(f), the President may
suspend or restrict the entry of any aliens deemed detrimental to U.S. interests. See 90 FR 24497 (PDF) (June 4, 2025).
[2] The term "benefit request" in this memorandum does not include USCIS screening activities, including credible fear,
reasonable fear, safe third country, third country removal, and threshold screenings under the Asylum Cooperative
Agreements.
[3] This applies to aliens who list one of the 19 high-risk countries as their Country of Birth or Country of Citizenship.
[4] Including Form I-485 (Application to Register Permanent Residence or Adjust Status), Form I-90 (Application to
Replace Permanent Resident Card (Green Card)), Form N-470 (Application to Preserve Residence for Naturalization
Purposes), Form I-751, (Petition to Remove Conditions on Residence), and Form I-131 (Application for Travel
Documents, Parole Documents, and Arrival/Departure Records).
[5] Entered may include admitted, inspected, paroled, or entered without inspection.
[6] Interviews for this population shall not be waived under any circumstance. For benefit requests where an interview is
not required, the case review and evaluation will determine if the alien needs to appear at a USCIS office.
[7] See INA 212(a)(3)(A), (B), and (F) and 237(a)(4)(A) and (B).

www.uscis.gov

PM-602-0192: Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries
Page: 2

procedures, and operational guidance for compliance, accuracy, and needed improvements during this time.

This guidance outlines the adjudicative hold, procedural requirements, and processes for the re-review, interview, or re-interview of affected aliens. USCIS personnel are instructed to prioritize national security and public safety concerns and ensure compliance with all applicable laws and regulations during the adjudication process. All findings must be documented in accordance with established protocols to support any subsequent determinations or actions.

**Background**

On January 20, 2025, the President issued Executive Order (EO) 14161, titled *Protecting the United States from Foreign Terrorist and Other National Security and Public Safety Threats*. This order aims to safeguard U.S. citizens from aliens who may seek to commit terrorist acts, pose threats to national security, promote hateful ideologies, or exploit immigration laws for malicious purposes. EO 14161 underscores the importance of vigilance during the visa issuance process to ensure that individuals approved for admission into the United States do not intend to harm Americans or compromise U.S. national interests.

Recently, the United States has seen what a lack of screening, vetting, and prioritizing expedient adjudications can do to the American people. An Afghan national, Nasir Ahmad Tawhedi, planned a terrorist attack in the United States on Election Day 2024. Tawhedi pled guilty in federal court to conspiring and attempting to provide material support and resources to the Islamic State of Iraq and al-Sham (ISIS).[8] In another instance, an Afghan national, Rahmanullah Lakanwal, is suspected of planning and executing a terrorist attack in Washington, DC against two National Guard members,[9] one who was killed and another who remains critically injured. USCIS plays an instrumental role in preventing terrorists from seeking safe haven in the United States and ensuring that USCIS' screening and vetting and adjudications prioritize the safety of the American people and uphold all U.S. laws.

In light of identified concerns and the threat to the American people, USCIS has determined that a comprehensive re-review, potential interview, and re-interview of all aliens from high-risk countries of concern who entered the United States on or after January 20, 2021 is necessary. Lastly, USCIS may, when appropriate, extend this review and re-interview process to aliens who entered the United States outside of this timeframe.

USCIS remains committed to ensuring that all aliens from high-risk countries of concern that entered the United States do not present threats to national security or public safety. To address vulnerabilities during this process, and in order to conduct a comprehensive review of all policies, procedures, and guidance, USCIS has determined that it must implement an adjudicative hold on all pending asylum applications, regardless of the alien's country of nationality, as well as pending benefit requests filed by aliens from high-risk countries outlined in PP 10949. This hold will remain

---

[8] See *Afghan National Pleads Guilty to Plotting Election Day Terror Attack in the United States,* U.S. Department of Justice, June 13, 2025.

[9] See *Terrorist Who Shot Two National Guard Members in D.C. Was Let into the Country by the Biden Administration's Operation Allies Welcome Program*, U.S. Department of Homeland Security Press Release, November 26, 2025.

PM-602-0192: Hold and Review of all Pending Asylum Applications and all USCIS Benefit
Applications Filed by Aliens from High-Risk Countries
Page: 3

in effect until lifted by the USCIS Director through a subsequent memorandum. Any requests to lift
the hold due to litigation or other extraordinary circumstances must receive approval from the
USCIS Director or Deputy Director.[10]

## Guidance

USCIS has determined the operational necessity to ensure that all asylum applicants and aliens from
high-risk countries of concern who entered the United States do not pose a threat to national
security or public safety. This effort ensures that USCIS exercises its full authority to investigate
immigration benefit requests filed by aliens who may pose risks to the national security and public
safety of the United States, as outlined in DHS Delegation of Authority 0150.1, issued June 5,
2003.

USCIS will conduct a thorough review on a case-by-case basis to assess benefit eligibility including
whether:

1. The alien is listed in the Terrorist Screening Dataset (TSDS) as a Known or Suspected
   Terrorist (KST) under Tier 1 or Tier 2 classifications or is included in Tier 3 or Tier 4 of the
   TSDS with significant derogatory information related to the alien.
2. The alien is connected to prior, current, or planned involvement in, or association with, an
   activity, individual, or organization described in sections 212(a)(3)(A), (B), or (F), or
   237(a)(4)(A) or (B) of the Immigration and Nationality Act (INA).
3. The alien is linked to prior, current, or planned involvement in, or association with, an
   activity, individual, or organization that may pose a risk of serious harm or danger to the
   community, including criminal conduct described in INA 101(a)(43), 212(a)(1)(A)(iii),
   212(a)(2), 237(a)(2), or 237(a)(4)(A)(ii).
4. The alien is unable to establish their identity as outlined in PP 10949.[11]

This process ensures that USCIS exercises its full authority to protect national security and public
safety while adhering to the provisions of the INA and applicable laws. USCIS has considered that
this direction may result in delay to the adjudication of some pending applications and has weighed
that consequence against the urgent need for the agency to ensure that applicants are vetted and
screened to the maximum degree possible. Ultimately, USCIS has determined that the burden of
processing delays that will fall on some applicants is necessary and appropriate in this instance,
when weighed against the agency's obligation to protect and preserve national security.

Within 90 days of issuance of this memorandum, USCIS will prioritize a list for review, interview,
re-interview, and referral to ICE and other law enforcement agencies as appropriate, and, in
consultation with the Office of Policy and Strategy and the Fraud Detection and National Security
Directorate, issue operational guidance.

## Use

---

[10] Any request for an exemption to the adjudicative hold must be coordinated with the Office of Policy and Strategy.
[11] See USCIS Policy Manual, Volume 1, General Policies and Procedures, Part E, Adjudications, Chapter 8,
Discretionary Analysis [1 USCIS-PM E.8].

PM-602-0192: Hold and Review of all Pending Asylum Applications and all USCIS Benefit
Applications Filed by Aliens from High-Risk Countries
Page: 4

This policy memorandum is intended solely for the guidance of USCIS personnel in the
performance of their official duties, but it does not remove their discretion in making adjudicatory
decisions. It may not be relied upon to create any right or benefit, substantive or procedural,
enforceable under law or by any individual or other party in removal proceedings, in litigation with
the United States, or in any other form or manner.

PRE-DECISIONAL/DELIBERATIVE – FOR OFFICIAL USE ONLY



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Camp Springs, MD  20588-0009

**U.S. Citizenship and Immigration Services**

November 29, 2025

# Memorandum

TO:        Sarah M. Kendall, Associate Director
Field Operations Directorate

Ted Kim, Associate Director
Refugee, Asylum and International Operations Directorate

Carrie Selby, Acting Associate Director
Service Center Operations Directorate

Andrew Davidson, Acting Associate Director
Fraud Detection and National Security Directorate

Susan Dibbins, Chief
Administrative Appeals Office

Andrew Good, Chief
Office of Policy and Strategy

FROM:     Joesph B. Edlow
Director, U.S. Citizenship and Immigration Services

SUBJECT**:**    **Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries[1]**

**Purpose:** Effective immediately, this memorandum directs U.S. Citizenship and Immigration Services (USCIS) personnel to:

---

[1] On June 4, 2025, the President issued Presidential Proclamation 10949, *Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats.* Exercising authority under section 212(f) of the Immigration and Nationality Act (INA), the proclamation imposes restrictions, limitations, and exceptions on the entry of aliens from 19 high-risk countries. Under INA 212(f), the President may suspend or restrict the entry of any aliens deemed detrimental to U.S. interests. See 90 FR 24497 (PDF) (June 4, 2025).

PRE-DECISIONAL/DELIBERATIVE – FOR OFFICIAL USE ONLY

www.uscis.gov

PRE-DECISIONAL/DELIBERATIVE – FOR OFFICIAL USE ONLY

1. Place a hold on all Forms I-589 (Application for Asylum and for Withholding of Removal), regardless of the alien's country of nationality, pending a comprehensive review;
2. Place a hold on pending benefit requests[2] for aliens from countries listed in *Presidential Proclamation (PP) 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats*,[3] pending a comprehensive review, regardless of entry date[4]; and
3. Conduct a comprehensive re-review of approved benefit requests for aliens from countries listed in PP 10949 who entered the United States on or after January 20, 2021.[5]

This directive mandates that all aliens meeting these criteria undergo a thorough re-review process, including a potential interview[6] and, if necessary, a re-interview, to fully assess all national security and public safety threats along with any other related grounds of inadmissibility or ineligibility.[7] An individualized, case-by-case review and assessment will be done of all relevant information and facts. USCIS will also conduct a comprehensive review of all relevant policies, procedures, and operational guidance for compliance, accuracy, and needed improvements during this time.

This guidance outlines the adjudicative hold, procedural requirements, and processes for the re-review, interview, or re-interview of affected aliens. USCIS personnel are instructed to prioritize national security and public safety concerns and ensure compliance with all applicable laws and regulations during the adjudication process. All findings must be documented in accordance with established protocols to support any subsequent determinations or actions.

**Background:** On January 20, 2025, the President issued Executive Order (EO) 14161, titled *Protecting the United States from Foreign Terrorist and Other National Security and Public Safety Threats*. This order aims to safeguard U.S. citizens from aliens who may seek to commit terrorist acts, pose threats to national security, promote hateful ideologies, or exploit immigration laws for malicious purposes. EO 14161 underscores the importance of vigilance during the visa issuance process to ensure that individuals approved for admission into the United States do not intend to harm Americans or compromise U.S. national interests.

Recently, the United States has seen what a lack of screening, vetting, and prioritizing expedient adjudications can do to the American people. An Afghan national, Nasir Ahmad Tawhedi,

---

[2] The term "benefit request" in this memorandum does not include USCIS screening activities, including credible fear, reasonable fear, safe third country, third country removal, and threshold screenings under the Asylum Cooperative Agreements.

[3] This applies to aliens who list one of the 19 high-risk countries as their Country of Birth or Country of Citizenship.

[4] Including Form I-485 (Application to Register Permanent Residence or Adjust Status), Form I-90 (Application to Replace Permanent Resident Card (Green Card)), Form N-470 (Application to Preserve Residence for Naturalization Purposes), Form I-751, (Petition to Remove Conditions on Residence) and Form I-131 (Application for Travel Documents, Parole Documents, and Arrival/Departure Records).

[5] Entered may include admitted, inspected, paroled, or entered without inspection.

[6] Interviews for this population shall not be waived under any circumstance. For benefit requests where an interview is not required, the case review and evaluation will determine if the alien needs to appear at a USCIS office.

[7] See INA 212(a)(3)(A), (B), and (F) and 237(a)(4)(A) and (B).

PRE-DECISIONAL/DELIBERATIVE – FOR OFFICIAL USE ONLY

www.uscis.gov

PRE-DECISIONAL/DELIBERATIVE – FOR OFFICIAL USE ONLY

planned a terrorist attack in the United States on Election Day 2024. Tawhedi pled guilty in federal court to conspiring and attempting to provide material support and resources to the Islamic State of Iraq and al-Sham (ISIS).[8] In another instance, an Afghan national, Rahmanullah Lakanwal, is suspected of planning and executing a terrorist attack in Washington, DC against two National Guard members[9], one who was killed and another who remains critically injured. USCIS plays an instrumental role in preventing terrorists from seeking safe haven in the United States and ensuring that our screening and vetting and adjudications prioritize the safety of the American people and uphold all of our laws.

In light of identified concerns and the threat to the American people, USCIS has determined that a comprehensive re-review, potential interview, and re-interview of all aliens from high-risk countries of concern who entered the United States on or after January 20, 2021 is necessary. Lastly, USCIS may, when appropriate, extend this review and re-interview process to aliens who entered the United States outside of this timeframe.

USCIS remains committed to ensuring that all aliens from high-risk countries of concern that entered the United States do not present threats to national security or public safety. To address vulnerabilities during this process, and in order to conduct a comprehensive review of all policies, procedures, and guidance, USCIS has determined that it must implement an adjudicative hold on all pending asylum applications, regardless of the alien's country of nationality, as well as pending benefit requests filed by aliens from high-risk countries outlined in PP 10949. This hold will remain in effect until lifted by the USCIS Director through a subsequent memorandum. Any requests to lift the hold due to litigation or other extraordinary circumstances must receive approval from the USCIS Director or Deputy Director.[10]

**Discussion:** USCIS has determined the operational necessity to ensure that all asylum applicants and aliens from high-risk countries of concern who entered the United States do not pose a threat to national security or public safety. This effort ensures that USCIS exercises its full authority to investigate immigration benefit requests filed by aliens who may pose risks to the national security and public safety of the United States, as outlined in DHS Delegation of Authority 0150.1, issued June 5, 2003.

USCIS will conduct a thorough review on a case-by-case basis to assess benefit eligibility including whether:

1. The alien is listed in the Terrorist Screening Dataset (TSDS) as a Known or Suspected Terrorist (KST) under Tier 1 or Tier 2 classifications or is included in Tier 3 or Tier 4 of the TSDS with significant derogatory information related to the alien.

---

[8] See *Afghan National Pleads Guilty to Plotting Election Day Terror Attack in the United States,* U.S. Department of Justice, June 13, 2025.

[9] See *Terrorist Who Shot Two National Guard Members in D.C. Was Let into the Country by the Biden Administration's Operation Allies Welcome Program,* Department of Homeland Security Press Release, November 26, 2025.

[10] Any request for an exemption to the adjudicative hold must be coordinated with the Office of Policy and Strategy.

PRE-DECISIONAL/DELIBERATIVE – FOR OFFICIAL USE ONLY

www.uscis.gov

PRE-DECISIONAL/DELIBERATIVE – FOR OFFICIAL USE ONLY

2.  The alien is connected to prior, current, or planned involvement in, or association with, an activity, individual, or organization described in sections 212(a)(3)(A), (B), or (F), or 237(a)(4)(A) or (B) of the Immigration and Nationality Act (INA).

3.  The alien is linked to prior, current, or planned involvement in, or association with, an activity, individual, or organization that may pose a risk of serious harm or danger to the community, including criminal conduct described in INA §§ 101(a)(43), 212(a)(1)(A)(iii), 212(a)(2), 237(a)(2), or 237(a)(4)(A)(ii).

4.  The alien is unable to establish their identity as outlined in PP 10949.[11]

This process ensures that USCIS exercises its full authority to protect national security and public safety while adhering to the provisions of the INA and applicable laws. USCIS has considered that this direction may result in delay to the adjudication of some pending applications and has weighed that consequence against the urgent need for the agency to ensure that applicants are vetted and screened to the maximum degree possible. Ultimately, USCIS has determined that the burden of processing delays that will fall on some applicants is necessary and appropriate in this instance, when weighed against the agency's obligation to protect and preserve our national security.

Within 90 days of issuance of this memorandum, USCIS will prioritize a list for review, interview, re-interview, and referral to ICE and other law enforcement agencies as appropriate, and in consultation with the Office of Policy and Strategy and the Fraud Detection and National Security Directorate, issue operational guidance.

cc:
David Roy, Acting Chief Counsel, Office of the Chief Counsel

---

[11] See USCIS Policy Manual, Volume 1,General Policies and Procedures, Part E, Adjudications, Chapter 8, Discretionary Analysis [1 USCIS-PM E.8].

PRE-DECISIONAL/DELIBERATIVE – FOR OFFICIAL USE ONLY

www.uscis.gov

**Department of Homeland Security**
**Delegation Number: 0150.1**
**Issue Date: 06/05/2003**

# DELEGATION TO THE BUREAU OF CITIZENSHIP AND IMMIGRATION SERVICES

## I.   Purpose

This delegation vests in the Bureau of Citizenship and Immigration Services (BCIS) and through its highest ranking official to regional directors, asylum directors, district directors, service center directors, adjudication officers, asylum officers, immigration information officers, and other officers or employees of the BCIS the authorities described herein in order to accomplish the mission of the BCIS.  This delegation is made through, and the exercise of any authorities therein is subject to the authority, direction, and control of, the Deputy Secretary of the Department of Homeland Security.

## II.   Delegations

Pursuant to the authority vested in the Secretary of Homeland Security by law, including the Homeland Security Act of 2002, I hereby delegate to the Bureau of Citizenship and Immigration Services:

> A.   Authority to establish policies for performing such functions as are transferred to the Director by section 451 of the Homeland Security Act of 2002 (Act) or otherwise vested in the Bureau by law.

> B.   Authority to oversee the administration of such policies.

> C.   Responsibility for advising the Deputy Secretary with respect to any policy or operation of the BCIS that may affect the Bureau of Customs and Border Protection (BCBP) or the Bureau of Immigration and Customs Enforcement (BICE) of the Department, including potentially conflicting policies or operations.

> D.   Authority to establish national immigration services policies and priorities.

> E.   Authority to meet regularly with the Citizenship and Immigration Services Ombudsman ("the Ombudsman") described in section 452 of Act and to establish procedures requiring a formal response to any recommendations submitted in the Ombudsman's annual report to Congress pursuant to section 451(a)(3)(F) of the Act.

1

Delegation # 0150.1

CAR 000009

F.      Authority to design and implement in consultation with the Chief Human Capital Officer the managerial rotation program described in section 451(a)(4) of the Homeland Security Act of 2002.

G.      Authority to implement pilot initiatives for backlog elimination as described in section 451(a)(5) of the Homeland Security Act of 2002, including the authority to increase personnel, transfer personnel to focus on areas with the largest potential for backlog, and streamline paperwork.

H.      Authority under section 103(a)(1) of the Immigration and Nationality Act of 1952, as amended (INA), 8 U.S.C. §1103(a)(1), to administer the immigration laws (as defined in section 101(a)(17) of the INA).

I.      Authority to investigate alleged civil and criminal violations of the immigration laws, including but not limited to alleged fraud with respect to applications or determinations within the BCIS and make recommendations for prosecutions, or other appropriate action when deemed advisable.

J.      Authority to register and fingerprint aliens in the United States, and exercise other functions relating to registration and change of address, as provided by sections 262-266 of the INA, 8 U.S.C. §§1302-06.

K.      Authority, in consultation with the legislative affairs function of the Department of Homeland Security, to prepare reports on private bills pertaining to immigration matters under 28 C.F.R. §0.105(h).

L.      Authority to certify official Department of Homeland Security records relating to immigration matters.

M.      Authority to maintain such files and records systems as are necessary to carry out the functions of the BCIS.

N.      Authority to place aliens in removal proceeding by issuance of a Notice to Appear, and to cancel such Notice before jurisdiction vests with the Executive Office for Immigration Review of the Department of Justice (EOIR).

O.      Authority to parole an applicant for admission into the United States under section 212(d)(5) of the INA, 8 U.S.C. §1182(d)(5), and to issue advance parole documentation.

P.      Authority to grant voluntary departure under section 240B of the INA, 8 U.S.C. §1229c, and deferred action.

Q.      Authority to approve bonds issued pursuant to the immigration laws, to determine whether such bonds have been breached, and take appropriate action to protect the interests of the United States with respect to such bonds.

2

Delegation # 0150.1

R.      Authority to grant employment authorization under sections 214(a) or 274A(h)(3) of the INA (8 U.S.C. §§1184(a) and 1324A(h)(3)), 8 C.F.R. §274a.13, or other applicable law.

S.      Authority to interrogate aliens and issue subpoenas, administer oaths, take and consider evidence, and fingerprint and photograph aliens under sections 287(a), (b), and (f) of the INA, 8 U.S.C. §1357 and under section 235(d) of the INA, 8 U.S.C. §1225(d).

T.      Authority under the immigration laws, including but not limited to sections 207 and 208 of the INA (8 U.S.C. §1157 and §1158), to grant asylum and refugee status (and terminate such status), adjust status of refugees and asylees, make credible fear determinations, and approve withholding of removal under the Convention Against Torture.

U.      Authority to exercise appellate jurisdiction over the matters described in 8 C.F.R. §103.1(f)(3)(E)(iii) (as in effect on February 28, 2003).

V.      Authority under the immigration laws, including but not limited to sections 310 and 341 of the INA (8 U.S.C. §1421 and §1452), to grant applications for naturalization and certificates of citizenship (and revoke such naturalization), including administration of oaths, issuance of certificates, provision of citizenship materials and services to public schools to prepare naturalization candidates, supervision of courts designated under section 310 of the INA to administer oaths, and any other rights and responsibilities relating to the naturalization or citizenship of aliens.

W.      Authority under the immigration laws, including but not limited to sections 204 and 214 of the INA (8 U.S.C. §1154 and §1184), to accept and adjudicate nonimmigrant and immigrant visa petitions (whether family based, employment based, or other), including collection of appropriate fees, conduct of interviews, and appellate review of the BCIS decisions that do not fall within the jurisdiction of the EOIR.

X.      Authority to invalidate labor certifications under 8 C.F.R §214.2, 20 C.F.R. §655.209 and §656.30.

Y.      Authority to approve participation as a Regional Center and to terminate such participation under 8 C.F.R.§204.6(m) and to take other actions to administer the Immigrant Investor (EB-5) Program.

3

Delegation # 0150.1

Z.      Authority under the immigration laws to extend and change nonimmigrant status and to adjust the status of aliens to lawful residents (on a temporary or permanent basis) and to revoke such status, including determination of admissibility of aliens, authority to grant waivers of inadmissibility and permission to reapply for entry, and authority to conduct interviews (or waive interviews) regarding an alien's eligibility for an immigration benefit.

AA.     Authority to approve or deny, or withdraw approval of petitions for schools seeking approval for attendance by nonimmigrant students under 8 C.F.R. §214.3.

BB.     Authority under the immigration laws to accept, process and adjudicate any application for any immigration benefit or service not exclusively under the jurisdiction of the EOIR, ICE or CBP, including but not limited to the authority to approve, deny, transfer, revoke, rescind, or certify all existing and future immigration, naturalization and citizenship benefits.

CC.     Authority to station officers and employees of the BCIS in foreign countries as provided by section 103(a)(7) of the INA, 8 U.S.C. §1103(a)(7), and other applicable law, and to perform such other activities with respect to the international operations of the Department of Homeland Security as I may direct.

DD.     Authority to perform other functions or duties as I may direct.

The authority delegated herein may be exercised by the director, his deputy, or the highest ranking official in the Bureau.  In exercising the authority delegated herein, the BCIS shall be governed by the Homeland Security Act of 2002; all applicable federal laws, rules and regulations; and the policies, procedures, direction, authority and control of the Secretary, the Deputy Secretary, the Under Secretary for Management, or other officer authorized by the Secretary to prescribe such policies and procedures or exercise such authority, direction and control.  Nothing herein shall be construed to limit or detract from the authority of the Secretary under section 102(a)(2) and (3) of the Homeland Security Act and other applicable law.

# III.   Reservations

The above delegations of authority to the BCIS in no way limit the functions, rights, privileges, powers, and duties vested in the Commissioner of CBP or in the Assistant Secretary for ICE by law, including authority provided by the above listed statutes or any delegation from the Secretary of Homeland Security.

CAR 000012

Delegation # 0150.1

The BCIS is directed to coordinate, to the extent necessary and appropriate, his exercise of the authorities under this delegation with other officials to whom I have delegated authorities that complement, relate to, involve, or are concurrent with the authorities in this delegation.  Specific reference in this delegation to coordination or consultation with other officials as to certain matters is not meant to limit the responsibility of the BCIS to coordinate or consult in other matters when appropriate. Delegation of an authority to the BCIS shall not be construed to mean that the authority may be exclusively exercised by the Director; in particular, reference is made to delegations of authority to the Commissioner of CBP and to the Assistant Secretary for ICE that are with respect to many authorities parallel to, concurrent with, or overlapping with this delegation.

Unless specifically provided therein, nothing in this delegation authorizes the BCIS to enforce immigration laws by inspection of aliens or vehicles, issuance or execution of warrants, detention or release of aliens on bond, removal of aliens from the United States, issuance of stays of removal, reinstatement of removal orders, or any other enforcement authority exclusively delegated to the Commissioner of CBP or the Assistant Secretary for ICE.

Nothing is this delegation is intended to grant or provide authority or jurisdiction over any determination or matter within the sole authority of the Executive Office for Immigration Review of the Department of Justice.

# IV.  Re-delegations

Unless otherwise proscribed by statute, Executive Order, or the terms of this delegation, the powers, authorities, responsibilities, and functions of the BCIS may be re-delegated in writing by the Director or the highest ranking official to appropriate subordinate officials of the BCIS, and may be successively re-delegated to other officers or employees of the BCIS qualified to exercise the authority.  The Director or the highest ranking official also may re-delegate the authority contained in this delegation to the Commissioner of CBP or to Assistant Secretary for ICE, with their consent.

Officers and employees of the former Immigration and Naturalization Service (INS), including but not limited to the Examinations (Adjudications), Citizenship and International Affairs (including asylum and refugee) Programs of the former INS will, following their transfer to the BCIS, continue to exercise their authorities and responsibilities as they existed on February 28, 2003, unless modified or revoked by the BCIS or other authorized official.  Asylum officers continue to be delegated responsibilities as described in 8 C.F.R. §103.1(g)(3)(ii) (as in effect on February 28, 2003) unless modified or revoked by the BCIS or other authorized official.

CAR 000013

Delegation # 0150.1

## V.   Authorities

Homeland Security Act, 116 Stat. 2135, Pub. L. 107-296 §§ 101, 102, 403, 441, 1502, 1706 (2002); 5 U.S.C. § 301; Immigration and Nationality Act of 1952, as amended, 8 U.S.C. 1101 et seq.; the "immigration laws," as defined by section 101(a)(17) of the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. 1101(a)(17).

## VI.   Credentials

Any badge, credential, seal, stamp or other such item or document that is valid at 11:59 p.m. on February 28, 2003, and that identifies an officer or employee of the INS, who is transferred to the BCIS, shall continue in effect as a badge, credential or other documentation identifying an officer or employee of the BCIS until its expiration, revocation, withdrawal, or replacement, whichever comes first.  The BCIS may authorize replacement, renewal, or new issuance of badges, credentials, seals, stamps or other such items or documents to BCIS officers or employees using Immigration and Naturalization Service identity and forms until BCIS forms are available.

## VII.  Office of Primary Interest

The Bureau of Citizenship and Immigration Services is the office with primary interest in this delegation.

## VIII. Cancellation

Delegation Number 0150 is rescinded.

## IX.   Effective Date and Time

This delegation of authority shall take effect at 12:00 midnight, March 1, 2003.

Tom Ridge

Secretary of Homeland Security

6

Delegation # 0150.1

**8451**

**Federal Register**

Vol. 90, No. 19

Thursday, January 30, 2025

# Presidential Documents

Title 3—

The President

Executive Order 14161 of January 20, 2025

## Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Policy and Purpose.* (a) It is the policy of the United States to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes.

(b) To protect Americans, the United States must be vigilant during the visa-issuance process to ensure that those aliens approved for admission into the United States do not intend to harm Americans or our national interests. More importantly, the United States must identify them before their admission or entry into the United States. And the United States must ensure that admitted aliens and aliens otherwise already present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid, or support designated foreign terrorists and other threats to our national security.

**Sec. 2**. *Enhanced Vetting and Screening Across Agencies.*

(a) The Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall promptly:

(i) identify all resources that may be used to ensure that all aliens seeking admission to the United States, or who are already in the United States, are vetted and screened to the maximum degree possible;

(ii) determine the information needed from any country to adjudicate any visa, admission, or other benefit under the INA for one of its nationals, and to ascertain whether the individual seeking the benefit is who the individual claims to be and that the individual is not a security or public-safety threat;

(iii) re-establish a uniform baseline for screening and vetting standards and procedures, consistent with the uniform baseline that existed on January 19, 2021, that will be used for any alien seeking a visa or immigration benefit of any kind; and

(iv) vet and screen to the maximum degree possible all aliens who intend to be admitted, enter, or are already inside the United States, particularly those aliens coming from regions or nations with identified security risks.

(b) Within 60 days of the date of this order, the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence shall jointly submit to the President, through the Assistant to the President for Homeland Security, a report:

(i) identifying countries throughout the world for which vetting and screening information is so deficient as to warrant a partial or full suspension on the admission of nationals from those countries pursuant to section 212(f) of the INA (8 U.S.C. 1182(f)); and

(ii) identifying how many nationals from those countries have entered or have been admitted into the United States on or since January 20,

2021, and any other information the Secretaries and Attorney General deem relevant to the actions or activities of such nationals since their admission or entry to the United States.

(c) Whenever information is identified that would support the exclusion or removal of any alien described in subsection 2(b), the Secretary of Homeland Security shall take immediate steps to exclude or remove that alien unless she determines that doing so would inhibit a significant pending investigation or prosecution of the alien for a serious criminal offense or would be contrary to the national security interests of the United States.

**Sec. 3**. *Additional Measures to Protect the Nation.* As soon as possible, but no later than 30 days from the date of this order, the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall also:

(a) Evaluate and adjust all existing regulations, policies, procedures, and provisions of the Foreign Service Manual, or guidance of any kind pertaining to each of the grounds of inadmissibility listed in sections 212(a)(2)–(3) of the INA (8 U.S.C. 1182(a)(2)–(3)), to ensure the continued safety and security of the American people and our constitutional republic;

(b) Ensure that sufficient safeguards are in place to prevent any refugee or stateless individual from being admitted to the United States without undergoing stringent identification verification beyond that required of any other alien seeking admission or entry to the United States;

(c) Evaluate all visa programs to ensure that they are not used by foreign nation-states or other hostile actors to harm the security, economic, political, cultural, or other national interests of the United States;

(d) Recommend any actions necessary to protect the American people from the actions of foreign nationals who have undermined or seek to undermine the fundamental constitutional rights of the American people, including, but not limited to, our Citizens' rights to freedom of speech and the free exercise of religion protected by the First Amendment, who preach or call for sectarian violence, the overthrow or replacement of the culture on which our constitutional Republic stands, or who provide aid, advocacy, or support for foreign terrorists;

(e) Ensure the devotion of adequate resources to identify and take appropriate action for offenses described in 8 U.S.C. 1451;

(f) Evaluate the adequacy of programs designed to ensure the proper assimilation of lawful immigrants into the United States, and recommend any additional measures to be taken that promote a unified American identity and attachment to the Constitution, laws, and founding principles of the United States; and

(g) Recommend any additional actions to protect the American people and our constitutional republic from foreign threats.

**Sec. 4**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

CAR 000016

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20 2025.*

[FR Doc. 2025–02009
Filed 1–29–25; 8:45 am]
Billing code 3395–F4–P

CAR 000017

# Presidential Documents

Proclamation 10949 of June 4, 2025

## Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats

**By the President of the United States of America**

**A Proclamation**

During my first Administration, I restricted the entry of foreign nationals into the United States, which successfully prevented national security threats from reaching our borders and which the Supreme Court upheld. In Executive Order 14161 of January 20, 2025 (Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats), I stated that it is the policy of the United States to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes.

I also stated that the United States must be vigilant during the visa-issuance process to ensure that those aliens approved for admission into the United States do not intend to harm Americans or our national interests. More importantly, the United States must identify such aliens before their admission or entry into the United States. The United States must ensure that admitted aliens and aliens otherwise already present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid, or support designated foreign terrorists or other threats to our national security.

I directed the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to identify countries throughout the world for which vetting and screening information is so deficient as to warrant a full or partial suspension on the admission of nationals from those countries pursuant to section 212(f) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f). After completing that process, the Secretary of State determined that a number of countries remain deficient with regards to screening and vetting. Many of these countries have also taken advantage of the United States in their exploitation of our visa system and their historic failure to accept back their removable nationals.

As President, I must act to protect the national security and national interest of the United States and its people. I remain committed to engaging with those countries willing to cooperate to improve information-sharing and identity-management procedures, and to address both terrorism-related and public-safety risks. Nationals of some countries also pose significant risks of overstaying their visas in the United States, which increases burdens on immigration and law enforcement components of the United States, and often exacerbates other risks related to national security and public safety.

Some of the countries with inadequacies face significant challenges to reform efforts. Others have made important improvements to their protocols and procedures, and I commend them for these efforts. But until countries with identified inadequacies address them, members of my Cabinet have recommended certain conditional restrictions and limitations. I have considered and largely accepted those recommendations and impose the limitations

CAR 000018

set forth below on the entry into the United States by the classes of foreign nationals identified in sections 2 and 3 of this proclamation.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in this proclamation, the immigrant and nonimmigrant entry into the United States of persons described in sections 2 and 3 of this proclamation would be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1**. *Policy and Purpose.* (a) It is the policy of the United States to protect its citizens from terrorist attacks and other national security or public-safety threats. Screening and vetting protocols and procedures associated with visa adjudications and other immigration processes play a critical role in implementing that policy. These protocols enhance our ability to detect foreign nationals who may commit, aid, or support acts of terrorism, or otherwise pose a safety threat, and they aid our efforts to prevent such individuals from entering the United States.

(b) Information-sharing and identity-management protocols and practices of foreign governments are important for the effectiveness of the screening and vetting protocols and procedures of the United States. Governments manage the identity and travel documents of their nationals and residents. They also control the circumstances under which they provide information about their nationals to other governments, including information about known or suspected terrorists and criminal-history information. It is, therefore, the policy of the United States to take all necessary and appropriate steps to encourage foreign governments to improve their information-sharing and identity-management protocols and practices and to regularly share their identity and threat information with the immigration screening and vetting systems of the United States.

(c) Section 2(b) of Executive Order 14161 directed the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, within 60 days of the date of that order, to jointly submit to the President, through the Assistant to the President for Homeland Security, a report identifying countries throughout the world for which vetting and screening information is so deficient as to warrant a full or partial suspension on the entry or admission of nationals from those countries pursuant to section 212(f) of the INA (8 U.S.C. 1182(f)).

(d) On April 9, 2025, the Secretary of State, with the Assistant to the President for Homeland Security, presented the report described in subsection (c) of this section, recommending that entry restrictions and limitations be placed on foreign nationals of several countries. The report identified countries for which vetting and screening information is so deficient as to warrant a full suspension of admissions and countries that warrant a partial suspension of admission.

(e) In evaluating the recommendations from the Secretary of State and in determining what restrictions to impose for each country, I consulted with the Secretary of State, the Secretary of Defense, the Attorney General, the Secretary of Homeland Security, appropriate Assistants to the President, the Director of National Intelligence, and the Director of the Central Intelligence Agency. I considered foreign policy, national security, and counterterrorism goals. And I further considered various factors, including each country's screening and vetting capabilities, information sharing policies, and country-specific risk factors—including whether each country has a significant terrorist presence within its territory, its visa-overstay rate, and its cooperation with accepting back its removable nationals.

CAR 000019

I also considered the different risks posed by aliens admitted on immigrant visas and those admitted on nonimmigrant visas. Persons admitted on immigrant visas become lawful permanent residents of the United States. Such persons may present national security or public-safety concerns that may be distinct from those admitted as nonimmigrants. The United States affords lawful permanent residents more enduring rights than it does to nonimmigrants. Lawful permanent residents are more difficult to remove than nonimmigrants, even after national security concerns arise, which increases the costs and aggravates the dangers of errors associated with admitting such individuals. And although immigrants are generally subject to more extensive vetting than nonimmigrants, such vetting is far less reliable when the country from which someone seeks to emigrate maintains inadequate identity-management or information-sharing policies or otherwise poses risks to the national security of the United States.

I reviewed these factors and assessed these goals, with a particular focus on crafting country-specific restrictions. This approach was designed to encourage cooperation with the subject countries in recognition of each country's unique circumstances. The restrictions and limitations imposed by this proclamation are, in my judgment, necessary to prevent the entry or admission of foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States. The restrictions and limitations imposed by this proclamation are necessary to garner cooperation from foreign governments, enforce our immigration laws, and advance other important foreign policy, national security, and counterterrorism objectives.

(f) After reviewing the report described in subsection (d) of this section, and after accounting for the foreign policy, national security, and counterterrorism objectives of the United States, I have determined to fully restrict and limit the entry of nationals of the following 12 countries: Afghanistan, Burma, Chad, Republic of the Congo, Equatorial Guinea, Eritrea, Haiti, Iran, Libya, Somalia, Sudan, and Yemen. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants.

(g) I have determined to partially restrict and limit the entry of nationals of the following 7 countries: Burundi, Cuba, Laos, Sierra Leone, Togo, Turkmenistan, and Venezuela. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants.

(h) Sections 2 and 3 of this proclamation describe some of the identity-management or information-sharing inadequacies that led me to impose restrictions. These inadequacies are sufficient to justify my finding that unrestricted entry of nationals from the named countries would be detrimental to the interests of the United States. Publicly disclosing additional details on which I relied in making these determinations, however, would cause serious damage to the national security of the United States, and many such details are classified.

**Sec. 2**. *Full Suspension of Entry for Nationals of Countries of Identified Concern.* The entry into the United States of nationals of the following countries is hereby suspended and limited, as follows, subject to the categorical exceptions and case-by-case waivers described in section 5 of this proclamation:

(a) *Afghanistan*

(i) The Taliban, a Specially Designated Global Terrorist (SDGT) group, controls Afghanistan. Afghanistan lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. According to the Fiscal Year 2023 Department of Homeland Security (DHS) Entry/Exit Overstay Report ("Overstay Report"), Afghanistan had a business/tourist (B–1/B–2) visa overstay rate of 9.70 percent and a student (F), vocational (M), and exchange visitor (J) visa overstay rate of 29.30 percent.

(ii) The entry into the United States of nationals of Afghanistan as immigrants and nonimmigrants is hereby fully suspended.

CAR 000020

(b) *Burma*

(i) According to the Overstay Report, Burma had a B–1/B–2 visa overstay rate of 27.07 percent and an F, M, and J visa overstay rate of 42.17 percent. Additionally, Burma has historically not cooperated with the United States to accept back their removable nationals.

(ii) The entry into the United States of nationals of Burma as immigrants and nonimmigrants is hereby fully suspended.

(c) *Chad*

(i) According to the Overstay Report, Chad had a B–1/B–2 visa overstay rate of 49.54 percent and an F, M, and J visa overstay rate of 55.64 percent. According to the Fiscal Year 2022 Overstay Report, Chad had a B–1/B–2 visa overstay rate of 37.12 percent. The high visa overstay rate for 2022 and 2023 is unacceptable and indicates a blatant disregard for United States immigration laws.

(ii) The entry into the United States of nationals of Chad as immigrants and nonimmigrants is hereby fully suspended.

(d) *Republic of the Congo*

(i) According to the Overstay Report, the Republic of the Congo had a B–1/B–2 visa overstay rate of 29.63 percent and an F, M, and J visa overstay rate of 35.14 percent.

(ii) The entry into the United States of nationals of the Republic of the Congo as immigrants and nonimmigrants is hereby fully suspended.

(e) *Equatorial Guinea*

(i) According to the Overstay Report, Equatorial Guinea had a B–1/B–2 visa overstay rate of 21.98 percent and an F, M, and J visa overstay rate of 70.18 percent.

(ii) The entry into the United States of nationals of Equatorial Guinea as immigrants and nonimmigrants is hereby fully suspended.

(f) *Eritrea*

(i) The United States questions the competence of the central authority for issuance of passports or civil documents in Eritrea. Criminal records are not available to the United States for Eritrean nationals. Eritrea has historically refused to accept back its removable nationals. According to the Overstay Report, Eritrea had a B–1/B–2 visa overstay rate of 20.09 percent and an F, M, and J visa overstay rate of 55.43 percent.

(ii) The entry into the United States of nationals of Eritrea as immigrants and nonimmigrants is hereby fully suspended.

(g) *Haiti*

(i) According to the Overstay Report, Haiti had a B–1/B–2 visa overstay rate of 31.38 percent and an F, M, and J visa overstay rate of 25.05 percent. Additionally, hundreds of thousands of illegal Haitian aliens flooded into the United States during the Biden Administration. This influx harms American communities by creating acute risks of increased overstay rates, establishment of criminal networks, and other national security threats. As is widely known, Haiti lacks a central authority with sufficient availability and dissemination of law enforcement information necessary to ensure its nationals do not undermine the national security of the United States.

(ii) The entry into the United States of nationals of Haiti as immigrants and nonimmigrants is hereby fully suspended.

(h) *Iran*

(i) Iran is a state sponsor of terrorism. Iran regularly fails to cooperate with the United States Government in identifying security risks, is the source of significant terrorism around the world, and has historically failed to accept back its removable nationals.

(ii) The entry into the United States of nationals of Iran as immigrants and nonimmigrants is hereby suspended.

(i) *Libya*

(i) There is no competent or cooperative central authority for issuing passports or civil documents in Libya. The historical terrorist presence within Libya's territory amplifies the risks posed by the entry into the United States of its nationals.

(ii) The entry into the United States of nationals of Libya as immigrants and nonimmigrants is hereby fully suspended.

(j) *Somalia*

(i) Somalia lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. Somalia stands apart from other countries in the degree to which its government lacks command and control of its territory, which greatly limits the effectiveness of its national capabilities in a variety of respects. A persistent terrorist threat also emanates from Somalia's territory. The United States Government has identified Somalia as a terrorist safe haven. Terrorists use regions of Somalia as safe havens from which they plan, facilitate, and conduct their operations. Somalia also remains a destination for individuals attempting to join terrorist groups that threaten the national security of the United States. The Government of Somalia struggles to provide governance needed to limit terrorists' freedom of movement. Additionally, Somalia has historically refused to accept back its removable nationals.

(ii) The entry into the United States of nationals of Somalia as immigrants and nonimmigrants is hereby fully suspended.

(k) *Sudan*

(i) Sudan lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. According to the Overstay Report, Sudan had a B–1/B–2 visa overstay rate of 26.30 percent and an F, M, and J visa overstay rate of 28.40 percent.

(ii) The entry into the United States of nationals of Sudan as immigrants and nonimmigrants is hereby fully suspended.

(l) *Yemen*

(i) Yemen lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. The government does not have physical control over its own territory. Since January 20, 2025, Yemen has been the site of active United States military operations.

(ii) The entry into the United States of nationals of Yemen as immigrants and nonimmigrants is hereby fully suspended.

**Sec. 3.** *Partial Suspension of Entry for Nationals of Countries of Identified Concern.*

(a) *Burundi*

(i) According to the Overstay Report, Burundi had a B–1/B–2 visa overstay rate of 15.35 percent and an F, M, and J visa overstay rate of 17.52 percent.

(ii) The entry into the United States of nationals of Burundi as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Burundi to the extent permitted by law.

(b) *Cuba*

(i) Cuba is a state sponsor of terrorism. The Government of Cuba does not cooperate or share sufficient law enforcement information with the United States. Cuba has historically refused to accept back its removable nationals. According to the Overstay Report, Cuba had a B–1/B–2 visa overstay rate of 7.69 percent and an F, M, and J visa overstay rate of 18.75 percent.

(ii) The entry into the United States of nationals of Cuba as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Cuba to the extent permitted by law.

(c) *Laos*

(i) According to the Overstay Report, Laos had a B–1/B–2 visa overstay rate of 34.77 percent and an F, M, and J visa overstay rate of 6.49 percent. Laos has historically failed to accept back its removable nationals.

(ii) The entry into the United States of nationals of Laos as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Laos to the extent permitted by law.

(d) *Sierra Leone*

(i) According to the Overstay Report, Sierra Leone had a B–1/B–2 visa overstay rate of 15.43 percent and an F, M, and J visa overstay rate of 35.83 percent. Sierra Leone has historically failed to accept back its removable nationals.

(ii) The entry into the United States of nationals of Sierra Leone as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Sierra Leone to the extent permitted by law.

(e) *Togo*

(i) According to the Overstay Report, Togo had a B–1/B–2 visa overstay rate of 19.03 percent and an F, M, and J visa overstay rate of 35.05 percent.

(ii) The entry into the United States of nationals of Togo as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Togo to the extent permitted by law.

(f) *Turkmenistan*

(i) According to the Overstay Report, Turkmenistan had a B–1/B–2 visa overstay rate of 15.35 percent and an F, M, and J visa overstay rate of 21.74 percent.

(ii) The entry into the United States of nationals of Turkmenistan as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Turkmenistan to the extent permitted by law.

(g) *Venezuela*

(i) Venezuela lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. Venezuela has historically refused to accept back its removable nationals. According to the Overstay Report, Venezuela had a B–1/B–2 visa overstay rate of 9.83 percent.

(ii) The entry into the United States of nationals of Venezuela as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Venezuela to the extent permitted by law.

**Sec. 4**. *Scope and Implementation of Suspensions and Limitations.* (a) *Scope.* Subject to the exceptions set forth in subsection (b) of this section and

CAR 000023

any exceptions made pursuant to subsections (c) and (d) of this section, the suspensions of and limitations on entry pursuant to sections 2 and 3 of this proclamation shall apply only to foreign nationals of the designated countries who:

(i) are outside the United States on the applicable effective date of this proclamation; and

(ii) do not have a valid visa on the applicable effective date of this proclamation.

(b) *Exceptions.* The suspension of and limitation on entry pursuant to sections 2 and 3 of this proclamation shall not apply to:

(i) any lawful permanent resident of the United States;

(ii) any dual national of a country designated under sections 2 and 3 of this proclamation when the individual is traveling on a passport issued by a country not so designated;

(iii) any foreign national traveling with a valid nonimmigrant visa in the following classifications: A–1, A–2, C–2, C–3, G–1, G–2, G–3, G–4, NATO–1, NATO–2, NATO–3, NATO–4, NATO–5, or NATO–6;

(iv) any athlete or member of an athletic team, including coaches, persons performing a necessary support role, and immediate relatives, traveling for the World Cup, Olympics, or other major sporting event as determined by the Secretary of State;

(v) immediate family immigrant visas (IR–1/CR–1, IR–2/CR–2, IR–5) with clear and convincing evidence of identity and family relationship (*e.g.,* DNA);

(vi) adoptions (IR–3, IR–4, IH–3, IH–4);

(vii) Afghan Special Immigrant Visas;

(viii) Special Immigrant Visas for United States Government employees; and

(ix) immigrant visas for ethnic and religious minorities facing persecution in Iran.

(c) Exceptions to the suspension of and limitation on entry pursuant to sections 2 and 3 of this proclamation may be made for certain individuals for whom the Attorney General finds, in her discretion, that the travel by the individual would advance a critical United States national interest involving the Department of Justice, including when individuals must be present to participate in criminal proceedings as witnesses. These exceptions shall be made only by the Attorney General, or her designee, in coordination with the Secretary of State and the Secretary of Homeland Security.

(d) Exceptions to the suspension of and limitation on entry pursuant to sections 2 and 3 of this proclamation may be made case-by-case for individuals for whom the Secretary of State finds, in his discretion, that the travel by the individual would serve a United States national interest. These exceptions shall be made by only the Secretary of State or his designee, in coordination with the Secretary of Homeland Security or her designee.

**Sec. 5**. *Adjustments to and Removal of Suspensions and Limitations.* (a) The Secretary of State shall, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director for National Intelligence, devise a process to assess whether any suspensions and limitations imposed by sections 2 and 3 of this proclamation should be continued, terminated, modified, or supplemented. Within 90 days of the date of this proclamation, and every 180 days thereafter, the Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall submit a report to the President, through the Assistant to the President for Homeland Security, describing his assessment and recommending whether any suspensions and limitations imposed by sections 2 and 3 of this proclamation should be continued, terminated, modified, or supplemented.

CAR 000024

(b) The Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall immediately engage each of the countries identified in sections 2 and 3 of this proclamation on measures that must be taken to comply with United States screening, vetting, immigration, and security requirements.

(c) Additionally, and in light of recent events, the Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall provide me an update to the review of the practices and procedures of Egypt to confirm the adequacy of its current screening and vetting capabilities.

Sec. 6. *Enforcement.* (a) The Secretary of State and the Secretary of Homeland Security shall consult with appropriate domestic and international partners, including countries and organizations, to ensure efficient, effective, and appropriate implementation of this proclamation.

(b) In implementing this proclamation, the Secretary of State and the Secretary of Homeland Security shall comply with all applicable laws and regulations.

(c) No immigrant or nonimmigrant visa issued before the applicable effective date of this proclamation shall be revoked pursuant to this proclamation.

(d) This proclamation shall not apply to an individual who has been granted asylum by the United States, to a refugee who has already been admitted to the United States, or to an individual granted withholding of removal or protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment of Punishment (CAT). Nothing in this proclamation shall be construed to limit the ability of an individual to seek asylum, refugee status, withholding of removal, or protection under the CAT, consistent with the laws of the United States.

Sec. 7. *Severability.* It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the national security, foreign policy, and counterterrorism interests of the United States. Accordingly:

(a) if any provision of this proclamation, or the application of any provision of this proclamation to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) if any provision of this proclamation, or the application of any provision of this proclamation to any person or circumstance, is held to be invalid because of the lack of certain procedural requirements, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

Sec. 8. *Effective Date.* This proclamation is effective at 12:01 a.m. eastern daylight time on June 9, 2025.

Sec. 9. *General Provisions.* (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable by law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

CAR 000025

IN WITNESS WHEREOF, I have hereunto set my hand this fourth day of June, in the year of our Lord two thousand twenty-five, and of the Independence of the United States of America the two hundred and forty-ninth.

[FR Doc. 2025–10669

Filed 6–9–25; 11:15 am]

Billing code 3395–F4–P



PRESS RELEASE

# Afghan National Pleads Guilty to Plotting Election Day Terror Attack in the United States

Friday, June 13, 2025

**For Immediate Release**

Office of Public Affairs

Nasir Ahmad Tawhedi, 27, a native and citizen of Afghanistan, pleaded guilty today in federal court in Oklahoma City to two terrorism-related offenses: conspiring and attempting to provide material support and resources to the Islamic State of Iraq and al-Sham (ISIS), a designated foreign terrorist organization, and receiving, attempting to receive, and conspiring to receive firearms and ammunition in furtherance of a federal crime of terrorism.

"By pledging allegiance to ISIS and plotting an attack against innocent Americans on Election Day, this defendant endangered lives and gravely betrayed the nation that gave him refuge," said Attorney General Pamela Bondi. "Today's guilty plea guarantees he will be held accountable, stripped of his immigration status, and permanently removed from the United States, and shows the Justice Department has zero tolerance for those who exploit our freedoms to spread violence."

"The defendant admits he planned and obtained firearms to carry out a violent terror attack on Election Day in 2024, a plot that was detected and disrupted through the good work of the FBI and our partners," said FBI Director Kash Patel. "Let this serve as notice to anyone who tries to conduct attacks in our homeland for ISIS or any other terror group: we will find you and you'll face American justice. I want to commend the FBI teams and our partners for their hard work and success in executing the mission."

"Through incredible law enforcement effort and coordination, a violent terrorist attack on American soil was thwarted, and those responsible are being held accountable," said U.S. Attorney Robert J. Troester for the Western District of Oklahoma. "I commend the outstanding work by the FBI, our law enforcement partners, and prosecutors to diligently discover, thoroughly investigate, and

CAR 000027

completely foil this terror plot. These guilty pleas serve as an emphatic reminder that the Department of Justice and its law enforcement partners will aggressively pursue those who attempt to harm Americans through terrorist acts."

"Thanks to outstanding work by the Oklahoma City Joint Terrorism Task Force, the defendant's plan to kill innocent Americans in a terrorist attack on Election Day was stopped," said Special Agent in Charge Doug Goodwater of the FBI Oklahoma City Field Office. "The FBI is grateful to all who stand beside us in our fight against terrorism. Together, we will continue to safeguard our communities from those who conspire against the United States."

According to court documents, Tawhedi admitted that between June 2024 and October 2024 he conspired with at least one other individual to purchase two AK-47 rifles, 500 rounds of ammunition, and 10 magazines, with the intent to carry out a mass-casualty attack on or around Election Day, Nov. 5, 2024, on behalf of ISIS.  According to a criminal complaint affidavit filed in the case, Tawhedi communicated with an ISIS facilitator about his plan to purchase firearms for use in the terror plot, including asking the individual whether 500 rounds of ammunition would be sufficient.

Tawhedi and his co-conspirator, Abdullah Haji Zada, were arrested on Oct. 7, 2024, after purchasing the firearms and ammunition from an undercover FBI employee.  Zada, 18, pleaded guilty in April 2025 to the firearms offense in connection with his role in the terror plot and is awaiting sentencing. Zada, who was 17 at the time of his arrest, entered his guilty plea as an adult and will be sentenced as an adult.

At sentencing, Tawhedi faces a maximum penalty 20 years in prison for the material support charge and up to 15 years in prison for the firearms charge. Zada faces up to 15 years in federal prison. Upon completion of any sentence, Tawhedi and Zada will be permanently removed from the United States and barred from reentry under stipulated judicial orders of removal to Afghanistan. A federal district court judge will determine any sentence after considering the U.S. Sentencing Guidelines and other statutory factors.

The FBI Oklahoma City Field Office's Joint Terrorism Task Force, which includes Homeland Security Investigations, U.S. Immigration and Customs Enforcement, U.S. Citizenship and Immigration Services, U.S. Marshals Service, Oklahoma State Bureau of Investigation, the Edmond Police Department, the Moore Police Department, the Oklahoma City Police Department, the Oklahoma City Community College Police Department, and the Oklahoma City University Police Department, is investigating the case.

Assistant U.S. Attorneys Jessica L. Perry and Matt Dillon for the Western District of Oklahoma; Assistant U.S. Attorney Everett McMillian, who previously served in the National Security Division's Counterterrorism Section; and Trial Attorney Jennifer Levy of the Counterterrorism Section are prosecuting the case. Trial Attorney Mark Stoneman of the Money Laundering and Asset Recovery Section, who previously served as an Assistant U.S. Attorney for the Western District of Oklahoma, also assisted with the prosecution.

*Updated June 13, 2025*

CAR 000028

**Topics**

| COUNTERTERRORISM | NATIONAL SECURITY |

**Components**

Office of the Attorney General   |   Federal Bureau of Investigation (FBI)   |   National Security Division (NSD)   |   USAO - Oklahoma, Western

Press Release Number: 25-617

# Related Content

---

**PRESS RELEASE**

**Brooklyn Man Sentenced to 15 Years in Prison for Murder-for-Hire Plot and Stalking a Journalist and Prominent Critic of the Iranian Government**

Convicted murderer Carlisle Rivera, also known as "Pop," was sentenced to 15 years in prison for his participation in a murder-for-hire plot directed by the Government of Iran targeting Masih...

**PRESS RELEASE**

**Investigation into International "ATM Jackpotting" Scheme and Tren de Aragua results in Additional Indictment and 87 Total Charged Defendants**

A federal grand jury in the District of Nebraska returned an additional indictment Thursday charging 31 individuals for their roles in a large conspiracy to deploy malware and steal millions...

**PRESS RELEASE**

**Maryland Man Indicted on Unlawful Transmission and Retention of Classified National Defense Information Charges**

Today, a federal grand jury indicted a Laurel, Maryland man on five counts of unlawfully transmitting and one count of unlawfully retaining classified national defense information, in violation of 18...

CAR 000029

January 28, 2026

January 26, 2026

January 22, 2026

 **Office of Public Affairs**

U.S. Department of Justice

950 Pennsylvania Avenue, NW

Washington DC 20530

Office of Public Affairs Direct Line

202-514-2007

Department of Justice Main Switchboard

202-514-2000

CAR 000030

| **INFO** | 2026 winter storm resources: One-stop shop for information, resources and tips on how to stay safe during and after the winter storm. |
|---|---|

U.S. Department of Homeland Security

# Terrorist Who Shot Two National Guard Members in D.C. Was Let into the Country by the Biden Administration's Operation Allies Welcome Program

**Release Date:** November 26, 2025

*This terrorist is one of thousands of unvetted Afghan nationals let into the country under the Biden Administration's Operation Allies Welcome program*

WASHINGTON – The Department of Homeland Security (DHS) released immigration history of Rahmanullah Lakanwal a criminal alien from Afghanistan who shot two national guard members in a terror attack in Washington D.C.

> *"The suspect who shot our brave National Guardsmen is an Afghan national who was one of the many unvetted, mass paroled into the United States under Operation Allies Welcome on September 8, 2021, under the Biden Administration. I will not utter this depraved individual's name. He should be starved of the glory he so desperately wants," said* **Secretary Noem**. *"These men and women of the National Guard are mothers, fathers, sisters, daughters, children of God, carrying out the same basic public safety and immigration laws enshrined in law for decades. Those politicians and media who continue to vilify our men and women in uniform need to take a long hard look in the mirror. Bryon and I will be praying hard for these two National Guardsmen, their families, and every American who puts on a uniform to defend our freedom."*

The Biden Administration let this terrorist into the country as part of their Operation Allies Welcome program on September 8, 2021. This program let in thousands of unvetted Afghan nationals including terrorists into our country.

CAR 000031

We will keep the public apprised as more information becomes available.

*###*

## Topics

HOMELAND SECURITY ENTERPRISE (/TOPICS/HOMELAND-SECURITY-ENTERPRISE)      SECRETARY OF HOMELAND SECURITY (/TOPICS/SECRETARY-HOMELAND-SECURITY)

## Keywords

SECRETARY KRISTI NOEM (/KEYWORDS/SECRETARY-KRISTI-NOEM)      ALIEN (/KEYWORDS/ALIEN)      CRIME (/KEYWORDS/CRIME)

OPERATION ALLIES WELCOME (/KEYWORDS/OPERATION-ALLIES-WELCOME)      TARGETED VIOLENCE (/KEYWORDS/TARGETED-VIOLENCE)

TERRORISM (/KEYWORDS/TERRORISM)

Last Updated: 11/28/2025

CAR 000032

[^ 99] If the derogatory information is disclosed during an interview, the officer records the information and the benefit requestor's rebuttal. See Section D, Types of Evidence, Subsection 2, Testimonial Evidence [1 USCIS-PM E.6(D)(2)].

[^ 100] See 8 CFR 103.2(b)(16). A determination of statutory eligibility must be based only on information contained in the record of proceeding that is disclosed to the benefit requestor, except as provided in 8 CFR 103.2(b)(16)(iv). See 8 CFR 103.2(b)(16)(ii).

[^ 101] Any attempts to explain or reconcile such inconsistencies, absent competent objective evidence pointing to where the truth lies, will not suffice. See *Matter of Ho*, 19 I&N Dec. 582 (BIA 1988).

[^ 102] For example, a benefit requestor's tax return statement submitted with the Form I-130 that USCIS uses as evidence of a lack of a qualifying spousal relationship.

[^ 103] For example, records such as marriage certificates or personal financial statements submitted with a previous spousal petition.

[^ 104] USCIS is not required to disclose derogatory information of which the benefit requestor is aware. See 8 CFR 103.2(b)(16). See Section F, Requests for Evidence and Notices of Intent to Deny [1 USCIS-PM E.6(F)]. However, USCIS may disclose derogatory information that the benefit requestor may be aware of to ensure the benefit requestor has sufficient opportunity to rebut information used in an adverse decision.

[^ 105] For example, officers may provide a copy of the source document containing derogatory information, such as a lease agreement, in instances where the document contains no privileged or confidential information, or information that is otherwise prohibited from disclosure.

[^ 106] USCIS must not provide screenshots of information obtained from DHS or other third agency systems absent permission from the data owner. If an adverse decision is based primarily on derogatory information that originates from such systems, any disclosure must be in a detailed summary statement and is subject to the terms and conditions of applicable data sharing agreements, such as the agreement between USCIS and DOS on disclosure authorization requirements.

## Chapter 7 - Interviews [Reserved]

## Chapter 8 - Discretionary Analysis

Many immigration benefits require the requestor[1] to demonstrate that the request merits a favorable exercise of discretion in order to receive the benefit.[2] For these benefits, a discretionary analysis is a separate, additional component of adjudicating the benefit request. Whether to favorably exercise discretion is typically assessed after an officer has determined that the requestor meets all applicable threshold eligibility requirements.

The discretionary analysis involves the review of all relevant, specific facts and circumstances in an individual case. However, there are limitations on how the officer may exercise discretion; the officer may not

exercise discretion arbitrarily, inconsistently, or in reliance on biases or assumptions.

In some contexts, there are regulations and case law that outline certain factors that officers must review and use as a guide in making a discretionary determination. However, there is no exhaustive list of factors that officers must consider. To perform a discretionary analysis, officers must weigh all positive factors present in a particular case against any negative factors in the totality of the record.[3] The analysis must be comprehensive, specific to the case, and based on all relevant facts known at the time of adjudication. For complex or difficult cases, officers should consult with supervisors and local counsel.

## A. Applicability

Congress generally provides discretionary authority explicitly in the statutory language that governs an immigration benefit. In some instances, however, discretionary authority is less explicit and must be inferred from the statutory language. Executive agencies may also outline their discretionary authority explicitly in regulations.[4]

Many immigration benefit requests are filed under provisions of law that require the favorable exercise of discretion to administer the benefit.[5] In these cases, the benefit requestor has the burden of demonstrating eligibility for the benefit sought and that USCIS should favorably exercise discretion.[6] Where an immigration benefit is discretionary, meeting the statutory and regulatory requirements alone does not entitle the requestor to the benefit sought.

Certain immigration benefits are not discretionary.[7] In these cases, if the requestor properly filed and meets the eligibility requirements then USCIS must approve the benefit request. There is no discretionary analysis as part of the adjudication, and these requests cannot be denied as a matter of discretion.

The following table provides a non-exhaustive overview of immigration benefits and whether discretion is involved in the adjudication of such benefits.

Immigration Benefits Involving Discretionary Review

| Benefit Type | Discretion Involved (Yes or No) |
|---|---|
| Petition to classify an alien as a nonimmigrant worker[8] | No (with some exceptions) |
| Petition to classify an alien as a fiancé(e) of a U.S. citizen[9] | Yes |
| Application to extend or change nonimmigrant status[10] | Yes |
| Advance permission to enter as a nonimmigrant[11] | Yes |

CAR 000034

| Benefit Type | Discretion Involved (Yes or No) |
|---|---|
| Initial Parole Document (for aliens who are currently outside the United States) also referred to as "humanitarian parole"[12] | Yes |
| International entrepreneur parole[13] | Yes |
| Temporary protected status[14] | Yes |
| Refugee status[15] | Yes (with some exceptions)[16] |
| Asylum[17] | Yes |
| Petition to classify an alien as a family-based immigrant[18] | No (with some exceptions) |
| Petition to classify an alien as an employment-based immigrant[19] | No (with one exception)[20] |
| Petition to classify an alien as an immigrant investor[21] | No (with some exceptions)[22] |
| Applications by an existing or prospective Regional Center[23] | No (with some exceptions)[24] |
| Adjustment of status[25] | Yes (with some exceptions)[26] |
| Registration[27] | Yes |
| Recognition as an American Indian born in Canada[28] | No |
| Waivers of inadmissibility[29] | Yes |
| Consent to reapply for admission after deportation or removal[30] | Yes |
| Employment authorization[31] | Yes (with some exceptions) |
| Removal of conditions on permanent residence[32] | No (with some exceptions)[33] |
| Naturalization[34] | No |
| Application for a Certificate of Citizenship[35] | No |

[Redaction - Start]

Officers are reminded to follow regulations and specific guidance applicable to the underlying eligibility category, as reflected in standard operating procedures (SOPs) and training materials. For example, specific regulations at 8 CFR 208.13(b)(1)(i)-(ii) govern portions of the discretionary analysis for asylum applications. The RAIO Training Module on Discretion (PDF) provides further information. In cases affected by special circumstances outlined in operational guidance, officers should consult with their supervisors before deciding if the negative factors in a particular case are significant enough to warrant an unfavorable exercise of discretion.

[Redaction - End]

## B. Overview of Discretion

### 1. Definition

The Board of Immigration Appeals (BIA) has described the exercise of discretion as:

- A balancing of the negative factors evidencing the alien's undesirability as a permanent resident with the social and humane considerations presented on his or her behalf to determine whether relief appears in the best interests of this country.[36]
- A matter of administrative grace where the applicant has the burden of showing that discretion should be exercised in his or her favor.[37]
- A consideration of negative factors and the need for the applicant to offset such factors by showing unusual or even outstanding equities.[38]

These characterizations imply that the exercise of discretion cannot be arbitrary, inconsistent, or dependent on intangible or imagined circumstances.

In short, discretion is defined as the ability or power to exercise sound judgment in decision-making. While the discretionary analysis gives the officer some autonomy in the way in which he or she decides a particular case after all applicable eligibility requirements are established, that autonomy may only be exercised within the confines of certain legal restrictions. These restrictions define the scope of the officer's discretionary authority.[39]

### 2. Adjudicative Discretion

There are two broad types of discretion that may be exercised in the context of immigration law: prosecutorial (or enforcement) discretion[40] and adjudicative discretion. The scope of discretion is defined by what type of discretionary decision is being made. This chapter only discusses the exercise of adjudicative discretion.

Adjudicative discretion requires an officer to decide whether to exercise discretion favorably when adjudicating a request for an immigration benefit. This decision is guided by the applicable statutes,

regulations, and policies that outline the eligibility requirements for the benefit and the facts present in the case at issue. The U.S. Supreme Court has referred to adjudicative discretion as merit-deciding discretion.[41]

In general, an officer may exercise favorable adjudicative discretion to approve a benefit request when the requestor has met the applicable eligibility requirements and negative factors impacting discretion are not present.[42] An exercise of discretion to grant a benefit may also be appropriate when the requestor has met the eligibility requirements for the benefit, and the positive factors outweigh the negative factors. An exercise of discretion to deny, rather than to grant, may likewise be appropriate when the requestor has met the requirements of the request, but negative factors found in the course of the adjudication outweigh the positive factors.

## 3. Who Exercises Discretion

Congress expressly granted discretion to the Secretary of Homeland Security in deciding when to grant certain immigration benefits. For example, the Immigration and Nationality Act (INA) states: "The Secretary of Homeland Security or the Attorney General, in the Secretary's or the Attorney General's discretion and under such regulations as the Secretary or the Attorney General may prescribe, may adjust to the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum . . . ."[43]

The Secretary's discretionary power is delegated to the officer, through DHS and USCIS. Therefore, when an officer exercises discretion in adjudicating a request for an immigration benefit, the officer is exercising discretion on behalf of the Secretary of Homeland Security.

In many cases, the INA still refers to the Attorney General's discretion because the statutory text has not been changed to reflect the creation of DHS and the transfer of many functions from the U.S. Department of Justice (DOJ) to DHS.[44] If USCIS has adjudicative authority over the benefit, the statute should be read as conferring the power to exercise discretion on the Secretary of Homeland Security.[45]

## 4. Discretion

*Eligibility Threshold*

For discretionary benefits, there is never discretion to grant an immigration benefit if the benefit requestor has not first met all applicable threshold eligibility requirements.

It is legally permissible to deny an application as a matter of discretion without determining whether the requestor is otherwise eligible for the benefit.[46] However, the record is essentially incomplete if USCIS denies an application, petition, or request in its exercise of discretion without making a determination concerning eligibility.

Therefore, as a matter of policy, officers should generally make a specific determination regarding eligibility before addressing the exercise of discretion. Where denying the benefit request is appropriate, the officer should generally include in the denial letter his or her determination on all eligibility requirements, including

CAR 000037

but not limited to discretionary grounds, if applicable, so that the reasons for the ultimate denial are clearly reflected in the record.

*Lack of Negative Factors*

An alien's threshold eligibility for the benefit sought is generally also a positive factor. Therefore, absent any negative factors, USCIS ordinarily exercises discretion positively.[47] Generally, if there are no negative factors to weigh against that positive factor, denial of the benefit would be an inappropriate use of discretion.

## C. Adjudicating Discretionary Benefits

When adjudicating a discretionary benefit, the officer should first determine whether the requestor meets all threshold eligibility requirements. For example, in adjudicating an application for adjustment of status under INA 245(a), the officer should first determine:

- Whether the applicant was inspected and admitted or paroled or has an approved petition as a VAWA self-petitioner;
- Is eligible to receive an immigrant visa;
- Is admissible to the United States for permanent residence; and
- Has an immigrant visa immediately available to him or her at the time he or she files the adjustment application.[48]

If the officer finds that the requestor does not meet the eligibility requirements but may be eligible for a waiver, exemption, or other form of relief, the officer should determine whether the requestor qualifies for a waiver, exemption, or other form of relief. Not all applications are concurrently filed, and in some instances, applicants must file a separate waiver application or application for relief and have that application approved before the applicant qualifies for the benefit.

If the officer finds that the requestor meets the eligibility requirements because of an approved waiver, exemption, or other form of relief, the officer must then determine whether the request should be granted as a matter of discretion. If the officer finds that the requestor does not meet all applicable eligibility requirements, the officer can still include a discretionary analysis in the denial. The discretionary determination is the final step in the adjudication of a benefit request. Adding a discretionary analysis to a denial is useful if an appellate body on review disagrees with the officer's conclusion that the requestor failed to meet the threshold eligibility requirements. In such a situation, the discretionary denial may still stand.

## 1. Basic Adjudication Steps

Officers should generally follow a three-step process when adjudicating a benefit request involving a discretionary analysis.

| Basic Adjudication Steps Involving Discretion | |
|---|---|
| **Step One** | Fact finding |
| **Step Two** | Determine whether requestor meets the threshold eligibility requirements |
| **Step Three** | Conduct discretionary analysis |

*Fact Finding*[49]

Fact finding refers to the process of gathering and assessing evidence. The focus of fact finding should be to obtain credible evidence relevant to a requestor's eligibility for the benefit, including the discretionary determination. If a requestor is interviewed, the officer should elicit information pertinent to fact finding during the interview. As part of fact finding, officers should evaluate relevant information present in the record. Depending on the benefit sought, such information might include, but is not limited to:

- Immigration history;
- Family ties in the United States;
- Any serious medical conditions;
- Any criminal history;
- Other connections to the community; or
- Information indicating a public safety or national security concern.

Background information may be relevant for eligibility determinations and to the exercise of discretion.

For discretionary benefits, the benefit requestor has the burden of showing that a favorable exercise of discretion is warranted through the submission of evidence.[50] In cases where negative factors are present, the officer may ask the requestor directly why he or she warrants a favorable exercise of discretion. The officer should document any response, or lack thereof, in the record.

*Determining Whether Requestor First Meets Threshold Eligibility Requirements*

The discretionary analysis is the final step in the adjudication. Generally, the officer should first determine whether the requestor meets all threshold eligibility requirements before beginning the discretionary analysis. If the officer determines the requestor has not met the eligibility requirements for the benefit sought, the officer may deny the request without completing a discretionary analysis. However, an officer may include a discretionary analysis if a discretionary denial would be warranted even if the requestor had met the threshold statutory and regulatory requirements.

In the process of determining whether the requestor has met the eligibility requirements for the benefit sought, the officer might find that certain facts related to threshold eligibility for the specific benefit may also be relevant to the discretionary determination.

For example, if an officer finds that an adjustment applicant was convicted of a crime, the applicant might be inadmissible. The criminal conviction may also affect the discretionary analysis.

CAR 000039

*Conducting Discretionary Analysis*

The act of exercising discretion involves the weighing of positive and negative factors and considering the totality of the circumstances in the specific case. In the immigration context, the goal is to assess whether, based on the totality of the circumstances, the alien warrants a favorable exercise of discretion.[51]

## 2. Identifying Discretionary Factors

Any facts related to the alien's identity, conduct, character, family or other ties to the United States, immigration status, or any other humanitarian concerns may be appropriate factors to consider in the exercise of discretion. An alien's conduct can include how he or she entered the United States and what he or she has done since arrival, such as employment, schooling, or any evidence of criminal activity.

Whether the alien has family members living in the United States also is relevant to the discretionary analysis. Ties to the United States may include owning real estate or a business; the conduct of that business (including maintenance of such business in compliance with the law) may also be relevant to the discretionary analysis. Humanitarian concerns may include, but are not limited to, health issues.

Precedent case law provides guidance on how to consider evidence and weigh the positive and negative factors present in a case. These precedent decisions and USCIS guidance provide a framework to assist officers in making discretionary decisions that are reasonable and fair.[52]

*Factors That May Be Considered*

There are a number of factors or factual circumstances that are generally considered when conducting a discretionary analysis. Factors may include, but are not limited to:

- Extent to which identity can be established and aliases are disclosed;
- Contribute to the good order and happiness of the United States;
- Ties to family members in the United States and the closeness of the underlying relationships;[53]
- Hardship due to an adverse decision;[54]
- Value and service to the community;[55]
- Length of lawful residence in the United States and any immigration status held during that residence, including the age at which residence in the United States began;[56]
- Service in the U.S. armed forces;[57]
- History of employment;[58]
- Property or business ties in the United States;[59]
- History of taxes paid;
- Nature and underlying circumstances of any inadmissibility grounds at issue, the seriousness of the violations, and eligibility for a waiver of inadmissibility or other form of relief;[60]
- Likelihood that lawful permanent resident (LPR) status will ensue soon;

- Evidence regarding respect for law and order, good character, and intent to hold family responsibilities (for example, affidavits from family, friends, and responsible community representatives);[61]
- Criminal history (in the United States and abroad) and extent of rehabilitation and reform;[62]
- Community service, not including any instances imposed by the courts;
- Existence of an unexecuted administratively final removal, deportation, or exclusion order;[63]
- Public safety or national security concerns;[64]
- Moral depravity or criminal tendencies reflected by a single serious crime or an ongoing or continuing criminal record, with attention to the nature, scope, seriousness, and recent occurrence of criminal activity.[65]
- Findings of juvenile delinquency;[66]
- Compliance with immigration laws, including lawful entry into the United States;[67]
- Whether the alien has endorsed, promoted, supported, or otherwise espoused anti-American views or the views of a terrorist organization or group (including in social media content by, or involving an alien). This includes organizations who support or promote anti-American ideologies or activities, antisemitic terrorism, antisemitic terrorist organizations, antisemitic ideologies, or has engaged in physical harassment of any person in furtherance of the organization or group;[68]

[Redaction - Start]

This also includes antisemitic terrorism and antisemitic terrorist organizations such as Hamas, Palestinian Islamic Jihad, Hezbollah, or Ansar Allah "the Houthis." Upon identifying such a case, officers must notify and consult with their supervisory chain of command, and their local Fraud Detection and National Security point of contact.

[Redaction - End]

- In the case of an alien who was admitted or paroled into the United States, whether the application for admission or parole violated the laws, regulations, and policies in place at the time;[69]
- Relevant country-specific facts and circumstances, such as insufficient vetting and screening information;[70]
- Previous instances of fraud or false testimony in dealings with USCIS or any government agency;
- Marriage to a U.S. citizen or LPR for the primary purpose of circumventing immigration laws;[71]
- Conduct after admission as a nonimmigrant, where such conduct is inconsistent with the nonimmigrant status (for example, engaging in unlawful employment or unauthorized academic study) or with representations made to consular officers or DHS officers when applying for admission (for example, failing to engage in the activities for which they sought admission); and
- Other indicators of character.[72]

This is a non-exhaustive list of factors; the officer may consider any relevant fact in the discretionary analysis.

*Country-Specific Facts and Circumstances*

On June 4, 2025, the President issued Presidential Proclamation 10949, *Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats*, to exercise his authority under INA 212(f) and impose certain restrictions, limitations, and exceptions on the entry of aliens from 19 countries: Afghanistan, Burma, Burundi, Chad, Republic of Congo, Cuba, Equatorial Guinea, Eritrea, Haiti, Iran, Laos, Libya, Sierra Leone, Somalia, Sudan, Togo, Turkmenistan, Venezuela, and Yemen.[73] The Proclamation fully or partially restricts the entry or admission of aliens from those 19 countries who were outside the United States on or after June 9, 2025, and who do not have a valid visa on or after June 9, 2025. The reasons for the restrictions are country-specific and specified in the Proclamation.

The Proclamation's categorical ineligibility for entry or admission does not apply to adjustment of status, extension of stay, change of status, or other discretionary benefits made by applicants physically present in the United States. However, USCIS may considers on a case-by-case basis country-specific facts and circumstances, such as those outlined in the Proclamation, as a significant negative factor when making an individual assessment in weighing discretion, with certain exceptions.[74]

For example, certain countries (including but not limited to Afghanistan, Eritrea, Libya, Somalia, Sudan, Yemen, and Venezuela) lack a competent or central authority for issuing passports and civil documents among other concerns, which directly relates to USCIS' ability to meaningfully assess eligibility for benefit requests including identity, and therefore whether an alien warrants a favorable exercise of discretion.[75]

Where country-specific concerns relate to a high rate of overstay, such data may impact an officer's determination of likelihood that a particular individual may overstay, coupled with other case-specific facts and circumstances. For example, if an alien's conduct after admission as a nonimmigrant is inconsistent with the nonimmigrant status, and the alien is from a country with a high rate of overstay, then the officer may conclude that the alien's conduct should be considered as a significantly negative factor.

The mere fact that an individual is from a country subject to INA 212(f) restrictions on entry or admission, however, is not by itself a significant negative factor. USCIS considers relevant country-specific facts and circumstances such as those outlined in the Proclamation[76] on a case-by-case basis in the totality of the circumstances, considering the relevance of those facts to the benefit request being adjudicated and the alien requesting the benefit. USCIS weighs all relevant positive and negative factors when making these discretionary determinations.

[Redaction - Start]

Officers should consult with their supervisory chains of command before issuing a discretionary denial where country-specific factors such as those outlined in the Proclamation would warrant a denial but the case may also fall under an exception. See, for example, Section 4(b)-(d) of Presidential Proclamation 10949, 90 FR 24497, 24503 (June 4, 2025).

[Redaction - End]

*Anti-American Views or Views of a Terrorist Organization*

USCIS considers circumstances where an alien has endorsed, promoted, supported, or otherwise espoused anti-American views or the views of a terrorist organization or group, including terrorist organizations who support or promote antisemitic terrorism, antisemitic terrorist organizations, and antisemitic ideologies, as mentioned above, to be overwhelmingly negative factors in any applicable case involving USCIS discretionary analysis. Accordingly, USCIS enforces all relevant immigration laws to the maximum degree, including the use of discretion, to deny the benefit request involving such circumstances.

[Redaction - Start]

While engaging in the conduct cited above at any time is an overwhelmingly negative discretionary factor in the exercise of discretion, the officer should assign particular focus to aliens who engaged in on-campus anti-American and antisemitic activities that occurred on or after October 7, 2023.

This includes, in particular, aliens who file the following particular benefit requests:

Petition for a Nonimmigrant Worker (Form I-129) for the following categories:

- Petitions filed by any college, university, technical school, or similar educational institution where USCIS determines that significant antisemitic activity in violation of Executive Order 14188, Additional Measures to Combat Anti-Semitism, 90 FR 8847 (Jan. 29, 2025), has occurred.

Application to Register Permanent Residence or Adjust Status (Form I-485) for the following categories:

- Applications where, upon review, the officer has reason to believe the alien was studying, teaching, working, or otherwise affiliated with a college, university, technical school, or similar educational institution at any point after the October 7, 2023 Hamas attacks, regardless of whether the alien was engaged in this activity pursuant to an F1 or other nonimmigrant visa.

Application to Extend/Change Nonimmigrant Status (Form I-539) for the following category:

- Reinstatement of F-1 nonimmigrant status.

Application for Employment Authorization (Form I-765) for the following category:

- (c)(3)(A), F-1 student, pre-completion Optional Practical Training.

In addition, on February 20, 2025, the United States designated Tren de Aragua (TdA) as a Foreign Terrorist Organization. On March 14, 2025, the President issued Presidential Proclamation 10903, "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren De Aragua." In furtherance of the proclamation, USCIS officers must not approve any petition, application, or benefit request, under any circumstances, where an activity, association, or nexus with a known or suspected TdA member has been identified.

USCIS officers may continue to process cases with a known or suspected TdA member other than a grant or approval (such as denials or referrals). However, officers should consult with their supervisory chains of command to coordinate notification with U.S. Immigration and Customs Enforcement (ICE) prior to taking any adjudicative action and provide any relevant information ICE deems appropriate. USCIS will take all actions necessary to support law enforcement at all levels with their actions in support of the provisions of the proclamation.

Evidence of a nexus to TdA (or any other terrorist organization), which includes any unresolved evidence that tends to suggest an alien's involvement or association with TdA, is an overwhelmingly negative factor in any discretionary analysis.

When compelling circumstances exist, necessary vetting, deconfliction, and administrative investigative actions have been completed, and USCIS determines the approval of the benefit does not pose a threat to national security or public safety, the benefit may be approved only following approval from the USCIS Senior Leadership Review Board.

[Redaction - End]

## 3. Weighing Factors

The act of exercising discretion involves weighing both positive and negative factors and considering the totality of the circumstances in the case before making a decision. Whether a favorable exercise of discretion is warranted is case-specific and depends on the evidence of positive and negative factors submitted by the requestor. As the negative factors grow more serious, a favorable exercise of discretion may not be warranted without the existence of unusual or outstanding equities in the case.[77]

*Totality of the Circumstances: Evaluating the Case-Specific Considerations for Each Factor*

An officer must consider the totality of the facts and circumstances of each individual case involving discretionary benefit requests. To do so, officers should ensure discretionary factors are considered in the context of all factors in the case.

There is no formula for determining the weight to be given a specific positive or negative factor. Officers should not attempt to assign numbers or points to a specific factor to determine if one factor is more or less favorable than another. Officers should consider each factor separately and then all the factors as a whole. The negative and positive factors should be balanced against each other and then evaluated cumulatively. [78] The weight given to each factor may vary depending on the facts of a particular case as well as the relationship of the factor to other factors in the analysis.

Discretionary factors are often interrelated. Officers must therefore determine whether each particular factor is positive or negative and how it affects the other factors under consideration. Some factors are generally given more weight than others. A small number of positive factors may overcome a larger number of negative factors, and vice versa, depending on the specific factors.

For example, when weighing the positive and negative factors, the officer should not consider the various factors individually, in isolation from one another.[79] When considering each factor individually, without considering how all the factors relate to each other, it becomes difficult to weigh the positive and negative factors properly.

Once the officer has weighed each factor individually, the officer should consider all the factors cumulatively to determine whether the unfavorable factors outweigh the favorable ones. If, after weighing all the factors, the officer determines that the positive factors outweigh the negative factors, then the requestor merits a favorable exercise of discretion. If the negative factors outweigh the positive factors, then the officer may decline to favorably exercise discretion and deny the benefit request. There may be instances where the gravity of a negative factor is of such significance that the factor by itself weighs heavily against a favorable exercise of discretion.[80]

Cases that are denied on the basis of an unfavorable exercise of discretion must include an officer's explanation of why USCIS is not exercising discretion in the requestor's favor.[81] The denial notice must clearly set forth the positive and negative factors considered and explain why the negative factors outweigh the positive factors.

## 4. Supervisory Review[82]

Officers should discuss complex or difficult cases with their supervisors, as needed, particularly those involving criminality or national security issues, regardless of whether the outcome is favorable or unfavorable to the applicant. As appropriate, supervisors may raise issues with USCIS local counsel.

Sometimes a case, especially when coupled with government errors or delay and compelling humanitarian factors, may justify an exercise of discretion resulting in an extraordinarily favorable outcome for the applicant. Officers considering such action should carefully confirm the availability of such action under the law, weigh the factors as in every discretionary decision, consult with supervisors or counsel, and make a record of the analysis and consultation.

## D. Documenting Discretionary Determinations

When issuing a decision that involves a discretionary determination, a careful explanation of the officer's findings and analysis (communicating the positive and negative factors considered and how the officer weighed these factors) helps ensure that the decision is legally sufficient and appropriate. The discretionary determination gives the officer authority to ultimately approve a benefit or form of relief or deny a benefit or form of relief when the applicant otherwise meets eligibility requirements. Officers, however, cannot exercise that authority arbitrarily or capriciously.

*Favorable Exercise of Discretion*

If no negative factors are present, the officer may provide a simple statement in the file noting the absence of negative factors (for example, comments indicating that the applicant is eligible, that there are no negative

factors, and that therefore USCIS grants the benefit in the exercise of discretion).

If an officer grants a benefit in the exercise of discretion where negative factors are present but the positive factors outweigh the negative factors, the file should contain a record of the officer's deliberations. The officer should clearly annotate the favorable factors in the file. The officer should also annotate the file regarding any consultations that supported the approval in complex or difficult cases. In some situations, the file annotation may be the only record or documentation for other officers to understand the reasons for the decision.

The officer should indicate the rationale for the decision in a clear manner so that it is easily understandable to others reviewing the file. This may include the officer addressing the discretionary issues in the written decision or by making an annotation in the file.

*Unfavorable Exercise of Discretion*[83]

If negative factors outweigh the positive factors and USCIS denies the benefit request, the written decision must contain an analysis of the factors considered in exercising discretion, where possible.[84]

Negative factors must never be analyzed in a generalized way. The decision must address negative factors on an individualized basis, applying the totality of the circumstances to the specific facts of the case. The decision should specify both the positive and negative factors that the officer identified and considered in support of the decision and should explain how the officer weighted the different factors. The denial notice should set forth the rationale for the decision so that the officer's deliberation may be understood by the requestor as well as any administrative reviewer (such as the Administrative Appeals Office or immigration judge) and the federal courts.

*Articulating Analysis Separately for Discretion and Threshold Eligibility Requirements*

In cases involving the negative exercise of discretion, officers should generally articulate clearly the legal analysis of whether the applicant meets the threshold eligibility requirements and then, separately, the discretionary analysis.

*Denying Benefit Requests as a Matter of Discretion*

If the officer denies a benefit request as a matter of discretion, the officer generally must, in the written notice to the requestor:[85]

- Indicate the decision to deny was made as a matter of discretion;
- Identify, specifically, each positive factor presented by the facts of the case;
- Identify, specifically, each negative factor;
- Explain the relative decisional weight given to each negative and positive factor; and
- Explain the cumulative weight given to the negative and positive factors, and reason for the outcome.

CAR 000046

By including the appropriate articulation of discretionary determinations in USCIS decision-making, officers enhance the quality of adjudications and provide appropriate explanation to the requestor.

## Footnotes

[^ 1] For purposes of this Policy Manual part, the term requestor means the person, organization, or business requesting an immigration benefit from USCIS. This may include an applicant or petitioner, depending on the request.

[^ 2] See *Matter of Patel (PDF)*, 17 I&N Dec. 597 (BIA 1980). See the program-specific Policy Manual part to determine whether the adjudication of a benefit request requires the exercise of discretion.

[^ 3] See Section C, Adjudicating Discretionary Benefits, Subsection 3, Weighing Factors [1 USCIS-PM E.8(C)(3)].

[^ 4] For example, see *Kucana v. Holder*, 558 U.S. 233 (2010) (comparing discretion provided in statutory language against regulations promulgated by the U.S. Department of Justice).

[^ 5] See, for example, INA 245(a) (adjustment of status).

[^ 6] See INA 291. See *Matter of Patel (PDF)*, 17 I&N Dec. 597 (BIA 1980). See *Matter of Leung (PDF)*, 16 I&N Dec. 12 (BIA 1976). See *Matter of Arai (PDF)*, 13 I&N Dec. 494 (BIA 1970).

[^ 7] See, for example, INA 316 (naturalization).

[^ 8] See Petition for a Nonimmigrant Worker (Form I-129). See INA 101(a)(15). See INA 214 and 8 CFR 214.

[^ 9] See Petition for Alien Fiancé(e) (Form I-129F). See INA 101(a)(15)(K). See INA 214(d) and INA 214(r). See 8 CFR 214.2(k).

[^ 10] See Application to Extend/Change Nonimmigrant Status (Form I-539). See INA 214 and 8 CFR 214.

[^ 11] See Application for Advance Permission to Enter as a Nonimmigrant (Form I-192). See INA 212(d)(3)(A).

[^ 12] See Application for Travel Documents, Parole Documents, and Arrival/Departure Records (Form I-131). See INA 212(d)(5)(A).

[^ 13] See INA 212(d)(5)(A). See 8 CFR 212.19. See Volume 3, Humanitarian Protection and Parole, Part G, International Entrepreneur Parole [3 USCIS-PM G].

[^ 14] See Application for Temporary Protected Status (Form I-821). See INA 244 and 8 CFR 244.

[^ 15] See Refugee/Asylee Relative Petition (Form I-730). See INA 207 and 8 CFR 207.

[^ 16] Except for following-to-join refugee adjudications. See 8 CFR 207.7.

[^ 17] See Application for Asylum and for Withholding of Removal (Form I-589). See INA 208 and 8 CFR 208. See *Matter of Pula (PDF)*, 19 I&N Dec. 467, 471 (BIA 1987).

[^ 18] See Petition for Alien Relative (Form I-130). See INA 203(a) and INA 204(a)(1)(A)-(D). See 8 CFR 204.

[^ 19] See Immigrant Petition for Alien Workers (Form I-140). See INA 203(b) and INA 204(a)(1)(E)-(G). See 8 CFR 204.5.

[^ 20] The national interest waiver element of a petition seeking classification under INA 203(b)(2)(B) is discretionary. See *Mousavi v. USCIS*, 828 Fed. Appx. 130, 133 (3rd Cir. 2020). See *Poursina v. USCIS*, 936 F.3d 868, 870-72 (9th Cir. 2019). See *Matter of Dhanasar*, 26 I&N Dec. 884, 889 n. 9 (AAO 2016). For specific information on applying discretion in national interest waiver petitions, see Volume 6, Immigrants, Part F, Employment-Based Classifications, Chapter 5, Advanced Degree or Exceptional Ability, Section D, National Interest Waiver of Job Offer [6 USCIS-PM F.5(D)].

[^ 21] See Immigrant Petition by Standalone Investor (Form I-526) or Immigrant Petition by Regional Center Investor (Form I-526E). See INA 203(b)(5) and INA 204(a)(1)(H). See 8 CFR 204.6.

[^ 22] Exceptions include threats to the national interest, fraud, deceit, misrepresentation, and criminal misuse. See INA 203(b)(5)(N)(i) and INA 203(b)(5)(O)(i). See Volume 6, Immigrants, Part G, Investors, Chapter 8, Sanctions and Discretionary Determinations [6 USCIS-PM G.8].

[^ 23] See Application for Regional Center Designation (Form I-956) and Application for Approval of an Investment in a Commercial Enterprise (Form I-956F).

[^ 24] Exceptions include threats to the national interest, fraud, deceit, misrepresentation, and criminal misuse. See INA 203(b)(5)(N)(i) and INA 203(b)(5)(O)(i). See Volume 6, Immigrants, Part G, Investors, Chapter 8, Sanctions and Discretionary Determinations [6 USCIS-PM G.8].

[^ 25] See Application to Register Permanent Residence or Adjust Status (Form I-485). For more information on how to conduct a discretionary analysis in the context of an adjustment application, see Volume 7, Adjustment of Status, Part A, Adjustment of Status Policies and Procedures, Chapter 10, Legal Analysis and Use of Discretion [7 USCIS-PM A.10].

[^ 26] See, for example, INA 245(a) and INA 209(b). Exceptions include adjustment of status based on Nicaraguan Adjustment and Central American Relief Act of 1997 (NACARA), Title II of Pub. L. 105-100 (PDF), 111 Stat. 2160, 2193 (November 19, 1997); refugee-based adjustment under INA 209(a)(2); adjustment of status based on Haitian Refugee Immigration Fairness Act of 1998 (HRIFA), Section 902 of Division A, Title IX of Pub. L. 105-277 (PDF), 112 Stat. 2681, 2681-538 (October 21, 1998); adjustment of status based on Liberian Refugee Immigration Fairness (LRIF) law, Section 7611 of the National Defense Authorization Act for Fiscal Year 2020, Pub. L. 116-92 (PDF), 113 Stat. 1198, 2309 (December 20, 2019).

[^ 27] See Application to Register Permanent Residence or Adjust Status (Form I-485). See INA 249. See 8 CFR 249. For more information, see Volume 7, Adjustment of Status, Part O, Registration [7 USCIS-PM O].

[^ 28] See INA 289 and 8 CFR 289.

[^ 29] See Application for Waiver of Grounds of Inadmissibility (Form I-601). See Application for Provisional Unlawful Presence Waiver (Form I-601A). See Application by Refugee for Waiver of Inadmissibility Grounds (Form I-602). See, for example, INA 209(c), INA 212(a)(9)(B)(v), INA 212(a)(9)(C)(iii), and INA 212(g)-(i). For more information on how to conduct a discretionary analysis in the context of a waiver application, see Volume 9, Waivers and Other Forms of Relief, Part A, Waiver Policies and Procedures, Chapter 5, Discretion [9 USCIS-PM A.5]. [Redaction - Start] Additional guidance for officers adjudicating refugee claims is available in International and Refugee Affairs Division (IRAD) materials. [Redaction - End]

[^ 30] See Application for Permission to Reapply for Admission into the United States After Deportation or Removal (Form I-212). See INA 212(a)(9)(A)(iii) and INA 212(a)(9)(C)(ii).

[^ 31] See Application for Employment Authorization (Form I-765). See INA 274A. See 8 CFR 274a.12. For more information, see Volume 10, Employment Authorization [10 USCIS-PM].

[^ 32] See Petition to Remove Conditions on Residence (Form I-751). See Petition by Investor to Remove Conditions on Permanent Resident Status (Form I-829). See INA 216 and INA 216A. See 8 CFR 216.

[^ 33] When a family-based conditional permanent resident files a Petition to Remove Conditions on Residence (Form I-751) as a waiver request based on termination of marriage, battery or extreme cruelty, or extreme hardship, it is a discretionary decision. See INA 216(c)(4).

[^ 34] See Application for Naturalization (Form N-400). See INA 316. For more information, see Volume 12, Citizenship and Naturalization [12 USCIS-PM].

[^ 35] See Application for Certificate of Citizenship (Form N-600). See INA 301, INA 309 and INA 320. For more information, see Volume 12, Citizenship and Naturalization, Part K, Certificates of Citizenship and Naturalization [12 USCIS-PM K].

[^ 36] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 300 (BIA 1996).

[^ 37] See *Matter of Patel (PDF)*, 17 I&N Dec. 597 (BIA 1980) (adjustment of status). See *Von Pervieux v. INS*, 572 F.2d 114, 118 (3rd Cir. 1978). See *Ameeriar v. INS*, 438 F.2d 1028, 1030 (3rd Cir. 1971). See *Matter of Marques (PDF)*, 16 I&N Dec. 314 (BIA 1977).

[^ 38] See *Matter of Ortiz-Prieto (PDF)*, 11 I&N Dec. 317 (BIA 1965).

[^ 39] See Subsection 4, Discretion [1 USCIS-PM E.8(B)(4)].

[^ 40] Prosecutorial discretion is a decision to enforce or not enforce the law against someone. Prosecutorial discretion is exercised when an agency makes a decision with respect to enforcing the law. USCIS, along with

CAR 000049

other DHS agencies such as U.S. Immigration and Customs Enforcement and U.S. Customs and Border Protection, has the authority to exercise prosecutorial discretion related to immigration enforcement actions it may take, particularly in the context of initiating removal proceedings through the issuance of a non-mandatory Notice to Appear. Prosecutorial discretion does not decrease USCIS' commitment to enforcing the immigration laws. Rather, it is a means to use agency resources in a way that best accomplishes the mission of administering and enforcing the immigration laws of the United States.

[^ 41] See *INS v. Doherty (PDF)*, 502 U.S. 314 (1992).

[^ 42] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970) ("In the absence of adverse factors, adjustment will ordinarily be granted, still as a matter of discretion."). See *Matter of Pula (PDF)*, 19 I&N Dec. 467, 474 (BIA 1987) ("In the absence of any adverse factors, however, asylum should be granted in the exercise of discretion.").

[^ 43] See INA 209(b).

[^ 44] As of March 1, 2003, in accordance with Section 1517 of the Homeland Security Act of 2002 (HSA), Pub. L. 107-296 (PDF), 116 Stat. 2135, 2311 (November 25, 2002), any reference to the Attorney General in a provision of the INA describing functions that were transferred from the Attorney General or other DOJ official to DHS by the HSA "shall be deemed to refer to the Secretary" of Homeland Security. See 6 U.S.C. 557 (codifying Section 1517 of the HSA).

[^ 45] See 6 U.S.C. 275.

[^ 46] See *INS v. Abudu (PDF)*, 485 U.S. 94, 105 (1988). See *INS v. Bagamasbad (PDF)*, 429 U.S. 24, 26 (1976). See *INS v. Rios-Pineda (PDF)*, 471 U.S. 444 (1985).

[^ 47] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970). See *Matter of Lam (PDF)*, 16 I&N Dec. 432 (BIA 1978).

[^ 48] See INA 245(a). See Volume 7, Adjustment of Status, Part B, 245(a) Adjustment, Chapter 2, Eligibility Requirements [7 USCIS-PM B.2].

[^ 49] See Chapter 6, Evidence [1 USCIS-PM E.6].

[^ 50] See 8 CFR 103.2(b)(1).

[^ 51] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 586-587 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990).

[^ 52] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970). See *Matter of Lam (PDF)*, 16 I&N Dec. 432, 434 (BIA 1978). See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 53] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970). See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301-302 (BIA 1996) (". . . if the alien has relatives in the United States, the quality of their relationship must be considered in determining the weight to be awarded this equity.").

[^ 54] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970). See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 55] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990).

[^ 56] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970). See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584-85 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996). Residence must be lawful to be considered a positive factor. See *Matter of Lee (PDF)*, 17 I&N Dec. 275, 278 (Comm. 1978).

[^ 57] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 58] See *Matter of Lam (PDF)*, 16 I&N Dec. 432, 434 (BIA 1978). See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301-302 (BIA 1996) (". . . if the alien has a history of employment, it is important to consider the type of employment and its length and stability.").

[^ 59] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 60] See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 61] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990).

[^ 62] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996). However, reformation is not an absolute prerequisite to a favorable exercise of discretion. Rather, the discretionary analysis must be conducted on a case-by-case basis, with rehabilitation a factor to be considered in the exercise of discretion. See *Matter of Edwards (PDF)*, 20 I&N Dec.

191, 196 (BIA 1990) (considering rehabilitation a significant factor in view of the nature and extent of the respondent's criminal history, which spanned 10 years).

[^ 63] USCIS generally does not exercise discretion favorably to grant adjustment where the adjustment applicant has an unexecuted removal order. For information on the effect of an unexecuted removal order of an arriving alien on adjustment of status, see Volume 7, Adjustment of Status, Part A, Adjustment of Status Policies and Procedures, Chapter 10, Legal Analysis and Use of Discretion, Section B, Discretion, Subsection 2, Issues and Factors to Consider [7 USCIS-PM A.10(B)(2)].

[^ 64] See Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens, PM-602-0187, issued February 28, 2025.

[^ 65] The officer should not go behind the record of conviction to reassess an alien's ultimate guilt or innocence, but rather inquire into the circumstances surrounding the commission of the crime in order to determine whether a favorable exercise of discretion is warranted. See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 197 (BIA 1990).

[^ 66] USCIS considers findings of juvenile delinquency on a case-by-case basis, based on the totality of the evidence, to determine whether a favorable exercise of discretion is warranted. Therefore, an adjustment applicant must disclose all arrests and charges. If any arrest or charge was disposed of as a matter of juvenile delinquency, the alien must include the court or other public record that establishes this disposition. See Volume 7, Adjustment of Status, Part A, Adjustment of Status Policies and Procedures, Chapter 4, Documentation, Section A, Initial Evidence, Subsection 7, Certified Copies of Arrest Records and Court Dispositions [7 USCIS-PM A.4(A)(7)]. For more information, see Volume 7, Adjustment of Status, Part B, 245(a) Adjustment [7 USCIS-PM B] and Part F, Special Immigrant-Based Adjustment, Chapter 7, Special Immigrant Juveniles, Section C, Eligibility Requirements, Subsection 4, Admissibility and Waiver Requirements [7 USCIS-PM F.7(C)(4)].

[^ 67] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584 (BIA 1978). See *Matter of Lee (PDF)*, 17 I&N Dec. 275, 278 (Comm. 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996). However, the BIA found that a record of immigration violations standing alone does not conclusively support a finding of lack of good moral character. Further, how recent the deportation was can only be considered when there is a finding of a poor moral character based on moral turpitude in the conduct and attitude of an alien which evinces a callous conscience. In such circumstances, there must be a measurable reformation of character over a period of time in order to properly assess an alien's ability to assimilate into society. In all other instances, when the cause for deportation has been removed and the alien now appears eligible for issuance of a visa, the time factor should not be considered. See *Matter of Lee (PDF)*, 17 I&N Dec. 275 (Comm. 1978).

[^ 68] USCIS uses the definitions at INA 313(a) when identifying and determining anti-American organizations, views, activities, and ideologies.

[^ 69] This includes compliance with any requirements announced by DHS for any parole program or process, including whether the alien had knowledge of any false or fraudulent information. For example, in certain circumstances, DHS required a financial sponsor to submit an approvable Declaration of Financial Support (Form I-134) or Online Request to Be a Supporter and Declaration of Financial Support (Form I-134A) as a condition of an alien being authorized parole. An officer adjudicating an alien's pending immigration benefit request involving discretion may determine that the alien's prior application for parole was not in accordance with the policies in place at the time if the Form I-134 or Form I-134A relied upon by DHS to authorize parole contained false information or was accompanied by supporting evidence that contained false or fraudulent information.

[^ 70] Insufficient vetting and screening information may involve insufficient identity documents or inability to rely on documentation or information provided by the specified countries for identity purposes or determining criminal history or ties to criminal or terrorist organizations. For more information, see Presidential Proclamation 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats, 90 FR 24497 (PDF) (June 4, 2025).

[^ 71] Although this factor could lead to a statutory denial under INA 204(c).

[^ 72] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 73] See INA 212(f) ("Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate."). See 90 FR 24497 (PDF) (June 4, 2025).

[^ 74] For a list of exceptions, see Section 4(b)-(d) of Presidential Proclamation 10949, 90 FR 24497, 24503 (PDF) (June 4, 2025).

[^ 75] For additional reciprocity information by country, see U.S. Department of State's U.S. Visa: Reciprocity and Civil Documents by Country webpage.

[^ 76] USCIS acknowledges that the President has issued other proclamations exercising authority under INA 212(f), and that this Proclamation may also be amended or reissued. To the extent that this Proclamation is amended or reissued, or the President further exercises his authority under INA 212(f), USCIS will consider any country-specific facts and circumstances outlined therein when making discretionary determinations for immigration benefit requests.

[^ 77] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales*

*(PDF)*, 21 I&N Dec. 296, 301 (BIA 1996). For example, USCIS generally does not favorably exercise discretion in certain cases involving violent or dangerous crimes except in extraordinary circumstances. See 8 CFR 212.7(d). For more information, see Volume 9, Waivers and Other Forms of Relief, Part A, Waiver Policies and Procedures, Chapter 5, Discretion, Section C, Cases Involving Violent or Dangerous Crimes [9 USCIS-PM A.5(C)]. See Volume 7, Adjustment of Status, Part A, Adjustment of Status Policies and Procedures, Chapter 10, Legal Analysis and Use of Discretion, Section B, Discretion, Subsection 2, Issues and Factors to Consider [7 USCIS-PM A.10(B)(2)]. Another example relates to applicants seeking adjustment based on U nonimmigrant status: Depending on the nature of the adverse factors, applicants may be required to clearly demonstrate that denial of adjustment would result in exceptional and extremely unusual hardship. Even if the applicant makes such a showing, however, USCIS may still find favorable exercise of discretion is not warranted in certain cases. See 8 CFR 245.24(d)(11).

[^ 78] See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 200 (BIA 1990) (concurring opinion).

[^ 79] See *Matter of Pula (PDF)*, 19 I&N Dec. 467, 473-74 (BIA 1987).

[^ 80] See, for example, 8 CFR 212.7(d) (In adjudicating an application for a waiver of a criminal ground of inadmissibility involving a violent or dangerous crime, "depending on the gravity of the alien's underlying criminal offense, a showing of extraordinary circumstances might still be insufficient to warrant a favorable exercise of discretion . . . .") For more information on discretion in the context of waivers of inadmissibility, see Volume 9, Waivers and Other Forms of Relief, Part A, Waiver Policies and Procedures, Chapter 5, Discretion [9 USCIS-PM A.5].

[^ 81] See 8 CFR 103.3(a).

[^ 82] Supervisory review is required in certain situations. The law provides for outcomes that may be extraordinarily favorable for the applicant but uphold principles of fairness and equity. See *Munoz v. Ashcroft*, 339 F.3d 950 (9th Cir. 2003) (stating, "It is true that equitable tolling is available in INA cases, as there is a 'presumption, read into every federal statute of limitation, that filing deadlines are subject to equitable tolling [and that] the same rebuttable presumption of equitable tolling . . . applies in suits against private defendants and . . . in suits against the United States'", but concluding that the April 1, 1990 (asylum application deadline to qualify under the Nicaraguan Adjustment and Central American Relief Act, Title II of Pub. L. 105-100 (PDF), 111 Stat. 2160 (November 19, 1997)) is a statute of repose that cannot be subject to equitable tolling). See *Mohawk Power Corp. v. Federal Power Commission*, 379 F.2d 153, 160 (D.C. Cir. 1967) ("Conceptions of equity are not a special province of the courts but may properly be invoked by administrative agencies seeking to achieve 'the necessities of control in an increasingly complex society without sacrifice of fundamental principles of fairness and justice.'").

[^ 83] These analytical steps amplify guidance concerning denial notices, and do not replace them.

[^ 84] See 8 CFR 103.3(a). In some cases, the officer may not be able to fully reveal negative discretionary factors if they are classified. Additionally, an exception may be made for denial letters issued to applicants

CAR 000054

for admissions as a refugee under the U.S. Refugee Admissions Program, which contain only summary reasons for denials and are not required to contain detailed analysis of the basis for negative decisions.

[^ 85] See 8 CFR 103.3(a). In some cases, the officer may not be able to fully reveal negative discretionary factors if they are classified. Additionally, an exception may be made for denial letters issued to applicants for admissions as a refugee under the U.S. Refugee Admissions Program, which contain only summary reasons for denials and are not required to contain detailed analysis of the basis for negative decisions.

## Chapter 9 - Rendering a Decision

### A. Approvals

If the requestor properly filed the benefit request and the officer determines that the requestor meets all eligibility requirements, then the officer may approve the request. Upon approval, the officer updates all relevant electronic systems to reflect the approval.

### B. Denials[1]

If, after evaluating all evidence submitted (including in response to a Request for Evidence (RFE) or Notice of Intent to Deny (NOID), if applicable), the officer determines the requestor is ineligible for the benefit sought, the officer denies the benefit request.[2] Upon denial of a request, the officer updates all relevant electronic systems and issues a written decision informing the requestor of the reason(s) for denial.[3]

If the denial notice is returned as undeliverable, USCIS verifies the mailing address and places the notice, including the original mailing envelope, in the appropriate file as evidence of service of the decision.[4]

Written decisions should use plain language that the requestor can understand. When applicable, the decision includes guidance on the procedures for filing appeals and motions, including instructions for where to find the appropriate forms.[5]

#### 1. Denials Based on Lack of Legal Basis

Generally, if a benefit request does not have a legal basis for approval, and the officer determines there is no possibility additional evidence could establish a legal basis for approval, the officer should issue a denial without first issuing an RFE or NOID.

This includes any filing in which the benefit requestor has no legal basis for the benefit sought or submits a request for an inactive or terminated program. For example, this includes family-based petitions filed for family members based on claimed relationships under categories not provided by statute (such as a grandparent filing a petition for a grandchild).

#### 2. Abandonment Denials[6]

# Ex. 3

CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
JOHN L. WOLLMAN (CABN 197362)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7031
Fax: (415) 436-6748
john.wollman@usdoj.gov

Attorneys for Defendant

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| KAYHAN BEHDIN, et al., | Case No. 5:26-cv-00566-SVK |
|---|---|
| Plaintiffs, | |
| v. | |
| JOSEPH B. EDLOW, in his official capacity as Director of U.S. Citizenship and Immigration Services, | |
| Defendant. | |

**CERTIFIED ADMINISTRATIVE RECORD**

**USCIS POLICY MEMORANDUM PM-602-0194**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

KAYHAN BEHDIN, et al.,

      Plaintiffs,

v.

JOSEPH B. EDLOW, in his official capacity as
Director of U.S. Citizenship and Immigration
Services,

      Defendant.

Case No. 5:26-CV-00566

## INDEX AND THE CERTIFIED ADMINISTRATIVE RECORD

| PM-602-0194 records (in chronological order) | | | |
|---|---|---|---|
| Document Number | Document Title | Beginning Bates Number | Ending Bates Number |
| 1 | Executive Order 14161, Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats | 000001 | 000003 |
| 2 | USCIS Policy Manual, Volume 1, Part E, Chapter 8 - Discretionary Analysis | 000004 | 000025 |
| 3 | USCIS Policy Manual, Volume 11, Part B, Chapter 2 - Replacement of Permanent Resident Card | 000026 | 000034 |
| 4 | Delegation to the Bureau of Citizenship and Immigration Services | 000035 | 000040 |

1

| 5 | Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries | 000041 | 000044 |
|---|---|---|---|
| 6 | Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries | 000045 | 000049 |
| 7 | Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries | 000050 | 000055 |
| 8 | Proclamation 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats | 000056 | 000064 |
| 9 | Proclamation 10998, Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States | 000065 | 000077 |

I, James Kernochan, make the following declaration, as provided by Section 1746 of Title 28 of the United States Code. I am aware that this declaration will be filed in the above-captioned civil action with the United States District Court for the Northern District of California. I hereby certify that:

1. I am the Deputy Director of U.S. Citizenship and Immigration Services (USCIS), a component agency within the U.S. Department of Homeland Security (DHS). I have held this position since December 22, 2025. Previously, I served as Chief of Staff at the U.S. Customs and Border Protection from January 20, 2025.

2. I assist the Director in the overall administration and supervision of the agency. I provide executive oversight of USCIS operations, including the adjudication of immigration benefit applications and petitions; support the implementation of immigration laws, regulations, and policies; oversee operational components such as service centers and field offices; ensure compliance with applicable statutory and regulatory requirements; and exercise delegated authority on behalf of the Director.

3. I certify that, to the best of my knowledge, information, and belief that the documents listed in the accompanying administrative record index hereto constitute the nonprivileged documents and materials directly and indirectly considered by USCIS and that these documents constitute the administrative record the agency considered in issuing USCIS Policy Memorandum 602-0194 (PM-602-0194) (Jan. 1, 2026).

I certify under penalty of perjury that the foregoing is true and correct.

_____          2|20|26
                                          _____
James Kernochan                                      Date
Deputy Director
U.S. Citizenship and Immigration Services
U.S. Department of Homeland Security

3

**INDEX**

| Document No. | Date | Name | Document Title | Bates No. |
|---|---|---|---|---|
| 01 | 2025-01-20 | 2025-02009 | Executive Order 14161, Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats | 000001 |
| 02 | 2025-12-22 | 20251222-PM-internal_PM01E.8_unredacted | USCIS Policy Manual, Volume 1, Part E, Chapter 8 - Discretionary Analysis | 000004 |
| 03 | 2025-12-22 | 20251222-PM-internal_PM11B.2_unredacted | USCIS Policy Manual, Volume 11, Part B, Chapter 2 - Replacement of Permanent Resident Card | 000026 |
| 04 | 2003-06-05 | DHS Delegation of Authority | Delegation to the Bureau of Citizenship and Immigration Services | 000035 |
| 05 | 2025-12-02 | PM 602-0192-PendingApplicationsHighRiskCountries-2025-12-2 | Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries | 000041 |
| 06 | 2026-01-01 | PM-602-0194-PendingApplicationsAdditionalHighRiskCountries-20260101 | Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries | 000045 |
| 07 | 2026-01-01 | Policy Memo_HoldReviewNewHRCountries_D1 Signed | Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries | 000050 |
| 08 | 2025-06-04 | Proclamation 10949 of June 4, 2025 | Proclamation 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats | 000056 |
| 09 | 2025-12-16 | Proclamation 10998 of December 16, 2025 | Proclamation 10998, Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States | 000065 |

**Federal Register**

Vol. 90, No. 19

Thursday, January 30, 2025

# Presidential Documents

| | |
|---|---|
| **Title 3—** | **Executive Order 14161 of January 20, 2025** |
| **The President** | **Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats** |

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Policy and Purpose.* (a) It is the policy of the United States to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes.

(b) To protect Americans, the United States must be vigilant during the visa-issuance process to ensure that those aliens approved for admission into the United States do not intend to harm Americans or our national interests. More importantly, the United States must identify them before their admission or entry into the United States. And the United States must ensure that admitted aliens and aliens otherwise already present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid, or support designated foreign terrorists and other threats to our national security.

**Sec. 2**. *Enhanced Vetting and Screening Across Agencies.*

(a) The Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall promptly:

(i) identify all resources that may be used to ensure that all aliens seeking admission to the United States, or who are already in the United States, are vetted and screened to the maximum degree possible;

(ii) determine the information needed from any country to adjudicate any visa, admission, or other benefit under the INA for one of its nationals, and to ascertain whether the individual seeking the benefit is who the individual claims to be and that the individual is not a security or public-safety threat;

(iii) re-establish a uniform baseline for screening and vetting standards and procedures, consistent with the uniform baseline that existed on January 19, 2021, that will be used for any alien seeking a visa or immigration benefit of any kind; and

(iv) vet and screen to the maximum degree possible all aliens who intend to be admitted, enter, or are already inside the United States, particularly those aliens coming from regions or nations with identified security risks.

(b) Within 60 days of the date of this order, the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence shall jointly submit to the President, through the Assistant to the President for Homeland Security, a report:

(i) identifying countries throughout the world for which vetting and screening information is so deficient as to warrant a partial or full suspension on the admission of nationals from those countries pursuant to section 212(f) of the INA (8 U.S.C. 1182(f)); and

(ii) identifying how many nationals from those countries have entered or have been admitted into the United States on or since January 20,

2021, and any other information the Secretaries and Attorney General deem relevant to the actions or activities of such nationals since their admission or entry to the United States.

(c) Whenever information is identified that would support the exclusion or removal of any alien described in subsection 2(b), the Secretary of Homeland Security shall take immediate steps to exclude or remove that alien unless she determines that doing so would inhibit a significant pending investigation or prosecution of the alien for a serious criminal offense or would be contrary to the national security interests of the United States.

**Sec. 3**. *Additional Measures to Protect the Nation.* As soon as possible, but no later than 30 days from the date of this order, the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall also:

(a) Evaluate and adjust all existing regulations, policies, procedures, and provisions of the Foreign Service Manual, or guidance of any kind pertaining to each of the grounds of inadmissibility listed in sections 212(a)(2)–(3) of the INA (8 U.S.C. 1182(a)(2)–(3)), to ensure the continued safety and security of the American people and our constitutional republic;

(b) Ensure that sufficient safeguards are in place to prevent any refugee or stateless individual from being admitted to the United States without undergoing stringent identification verification beyond that required of any other alien seeking admission or entry to the United States;

(c) Evaluate all visa programs to ensure that they are not used by foreign nation-states or other hostile actors to harm the security, economic, political, cultural, or other national interests of the United States;

(d) Recommend any actions necessary to protect the American people from the actions of foreign nationals who have undermined or seek to undermine the fundamental constitutional rights of the American people, including, but not limited to, our Citizens' rights to freedom of speech and the free exercise of religion protected by the First Amendment, who preach or call for sectarian violence, the overthrow or replacement of the culture on which our constitutional Republic stands, or who provide aid, advocacy, or support for foreign terrorists;

(e) Ensure the devotion of adequate resources to identify and take appropriate action for offenses described in 8 U.S.C. 1451;

(f) Evaluate the adequacy of programs designed to ensure the proper assimilation of lawful immigrants into the United States, and recommend any additional measures to be taken that promote a unified American identity and attachment to the Constitution, laws, and founding principles of the United States; and

(g) Recommend any additional actions to protect the American people and our constitutional republic from foreign threats.

**Sec. 4**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

CAR000002

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20 2025.*

[FR Doc. 2025–02009
Filed 1–29–25; 8:45 am]
Billing code 3395–F4–P

CAR000003

[^ 102] For example, a benefit requestor's tax return statement submitted with the Form I-130 that USCIS uses as evidence of a lack of a qualifying spousal relationship.

[^ 103] For example, records such as marriage certificates or personal financial statements submitted with a previous spousal petition.

[^ 104] USCIS is not required to disclose derogatory information of which the benefit requestor is aware. See 8 CFR 103.2(b)(16). See Section F, Requests for Evidence and Notices of Intent to Deny [1 USCIS-PM E.6(F)]. However, USCIS may disclose derogatory information that the benefit requestor may be aware of to ensure the benefit requestor has sufficient opportunity to rebut information used in an adverse decision.

[^ 105] For example, officers may provide a copy of the source document containing derogatory information, such as a lease agreement, in instances where the document contains no privileged or confidential information, or information that is otherwise prohibited from disclosure.

[^ 106] USCIS must not provide screenshots of information obtained from DHS or other third agency systems absent permission from the data owner. If an adverse decision is based primarily on derogatory information that originates from such systems, any disclosure must be in a detailed summary statement and is subject to the terms and conditions of applicable data sharing agreements, such as the agreement between USCIS and DOS on disclosure authorization requirements.

## Chapter 7 - Interviews [Reserved]

## Chapter 8 - Discretionary Analysis

Many immigration benefits require the requestor[1] to demonstrate that the request merits a favorable exercise of discretion in order to receive the benefit.[2] For these benefits, a discretionary analysis is a separate, additional component of adjudicating the benefit request. Whether to favorably exercise discretion is typically assessed after an officer has determined that the requestor meets all applicable threshold eligibility requirements.

The discretionary analysis involves the review of all relevant, specific facts and circumstances in an individual case. However, there are limitations on how the officer may exercise discretion; the officer may not exercise discretion arbitrarily, inconsistently, or in reliance on biases or assumptions.

In some contexts, there are regulations and case law that outline certain factors that officers must review and use as a guide in making a discretionary determination. However, there is no exhaustive list of factors that officers must consider. To perform a discretionary analysis, officers must weigh all positive factors present in a particular case against any negative factors in the totality of the record.[3] The analysis must be comprehensive, specific to the case, and based on all relevant facts known at the time of adjudication. For complex or difficult cases, officers should consult with supervisors and local counsel.

**A. Applicability**

Congress generally provides discretionary authority explicitly in the statutory language that governs an immigration benefit. In some instances, however, discretionary authority is less explicit and must be inferred from the statutory language. Executive agencies may also outline their discretionary authority explicitly in regulations.[4]

Many immigration benefit requests are filed under provisions of law that require the favorable exercise of discretion to administer the benefit.[5] In these cases, the benefit requestor has the burden of demonstrating eligibility for the benefit sought and that USCIS should favorably exercise discretion.[6] Where an immigration benefit is discretionary, meeting the statutory and regulatory requirements alone does not entitle the requestor to the benefit sought.

Certain immigration benefits are not discretionary.[7] In these cases, if the requestor properly filed and meets the eligibility requirements then USCIS must approve the benefit request. There is no discretionary analysis as part of the adjudication, and these requests cannot be denied as a matter of discretion.

The following table provides a non-exhaustive overview of immigration benefits and whether discretion is involved in the adjudication of such benefits.

Immigration Benefits Involving Discretionary Review

| Benefit Type | Discretion Involved (Yes or No) |
| --- | --- |
| Petition to classify an alien as a nonimmigrant worker[8] | No (with some exceptions) |
| Petition to classify an alien as a fiancé(e) of a U.S. citizen[9] | Yes |
| Application to extend or change nonimmigrant status[10] | Yes |
| Advance permission to enter as a nonimmigrant[11] | Yes |
| Initial Parole Document (for aliens who are currently outside the United States) also referred to as "humanitarian parole"[12] | Yes |
| International entrepreneur parole[13] | Yes |
| Temporary protected status[14] | Yes |
| Refugee status[15] | Yes (with some exceptions)[16] |
| Asylum[17] | Yes |
| Petition to classify an alien as a family-based immigrant[18] | No (with some exceptions) |

CAR000005

| Benefit Type | Discretion Involved (Yes or No) |
|---|---|
| Petition to classify an alien as an employment-based immigrant[19] | No (with one exception)[20] |
| Petition to classify an alien as an immigrant investor[21] | No (with some exceptions)[22] |
| Applications by an existing or prospective Regional Center[23] | No (with some exceptions)[24] |
| Adjustment of status[25] | Yes (with some exceptions)[26] |
| Registration[27] | Yes |
| Recognition as an American Indian born in Canada[28] | No |
| Waivers of inadmissibility[29] | Yes |
| Consent to reapply for admission after deportation or removal[30] | Yes |
| Employment authorization[31] | Yes (with some exceptions) |
| Removal of conditions on permanent residence[32] | No (with some exceptions)[33] |
| Naturalization[34] | No |
| Application for a Certificate of Citizenship[35] | No |

[Redaction - Start]

Officers are reminded to follow regulations and specific guidance applicable to the underlying eligibility category, as reflected in standard operating procedures (SOPs) and training materials. For example, specific regulations at 8 CFR 208.13(b)(1)(i)-(ii) govern portions of the discretionary analysis for asylum applications. The RAIO Training Module on Discretion (PDF) provides further information. In cases affected by special circumstances outlined in operational guidance, officers should consult with their supervisors before deciding if the negative factors in a particular case are significant enough to warrant an unfavorable exercise of discretion.

[Redaction - End]

## B. Overview of Discretion

CAR000006

# 1. Definition

The Board of Immigration Appeals (BIA) has described the exercise of discretion as:

- A balancing of the negative factors evidencing the alien's undesirability as a permanent resident with the social and humane considerations presented on his or her behalf to determine whether relief appears in the best interests of this country.[36]
- A matter of administrative grace where the applicant has the burden of showing that discretion should be exercised in his or her favor.[37]
- A consideration of negative factors and the need for the applicant to offset such factors by showing unusual or even outstanding equities.[38]

These characterizations imply that the exercise of discretion cannot be arbitrary, inconsistent, or dependent on intangible or imagined circumstances.

In short, discretion is defined as the ability or power to exercise sound judgment in decision-making. While the discretionary analysis gives the officer some autonomy in the way in which he or she decides a particular case after all applicable eligibility requirements are established, that autonomy may only be exercised within the confines of certain legal restrictions. These restrictions define the scope of the officer's discretionary authority.[39]

## 2. Adjudicative Discretion

There are two broad types of discretion that may be exercised in the context of immigration law: prosecutorial (or enforcement) discretion[40] and adjudicative discretion. The scope of discretion is defined by what type of discretionary decision is being made. This chapter only discusses the exercise of adjudicative discretion.

Adjudicative discretion requires an officer to decide whether to exercise discretion favorably when adjudicating a request for an immigration benefit. This decision is guided by the applicable statutes, regulations, and policies that outline the eligibility requirements for the benefit and the facts present in the case at issue. The U.S. Supreme Court has referred to adjudicative discretion as merit-deciding discretion.[41]

In general, an officer may exercise favorable adjudicative discretion to approve a benefit request when the requestor has met the applicable eligibility requirements and negative factors impacting discretion are not present.[42] An exercise of discretion to grant a benefit may also be appropriate when the requestor has met the eligibility requirements for the benefit, and the positive factors outweigh the negative factors. An exercise of discretion to deny, rather than to grant, may likewise be appropriate when the requestor has met the requirements of the request, but negative factors found in the course of the adjudication outweigh the positive factors.

## 3. Who Exercises Discretion

Congress expressly granted discretion to the Secretary of Homeland Security in deciding when to grant certain immigration benefits. For example, the Immigration and Nationality Act (INA) states: "The Secretary of Homeland Security or the Attorney General, in the Secretary's or the Attorney General's discretion and under such regulations as the Secretary or the Attorney General may prescribe, may adjust to the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum . . . ."[43]

The Secretary's discretionary power is delegated to the officer, through DHS and USCIS. Therefore, when an officer exercises discretion in adjudicating a request for an immigration benefit, the officer is exercising discretion on behalf of the Secretary of Homeland Security.

In many cases, the INA still refers to the Attorney General's discretion because the statutory text has not been changed to reflect the creation of DHS and the transfer of many functions from the U.S. Department of Justice (DOJ) to DHS.[44] If USCIS has adjudicative authority over the benefit, the statute should be read as conferring the power to exercise discretion on the Secretary of Homeland Security.[45]

## 4. Discretion

*Eligibility Threshold*

For discretionary benefits, there is never discretion to grant an immigration benefit if the benefit requestor has not first met all applicable threshold eligibility requirements.

It is legally permissible to deny an application as a matter of discretion without determining whether the requestor is otherwise eligible for the benefit.[46] However, the record is essentially incomplete if USCIS denies an application, petition, or request in its exercise of discretion without making a determination concerning eligibility.

Therefore, as a matter of policy, officers should generally make a specific determination regarding eligibility before addressing the exercise of discretion. Where denying the benefit request is appropriate, the officer should generally include in the denial letter his or her determination on all eligibility requirements, including but not limited to discretionary grounds, if applicable, so that the reasons for the ultimate denial are clearly reflected in the record.

*Lack of Negative Factors*

An alien's threshold eligibility for the benefit sought is generally also a positive factor. Therefore, absent any negative factors, USCIS ordinarily exercises discretion positively.[47] Generally, if there are no negative factors to weigh against that positive factor, denial of the benefit would be an inappropriate use of discretion.

## C. Adjudicating Discretionary Benefits

When adjudicating a discretionary benefit, the officer should first determine whether the requestor meets all threshold eligibility requirements. For example, in adjudicating an application for adjustment of status under INA 245(a), the officer should first determine:

- Whether the applicant was inspected and admitted or paroled or has an approved petition as a VAWA self-petitioner;
- Is eligible to receive an immigrant visa;
- Is admissible to the United States for permanent residence; and
- Has an immigrant visa immediately available to him or her at the time he or she files the adjustment application.[48]

If the officer finds that the requestor does not meet the eligibility requirements but may be eligible for a waiver, exemption, or other form of relief, the officer should determine whether the requestor qualifies for a waiver, exemption, or other form of relief. Not all applications are concurrently filed, and in some instances, applicants must file a separate waiver application or application for relief and have that application approved before the applicant qualifies for the benefit.

If the officer finds that the requestor meets the eligibility requirements because of an approved waiver, exemption, or other form of relief, the officer must then determine whether the request should be granted as a matter of discretion. If the officer finds that the requestor does not meet all applicable eligibility requirements, the officer can still include a discretionary analysis in the denial. The discretionary determination is the final step in the adjudication of a benefit request. Adding a discretionary analysis to a denial is useful if an appellate body on review disagrees with the officer's conclusion that the requestor failed to meet the threshold eligibility requirements. In such a situation, the discretionary denial may still stand.

## 1. Basic Adjudication Steps

Officers should generally follow a three-step process when adjudicating a benefit request involving a discretionary analysis.

| Basic Adjudication Steps Involving Discretion | |
|---|---|
| Step One | Fact finding |
| Step Two | Determine whether requestor meets the threshold eligibility requirements |
| Step Three | Conduct discretionary analysis |

*Fact Finding*[49]

Fact finding refers to the process of gathering and assessing evidence. The focus of fact finding should be to obtain credible evidence relevant to a requestor's eligibility for the benefit, including the discretionary determination. If a requestor is interviewed, the officer should elicit information pertinent to fact finding during the interview. As part of fact finding, officers should evaluate relevant information present in the record. Depending on the benefit sought, such information might include, but is not limited to:

CAR000009

- Immigration history;
- Family ties in the United States;
- Any serious medical conditions;
- Any criminal history;
- Other connections to the community; or
- Information indicating a public safety or national security concern.

Background information may be relevant for eligibility determinations and to the exercise of discretion.

For discretionary benefits, the benefit requestor has the burden of showing that a favorable exercise of discretion is warranted through the submission of evidence.[50] In cases where negative factors are present, the officer may ask the requestor directly why he or she warrants a favorable exercise of discretion. The officer should document any response, or lack thereof, in the record.

*Determining Whether Requestor First Meets Threshold Eligibility Requirements*

The discretionary analysis is the final step in the adjudication. Generally, the officer should first determine whether the requestor meets all threshold eligibility requirements before beginning the discretionary analysis. If the officer determines the requestor has not met the eligibility requirements for the benefit sought, the officer may deny the request without completing a discretionary analysis. However, an officer may include a discretionary analysis if a discretionary denial would be warranted even if the requestor had met the threshold statutory and regulatory requirements.

In the process of determining whether the requestor has met the eligibility requirements for the benefit sought, the officer might find that certain facts related to threshold eligibility for the specific benefit may also be relevant to the discretionary determination.

For example, if an officer finds that an adjustment applicant was convicted of a crime, the applicant might be inadmissible. The criminal conviction may also affect the discretionary analysis.

*Conducting Discretionary Analysis*

The act of exercising discretion involves the weighing of positive and negative factors and considering the totality of the circumstances in the specific case. In the immigration context, the goal is to assess whether, based on the totality of the circumstances, the alien warrants a favorable exercise of discretion.[51]

## 2. Identifying Discretionary Factors

Any facts related to the alien's identity, conduct, character, family or other ties to the United States, immigration status, or any other humanitarian concerns may be appropriate factors to consider in the exercise of discretion. An alien's conduct can include how he or she entered the United States and what he or she has done since arrival, such as employment, schooling, or any evidence of criminal activity.

Whether the alien has family members living in the United States also is relevant to the discretionary analysis. Ties to the United States may include owning real estate or a business; the conduct of that business (including maintenance of such business in compliance with the law) may also be relevant to the discretionary analysis. Humanitarian concerns may include, but are not limited to, health issues.

Precedent case law provides guidance on how to consider evidence and weigh the positive and negative factors present in a case. These precedent decisions and USCIS guidance provide a framework to assist officers in making discretionary decisions that are reasonable and fair.[52]

*Factors That May Be Considered*

There are a number of factors or factual circumstances that are generally considered when conducting a discretionary analysis. Factors may include, but are not limited to:

- Extent to which identity can be established and aliases are disclosed;
- Contribute to the good order and happiness of the United States;
- Ties to family members in the United States and the closeness of the underlying relationships;[53]
- Hardship due to an adverse decision;[54]
- Value and service to the community;[55]
- Length of lawful residence in the United States and any immigration status held during that residence, including the age at which residence in the United States began;[56]
- Service in the U.S. armed forces;[57]
- History of employment;[58]
- Property or business ties in the United States;[59]
- History of taxes paid;
- Nature and underlying circumstances of any inadmissibility grounds at issue, the seriousness of the violations, and eligibility for a waiver of inadmissibility or other form of relief;[60]
- Likelihood that lawful permanent resident (LPR) status will ensue soon;
- Evidence regarding respect for law and order, good character, and intent to hold family responsibilities (for example, affidavits from family, friends, and responsible community representatives);[61]
- Criminal history (in the United States and abroad) and extent of rehabilitation and reform;[62]
- Community service, not including any instances imposed by the courts;
- Existence of an unexecuted administratively final removal, deportation, or exclusion order;[63]
- Public safety or national security concerns;[64]
- Moral depravity or criminal tendencies reflected by a single serious crime or an ongoing or continuing criminal record, with attention to the nature, scope, seriousness, and recent occurrence of criminal activity.[65]
- Findings of juvenile delinquency;[66]
- Compliance with immigration laws, including lawful entry into the United States;[67]

CAR000011

- Whether the alien has endorsed, promoted, supported, or otherwise espoused anti-American views or the views of a terrorist organization or group (including in social media content by, or involving an alien). This includes organizations who support or promote anti-American ideologies or activities, antisemitic terrorism, antisemitic terrorist organizations, antisemitic ideologies, or have engaged in physical harassment of any person in furtherance of the organization or group;[68]

[Redaction - Start]

This also includes antisemitic terrorism and antisemitic terrorist organizations such as Hamas, Palestinian Islamic Jihad, Hezbollah, or Ansar Allah "the Houthis." Upon identifying such a case, officers must notify and consult with their supervisory chain of command, and their local Fraud Detection and National Security point of contact.

[Redaction - End]

- In the case of an alien who was admitted or paroled into the United States, whether the application for admission or parole violated the laws, regulations, and policies in place at the time;[69]
- Relevant country-specific facts and circumstances, such as insufficient vetting and screening information;[70]
- Previous instances of fraud or false testimony in dealings with USCIS or any government agency;
- Marriage to a U.S. citizen or LPR for the primary purpose of circumventing immigration laws;[71]
- Conduct after admission as a nonimmigrant, where such conduct is inconsistent with the nonimmigrant status (for example, engaging in unlawful employment or unauthorized academic study) or with representations made to consular officers or DHS officers when applying for admission (for example, failing to engage in the activities for which they sought admission); and
- Other indicators of character.[72]

This is a non-exhaustive list of factors; the officer may consider any relevant fact in the discretionary analysis.

*Country-Specific Facts and Circumstances*

On June 4, 2025, the President issued Presidential Proclamation 10949, *Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats*, to exercise his authority under INA 212(f) and impose certain restrictions, limitations, and exceptions on the entry of aliens from 19 countries: Afghanistan, Burma, Burundi, Chad, Republic of Congo, Cuba, Equatorial Guinea, Eritrea, Haiti, Iran, Laos, Libya, Sierra Leone, Somalia, Sudan, Togo, Turkmenistan, Venezuela, and Yemen.[73] The Proclamation fully or partially restricts the entry or admission of aliens from those 19 countries who were outside the United States on or after June 9, 2025, and who do not have a valid visa on or after June 9, 2025. The reasons for the restrictions are country-specific and specified in the Proclamation.

CAR000012

The Proclamation's categorical ineligibility for entry or admission does not apply to adjustment of status, extension of stay, change of status, or other discretionary benefits made by applicants physically present in the United States. However, USCIS may consider on a case-by-case basis country-specific facts and circumstances, such as those outlined in the Proclamation, as a significant negative factor when making an individual assessment in weighing discretion, with certain exceptions.[74]

For example, certain countries (including but not limited to Afghanistan, Eritrea, Libya, Somalia, Sudan, Yemen, and Venezuela) lack a competent or central authority for issuing passports and civil documents among other concerns, which directly relates to USCIS' ability to meaningfully assess eligibility for benefit requests including identity, and therefore whether an alien warrants a favorable exercise of discretion.[75]

Where country-specific concerns relate to a high rate of overstay, such data may impact an officer's determination of likelihood that a particular individual may overstay, coupled with other case-specific facts and circumstances. For example, if an alien's conduct after admission as a nonimmigrant is inconsistent with the nonimmigrant status, and the alien is from a country with a high rate of overstay, then the officer may conclude that the alien's conduct should be considered as a significantly negative factor.

The mere fact that an individual is from a country subject to INA 212(f) restrictions on entry or admission, however, is not by itself a significant negative factor. USCIS considers relevant country-specific facts and circumstances such as those outlined in the Proclamation[76] on a case-by-case basis in the totality of the circumstances, considering the relevance of those facts to the benefit request being adjudicated and the alien requesting the benefit. USCIS weighs all relevant positive and negative factors when making these discretionary determinations.

[Redaction - Start]

Officers should consult with their supervisory chains of command before issuing a discretionary denial where country-specific factors such as those outlined in the Proclamation would warrant a denial but the case may also fall under an exception. See, for example, Section 4(b)-(d) of Presidential Proclamation 10949, 90 FR 24497, 24503 (June 4, 2025).

[Redaction - End]

*Anti-American Views or Views of a Terrorist Organization*

USCIS considers circumstances where an alien has endorsed, promoted, supported, or otherwise espoused anti-American views or the views of a terrorist organization or group, including terrorist organizations who support or promote antisemitic terrorism, antisemitic terrorist organizations, and antisemitic ideologies, as mentioned above, to be overwhelmingly negative factors in any applicable case involving USCIS discretionary analysis. Accordingly, USCIS enforces all relevant immigration laws to the maximum degree, including the use of discretion, to deny the benefit request involving such circumstances.

[Redaction - Start]

While engaging in the conduct cited above at any time is an overwhelmingly negative discretionary factor in the exercise of discretion, the officer should assign particular focus to aliens who engaged in on-campus anti-American and antisemitic activities that occurred on or after October 7, 2023.

This includes, in particular, aliens who file the following particular benefit requests:

Petition for a Nonimmigrant Worker (Form I-129) for the following categories:

- Petitions filed by any college, university, technical school, or similar educational institution where USCIS determines that significant antisemitic activity in violation of Executive Order 14188, Additional Measures to Combat Anti-Semitism, 90 FR 8847 (Jan. 29, 2025), has occurred.

Application to Register Permanent Residence or Adjust Status (Form I-485) for the following categories:

- Applications where, upon review, the officer has reason to believe the alien was studying, teaching, working, or otherwise affiliated with a college, university, technical school, or similar educational institution at any point after the October 7, 2023 Hamas attacks, regardless of whether the alien was engaged in this activity pursuant to an F1 or other nonimmigrant visa.

Application to Extend/Change Nonimmigrant Status (Form I-539) for the following category:

- Reinstatement of F-1 nonimmigrant status.

Application for Employment Authorization (Form I-765) for the following category:

- (c)(3)(A), F-1 student, pre-completion Optional Practical Training.

In addition, on February 20, 2025, the United States designated Tren de Aragua (TdA) as a Foreign Terrorist Organization. On March 14, 2025, the President issued Presidential Proclamation 10903, "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren De Aragua." In furtherance of the proclamation, USCIS officers must not approve any petition, application, or benefit request, under any circumstances, where an activity, association, or nexus with a known or suspected TdA member has been identified.

USCIS officers may continue to process cases with a known or suspected TdA member other than a grant or approval (such as denials or referrals). However, officers should consult with their supervisory chains of command to coordinate notification with U.S. Immigration and Customs Enforcement (ICE) prior to taking any adjudicative action and provide any relevant information ICE deems appropriate. USCIS will take all actions necessary to support law enforcement at all levels with their actions in support of the provisions of the proclamation.

Evidence of a nexus to TdA (or any other terrorist organization), which includes any unresolved evidence that tends to suggest an alien's involvement or association with TdA, is an overwhelmingly negative factor in any discretionary analysis.

When compelling circumstances exist, necessary vetting, deconfliction, and administrative investigative actions have been completed, and USCIS determines the approval of the benefit does not pose a threat to national security or public safety, the benefit may be approved only following approval from the USCIS Senior Leadership Review Board.

[Redaction - End]

## 3. Weighing Factors

The act of exercising discretion involves weighing both positive and negative factors and considering the totality of the circumstances in the case before making a decision. Whether a favorable exercise of discretion is warranted is case-specific and depends on the evidence of positive and negative factors submitted by the requestor. As the negative factors grow more serious, a favorable exercise of discretion may not be warranted without the existence of unusual or outstanding equities in the case.[77]

*Totality of the Circumstances: Evaluating the Case-Specific Considerations for Each Factor*

An officer must consider the totality of the facts and circumstances of each individual case involving discretionary benefit requests. To do so, officers should ensure discretionary factors are considered in the context of all factors in the case.

There is no formula for determining the weight to be given a specific positive or negative factor. Officers should not attempt to assign numbers or points to a specific factor to determine if one factor is more or less favorable than another. Officers should consider each factor separately and then all the factors as a whole. The negative and positive factors should be balanced against each other and then evaluated cumulatively. [78] The weight given to each factor may vary depending on the facts of a particular case as well as the relationship of the factor to other factors in the analysis.

Discretionary factors are often interrelated. Officers must therefore determine whether each particular factor is positive or negative and how it affects the other factors under consideration. Some factors are generally given more weight than others. A small number of positive factors may overcome a larger number of negative factors, and vice versa, depending on the specific factors.

For example, when weighing the positive and negative factors, the officer should not consider the various factors individually, in isolation from one another.[79] When considering each factor individually, without considering how all the factors relate to each other, it becomes difficult to weigh the positive and negative factors properly.

Once the officer has weighed each factor individually, the officer should consider all the factors cumulatively to determine whether the unfavorable factors outweigh the favorable ones. If, after weighing all the factors, the officer determines that the positive factors outweigh the negative factors, then the requestor merits a favorable exercise of discretion. If the negative factors outweigh the positive factors, then the officer may decline to favorably exercise discretion and deny the benefit request. There may be instances where the

gravity of a negative factor is of such significance that the factor by itself weighs heavily against a favorable exercise of discretion.[80]

Cases that are denied on the basis of an unfavorable exercise of discretion must include an officer's explanation of why USCIS is not exercising discretion in the requestor's favor.[81] The denial notice must clearly set forth the positive and negative factors considered and explain why the negative factors outweigh the positive factors.

## 4. Supervisory Review[82]

Officers should discuss complex or difficult cases with their supervisors, as needed, particularly those involving criminality or national security issues, regardless of whether the outcome is favorable or unfavorable to the applicant. As appropriate, supervisors may raise issues with USCIS local counsel.

Sometimes a case, especially when coupled with government errors or delay and compelling humanitarian factors, may justify an exercise of discretion resulting in an extraordinarily favorable outcome for the applicant. Officers considering such action should carefully confirm the availability of such action under the law, weigh the factors as in every discretionary decision, consult with supervisors or counsel, and make a record of the analysis and consultation.

## D. Documenting Discretionary Determinations

When issuing a decision that involves a discretionary determination, a careful explanation of the officer's findings and analysis (communicating the positive and negative factors considered and how the officer weighed these factors) helps ensure that the decision is legally sufficient and appropriate. The discretionary determination gives the officer authority to ultimately approve a benefit or form of relief or deny a benefit or form of relief when the applicant otherwise meets eligibility requirements. Officers, however, cannot exercise that authority arbitrarily or capriciously.

*Favorable Exercise of Discretion*

If no negative factors are present, the officer may provide a simple statement in the file noting the absence of negative factors (for example, comments indicating that the applicant is eligible, that there are no negative factors, and that therefore USCIS grants the benefit in the exercise of discretion).

If an officer grants a benefit in the exercise of discretion where negative factors are present but the positive factors outweigh the negative factors, the file should contain a record of the officer's deliberations. The officer should clearly annotate the favorable factors in the file. The officer should also annotate the file regarding any consultations that supported the approval in complex or difficult cases. In some situations, the file annotation may be the only record or documentation for other officers to understand the reasons for the decision.

CAR000016

The officer should indicate the rationale for the decision in a clear manner so that it is easily understandable to others reviewing the file. This may include the officer addressing the discretionary issues in the written decision or by making an annotation in the file.

*Unfavorable Exercise of Discretion*[83]

If negative factors outweigh the positive factors and USCIS denies the benefit request, the written decision must contain an analysis of the factors considered in exercising discretion, where possible.[84]

Negative factors must never be analyzed in a generalized way. The decision must address negative factors on an individualized basis, applying the totality of the circumstances to the specific facts of the case. The decision should specify both the positive and negative factors that the officer identified and considered in support of the decision and should explain how the officer weighted the different factors. The denial notice should set forth the rationale for the decision so that the officer's deliberation may be understood by the requestor as well as any administrative reviewer (such as the Administrative Appeals Office or immigration judge) and the federal courts.

*Articulating Analysis Separately for Discretion and Threshold Eligibility Requirements*

In cases involving the negative exercise of discretion, officers should generally articulate clearly the legal analysis of whether the applicant meets the threshold eligibility requirements and then, separately, the discretionary analysis.

*Denying Benefit Requests as a Matter of Discretion*

If the officer denies a benefit request as a matter of discretion, the officer generally must, in the written notice to the requestor:[85]

- Indicate the decision to deny was made as a matter of discretion;
- Identify, specifically, each positive factor presented by the facts of the case;
- Identify, specifically, each negative factor;
- Explain the relative decisional weight given to each negative and positive factor; and
- Explain the cumulative weight given to the negative and positive factors, and reason for the outcome.

By including the appropriate articulation of discretionary determinations in USCIS decision-making, officers enhance the quality of adjudications and provide appropriate explanation to the requestor.

## Footnotes

[^ 1] For purposes of this Policy Manual part, the term requestor means the person, organization, or business requesting an immigration benefit from USCIS. This may include an applicant or petitioner, depending on the request.

CAR000017

[^ 2] See *Matter of Patel (PDF)*, 17 I&N Dec. 597 (BIA 1980). See the program-specific Policy Manual part to determine whether the adjudication of a benefit request requires the exercise of discretion.

[^ 3] See Section C, Adjudicating Discretionary Benefits, Subsection 3, Weighing Factors [1 USCIS-PM E.8(C)(3)].

[^ 4] For example, see *Kucana v. Holder*, 558 U.S. 233 (2010) (comparing discretion provided in statutory language against regulations promulgated by the U.S. Department of Justice).

[^ 5] See, for example, INA 245(a) (adjustment of status).

[^ 6] See INA 291. See *Matter of Patel (PDF)*, 17 I&N Dec. 597 (BIA 1980). See *Matter of Leung (PDF)*, 16 I&N Dec. 12 (BIA 1976). See *Matter of Arai (PDF)*, 13 I&N Dec. 494 (BIA 1970).

[^ 7] See, for example, INA 316 (naturalization).

[^ 8] See Petition for a Nonimmigrant Worker (Form I-129). See INA 101(a)(15). See INA 214 and 8 CFR 214.

[^ 9] See Petition for Alien Fiancé(e) (Form I-129F). See INA 101(a)(15)(K). See INA 214(d) and INA 214(r). See 8 CFR 214.2(k).

[^ 10] See Application to Extend/Change Nonimmigrant Status (Form I-539). See INA 214 and 8 CFR 214.

[^ 11] See Application for Advance Permission to Enter as a Nonimmigrant (Form I-192). See INA 212(d)(3)(A).

[^ 12] See Application for Travel Documents, Parole Documents, and Arrival/Departure Records (Form I-131). See INA 212(d)(5)(A).

[^ 13] See INA 212(d)(5)(A). See 8 CFR 212.19. See Volume 3, Humanitarian Protection and Parole, Part G, International Entrepreneur Parole [3 USCIS-PM G].

[^ 14] See Application for Temporary Protected Status (Form I-821). See INA 244 and 8 CFR 244.

[^ 15] See Refugee/Asylee Relative Petition (Form I-730). See INA 207 and 8 CFR 207.

[^ 16] Except for following-to-join refugee adjudications. See 8 CFR 207.7.

[^ 17] See Application for Asylum and for Withholding of Removal (Form I-589). See INA 208 and 8 CFR 208. See *Matter of Pula (PDF)*, 19 I&N Dec. 467, 471 (BIA 1987).

[^ 18] See Petition for Alien Relative (Form I-130). See INA 203(a) and INA 204(a)(1)(A)-(D). See 8 CFR 204.

[^ 19] See Immigrant Petition for Alien Workers (Form I-140). See INA 203(b) and INA 204(a)(1)(E)-(G). See 8 CFR 204.5.

[^ 20] The national interest waiver element of a petition seeking classification under INA 203(b)(2)(B) is discretionary. See *Mousavi v. USCIS*, 828 Fed. Appx. 130, 133 (3rd Cir. 2020). See *Poursina v. USCIS*, 936 F.3d 868, 870-72 (9th Cir. 2019). See *Matter of Dhanasar*, 26 I&N Dec. 884, 889 n. 9 (AAO 2016). For specific information on applying discretion in national interest waiver petitions, see Volume 6, Immigrants, Part F, Employment-Based Classifications, Chapter 5, Advanced Degree or Exceptional Ability, Section D, National Interest Waiver of Job Offer [6 USCIS-PM F.5(D)].

[^ 21] See Immigrant Petition by Standalone Investor (Form I-526) or Immigrant Petition by Regional Center Investor (Form I-526E). See INA 203(b)(5) and INA 204(a)(1)(H). See 8 CFR 204.6.

[^ 22] Exceptions include threats to the national interest, fraud, deceit, misrepresentation, and criminal misuse. See INA 203(b)(5)(N)(i) and INA 203(b)(5)(O)(i). See Volume 6, Immigrants, Part G, Investors, Chapter 8, Sanctions and Discretionary Determinations [6 USCIS-PM G.8].

[^ 23] See Application for Regional Center Designation (Form I-956) and Application for Approval of an Investment in a Commercial Enterprise (Form I-956F).

[^ 24] Exceptions include threats to the national interest, fraud, deceit, misrepresentation, and criminal misuse. See INA 203(b)(5)(N)(i) and INA 203(b)(5)(O)(i). See Volume 6, Immigrants, Part G, Investors, Chapter 8, Sanctions and Discretionary Determinations [6 USCIS-PM G.8].

[^ 25] See Application to Register Permanent Residence or Adjust Status (Form I-485). For more information on how to conduct a discretionary analysis in the context of an adjustment application, see Volume 7, Adjustment of Status, Part A, Adjustment of Status Policies and Procedures, Chapter 10, Legal Analysis and Use of Discretion [7 USCIS-PM A.10].

[^ 26] See, for example, INA 245(a) and INA 209(b). Exceptions include adjustment of status based on Nicaraguan Adjustment and Central American Relief Act of 1997 (NACARA), Title II of Pub. L. 105-100 (PDF), 111 Stat. 2160, 2193 (November 19, 1997); refugee-based adjustment under INA 209(a)(2); adjustment of status based on Haitian Refugee Immigration Fairness Act of 1998 (HRIFA), Section 902 of Division A, Title IX of Pub. L. 105-277 (PDF), 112 Stat. 2681, 2681-538 (October 21, 1998); adjustment of status based on Liberian Refugee Immigration Fairness (LRIF) law, Section 7611 of the National Defense Authorization Act for Fiscal Year 2020, Pub. L. 116-92 (PDF), 113 Stat. 1198, 2309 (December 20, 2019).

[^ 27] See Application to Register Permanent Residence or Adjust Status (Form I-485). See INA 249. See 8 CFR 249. For more information, see Volume 7, Adjustment of Status, Part O, Registration [7 USCIS-PM O].

[^ 28] See INA 289 and 8 CFR 289.

[^ 29] See Application for Waiver of Grounds of Inadmissibility (Form I-601). See Application for Provisional Unlawful Presence Waiver (Form I-601A). See Application by Refugee for Waiver of Inadmissibility Grounds (Form I-602). See, for example, INA 209(c), INA 212(a)(9)(B)(v), INA 212(a)(9)(C)(iii), and INA 212(g)-(i). For more information on how to conduct a discretionary analysis in the context of a waiver application, see

Volume 9, Waivers and Other Forms of Relief, Part A, Waiver Policies and Procedures, Chapter 5, Discretion [9 USCIS-PM A.5]. [Redaction - Start] Additional guidance for officers adjudicating refugee claims is available in International and Refugee Affairs Division (IRAD) materials. [Redaction - End]

[^ 30] See Application for Permission to Reapply for Admission into the United States After Deportation or Removal (Form I-212). See INA 212(a)(9)(A)(iii) and INA 212(a)(9)(C)(ii).

[^ 31] See Application for Employment Authorization (Form I-765). See INA 274A. See 8 CFR 274a.12. For more information, see Volume 10, Employment Authorization [10 USCIS-PM].

[^ 32] See Petition to Remove Conditions on Residence (Form I-751). See Petition by Investor to Remove Conditions on Permanent Resident Status (Form I-829). See INA 216 and INA 216A. See 8 CFR 216.

[^ 33] When a family-based conditional permanent resident files a Petition to Remove Conditions on Residence (Form I-751) as a waiver request based on termination of marriage, battery or extreme cruelty, or extreme hardship, it is a discretionary decision. See INA 216(c)(4).

[^ 34] See Application for Naturalization (Form N-400). See INA 316. For more information, see Volume 12, Citizenship and Naturalization [12 USCIS-PM].

[^ 35] See Application for Certificate of Citizenship (Form N-600). See INA 301, INA 309 and INA 320. For more information, see Volume 12, Citizenship and Naturalization, Part K, Certificates of Citizenship and Naturalization [12 USCIS-PM K].

[^ 36] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 300 (BIA 1996).

[^ 37] See *Matter of Patel (PDF)*, 17 I&N Dec. 597 (BIA 1980) (adjustment of status). See *Von Pervieux v. INS*, 572 F.2d 114, 118 (3rd Cir. 1978). See *Ameeriar v. INS*, 438 F.2d 1028, 1030 (3rd Cir. 1971). See *Matter of Marques (PDF)*, 16 I&N Dec. 314 (BIA 1977).

[^ 38] See *Matter of Ortiz-Prieto (PDF)*, 11 I&N Dec. 317 (BIA 1965).

[^ 39] See Subsection 4, Discretion [1 USCIS-PM E.8(B)(4)].

[^ 40] Prosecutorial discretion is a decision to enforce or not enforce the law against someone. Prosecutorial discretion is exercised when an agency makes a decision with respect to enforcing the law. USCIS, along with other DHS agencies such as U.S. Immigration and Customs Enforcement and U.S. Customs and Border Protection, has the authority to exercise prosecutorial discretion related to immigration enforcement actions it may take, particularly in the context of initiating removal proceedings through the issuance of a non-mandatory Notice to Appear. Prosecutorial discretion does not decrease USCIS' commitment to enforcing the immigration laws. Rather, it is a means to use agency resources in a way that best accomplishes the mission of administering and enforcing the immigration laws of the United States.

CAR000020

[^ 41] See *INS v. Doherty (PDF)*, 502 U.S. 314 (1992).

[^ 42] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970) ("In the absence of adverse factors, adjustment will ordinarily be granted, still as a matter of discretion."). See *Matter of Pula (PDF)*, 19 I&N Dec. 467, 474 (BIA 1987) ("In the absence of any adverse factors, however, asylum should be granted in the exercise of discretion.").

[^ 43] See INA 209(b).

[^ 44] As of March 1, 2003, in accordance with Section 1517 of the Homeland Security Act of 2002 (HSA), Pub. L. 107-296 (PDF), 116 Stat. 2135, 2311 (November 25, 2002), any reference to the Attorney General in a provision of the INA describing functions that were transferred from the Attorney General or other DOJ official to DHS by the HSA "shall be deemed to refer to the Secretary" of Homeland Security. See 6 U.S.C. 557 (codifying Section 1517 of the HSA).

[^ 45] See 6 U.S.C. 275.

[^ 46] See *INS v. Abudu (PDF)*, 485 U.S. 94, 105 (1988). See *INS v. Bagamasbad (PDF)*, 429 U.S. 24, 26 (1976). See *INS v. Rios-Pineda (PDF)*, 471 U.S. 444 (1985).

[^ 47] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970). See *Matter of Lam (PDF)*, 16 I&N Dec. 432 (BIA 1978).

[^ 48] See INA 245(a). See Volume 7, Adjustment of Status, Part B, 245(a) Adjustment, Chapter 2, Eligibility Requirements [7 USCIS-PM B.2].

[^ 49] See Chapter 6, Evidence [1 USCIS-PM E.6].

[^ 50] See 8 CFR 103.2(b)(1).

[^ 51] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 586-587 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990).

[^ 52] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970). See *Matter of Lam (PDF)*, 16 I&N Dec. 432, 434 (BIA 1978). See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 53] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970). See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301-302 (BIA 1996) (". . . if the alien has relatives in the United States, the quality of their relationship must be considered in determining the weight to be awarded this equity.").

[^ 54] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970). See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 55] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990).

[^ 56] See *Matter of Arai (PDF)*, 13 I&N Dec. 494, 496 (BIA 1970). See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584-85 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996). Residence must be lawful to be considered a positive factor. See *Matter of Lee (PDF)*, 17 I&N Dec. 275, 278 (Comm. 1978).

[^ 57] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 58] See *Matter of Lam (PDF)*, 16 I&N Dec. 432, 434 (BIA 1978). See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301-302 (BIA 1996) (". . . if the alien has a history of employment, it is important to consider the type of employment and its length and stability.").

[^ 59] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 60] See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 61] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990).

[^ 62] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996). However, reformation is not an absolute prerequisite to a favorable exercise of discretion. Rather, the discretionary analysis must be conducted on a case-by-case basis, with rehabilitation a factor to be considered in the exercise of discretion. See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 196 (BIA 1990) (considering rehabilitation a significant factor in view of the nature and extent of the respondent's criminal history, which spanned 10 years).

[^ 63] USCIS generally does not exercise discretion favorably to grant adjustment where the adjustment applicant has an unexecuted removal order. For information on the effect of an unexecuted removal order of an arriving alien on adjustment of status, see Volume 7, Adjustment of Status, Part A, Adjustment of Status

CAR000022

Policies and Procedures, Chapter 10, Legal Analysis and Use of Discretion, Section B, Discretion, Subsection 2, Issues and Factors to Consider [7 USCIS-PM A.10(B)(2)].

[^ 64] See Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens, PM-602-0187, issued February 28, 2025.

[^ 65] The officer should not go behind the record of conviction to reassess an alien's ultimate guilt or innocence, but rather inquire into the circumstances surrounding the commission of the crime in order to determine whether a favorable exercise of discretion is warranted. See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 197 (BIA 1990).

[^ 66] USCIS considers findings of juvenile delinquency on a case-by-case basis, based on the totality of the evidence, to determine whether a favorable exercise of discretion is warranted. Therefore, an adjustment applicant must disclose all arrests and charges. If any arrest or charge was disposed of as a matter of juvenile delinquency, the alien must include the court or other public record that establishes this disposition. See Volume 7, Adjustment of Status, Part A, Adjustment of Status Policies and Procedures, Chapter 4, Documentation, Section A, Initial Evidence, Subsection 7, Certified Copies of Arrest Records and Court Dispositions [7 USCIS-PM A.4(A)(7)]. For more information, see Volume 7, Adjustment of Status, Part B, 245(a) Adjustment [7 USCIS-PM B] and Part F, Special Immigrant-Based Adjustment, Chapter 7, Special Immigrant Juveniles, Section C, Eligibility Requirements, Subsection 4, Admissibility and Waiver Requirements [7 USCIS-PM F.7(C)(4)].

[^ 67] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584 (BIA 1978). See *Matter of Lee (PDF)*, 17 I&N Dec. 275, 278 (Comm. 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996). However, the BIA found that a record of immigration violations standing alone does not conclusively support a finding of lack of good moral character. Further, how recent the deportation was can only be considered when there is a finding of a poor moral character based on moral turpitude in the conduct and attitude of an alien which evinces a callous conscience. In such circumstances, there must be a measurable reformation of character over a period of time in order to properly assess an alien's ability to assimilate into society. In all other instances, when the cause for deportation has been removed and the alien now appears eligible for issuance of a visa, the time factor should not be considered. See *Matter of Lee (PDF)*, 17 I&N Dec. 275 (Comm. 1978).

[^ 68] USCIS uses the definitions at INA 313(a) when identifying and determining anti-American organizations, views, activities, and ideologies.

[^ 69] This includes compliance with any requirements announced by DHS for any parole program or process, including whether the alien had knowledge of any false or fraudulent information. For example, in certain circumstances, DHS required a financial sponsor to submit an approvable Declaration of Financial Support (Form I-134) or Online Request to Be a Supporter and Declaration of Financial Support (Form I-134A) as a condition of an alien being authorized parole. An officer adjudicating an alien's pending immigration benefit request involving discretion may determine that the alien's prior application for parole was not in

accordance with the policies in place at the time if the Form I-134 or Form I-134A relied upon by DHS to authorize parole contained false information or was accompanied by supporting evidence that contained false or fraudulent information.

[^ 70] Insufficient vetting and screening information may involve insufficient identity documents or inability to rely on documentation or information provided by the specified countries for identity purposes or determining criminal history or ties to criminal or terrorist organizations. For more information, see Presidential Proclamation 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats, 90 FR 24497 (PDF) (June 4, 2025).

[^ 71] Although this factor could lead to a statutory denial under INA 204(c).

[^ 72] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 584 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996).

[^ 73] See INA 212(f) ("Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate."). See 90 FR 24497 (PDF) (June 4, 2025).

[^ 74] For a list of exceptions, see Section 4(b)-(d) of Presidential Proclamation 10949, 90 FR 24497, 24503 (PDF) (June 4, 2025).

[^ 75] For additional reciprocity information by country, see U.S. Department of State's U.S. Visa: Reciprocity and Civil Documents by Country webpage.

[^ 76] USCIS acknowledges that the President has issued other proclamations exercising authority under INA 212(f), and that this Proclamation may also be amended or reissued. To the extent that this Proclamation is amended or reissued, or the President further exercises his authority under INA 212(f), USCIS will consider any country-specific facts and circumstances outlined therein when making discretionary determinations for immigration benefit requests.

[^ 77] See *Matter of Marin (PDF)*, 16 I&N Dec. 581, 585 (BIA 1978). See *Matter of Buscemi (PDF)*, 19 I&N Dec. 628, 633 (BIA 1988). See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 195 (BIA 1990). See *Matter of Mendez-Morales (PDF)*, 21 I&N Dec. 296, 301 (BIA 1996). For example, USCIS generally does not favorably exercise discretion in certain cases involving violent or dangerous crimes except in extraordinary circumstances. See 8 CFR 212.7(d). For more information, see Volume 9, Waivers and Other Forms of Relief, Part A, Waiver Policies and Procedures, Chapter 5, Discretion, Section C, Cases Involving Violent or Dangerous Crimes [9 USCIS-PM A.5(C)]. See Volume 7, Adjustment of Status, Part A, Adjustment of Status Policies and Procedures, Chapter 10, Legal Analysis and Use of Discretion, Section B, Discretion, Subsection 2, Issues and Factors to Consider [7

USCIS-PM A.10(B)(2)]. Another example relates to applicants seeking adjustment based on U nonimmigrant status: Depending on the nature of the adverse factors, applicants may be required to clearly demonstrate that denial of adjustment would result in exceptional and extremely unusual hardship. Even if the applicant makes such a showing, however, USCIS may still find favorable exercise of discretion is not warranted in certain cases. See 8 CFR 245.24(d)(11).

[^ 78] See *Matter of Edwards (PDF)*, 20 I&N Dec. 191, 200 (BIA 1990) (concurring opinion).

[^ 79] See *Matter of Pula (PDF)*, 19 I&N Dec. 467, 473-74 (BIA 1987).

[^ 80] See, for example, 8 CFR 212.7(d) (In adjudicating an application for a waiver of a criminal ground of inadmissibility involving a violent or dangerous crime, "depending on the gravity of the alien's underlying criminal offense, a showing of extraordinary circumstances might still be insufficient to warrant a favorable exercise of discretion . . . .") For more information on discretion in the context of waivers of inadmissibility, see Volume 9, Waivers and Other Forms of Relief, Part A, Waiver Policies and Procedures, Chapter 5, Discretion [9 USCIS-PM A.5].

[^ 81] See 8 CFR 103.3(a).

[^ 82] Supervisory review is required in certain situations. The law provides for outcomes that may be extraordinarily favorable for the applicant but uphold principles of fairness and equity. See *Munoz v. Ashcroft*, 339 F.3d 950 (9th Cir. 2003) (stating, "It is true that equitable tolling is available in INA cases, as there is a 'presumption, read into every federal statute of limitation, that filing deadlines are subject to equitable tolling [and that] the same rebuttable presumption of equitable tolling . . . applies in suits against private defendants and . . . in suits against the United States'", but concluding that the April 1, 1990 (asylum application deadline to qualify under the Nicaraguan Adjustment and Central American Relief Act, Title II of Pub. L. 105-100 (PDF), 111 Stat. 2160 (November 19, 1997)) is a statute of repose that cannot be subject to equitable tolling). See *Mohawk Power Corp. v. Federal Power Commission*, 379 F.2d 153, 160 (D.C. Cir. 1967) ("Conceptions of equity are not a special province of the courts but may properly be invoked by administrative agencies seeking to achieve 'the necessities of control in an increasingly complex society without sacrifice of fundamental principles of fairness and justice.'").

[^ 83] These analytical steps amplify guidance concerning denial notices, and do not replace them.

[^ 84] See 8 CFR 103.3(a). In some cases, the officer may not be able to fully reveal negative discretionary factors if they are classified. Additionally, an exception may be made for denial letters issued to applicants for admissions as a refugee under the U.S. Refugee Admissions Program, which contain only summary reasons for denials and are not required to contain detailed analysis of the basis for negative decisions.

[^ 85] See 8 CFR 103.3(a). In some cases, the officer may not be able to fully reveal negative discretionary factors if they are classified. Additionally, an exception may be made for denial letters issued to applicants for admissions as a refugee under the U.S. Refugee Admissions Program, which contain only summary reasons for denials and are not required to contain detailed analysis of the basis for negative decisions.

CAR000025

while the mother was temporarily abroad, should not file Form I-90 to request an initial PRC. The USCIS field office with jurisdiction over such an applicant's residence may be able to assist the applicant to obtain an initial PRC at an INFOPASS appointment. For more information, applicants may call the USCIS Contact Center at 1-800-375-5283 (TTY for applicants who are deaf, hard of hearing, or have a speech disability: 1-800-767-1833).

[^ 7] For example, special agricultural workers who automatically adjusted to permanent residence based on INA 210 must file Form I-90 in order to obtain a PRC.

[^ 8] For more information, see Chapter 4, Commuter Cards [11 USCIS-PM B.4].

[^ 9] See 54 Stat. 670 (June 28, 1940).

[^ 10] Exceptions to a 10-year card include, for example, conditional permanent residents for whom legacy INS began issuing Forms I-551 with an expiration date of 2 years after the date on which the person became a conditional permanent resident under the Immigration Marriage Fraud Amendments of 1986, Pub. L. 99-639 (PDF) (November 10, 1986). See Chapter 2, Replacement of Permanent Resident Card, Section C, Conditional Permanent Residents [11 USCIS-PM B.2(C)] for more information.

[^ 11] For example, in May 2017, USCIS began issuing redesigned permanent resident cards with enhanced security features.

## Chapter 2 - Replacement of Permanent Resident Card

### A. Eligibility Requirements

Lawful permanent residents (LPRs) are entitled to evidence of status in the United States. LPRs are eligible for replacement of their Permanent Resident Card (PRC) if they meet requirements, including but not limited to, the following:

- Properly file the Application to Replace Permanent Resident Card (Form I-90);
- Establish identity;
- Establish LPR or conditional permanent resident (CPR)[1] status; and
- Otherwise meet the eligibility requirements to receive a replacement PRC.

*Maintaining LPR or CPR Status*

LPR status generally begins from the date the government admits an alien to the United States as an LPR or grants or recognizes LPR status. LPR status ends if and when rescinded by USCIS,[2] terminated in removal proceedings,[3] or the status is abandoned.[4] Similarly, CPR status generally begins from the date the government admits a person to the United States as a CPR or grants CPR status. CPR status ends if and when rescinded or terminated.[5] For example, CPRs may lose status if they do not apply to remove conditions, if

they do not meet certain requirements to remove the conditions on their status during the required time period, or if USCIS denies a petition to remove conditions.[6]

*LPRs Applying for Naturalization*

LPRs (and CPRs) 18 years of age and over are required to carry their PRCs (or other proof of registration).[7] Applying for naturalization does not change this requirement.

## B. Lawful Permanent Residents in Proceedings

LPRs in deportation, exclusion, or removal proceedings are entitled to evidence of LPR status until ordered excluded, deported, or removed.[8]

If an LPR is in proceedings, USCIS reviews the Form I-90 and totality of the evidence in the record to determine if a new PRC will be issued or if the applicant will receive evidence of status in the form of a temporary permanent resident document.[9]

## C. Conditional Permanent Residents

A CPR is an alien admitted for permanent residence on a conditional basis for a period of 2 years because the alien sought LPR status:

- Based on a marriage of less than 2 years;[10] or
- As an investor.[11]

CPRs are issued PRCs by USCIS with an expiration date of 2 years from the date of obtaining permanent resident status. CPRs whose status is not expiring within 90 days may file a Form I-90 to replace a PRC for the reasons provided in the form instructions. If a CPR is eligible to receive a replacement card, the expiration date of the replacement card will be the same as that of the prior card (2 years from the date of becoming a CPR).

In general, a CPR is not eligible to file a Form I-90 for any reason during the 90-day period before the second anniversary of obtaining permanent resident status.[12] The expiration date on the PRC should be the second anniversary of the alien obtaining permanent resident status. This ensures the CPR files the appropriate petition to remove the conditions during the 90-day period before the second anniversary of obtaining permanent resident status.[13] The receipt notice for such a petition to remove conditions serves to extend evidence of CPR status while the petition to remove conditions is pending. The receipt notice, when presented with the expired PRC, may be used to prove employment authorization and authorization to return to the United States after temporary foreign travel.

If a CPR files a Form I-90 during the 90 days before the expiration of conditional status, USCIS denies the application and advises the applicant to file the appropriate petition to remove the conditions.

CAR000027

## D. Documentation and Evidence

### 1. Form

An Application to Replace Permanent Resident Card (Form I-90) must be used by an LPR to request replacement of a PRC expiring within 6 months.[14] Additional reasons for which LPRs must file Form I-90 include, but are not limited to, replacement of a lost, stolen, destroyed, or mutilated PRC, or when the LPR's name or other biographic information has legally changed since issuance of the PRC.[15]

CPRs may use Form I-90 to request replacement of a PRC that is not expiring within 90 days for reasons that include, but are not limited to, replacement of a lost, stolen, destroyed, or mutilated PRC, or when the CPR's name or other biographic information has legally changed since issuance of the PRC.[16] CPRs may not use Form I-90 to request removal of the conditions on residence.[17]

The Form I-90 instructions include a full list of reasons to request replacement of a PRC and further information on filing requirements for each reason. An applicant must file Form I-90 according to the form instructions. Applicants can access the current edition of the form on the USCIS website.

### 2. Fees

An applicant should refer to the Fee Schedule (Form G-1055) for the appropriate fees required for filing a Form I-90. Any required fees must be submitted at the time of filing.[18]

### 3. Filing Location

An applicant may submit a Form I-90 by mail or electronic filing as indicated in the form instructions. However, applicants may not file online if they are requesting a fee waiver.

### 4. Required Evidence

An applicant should refer to the Form I-90 instructions for required initial evidence based on the particular reason for which he or she is seeking a replacement card. For example, if an applicant requests a replacement PRC because the existing card has incorrect data because of DHS error, the applicant must submit proof of the correct name or biographical data and return the original PRC with the incorrect data to USCIS when filing Form I-90.

## E. Biometrics

### 1. Application Support Center Appointments

Replacement of a PRC requires submission of biometrics at the USCIS Application Support Center (ASC) servicing the applicant's place of residence in the United States.[19] USCIS generally schedules the applicant for a biometrics appointment after receiving a properly filed application. USCIS notifies the applicant of an

appointment by sending the applicant a Notice of Action (Form I-797C) stating the date, time, and location of the appointment.

For purposes of a request to replace a PRC, USCIS generally collects the following biometrics from the applicant: photograph, signature, and fingerprints.[20]

When an applicant appears at an ASC[21] to provide biometrics, the ASC may take actions that include, but are not limited to, the following:

- Verifying applicant identity;
- Verifying biographic changes, if applicable;[22] and
- Capturing biometrics.

## 2. Rescheduling Requests and Failure to Appear

If an applicant fails to appear for the scheduled biometrics appointment, his or her Form I-90 is considered abandoned and may be denied, unless USCIS receives a properly filed change of address or rescheduling request before the scheduled appointment.

Biometrics must be completed within 90 days of the biometrics appointment described in the initial Form I-797C. The application may be denied for abandonment if biometrics are not completed within this timeframe. If an applicant is unable to appear for the initial scheduled date, the applicant may request to reschedule the appointment along with a sufficient explanation for the applicant's inability to appear on that date. The applicant should submit the rescheduling request before the scheduled appointment, otherwise USCIS may deny the application for failure to appear at a scheduled biometrics appointment. The applicant should follow the instructions on the Form I-797C to request rescheduling.

## F. Temporary Evidence of Permanent Resident Status

LPRs are entitled to evidence of status.[23] In some cases, LPRs may require temporary evidence of LPR status. For example, a new LPR may require temporary evidence of status while waiting to receive his or her initial PRC or a Form I-90 applicant may require temporary evidence of status while waiting to receive his or her replacement PRC.[24] USCIS may also provide temporary evidence of status to LPRs in deportation, exclusion, or removal proceedings.[25]

## 1. I-90 Receipt Notice Includes Extension of Permanent Resident Card Validity

USCIS sends a receipt notice (Notice of Action (Form I-797)) to applicants who properly file a Form I-90 to replace their expiring PRC. The notice serves as proof of USCIS' receipt of the applicant's Form I-90. The notice also serves as evidence of USCIS' extension of the validity of the applicant's PRC for the time period specified in the notice (when the LPR presents the notice together with the PRC).[26] In these cases, the notice combined with the expiring or expired PRC serve as evidence of LPR status and may be used to prove

employment authorization and authorization to return to the United States after temporary foreign travel. [27]

## 2. Other Temporary Evidence of Permanent Resident Status

USCIS may issue temporary evidence of LPR status in other formats, such as an Alien Documentation, Identification and Telecommunication (ADIT) stamp (also known as an I-551 stamp). For example, LPRs who are not in possession of their PRC may need an ADIT stamp as temporary evidence of LPR status and employment authorization.

LPRs whose Form I-90 is still pending adjudication and whose PRC and extension notice have expired, may also request documentation of status for travel, employment, or other purposes. USCIS determines if the requestor should receive an ADIT stamp and has the discretion to determine the validity period based on the LPR's situation.

LPRs may obtain an ADIT stamp by calling the USCIS Contact Center to schedule an appointment with a USCIS field office. An officer may only place an ADIT stamp on Arrival/Departure Record (Form I-94) or in an unexpired passport.

## G. Adjudication

## 1. Lawful Permanent Resident Status

The officer reviews evidence submitted by the applicant to verify that the applicant is an LPR. An officer verifies an applicant's status using USCIS systems and records.

## 2. Security Checks

Officers should ensure biographic and biometric security checks are completed, and remain valid through adjudication of the application. [Redaction - Start] Officers should follow agency procedures for conducting security checks and directing what actions to take if they receive any derogatory information as a result of these checks. [Redaction - End]

## 3. Requests for Evidence and Interviews

Officers may issue Requests for Evidence for an application to replace a PRC.[28] In some cases, USCIS may refer a Form I-90 applicant to a field office for an interview.[29] [Redaction - Start] Officers should follow agency procedures for guidance on when to refer an applicant for an interview. [Redaction - End]

## 4. Decision

*Approval*

USCIS may approve a Form I-90 if the applicant meets the following requirements:

CAR000030

- The application is signed or certified via internet filing;
- All applicable fees have been paid (unless waived or not required);
- The applicant established his or her identity;
- The applicant is an LPR or CPR;
- Biometric requirements have been completed and remain valid at the time of the decision; and
- The applicant established all other eligibility criteria for the specific basis he or she filed Form I-90.

If the officer approves the Form I-90, USCIS sends both the approval notice and the new PRC to the applicant's U.S. mailing address.[30] PRCs cannot be mailed to addresses outside the United States.[31]

*Denial*

USCIS may deny an application to replace a PRC if the applicant fails to:

- Establish LPR or CPR status;
- Submit biometrics;
- Establish his or her identity;
- Attend an interview (if required); or
- Otherwise meet the eligibility criteria applicable to his or her Form I-90.

If the officer denies the Form I-90, the applicant cannot appeal the decision.[32] However, the applicant may file a motion to reopen or reconsider. A denial also does not preclude the applicant from filing a new Form I-90 if he or she can establish eligibility.

## H. Motions to Reopen or Reconsider

### 1. Requested by Applicant

To request a motion to reopen or motion to reconsider a denial, an applicant must file a Notice of Appeal or Motion (Form I-290B)[33] with applicable fee, unless waived or not required.[34] An applicant should follow the current form instructions to properly file a motion.

An applicant has 30 days[35] from the date of the decision to submit a motion. Officers may use discretion to excuse failure to file a motion to reopen within this time period if the applicant demonstrates the delay was reasonable and beyond the control of the applicant.[36]

### 2. Service Motion to Reopen

A Service motion to reopen is initiated by USCIS to reopen a case in order to change the decision or to correct information for card production. When USCIS initiates a Service motion, an officer issues a formal notice to the applicant advising him or her that the case has been reopened. If the new decision is favorable to the applicant, the officer updates appropriate systems and generates an automatic approval notice separate from the motion.

CAR000031

If the decision is unfavorable to the applicant, an officer provides 30 days[37] for the applicant to submit information in support of his or her case. USCIS may extend the time period for good cause shown.[38] If the applicant does not wish to submit any information relating to the motion, the applicant may waive the 30-day period.[39] If the applicant fails to submit the required information within the allocated timeframe or the information the applicant submits does not overcome the grounds for denial, an officer may proceed to make a final determination on the motion and change the decision on the Form I-90, if applicable. A new period for an applicant to file a motion to reopen or reconsider[40] begins from the date of issuance of the new adverse decision on the Form I-90.

## Footnotes

[^ 1] See INA 216 and INA 216A.

[^ 2] See INA 246.

[^ 3] See INA 240.

[^ 4] For example, if an alien files a Record of Abandonment of Lawful Permanent Resident Status (Form I-407). See INA 101(a)(13)(C)(i).

[^ 5] See INA 216. See INA 216A. See INA 246.

[^ 6] See INA 216(c) and INA 216A(c). USCIS may also terminate a CPR's status if, during the 2-year conditional resident period, USCIS determines the qualifying marriage or entrepreneurship that formed the basis of the conditional permanent residence was improper. See INA 216(b) and INA 216A(b).

[^ 7] See INA 264(e).

[^ 8] See 8 CFR 264.5(g) ("Issuance of evidence of permanent residence to an alien who had permanent resident status when the proceedings commenced shall not affect those proceedings").

[^ 9] For more information, see Section F, Temporary Evidence of Permanent Resident Status, Subsection 2, Other Temporary Evidence of Permanent Resident Status [11 PM-USCIS B.2(F)(2)].

[^ 10] See INA 216.

[^ 11] Also known as the employment-based 5th preference (EB-5) category. See INA 216A.

[^ 12] If the CPR has been misclassified and should have been admitted or adjusted status as an LPR without conditions on their permanent residence, the misclassified CPR may file a Form I-90 even within the 90-day period before the second anniversary of obtaining permanent resident status.

[^ 13] See Petition to Remove Conditions on Residence (Form I-751) or Petition by Investor to Remove Conditions on Permanent Resident Status (Form I-829). See 8 CFR 216.4 or 8 CFR 216.6.

[^ 14] See 8 CFR 264.5. See Form I-90 instructions.

[^ 15] See 8 CFR 264.5(b). See Form I-90 instructions for a full list of reasons. LPRs must also use Form I-90 to request a replacement of a prior edition of the alien registration card issued on Form AR-3, AR-103, or I-151. See 8 CFR 264.5(c).

[^ 16] See 8 CFR 264.5(d). See Form I-90 instruction for a full list of reasons.

[^ 17] A CPR whose card is expiring may apply to have the conditions on residence removed in accordance with 8 CFR 216.4 or 8 CFR 216.6.

[^ 18] For information on fee waivers, see the Request for Fee Waiver (Form I-912).

[^ 19] Form I-90 applicants who are commuters may be issued a Request for Evidence of a U.S. address for USCIS to use to schedule the location of a biometric services appointment.

[^ 20] For more information, see Preparing for Your Biometric Services Appointment.

[^ 21] If an applicant is temporarily outside of the United States due to U.S. military or government orders, he or she should refer to the form instructions to determine if biometrics are required for the filing, which would require a properly completed Form FD-258 (fingerprint card) and a passport-style photo with the application. See Form I-90 instructions for more information.

[^ 22] The ASC may verify portions of the name, date of birth, and sex.

[^ 23] See INA 264(d).

[^ 24] See 8 CFR 264.5(h).

[^ 25] See 8 CFR 264.5(g) ("Issuance of evidence of permanent residence to an alien who had permanent resident status when the proceedings commenced shall not affect those proceedings"). See Section B, Lawful Permanent Residents in Proceedings [11 USCIS-PM B.2(B)].

[^ 26] Before January 2021, USCIS issued an extension sticker on an applicant's current PRC if the applicant had a pending Form I-90 to replace an expiring PRC to allow for time to process the new card. As of that date, USCIS began phasing out issuing extension stickers and, instead, started issuing revised notices. See the USCIS.gov news alert.

[^ 27] For more information on travel documents for LPRs, see U.S. Customs and Border Protection's Carrier Information Guide.

[^ 28] For more information on Requests for Evidence, see Volume 1, General Policies and Procedures, Part E, Adjudications, Chapter 6, Evidence, Section F, Requests for Evidence and Notices of Intent to Deny [1 USCIS-PM E.6(F)].

CAR000033

[^ 29] See 8 CFR 103.2(b)(9).

[^ 30] Applicants may use Case Status Online to check on the status of their Form I-90. If Case Status Online indicates that USCIS has mailed a new PRC, the applicant should be provided with a U.S. Postal Service (USPS) tracking number. If Case Status Online and the USPS tracking number indicate a PRC has been mailed and delivered, but the applicant has not received the PRC, the applicant should inquire with USPS immediately. For more information, see the Form I-90 webpage. A PRC issued to a commuters is mailed to the port-of-entry designated by an applicant. For more information, see Chapter 4, Commuter Cards [11 USCIS-PM B.4].

[^ 31] Applicants temporarily outside of the United States due to U.S. military or government orders may be serviced by the U.S. armed forces or U.S. diplomatic postal systems.

[^ 32] See 8 CFR 264.5(f).

[^ 33] See 8 CFR 103.5(a).

[^ 34] See Fee Schedule (Form G-1055).

[^ 35] If the decision is mailed to the applicant, the applicant has 33 days from the date of the denial letter to submit the motion. See 8 CFR 103.8(b).

[^ 36] See 8 CFR 103.5(a)(1)(i).

[^ 37] If the decision is mailed to the applicant, the applicant has 33 days from the date of the decision letter to submit information in support of his or her case. See 8 CFR 103.8(b).

[^ 38] See 8 CFR 103.5(a)(5)(ii).

[^ 39] See 8 CFR 103.5(a)(5).

[^ 40] See Notice of Appeal or Motion (Form I-290B).

## Chapter 3 - Expired Permanent Resident Cards

To deter fraud and enhance security, USCIS field offices generally collect expired Permanent Resident Cards (PRCs) encountered through the normal course of business, unless the PRC has an unexpired extension sticker or a valid receipt notice to be used with the expired PRC as evidence of continuing LPR status.

Offices that have collected expired cards should follow agency procedures to update applicable systems and destroy the expired cards.

## Chapter 4 - Commuter Cards

CAR000034

Department of Homeland Security
Delegation Number: 0150.1
## Issue Date: 06/05/2003

# DELEGATION TO THE BUREAU OF CITIZENSHIP AND IMMIGRATION SERVICES

## I.  Purpose

This delegation vests in the Bureau of Citizenship and Immigration Services (BCIS) and through its highest ranking official to regional directors, asylum directors, district directors, service center directors, adjudication officers, asylum officers, immigration information officers, and other officers or employees of the BCIS the authorities described herein in order to accomplish the mission of the BCIS.  This delegation is made through, and the exercise of any authorities therein is subject to the authority, direction, and control of, the Deputy Secretary of the Department of Homeland Security.

## II.  Delegations

Pursuant to the authority vested in the Secretary of Homeland Security by law, including the Homeland Security Act of 2002, I hereby delegate to the Bureau of Citizenship and Immigration Services:

A.    Authority to establish policies for performing such functions as are transferred to the Director by section 451 of the Homeland Security Act of 2002 (Act) or otherwise vested in the Bureau by law.

B.    Authority to oversee the administration of such policies.

C.    Responsibility for advising the Deputy Secretary with respect to any policy or operation of the BCIS that may affect the Bureau of Customs and Border Protection (BCBP) or the Bureau of Immigration and Customs Enforcement (BICE) of the Department, including potentially conflicting policies or operations.

D.    Authority to establish national immigration services policies and priorities.

E.    Authority to meet regularly with the Citizenship and Immigration Services Ombudsman ("the Ombudsman") described in section 452 of Act and to establish procedures requiring a formal response to any recommendations submitted in the Ombudsman's annual report to Congress pursuant to section 451(a)(3)(F) of the Act.

1

Delegation # 0150.1

F.      Authority to design and implement in consultation with the Chief Human Capital Officer the managerial rotation program described in section 451(a)(4) of the Homeland Security Act of 2002.

G.      Authority to implement pilot initiatives for backlog elimination as described in section 451(a)(5) of the Homeland Security Act of 2002, including the authority to increase personnel, transfer personnel to focus on areas with the largest potential for backlog, and streamline paperwork.

H.      Authority under section 103(a)(1) of the Immigration and Nationality Act of 1952, as amended (INA), 8 U.S.C. §1103(a)(1), to administer the immigration laws (as defined in section 101(a)(17) of the INA).

I.      Authority to investigate alleged civil and criminal violations of the immigration laws, including but not limited to alleged fraud with respect to applications or determinations within the BCIS and make recommendations for prosecutions, or other appropriate action when deemed advisable.

J.      Authority to register and fingerprint aliens in the United States, and exercise other functions relating to registration and change of address, as provided by sections 262-266 of the INA, 8 U.S.C. §§1302-06.

K.      Authority, in consultation with the legislative affairs function of the Department of Homeland Security, to prepare reports on private bills pertaining to immigration matters under 28 C.F.R. §0.105(h).

L.      Authority to certify official Department of Homeland Security records relating to immigration matters.

M.      Authority to maintain such files and records systems as are necessary to carry out the functions of the BCIS.

N.      Authority to place aliens in removal proceeding by issuance of a Notice to Appear, and to cancel such Notice before jurisdiction vests with the Executive Office for Immigration Review of the Department of Justice (EOIR).

O.      Authority to parole an applicant for admission into the United States under section 212(d)(5) of the INA, 8 U.S.C. §1182(d)(5), and to issue advance parole documentation.

P.      Authority to grant voluntary departure under section 240B of the INA, 8 U.S.C. §1229c, and deferred action.

Q.      Authority to approve bonds issued pursuant to the immigration laws, to determine whether such bonds have been breached, and take appropriate action to protect the interests of the United States with respect to such bonds.

2

Delegation # 0150.1

R.     Authority to grant employment authorization under sections 214(a) or 274A(h)(3) of the INA (8 U.S.C. §§1184(a) and 1324A(h)(3)), 8 C.F.R. §274a.13, or other applicable law.

S.     Authority to interrogate aliens and issue subpoenas, administer oaths, take and consider evidence, and fingerprint and photograph aliens under sections 287(a), (b), and (f) of the INA, 8 U.S.C. §1357 and under section 235(d) of the INA, 8 U.S.C. §1225(d).

T.     Authority under the immigration laws, including but not limited to sections 207 and 208 of the INA (8 U.S.C. §1157 and §1158), to grant asylum and refugee status (and terminate such status), adjust status of refugees and asylees, make credible fear determinations, and approve withholding of removal under the Convention Against Torture.

U.     Authority to exercise appellate jurisdiction over the matters described in 8 C.F.R. §103.1(f)(3)(E)(iii) (as in effect on February 28, 2003).

V.     Authority under the immigration laws, including but not limited to sections 310 and 341 of the INA (8 U.S.C. §1421 and §1452), to grant applications for naturalization and certificates of citizenship (and revoke such naturalization), including administration of oaths, issuance of certificates, provision of citizenship materials and services to public schools to prepare naturalization candidates, supervision of courts designated under section 310 of the INA to administer oaths, and any other rights and responsibilities relating to the naturalization or citizenship of aliens.

W.     Authority under the immigration laws, including but not limited to sections 204 and 214 of the INA (8 U.S.C. §1154 and §1184), to accept and adjudicate nonimmigrant and immigrant visa petitions (whether family based, employment based, or other), including collection of appropriate fees, conduct of interviews, and appellate review of the BCIS decisions that do not fall within the jurisdiction of the EOIR.

X.     Authority to invalidate labor certifications under 8 C.F.R §214.2, 20 C.F.R. §655.209 and §656.30.

Y.     Authority to approve participation as a Regional Center and to terminate such participation under 8 C.F.R.§204.6(m) and to take other actions to administer the Immigrant Investor (EB-5) Program.

3

Delegation # 0150.1

Z.     Authority under the immigration laws to extend and change nonimmigrant status and to adjust the status of aliens to lawful residents (on a temporary or permanent basis) and to revoke such status, including determination of admissibility of aliens, authority to grant waivers of inadmissibility and permission to reapply for entry, and authority to conduct interviews (or waive interviews) regarding an alien's eligibility for an immigration benefit.

AA.     Authority to approve or deny, or withdraw approval of petitions for schools seeking approval for attendance by nonimmigrant students under 8 C.F.R. §214.3.

BB.     Authority under the immigration laws to accept, process and adjudicate any application for any immigration benefit or service not exclusively under the jurisdiction of the EOIR, ICE or CBP, including but not limited to the authority to approve, deny, transfer, revoke, rescind, or certify all existing and future immigration, naturalization and citizenship benefits.

CC.     Authority to station officers and employees of the BCIS in foreign countries as provided by section 103(a)(7) of the INA, 8 U.S.C. §1103(a)(7), and other applicable law, and to perform such other activities with respect to the international operations of the Department of Homeland Security as I may direct.

DD.     Authority to perform other functions or duties as I may direct.

The authority delegated herein may be exercised by the director, his deputy, or the highest ranking official in the Bureau.  In exercising the authority delegated herein, the BCIS shall be governed by the Homeland Security Act of 2002; all applicable federal laws, rules and regulations; and the policies, procedures, direction, authority and control of the Secretary, the Deputy Secretary, the Under Secretary for Management, or other officer authorized by the Secretary to prescribe such policies and procedures or exercise such authority, direction and control.  Nothing herein shall be construed to limit or detract from the authority of the Secretary under section 102(a)(2) and (3) of the Homeland Security Act and other applicable law.

# III.   Reservations

The above delegations of authority to the BCIS in no way limit the functions, rights, privileges, powers, and duties vested in the Commissioner of CBP or in the Assistant Secretary for ICE by law, including authority provided by the above listed statutes or any delegation from the Secretary of Homeland Security.

CAR000038

Delegation # 0150.1

The BCIS is directed to coordinate, to the extent necessary and appropriate, his exercise of the authorities under this delegation with other officials to whom I have delegated authorities that complement, relate to, involve, or are concurrent with the authorities in this delegation. Specific reference in this delegation to coordination or consultation with other officials as to certain matters is not meant to limit the responsibility of the BCIS to coordinate or consult in other matters when appropriate. Delegation of an authority to the BCIS shall not be construed to mean that the authority may be exclusively exercised by the Director; in particular, reference is made to delegations of authority to the Commissioner of CBP and to the Assistant Secretary for ICE that are with respect to many authorities parallel to, concurrent with, or overlapping with this delegation.

Unless specifically provided therein, nothing in this delegation authorizes the BCIS to enforce immigration laws by inspection of aliens or vehicles, issuance or execution of warrants, detention or release of aliens on bond, removal of aliens from the United States, issuance of stays of removal, reinstatement of removal orders, or any other enforcement authority exclusively delegated to the Commissioner of CBP or the Assistant Secretary for ICE.

Nothing is this delegation is intended to grant or provide authority or jurisdiction over any determination or matter within the sole authority of the Executive Office for Immigration Review of the Department of Justice.

# IV.  Re-delegations

Unless otherwise proscribed by statute, Executive Order, or the terms of this delegation, the powers, authorities, responsibilities, and functions of the BCIS may be re-delegated in writing by the Director or the highest ranking official to appropriate subordinate officials of the BCIS, and may be successively re-delegated to other officers or employees of the BCIS qualified to exercise the authority. The Director or the highest ranking official also may re-delegate the authority contained in this delegation to the Commissioner of CBP or to Assistant Secretary for ICE, with their consent.

Officers and employees of the former Immigration and Naturalization Service (INS), including but not limited to the Examinations (Adjudications), Citizenship and International Affairs (including asylum and refugee) Programs of the former INS will, following their transfer to the BCIS, continue to exercise their authorities and responsibilities as they existed on February 28, 2003, unless modified or revoked by the BCIS or other authorized official. Asylum officers continue to be delegated responsibilities as described in 8 C.F.R. §103.1(g)(3)(ii) (as in effect on February 28, 2003) unless modified or revoked by the BCIS or other authorized official.

CAR000039

Delegation # 0150.1

## V.   Authorities

Homeland Security Act, 116 Stat. 2135, Pub. L. 107-296 §§ 101, 102, 403, 441, 1502, 1706 (2002); 5 U.S.C. § 301; Immigration and Nationality Act of 1952, as amended, 8 U.S.C. 1101 et seq.; the "immigration laws," as defined by section 101(a)(17) of the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. 1101(a)(17).

## VI.   Credentials

Any badge, credential, seal, stamp or other such item or document that is valid at 11:59 p.m. on February 28, 2003, and that identifies an officer or employee of the INS, who is transferred to the BCIS, shall continue in effect as a badge, credential or other documentation identifying an officer or employee of the BCIS until its expiration, revocation, withdrawal, or replacement, whichever comes first.  The BCIS may authorize replacement, renewal, or new issuance of badges, credentials, seals, stamps or other such items or documents to BCIS officers or employees using Immigration and Naturalization Service identity and forms until BCIS forms are available.

## VII.  Office of Primary Interest

The Bureau of Citizenship and Immigration Services is the office with primary interest in this delegation.

## VIII. Cancellation

Delegation Number 0150 is rescinded.

## IX.   Effective Date and Time

This delegation of authority shall take effect at 12:00 midnight, March 1, 2003.

Secretary of Homeland Security

6

CAR000040

Delegation # 0150.1



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Camp Springs, MD 20588-0009

December 2, 2025

PM-602-0192

# Policy Memorandum

**SUBJECT:**   Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries[1]

**Purpose**

Effective immediately, this memorandum directs U.S. Citizenship and Immigration Services (USCIS) personnel to:

1. Place a hold on all Forms I-589 (Application for Asylum and for Withholding of Removal), regardless of the alien's country of nationality, pending a comprehensive review;
2. Place a hold on pending benefit requests[2] for aliens from countries listed in *Presidential Proclamation (PP) 10949, Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats*,[3] pending a comprehensive review, regardless of entry date[4]; and
3. Conduct a comprehensive re-review of approved benefit requests for aliens from countries listed in PP 10949 who entered the United States on or after January 20, 2021.[5]

This memorandum mandates that all aliens meeting these criteria undergo a thorough re-review process, including a potential interview[6] and, if necessary, a re-interview, to fully assess all national security and public safety threats along with any other related grounds of inadmissibility or ineligibility.[7] An individualized, case-by-case review and assessment will be done of all relevant information and facts. USCIS will also conduct a comprehensive review of all relevant policies,

---

[1] On June 4, 2025, the President issued Presidential Proclamation 10949, *Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats.* Exercising authority under section 212(f) of the Immigration and Nationality Act (INA), the proclamation imposes restrictions, limitations, and exceptions on the entry of aliens from 19 high-risk countries. Under INA 212(f), the President may suspend or restrict the entry of any aliens deemed detrimental to U.S. interests. See 90 FR 24497 (PDF) (June 4, 2025).

[2] The term "benefit request" in this memorandum does not include USCIS screening activities, including credible fear, reasonable fear, safe third country, third country removal, and threshold screenings under the Asylum Cooperative Agreements.

[3] This applies to aliens who list one of the 19 high-risk countries as their Country of Birth or Country of Citizenship.

[4] Including Form I-485 (Application to Register Permanent Residence or Adjust Status), Form I-90 (Application to Replace Permanent Resident Card (Green Card)), Form N-470 (Application to Preserve Residence for Naturalization Purposes), Form I-751, (Petition to Remove Conditions on Residence), and Form I-131 (Application for Travel Documents, Parole Documents, and Arrival/Departure Records).

[5] Entered may include admitted, inspected, paroled, or entered without inspection.

[6] Interviews for this population shall not be waived under any circumstance. For benefit requests where an interview is not required, the case review and evaluation will determine if the alien needs to appear at a USCIS office.

[7] See INA 212(a)(3)(A), (B), and (F) and 237(a)(4)(A) and (B).

PM-602-0192: Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries
Page: 2

procedures, and operational guidance for compliance, accuracy, and needed improvements during this time.

This guidance outlines the adjudicative hold, procedural requirements, and processes for the re-review, interview, or re-interview of affected aliens. USCIS personnel are instructed to prioritize national security and public safety concerns and ensure compliance with all applicable laws and regulations during the adjudication process. All findings must be documented in accordance with established protocols to support any subsequent determinations or actions.

**Background**

On January 20, 2025, the President issued Executive Order (EO) 14161, titled *Protecting the United States from Foreign Terrorist and Other National Security and Public Safety Threats*. This order aims to safeguard U.S. citizens from aliens who may seek to commit terrorist acts, pose threats to national security, promote hateful ideologies, or exploit immigration laws for malicious purposes. EO 14161 underscores the importance of vigilance during the visa issuance process to ensure that individuals approved for admission into the United States do not intend to harm Americans or compromise U.S. national interests.

Recently, the United States has seen what a lack of screening, vetting, and prioritizing expedient adjudications can do to the American people. An Afghan national, Nasir Ahmad Tawhedi, planned a terrorist attack in the United States on Election Day 2024. Tawhedi pled guilty in federal court to conspiring and attempting to provide material support and resources to the Islamic State of Iraq and al-Sham (ISIS).[8] In another instance, an Afghan national, Rahmanullah Lakanwal, is suspected of planning and executing a terrorist attack in Washington, DC against two National Guard members,[9] one who was killed and another who remains critically injured. USCIS plays an instrumental role in preventing terrorists from seeking safe haven in the United States and ensuring that USCIS' screening and vetting and adjudications prioritize the safety of the American people and uphold all U.S. laws.

In light of identified concerns and the threat to the American people, USCIS has determined that a comprehensive re-review, potential interview, and re-interview of all aliens from high-risk countries of concern who entered the United States on or after January 20, 2021 is necessary. Lastly, USCIS may, when appropriate, extend this review and re-interview process to aliens who entered the United States outside of this timeframe.

USCIS remains committed to ensuring that all aliens from high-risk countries of concern that entered the United States do not present threats to national security or public safety. To address vulnerabilities during this process, and in order to conduct a comprehensive review of all policies, procedures, and guidance, USCIS has determined that it must implement an adjudicative hold on all pending asylum applications, regardless of the alien's country of nationality, as well as pending benefit requests filed by aliens from high-risk countries outlined in PP 10949. This hold will remain

---

[8] See *Afghan National Pleads Guilty to Plotting Election Day Terror Attack in the United States,* U.S. Department of Justice, June 13, 2025.
[9] See *Terrorist Who Shot Two National Guard Members in D.C. Was Let into the Country by the Biden Administration's Operation Allies Welcome Program*, U.S. Department of Homeland Security Press Release, November 26, 2025.

PM-602-0192: Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries
Page: 3

in effect until lifted by the USCIS Director through a subsequent memorandum. Any requests to lift the hold due to litigation or other extraordinary circumstances must receive approval from the USCIS Director or Deputy Director.[10]

## Guidance

USCIS has determined the operational necessity to ensure that all asylum applicants and aliens from high-risk countries of concern who entered the United States do not pose a threat to national security or public safety. This effort ensures that USCIS exercises its full authority to investigate immigration benefit requests filed by aliens who may pose risks to the national security and public safety of the United States, as outlined in DHS Delegation of Authority 0150.1, issued June 5, 2003.

USCIS will conduct a thorough review on a case-by-case basis to assess benefit eligibility including whether:

1. The alien is listed in the Terrorist Screening Dataset (TSDS) as a Known or Suspected Terrorist (KST) under Tier 1 or Tier 2 classifications or is included in Tier 3 or Tier 4 of the TSDS with significant derogatory information related to the alien.
2. The alien is connected to prior, current, or planned involvement in, or association with, an activity, individual, or organization described in sections 212(a)(3)(A), (B), or (F), or 237(a)(4)(A) or (B) of the Immigration and Nationality Act (INA).
3. The alien is linked to prior, current, or planned involvement in, or association with, an activity, individual, or organization that may pose a risk of serious harm or danger to the community, including criminal conduct described in INA 101(a)(43), 212(a)(1)(A)(iii), 212(a)(2), 237(a)(2), or 237(a)(4)(A)(ii).
4. The alien is unable to establish their identity as outlined in PP 10949.[11]

This process ensures that USCIS exercises its full authority to protect national security and public safety while adhering to the provisions of the INA and applicable laws. USCIS has considered that this direction may result in delay to the adjudication of some pending applications and has weighed that consequence against the urgent need for the agency to ensure that applicants are vetted and screened to the maximum degree possible. Ultimately, USCIS has determined that the burden of processing delays that will fall on some applicants is necessary and appropriate in this instance, when weighed against the agency's obligation to protect and preserve national security.

Within 90 days of issuance of this memorandum, USCIS will prioritize a list for review, interview, re-interview, and referral to ICE and other law enforcement agencies as appropriate, and, in consultation with the Office of Policy and Strategy and the Fraud Detection and National Security Directorate, issue operational guidance.

## Use

---

[10] Any request for an exemption to the adjudicative hold must be coordinated with the Office of Policy and Strategy.
[11] See USCIS Policy Manual, Volume 1, General Policies and Procedures, Part E, Adjudications, Chapter 8, Discretionary Analysis [1 USCIS-PM E.8].

PM-602-0192: Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries
Page: 4

This policy memorandum is intended solely for the guidance of USCIS personnel in the performance of their official duties, but it does not remove their discretion in making adjudicatory decisions. It may not be relied upon to create any right or benefit, substantive or procedural, enforceable under law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Camp Springs, MD 20588-0009

January 1, 2026                                             PM-602-0194

# Policy Memorandum

**SUBJECT:**   Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries[1]

**Purpose**

Effective immediately, this memorandum directs U.S. Citizenship and Immigration Services (USCIS) personnel to:

1. Place a hold[2] on all pending benefit applications, for aliens[3] listed[4] in Presidential Proclamation (PP) 10998, *Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States*,[5] pending a comprehensive review, regardless of entry date;[6]
2. Conduct a comprehensive review of all policies, procedures, and screening and vetting processes for benefit requests for aliens from countries listed in PP 10998; and
3. Conduct a comprehensive re-review of approved benefit requests implicated in PP 10998 that were approved on or after January 20, 2021.

---

[1] On December 16, 2025, the President issued Presidential Proclamation (PP) 10998, *Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States*. Exercising authority under INA 212(f), the proclamation continues the full restrictions and entry limitations of nationals from the original high-risk countries established under PP 10949, *Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats* (June 4, 2025), and imposes restrictions, limitations, and exceptions on additional high-risk countries. Under INA 212(f), the President may suspend or restrict the entry of any aliens deemed detrimental to U.S. interests.

[2] A "hold" allows a case to proceed through processing, up to final adjudication. A "final adjudication" refers to the issuance of a final decision on a case, such as an approval, denial, or dismissal.

[3] The term "alien" means any person not a citizen or national of the United States. See INA 101(a)(3) and 8 U.S.C. 1101(a)(3).

[4] This refers to aliens with a nationality, country of birth, or aliens who have acquired Citizenship by Investment (CBI) listed in PP 10998. "As an example, a foreign national from a country that is subject to travel restrictions could purchase CBI from a second country that is not subject to travel restrictions, obtain a passport in the citizenship of that second country, and subsequently apply for a United States visa for travel to the United States, thus evading the travel restrictions on his or her first country." Further, this includes aliens with varying nationalities but are traveling on a Palestinian-Authority-issued document.

[5] This applies to aliens who list one of the high-risk countries as their Country of Birth or Country of Citizenship.

[6] Immigrant visas for family members of individuals in the United States will no longer be automatically or broadly exempt from PP 10949 and PP 10998 restrictions or requirements. Family-based immigrant visa applications are now subject to the same review, restrictions, or additional scrutiny as other benefit requests.

PM-602-0194: Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries
Page: 2

This memorandum specifies which cases are subject to the adjudicative hold, identifies exemptions, and outlines the factors to consider when assessing benefit eligibility during the re-review, interview, or re-interview of affected aliens. USCIS personnel are instructed to prioritize national security and public safety concerns and ensure compliance with applicable laws and regulations during the adjudication process. All findings must be documented in accordance with established protocols to support any subsequent determinations or actions.

This memorandum does not supersede the guidance in Policy Memorandum, *Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries* on December 1, 2025[7] except as specified under the "Exceptions to the Adjudication Hold" outlined in this memorandum.

**Background**

On January 20, 2025, the President issued Executive Order (EO) 14161, titled *Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats*. This order aimed to safeguard U.S. citizens from aliens who may seek to commit terrorist acts, pose threats to national security, promote hateful ideologies, or exploit immigration laws for malicious purposes. EO 14161 underscores the importance of vigilance during the visa issuance process to ensure that individuals approved for admission into the United States do not intend to harm Americans or compromise U.S. national interests.

Accordingly, through PP 10949 and PP 10998, the President restricted the entry of foreign nationals from countries lacking adequate screening and vetting information to safeguard the national security and public safety of the United States and its citizens. The proclamations also instructed the United States Government to promptly engage with the countries identified, outlining the necessary steps to meet U.S. screening, vetting, immigration, and security standards. However, despite those efforts, most of the countries named in PP 10949 and PP 10998 – and others – continue to demonstrate significant deficiencies in screening, vetting, and information sharing. In addition to PP 10949, PP 10998 emphasizes that "it is the policy of the United States to protect its citizens from foreign nationals who intend to commit terrorist attacks, threaten our national security and public safety, incite hate crimes, or otherwise exploit the immigration laws for malevolent purposes."

Following the continued review since the issuance of PP 10949, as well as the responses of foreign countries to that proclamation, the United States Government has identified additional countries that are unable to meet basic criteria for identifying their nationals and residents who may pose national security and public safety risks, or for sharing necessary information with the United States. It is paramount that the United States Government ensure aliens in the United States do not intend to threaten its citizens or undermine or destabilize its culture, government, institutions, or

---

[7] USCIS issued a public-facing version on December 2, 2025. See Policy Memorandum, *Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries,* December 2, 2025 (PM-602-0192).

PM-602-0194: Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries
Page: 3

founding principles. Entry will not be granted to aliens who advocate for, aid, or support designated foreign terrorists or other threats to our national security or public safety.

As a result of these reviews and considerations, the President has determined to maintain and adjust the restrictions outlined in sections 2 and 3 of PP 10949 regarding the entry of certain classes of foreign nationals into the United States. Additionally, further limitations have been imposed on the entry of aliens from additional high-risk countries in PP 10998.

Considering identified concerns and the threat to the American people, USCIS has determined a comprehensive re-review, potential interview, and re-interview of all aliens from high-risk countries of concern who entered the United States on or after January 20, 2021, is necessary.[8]

USCIS remains dedicated to ensuring aliens from high-risk countries of concern who have entered the United States do not pose risks to national security or public safety. To faithfully uphold United States immigration law, the flow of aliens from countries with high overstay rates, significant fraud, or both must stop. To address potential vulnerabilities, USCIS will place an adjudicative hold on all pending benefit requests submitted by or for aliens from the high-risk countries identified in PP 10998, allowing for a thorough case-by-case review. This hold will remain in effect until lifted or modified by the USCIS Director through a subsequent memorandum or memorandum attachment. Any requests to lift the hold due to litigation or other extraordinary circumstances must receive approval from the USCIS Director or Deputy Director.

**Guidance**

USCIS has determined the operational necessity to ensure all aliens from high-risk countries of concern who entered the United States do not pose a threat to national security or public safety. This effort ensures USCIS exercises its full authority to investigate immigration benefit requests filed by or for aliens who may pose risks to the national security and public safety of the United States, as outlined in DHS Delegation of Authority 0150.1, issued June 5, 2003.

USCIS will conduct a thorough review on a case-by-case basis to assess benefit eligibility including whether:

1.  The alien is listed in the Terrorist Screening Dataset (TSDS) as a Known or Suspected Terrorist under Tier 1 or Tier 2 classifications or is included in Tier 3 of the TSDS with significant derogatory information related to the alien.
2.  The alien is connected to prior, current, or planned involvement in, or association with, an activity, individual, or organization described in sections 212(a)(3)(A), (B), or (F), or 237(a)(4)(A) or (B) of the Immigration and Nationality Act (INA).
3.  The alien is linked to prior, current, or planned involvement in, or association with, an activity, individual, or organization that may pose a risk of serious harm or danger to the community, including criminal conduct described in INA 101(a)(43), 212(a)(1)(A)(iii), 212(a)(2), 237(a)(2), or 237(a)(4)(A)(ii).

---

[8] Additionally, USCIS may, when appropriate, extend this review and re-interview process to aliens who entered the United States outside of this timeframe.

CAR000047

PM-602-0194: Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries
Page: 4

4. The alien is unable to establish their identity as outlined in PP 10949 and PP 10998.[9]

Many of these restricted high-risk countries experience widespread corruption, unreliable or fraudulent civil documents and criminal records, and lack effective birth registration systems, which systematically hinder accurate vetting and identity verification. Officers must consider these country-specific factors when conducting security and background checks, and when reviewing civil documents such as passports, marriage and divorce certificates, and birth certificates, as well as criminal history information. Officers must follow established policies to ensure proper screening and vetting procedures are conducted, and that any derogatory information is thoroughly evaluated and appropriately resolved.

This process ensures that USCIS exercises its full authority to protect national security and public safety while adhering to the provisions of the INA and applicable laws. USCIS has considered that this direction may result in delay to the adjudication of some pending applications and has weighed that consequence against the urgent need for the agency to ensure that aliens are vetted and screened to the maximum degree possible. Ultimately, USCIS has determined the burden of processing delays which will fall on some aliens is necessary and appropriate, when weighed against the agency's obligation to protect and preserve our national security.

*Exceptions to the Adjudication Hold*[10]

Exceptions to the adjudication hold for cases with identified national security, public safety, or fraud-related derogatory information still require the adjudicative directorate or program office to coordinate with U.S. Immigration and Customs Enforcement (ICE) in accordance with current policies and procedures before final adjudication. The following are exceptions to the adjudication hold:

1. Form I-90, Application to Replace Permanent Resident Card (Green Card);[11]
2. Form N-565, Application for Replacement Naturalization/Citizenship Document;
3. Form N-600, Application for Certificate of Citizenship;[12]

---

[9] See USCIS Policy Manual, Volume 1, General Policies and Procedures, Part E, Adjudications, Chapter 8, Discretionary Analysis [1 USCIS-PM E.8].

[10] Any request for an exemption to the adjudicative hold must be coordinated with the USCIS Office of Policy and Strategy (OP&S). OP&S will track and record all the hold lifts. OP&S will issue additional guidance within 7 days of issuing this memorandum.

[11] Lawful permanent residents are entitled to evidence of status in the United States. Lawful permanent residents are eligible for replacement of their Permanent Resident Card if they meet certain requirements. See USCIS Policy Manual, Volume 11, Travel and Identity Documents, Part B, Permanent Resident Cards, Chapter 2, Replacement of Permanent Resident Card [11 USCIS-PM B.2].

[12] Except Yemen and Somalia. Yemen and Somalia are not included in this particular exception due to security and documentary concerns specific to those countries as documented on the Department of State Visa Reciprocity Schedules for these countries.

Case 1:26-cv-0XXXX-XXX   Document XXX-1   Filed 04/24/26   Page 259 of 288 PageID #: 341

PM-602-0194: Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries
Page: 5

4. Form I-765, Application for Employment Authorization filed under the (c)(8),[13] limited (c)(11),[14] and limited (c)(14)[15] categories;

5. Form I-910, Application for Civil Surgeon Designation (only for physicians that are citizens or nationals of the United States);

6. Benefit requests filed by any alien who is an athlete or member of an athletic team, including the coaches, persons performing a necessary support role, and immediate relatives for the purpose of participating in the World Cup, Olympics, or other major sporting event as determined by the Secretary of State;

7. Benefit requests that are a priority for law enforcement and where ICE has requested USCIS take adjudicative action to uphold public safety or national security;

8. Benefit requests filed by aliens whose entry would serve a United States national interest;[16]

9. Benefit requests, as well as the associated underlying benefits, for any programs that are terminated or discontinued as a result of an Executive Order, Proclamation, Federal Register Notice, or Directive issued by the President, the Secretary of Homeland Security, or the USCIS Director; and

10. Automatic termination decisions for ancillary or related benefit requests when an alien is granted Legal Permanent Resident status or becomes a naturalized citizen.[17]

Within 90 days of this memorandum issuance, and in consultation with OP&S and the Fraud Detection and National Security Directorate, USCIS will prioritize a list for review, interview, and re-interview, and issue operational guidance.

**Use**

This policy memorandum is intended solely for the guidance of USCIS personnel in the performance of their official duties, but it does not remove their discretion in making adjudicatory decisions. It may not be relied upon to create any right or benefit, substantive or procedural, enforceable under law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

---

[13] See 8 CFR 274a.12(c)(8). Only applies to *initial* (c)(8) filings. *Asylumworks v. Mayorkas* requires USCIS to process all initial Form I-765 filed under the (c)(8) category within 30 days.

[14] See 8 CFR 274a.12(c)(11). Form I-765 filed under the (c)(11) category exceptions only apply when the request comes from law enforcement because the alien is assisting law enforcement.

[15] See 8 CFR 274a.12(c)(14). Form I-765 filed under the (c)(14) category exceptions only apply when the request comes from law enforcement because the alien is assisting law enforcement.

[16] For example, a benefit request filed by an alien whose entry into the United States would provide significant benefit to the United States may include, but is not limited to, a scientist or medical researcher working on a critical public health project, an engineer with specialized skills needed for a key infrastructure initiative, or someone with unique expertise supporting U.S. national security or economic interests. This is a case-by-case determination and requires approval from the headquarters of the adjudicative directorate or program office.

[17] For example, when USCIS approves an individual's Form I-485, any associated or underlying applications, such as Form I-765, will be automatically terminated, as the benefit provided by the ancillary form is no longer necessary.

FOR OFFICIAL USE ONLY



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Camp Springs, MD  20588-0009

**U.S. Citizenship and Immigration Services**

January 1, 2026

# Memorandum

TO:       Sarah M. Kendall, Associate Director
Field Operations Directorate

Ted Kim, Associate Director
Refugee, Asylum and International Operations Directorate

Carrie Selby, Acting Associate Director
Service Center Operations Directorate

Andrew J. Davidson, Acting Associate Director
Fraud Detection and National Security Directorate

Susan Dibbins, Chief
Administrative Appeals Office

Andrew Good, Chief
Office of Policy and Strategy

FROM:    Joseph B. Edlow
Director

SUBJECT:  **Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries[1]**

**Purpose:** Effective immediately, this memorandum directs U.S. Citizenship and Immigration Services (USCIS) personnel to:

---

[1] On December 16, 2025, the President issued Presidential Proclamation (PP) 10998, *Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States*. Exercising authority under INA 212(f), the proclamation continues the full restrictions and entry limitations of nationals from the original high-risk countries established under PP 10949, *Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats* (June 4, 2025), and imposes restrictions, limitations, and exceptions on additional high-risk countries. Under INA 212(f), the President may suspend or restrict the entry of any aliens deemed detrimental to U.S. interests.

FOR OFFICIAL USE ONLY
CAR000050

**Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries**
Page 2

1. Place a hold[2] on all pending benefit applications, for aliens[3] listed[4] in *Presidential Proclamation (PP) 10998, Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States,*[5] pending a comprehensive review, regardless of entry date[6];

2. Conduct a comprehensive review of all policies, procedures, and screening and vetting processes for benefit requests for aliens from countries listed in PP 10998; and

3. Conduct a comprehensive re-review of approved benefit requests implicated in PP 10998 that were approved on or after January 20, 2021.

This directive specifies which cases are subject to the adjudicative hold, identifies exemptions, and outlines the factors to consider when assessing benefit eligibility during the re-review, interview, or re-interview of affected aliens. USCIS personnel are instructed to prioritize national security and public safety concerns and ensure compliance with applicable laws and regulations during the adjudication process. All findings must be documented in accordance with established protocols to support any subsequent determinations or actions.

This memorandum does not supersede the guidance in Policy Memorandum, *Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries* on December 1, 2025[7] except as specified under the "Exceptions to the Adjudicative Hold" outlined in this directive.

**Background:** On January 20, 2025, the President issued Executive Order (EO) 14161, titled *Protecting the United States from Foreign Terrorist and Other National Security and Public Safety Threats.* This order aimed to safeguard U.S. citizens from aliens who may seek to commit terrorist acts, pose threats to national security, promote hateful ideologies, or exploit immigration laws for malicious purposes. EO 14161 underscores the importance of vigilance

---

[2] A "hold" allows a case to proceed through processing, up to final adjudication. A "final adjudication" refers to the issuance of a final decision on a case, such as an approval, denial, or dismissal.

[3] The term "alien" means any person not a citizen or national of the United States. See INA § 101(a)(3) and 8 U.S.C. § 1101(a)(3).

[4] This refers to aliens with a nationality, country of birth, or aliens who have acquired Citizenship by Investment (CBI) listed in PP 10998. "As an example, a foreign national from a country that is subject to travel restrictions could purchase CBI from a second country that is not subject to travel restrictions, obtain a passport in the citizenship of that second country, and subsequently apply for a United States visa for travel to the United States, thus evading the travel restrictions on his or her first country." Further, this includes aliens with varying nationalities but are traveling on a Palestinian-Authority-issued document.

[5] This applies to aliens who list one of the high-risk countries as their Country of Birth or Country of Citizenship.

[6] Immigrant visas for family members of individuals in the United States will no longer be automatically or broadly exempt from PP 10949 and PP 10998 restrictions or requirements. Family-based immigrant visa applications are now subject to the same review, restrictions, or additional scrutiny as other benefit requests.

[7] USCIS issued a public-facing version on December 2, 2025. See Policy Memorandum, *Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries,* December 2, 2025 (PM-602-0192).

FOR OFFICIAL USE ONLY

**Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries**
Page 3

during the visa issuance process to ensure that individuals approved for admission into the United States do not intend to harm Americans or compromise U.S. national interests.

Accordingly, through PP 10949 and PP 10998, the President restricted the entry of foreign nationals from countries lacking adequate screening and vetting information to safeguard the national security and public safety of the United States and its citizens. The proclamations also instructed the United States Government to promptly engage with the countries identified, outlining the necessary steps to meet U.S. screening, vetting, immigration, and security standards. However, despite those efforts, most of the countries named in PP 10949 and PP 10998—and others—continue to demonstrate significant deficiencies in screening, vetting, and information sharing. In addition to PP 10949, PP 10998 emphasizes that "it is the policy of the United States to protect its citizens from foreign nationals who intend to commit terrorist attacks, threaten our national security and public safety, incite hate crimes, or otherwise exploit the immigration laws for malevolent purposes."

Following the continued review since the issuance of PP 10949, as well as the responses of foreign countries to that proclamation, the United States Government has identified additional countries that are unable to meet basic criteria for identifying their nationals and residents who may pose national security and public safety risks, or for sharing necessary information with the United States. It is paramount that the United States Government ensure aliens in the United States do not intend to threaten its citizens or undermine or destabilize its culture, government, institutions, or founding principles. Entry will not be granted to aliens who advocate for, aid, or support designated foreign terrorists or other threats to our national security or public safety.

As a result of these reviews and considerations, the President has determined to maintain and adjust the restrictions outlined in sections 2 and 3 of PP 10949 regarding the entry of certain classes of foreign nationals into the United States. Additionally, further limitations have been imposed on the entry of aliens from additional high-risk countries in PP 10998.

Considering identified concerns and the threat to the American people, USCIS has determined a comprehensive re-review, potential interview, and re-interview of all aliens from high-risk countries of concern who entered the United States on or after January 20, 2021, is necessary.[8] USCIS remains dedicated to ensuring aliens from high-risk countries of concern who have entered the United States do not pose risks to national security or public safety. To faithfully uphold United States immigration law, the flow of aliens from countries with high overstay rates, significant fraud, or both must stop. To address potential vulnerabilities, USCIS will place an adjudicative hold on all pending benefit requests submitted by or for aliens from the high-risk countries identified in PP 10998, allowing for a thorough case-by-case review. This hold will remain in effect until lifted or modified by the USCIS Director through a subsequent

---

[8] Additionally, USCIS may, when appropriate, extend this review and re-interview process to aliens who entered the United States outside of this timeframe.

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

**Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries**
Page 4

memorandum or memorandum attachment. Any requests to lift the hold due to litigation or other extraordinary circumstances must receive approval from the USCIS Director or Deputy Director.

**Discussion:** USCIS has determined the operational necessity to ensure all aliens from high-risk countries of concern who entered the United States do not pose a threat to national security or public safety. This effort ensures USCIS exercises its full authority to investigate immigration benefit requests filed by or for aliens who may pose risks to the national security and public safety of the United States, as outlined in DHS Delegation of Authority 0150.1, issued June 5, 2003.

USCIS will conduct a thorough review on a case-by-case basis to assess benefit eligibility including whether:

1. The alien is listed in the Terrorist Screening Dataset (TSDS) as a Known or Suspected Terrorist under Tier 1 or Tier 2 classifications or is included in Tier 3 of the TSDS with significant derogatory information related to the alien.
2. The alien is connected to prior, current, or planned involvement in, or association with, an activity, individual, or organization described in sections 212(a)(3)(A), (B), or (F), or 237(a)(4)(A) or (B) of the Immigration and Nationality Act (INA).
3. The alien is linked to prior, current, or planned involvement in, or association with, an activity, individual, or organization that may pose a risk of serious harm or danger to the community, including criminal conduct described in INA 101(a)(43), 212(a)(1)(A)(iii), 212(a)(2), 237(a)(2), or 237(a)(4)(A)(ii).
4. The alien is unable to establish their identity as outlined in PP 10949 and PP 10998.[9]

Many of these restricted high-risk countries experience widespread corruption, unreliable or fraudulent civil documents and criminal records, and lack effective birth registration systems, which systematically hinder accurate vetting and identity verification. Officers must consider these country-specific factors when conducting security and background checks, and when reviewing civil documents such as passports, marriage and divorce certificates, and birth certificates, as well as criminal history information. Officers must follow established policies to ensure proper screening and vetting procedures are conducted, and that any derogatory information is thoroughly evaluated and appropriately resolved.

This process ensures that USCIS exercises its full authority to protect national security and public safety while adhering to the provisions of the INA and applicable laws. USCIS has considered that this direction may result in delay to the adjudication of some pending applications and has weighed that consequence against the urgent need for the agency to ensure that aliens are vetted and screened to the maximum degree possible. Ultimately, USCIS has determined the burden of processing delays which will fall on some aliens is necessary and

---

[9] See USCIS Policy Manual, Volume 1,General Policies and Procedures, Part E, Adjudications, Chapter 8, Discretionary Analysis [1 USCIS-PM E.8].

FOR OFFICIAL USE ONLY

**Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries**
Page 5

appropriate, when weighed against the agency's obligation to protect and preserve our national security.

*Exceptions to the Adjudication Hold*[10]

Exceptions to the adjudication hold for cases with identified national security, public safety, or fraud-related derogatory information still require the adjudicative directorate or program office to coordinate with U.S. Immigration and Customs Enforcement (ICE) in accordance with current policies and procedures before final adjudication. The following are exceptions to the adjudication hold:

1. Form I-90, Application to Replace Permanent Resident Card (Green Card)[11];
2. Form N-565, Application for Replacement Naturalization/Citizenship Document;
3. Form N-600, Application for Certificate of Citizenship[12];
4. Form I-765, Application for Employment Authorization filed under the (c)(8),[13] limited (c)(11),[14] and limited (c)(14)[15] categories;
5. Form I-910, Application for Civil Surgeon Designation (only for physicians that are citizens or nationals of the United States);
6. Benefit requests filed by any alien who is an athlete or member of an athletic team, including the coaches, persons performing a necessary support role, and immediate relatives for the purpose of participating in the World Cup, Olympics, or other major sporting event as determined by the Secretary of State;
7. Benefit requests that are a priority for law enforcement and where ICE has requested USCIS take adjudicative action to uphold public safety or national security;

---

[10] Any request for an exemption to the adjudicative hold must be coordinated with the USCIS Office of Policy and Strategy (OP&S). OP&S will track and record all the hold lifts. OP&S will issue additional guidance within 7 days of issuing this memorandum.
[11] Lawful permanent residents are entitled to evidence of status in the United States. Lawful permanent residents are eligible for replacement of their Permanent Resident Card if they meet certain requirements. See USCIS Policy Manual, Volume 11, Travel and Identity Documents, Part B, Permanent Resident Cards, Chapter 2, Replacement of Permanent Resident Card [11 USCIS-PM B.2].
[12] Except Yemen and Somalia. Yemen and Somalia are not included in this particular exception due to security and documentary concerns specific to those countries as documented on the Department of State Visa Reciprocity Schedules for these countries.
[13] See 8 CFR 274a.12(c)(8). Only applies to *initial* (c)(8) filings. *Asylumworks v. Mayorkas* requires USCIS to process all initial Form I-765 filed under the (c)(8) category within 30 days.
[14] See 8 CFR 274a.12(c)(11). Form I-765 filed under the (c)(11) category exceptions only apply when the request comes from law enforcement because the alien is assisting law enforcement.
[15] See 8 CFR 274a.12(c)(14). Form I-765 filed under the (c)(14) category exceptions only apply when the request comes from law enforcement because the alien is assisting law enforcement.

FOR OFFICIAL USE ONLY
CAR000054

FOR OFFICIAL USE ONLY

**Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries**
Page 6

8.  Benefit requests filed by aliens whose entry would serve a United States national interest[16];

9.  Benefit requests, as well as the associated underlying benefits, for any programs that are terminated or discontinued as a result of an Executive Order, Proclamation, Federal Register Notice, or Directive issued by the President, the Secretary of Homeland Security, or the USCIS Director; and

10. Automatic termination decisions for ancillary or related benefit requests when an alien is granted Legal Permanent Resident status or becomes a naturalized citizen.[17]

Within 90 days of this memorandum issuance,  and in consultation with OP&S and the Fraud Detection and National Security Directorate, USCIS will prioritize a list for review, interview, and re-interview, and issue operational guidance.

cc:
Randolph N. Blair, Jr., Acting Chief Counsel, Office of the Chief Counsel

---

[16] For example, a benefit request filed by an alien whose entry into the United States would provide significant benefit to the United States may include, but is not limited to, a scientist or medical researcher working on a critical public health project, an engineer with specialized skills needed for a key infrastructure initiative, or someone with unique expertise supporting U.S. national security or economic interests. This is a case-by-case determination and requires approval from the headquarters of the adjudicative directorate or program office.

[17] For example, when USCIS approves an individual's Form I-485, any associated or underlying applications, such as Form I-765, will be automatically terminated, as the benefit provided by the ancillary form is no longer necessary.

# Presidential Documents

Proclamation 10949 of June 4, 2025

## Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats

### By the President of the United States of America

### A Proclamation

During my first Administration, I restricted the entry of foreign nationals into the United States, which successfully prevented national security threats from reaching our borders and which the Supreme Court upheld. In Executive Order 14161 of January 20, 2025 (Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats), I stated that it is the policy of the United States to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes.

I also stated that the United States must be vigilant during the visa-issuance process to ensure that those aliens approved for admission into the United States do not intend to harm Americans or our national interests. More importantly, the United States must identify such aliens before their admission or entry into the United States. The United States must ensure that admitted aliens and aliens otherwise already present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid, or support designated foreign terrorists or other threats to our national security.

I directed the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to identify countries throughout the world for which vetting and screening information is so deficient as to warrant a full or partial suspension on the admission of nationals from those countries pursuant to section 212(f) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f). After completing that process, the Secretary of State determined that a number of countries remain deficient with regards to screening and vetting. Many of these countries have also taken advantage of the United States in their exploitation of our visa system and their historic failure to accept back their removable nationals.

As President, I must act to protect the national security and national interest of the United States and its people. I remain committed to engaging with those countries willing to cooperate to improve information-sharing and identity-management procedures, and to address both terrorism-related and public-safety risks. Nationals of some countries also pose significant risks of overstaying their visas in the United States, which increases burdens on immigration and law enforcement components of the United States, and often exacerbates other risks related to national security and public safety.

Some of the countries with inadequacies face significant challenges to reform efforts. Others have made important improvements to their protocols and procedures, and I commend them for these efforts. But until countries with identified inadequacies address them, members of my Cabinet have recommended certain conditional restrictions and limitations. I have considered and largely accepted those recommendations and impose the limitations

set forth below on the entry into the United States by the classes of foreign nationals identified in sections 2 and 3 of this proclamation.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in this proclamation, the immigrant and nonimmigrant entry into the United States of persons described in sections 2 and 3 of this proclamation would be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1**. *Policy and Purpose.* (a) It is the policy of the United States to protect its citizens from terrorist attacks and other national security or public-safety threats. Screening and vetting protocols and procedures associated with visa adjudications and other immigration processes play a critical role in implementing that policy. These protocols enhance our ability to detect foreign nationals who may commit, aid, or support acts of terrorism, or otherwise pose a safety threat, and they aid our efforts to prevent such individuals from entering the United States.

(b) Information-sharing and identity-management protocols and practices of foreign governments are important for the effectiveness of the screening and vetting protocols and procedures of the United States. Governments manage the identity and travel documents of their nationals and residents. They also control the circumstances under which they provide information about their nationals to other governments, including information about known or suspected terrorists and criminal-history information. It is, therefore, the policy of the United States to take all necessary and appropriate steps to encourage foreign governments to improve their information-sharing and identity-management protocols and practices and to regularly share their identity and threat information with the immigration screening and vetting systems of the United States.

(c) Section 2(b) of Executive Order 14161 directed the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, within 60 days of the date of that order, to jointly submit to the President, through the Assistant to the President for Homeland Security, a report identifying countries throughout the world for which vetting and screening information is so deficient as to warrant a full or partial suspension on the entry or admission of nationals from those countries pursuant to section 212(f) of the INA (8 U.S.C. 1182(f)).

(d) On April 9, 2025, the Secretary of State, with the Assistant to the President for Homeland Security, presented the report described in subsection (c) of this section, recommending that entry restrictions and limitations be placed on foreign nationals of several countries. The report identified countries for which vetting and screening information is so deficient as to warrant a full suspension of admissions and countries that warrant a partial suspension of admission.

(e) In evaluating the recommendations from the Secretary of State and in determining what restrictions to impose for each country, I consulted with the Secretary of State, the Secretary of Defense, the Attorney General, the Secretary of Homeland Security, appropriate Assistants to the President, the Director of National Intelligence, and the Director of the Central Intelligence Agency. I considered foreign policy, national security, and counterterrorism goals. And I further considered various factors, including each country's screening and vetting capabilities, information sharing policies, and country-specific risk factors—including whether each country has a significant terrorist presence within its territory, its visa-overstay rate, and its cooperation with accepting back its removable nationals.

CAR000057

I also considered the different risks posed by aliens admitted on immigrant visas and those admitted on nonimmigrant visas. Persons admitted on immigrant visas become lawful permanent residents of the United States. Such persons may present national security or public-safety concerns that may be distinct from those admitted as nonimmigrants. The United States affords lawful permanent residents more enduring rights than it does to nonimmigrants. Lawful permanent residents are more difficult to remove than nonimmigrants, even after national security concerns arise, which increases the costs and aggravates the dangers of errors associated with admitting such individuals. And although immigrants are generally subject to more extensive vetting than nonimmigrants, such vetting is far less reliable when the country from which someone seeks to emigrate maintains inadequate identity-management or information-sharing policies or otherwise poses risks to the national security of the United States.

I reviewed these factors and assessed these goals, with a particular focus on crafting country-specific restrictions. This approach was designed to encourage cooperation with the subject countries in recognition of each country's unique circumstances. The restrictions and limitations imposed by this proclamation are, in my judgment, necessary to prevent the entry or admission of foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States. The restrictions and limitations imposed by this proclamation are necessary to garner cooperation from foreign governments, enforce our immigration laws, and advance other important foreign policy, national security, and counterterrorism objectives.

(f) After reviewing the report described in subsection (d) of this section, and after accounting for the foreign policy, national security, and counterterrorism objectives of the United States, I have determined to fully restrict and limit the entry of nationals of the following 12 countries: Afghanistan, Burma, Chad, Republic of the Congo, Equatorial Guinea, Eritrea, Haiti, Iran, Libya, Somalia, Sudan, and Yemen. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants.

(g) I have determined to partially restrict and limit the entry of nationals of the following 7 countries: Burundi, Cuba, Laos, Sierra Leone, Togo, Turkmenistan, and Venezuela. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants.

(h) Sections 2 and 3 of this proclamation describe some of the identity-management or information-sharing inadequacies that led me to impose restrictions. These inadequacies are sufficient to justify my finding that unrestricted entry of nationals from the named countries would be detrimental to the interests of the United States. Publicly disclosing additional details on which I relied in making these determinations, however, would cause serious damage to the national security of the United States, and many such details are classified.

**Sec. 2**. *Full Suspension of Entry for Nationals of Countries of Identified Concern.* The entry into the United States of nationals of the following countries is hereby suspended and limited, as follows, subject to the categorical exceptions and case-by-case waivers described in section 5 of this proclamation:

(a) *Afghanistan*

(i) The Taliban, a Specially Designated Global Terrorist (SDGT) group, controls Afghanistan. Afghanistan lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. According to the Fiscal Year 2023 Department of Homeland Security (DHS) Entry/Exit Overstay Report (''Overstay Report''), Afghanistan had a business/tourist (B–1/B–2) visa overstay rate of 9.70 percent and a student (F), vocational (M), and exchange visitor (J) visa overstay rate of 29.30 percent.

(ii) The entry into the United States of nationals of Afghanistan as immigrants and nonimmigrants is hereby fully suspended.

(b) *Burma*

(i) According to the Overstay Report, Burma had a B–1/B–2 visa overstay rate of 27.07 percent and an F, M, and J visa overstay rate of 42.17 percent. Additionally, Burma has historically not cooperated with the United States to accept back their removable nationals.

(ii) The entry into the United States of nationals of Burma as immigrants and nonimmigrants is hereby fully suspended.

(c) *Chad*

(i) According to the Overstay Report, Chad had a B–1/B–2 visa overstay rate of 49.54 percent and an F, M, and J visa overstay rate of 55.64 percent. According to the Fiscal Year 2022 Overstay Report, Chad had a B–1/B–2 visa overstay rate of 37.12 percent. The high visa overstay rate for 2022 and 2023 is unacceptable and indicates a blatant disregard for United States immigration laws.

(ii) The entry into the United States of nationals of Chad as immigrants and nonimmigrants is hereby fully suspended.

(d) *Republic of the Congo*

(i) According to the Overstay Report, the Republic of the Congo had a B–1/B–2 visa overstay rate of 29.63 percent and an F, M, and J visa overstay rate of 35.14 percent.

(ii) The entry into the United States of nationals of the Republic of the Congo as immigrants and nonimmigrants is hereby fully suspended.

(e) *Equatorial Guinea*

(i) According to the Overstay Report, Equatorial Guinea had a B–1/B–2 visa overstay rate of 21.98 percent and an F, M, and J visa overstay rate of 70.18 percent.

(ii) The entry into the United States of nationals of Equatorial Guinea as immigrants and nonimmigrants is hereby fully suspended.

(f) *Eritrea*

(i) The United States questions the competence of the central authority for issuance of passports or civil documents in Eritrea. Criminal records are not available to the United States for Eritrean nationals. Eritrea has historically refused to accept back its removable nationals. According to the Overstay Report, Eritrea had a B–1/B–2 visa overstay rate of 20.09 percent and an F, M, and J visa overstay rate of 55.43 percent.

(ii) The entry into the United States of nationals of Eritrea as immigrants and nonimmigrants is hereby fully suspended.

(g) *Haiti*

(i) According to the Overstay Report, Haiti had a B–1/B–2 visa overstay rate of 31.38 percent and an F, M, and J visa overstay rate of 25.05 percent. Additionally, hundreds of thousands of illegal Haitian aliens flooded into the United States during the Biden Administration. This influx harms American communities by creating acute risks of increased overstay rates, establishment of criminal networks, and other national security threats. As is widely known, Haiti lacks a central authority with sufficient availability and dissemination of law enforcement information necessary to ensure its nationals do not undermine the national security of the United States.

(ii) The entry into the United States of nationals of Haiti as immigrants and nonimmigrants is hereby fully suspended.

(h) *Iran*

(i) Iran is a state sponsor of terrorism. Iran regularly fails to cooperate with the United States Government in identifying security risks, is the source of significant terrorism around the world, and has historically failed to accept back its removable nationals.

(ii) The entry into the United States of nationals of Iran as immigrants and nonimmigrants is hereby suspended.

CAR000059

(i) *Libya*

(i) There is no competent or cooperative central authority for issuing passports or civil documents in Libya. The historical terrorist presence within Libya's territory amplifies the risks posed by the entry into the United States of its nationals.

(ii) The entry into the United States of nationals of Libya as immigrants and nonimmigrants is hereby fully suspended.

(j) *Somalia*

(i) Somalia lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. Somalia stands apart from other countries in the degree to which its government lacks command and control of its territory, which greatly limits the effectiveness of its national capabilities in a variety of respects. A persistent terrorist threat also emanates from Somalia's territory. The United States Government has identified Somalia as a terrorist safe haven. Terrorists use regions of Somalia as safe havens from which they plan, facilitate, and conduct their operations. Somalia also remains a destination for individuals attempting to join terrorist groups that threaten the national security of the United States. The Government of Somalia struggles to provide governance needed to limit terrorists' freedom of movement. Additionally, Somalia has historically refused to accept back its removable nationals.

(ii) The entry into the United States of nationals of Somalia as immigrants and nonimmigrants is hereby fully suspended.

(k) *Sudan*

(i) Sudan lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. According to the Overstay Report, Sudan had a B–1/B–2 visa overstay rate of 26.30 percent and an F, M, and J visa overstay rate of 28.40 percent.

(ii) The entry into the United States of nationals of Sudan as immigrants and nonimmigrants is hereby fully suspended.

(l) *Yemen*

(i) Yemen lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. The government does not have physical control over its own territory. Since January 20, 2025, Yemen has been the site of active United States military operations.

(ii) The entry into the United States of nationals of Yemen as immigrants and nonimmigrants is hereby fully suspended.

**Sec. 3.** *Partial Suspension of Entry for Nationals of Countries of Identified Concern.*

(a) *Burundi*

(i) According to the Overstay Report, Burundi had a B–1/B–2 visa overstay rate of 15.35 percent and an F, M, and J visa overstay rate of 17.52 percent.

(ii) The entry into the United States of nationals of Burundi as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Burundi to the extent permitted by law.

(b) *Cuba*

(i) Cuba is a state sponsor of terrorism. The Government of Cuba does not cooperate or share sufficient law enforcement information with the United States. Cuba has historically refused to accept back its removable nationals. According to the Overstay Report, Cuba had a B–1/B–2 visa overstay rate of 7.69 percent and an F, M, and J visa overstay rate of 18.75 percent.

(ii) The entry into the United States of nationals of Cuba as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Cuba to the extent permitted by law.

(c) *Laos*

(i) According to the Overstay Report, Laos had a B–1/B–2 visa overstay rate of 34.77 percent and an F, M, and J visa overstay rate of 6.49 percent. Laos has historically failed to accept back its removable nationals.

(ii) The entry into the United States of nationals of Laos as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Laos to the extent permitted by law.

(d) *Sierra Leone*

(i) According to the Overstay Report, Sierra Leone had a B–1/B–2 visa overstay rate of 15.43 percent and an F, M, and J visa overstay rate of 35.83 percent. Sierra Leone has historically failed to accept back its removable nationals.

(ii) The entry into the United States of nationals of Sierra Leone as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Sierra Leone to the extent permitted by law.

(e) *Togo*

(i) According to the Overstay Report, Togo had a B–1/B–2 visa overstay rate of 19.03 percent and an F, M, and J visa overstay rate of 35.05 percent.

(ii) The entry into the United States of nationals of Togo as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Togo to the extent permitted by law.

(f) *Turkmenistan*

(i) According to the Overstay Report, Turkmenistan had a B–1/B–2 visa overstay rate of 15.35 percent and an F, M, and J visa overstay rate of 21.74 percent.

(ii) The entry into the United States of nationals of Turkmenistan as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Turkmenistan to the extent permitted by law.

(g) *Venezuela*

(i) Venezuela lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. Venezuela has historically refused to accept back its removable nationals. According to the Overstay Report, Venezuela had a B–1/B–2 visa overstay rate of 9.83 percent.

(ii) The entry into the United States of nationals of Venezuela as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Venezuela to the extent permitted by law.

**Sec. 4**. *Scope and Implementation of Suspensions and Limitations.* (a) *Scope.* Subject to the exceptions set forth in subsection (b) of this section and

CAR000061

any exceptions made pursuant to subsections (c) and (d) of this section, the suspensions of and limitations on entry pursuant to sections 2 and 3 of this proclamation shall apply only to foreign nationals of the designated countries who:

(i) are outside the United States on the applicable effective date of this proclamation; and

(ii) do not have a valid visa on the applicable effective date of this proclamation.

(b) *Exceptions.* The suspension of and limitation on entry pursuant to sections 2 and 3 of this proclamation shall not apply to:

(i) any lawful permanent resident of the United States;

(ii) any dual national of a country designated under sections 2 and 3 of this proclamation when the individual is traveling on a passport issued by a country not so designated;

(iii) any foreign national traveling with a valid nonimmigrant visa in the following classifications: A–1, A–2, C–2, C–3, G–1, G–2, G–3, G–4, NATO–1, NATO–2, NATO–3, NATO–4, NATO–5, or NATO–6;

(iv) any athlete or member of an athletic team, including coaches, persons performing a necessary support role, and immediate relatives, traveling for the World Cup, Olympics, or other major sporting event as determined by the Secretary of State;

(v) immediate family immigrant visas (IR–1/CR–1, IR–2/CR–2, IR–5) with clear and convincing evidence of identity and family relationship (*e.g.,* DNA);

(vi) adoptions (IR–3, IR–4, IH–3, IH–4);

(vii) Afghan Special Immigrant Visas;

(viii) Special Immigrant Visas for United States Government employees; and

(ix) immigrant visas for ethnic and religious minorities facing persecution in Iran.

(c) Exceptions to the suspension of and limitation on entry pursuant to sections 2 and 3 of this proclamation may be made for certain individuals for whom the Attorney General finds, in her discretion, that the travel by the individual would advance a critical United States national interest involving the Department of Justice, including when individuals must be present to participate in criminal proceedings as witnesses. These exceptions shall be made only by the Attorney General, or her designee, in coordination with the Secretary of State and the Secretary of Homeland Security.

(d) Exceptions to the suspension of and limitation on entry pursuant to sections 2 and 3 of this proclamation may be made case-by-case for individuals for whom the Secretary of State finds, in his discretion, that the travel by the individual would serve a United States national interest. These exceptions shall be made by only the Secretary of State or his designee, in coordination with the Secretary of Homeland Security or her designee.

**Sec. 5**. *Adjustments to and Removal of Suspensions and Limitations.* (a) The Secretary of State shall, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director for National Intelligence, devise a process to assess whether any suspensions and limitations imposed by sections 2 and 3 of this proclamation should be continued, terminated, modified, or supplemented. Within 90 days of the date of this proclamation, and every 180 days thereafter, the Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall submit a report to the President, through the Assistant to the President for Homeland Security, describing his assessment and recommending whether any suspensions and limitations imposed by sections 2 and 3 of this proclamation should be continued, terminated, modified, or supplemented.

CAR000062

(b) The Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall immediately engage each of the countries identified in sections 2 and 3 of this proclamation on measures that must be taken to comply with United States screening, vetting, immigration, and security requirements.

(c) Additionally, and in light of recent events, the Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall provide me an update to the review of the practices and procedures of Egypt to confirm the adequacy of its current screening and vetting capabilities.

Sec. 6. *Enforcement.* (a) The Secretary of State and the Secretary of Homeland Security shall consult with appropriate domestic and international partners, including countries and organizations, to ensure efficient, effective, and appropriate implementation of this proclamation.

(b) In implementing this proclamation, the Secretary of State and the Secretary of Homeland Security shall comply with all applicable laws and regulations.

(c) No immigrant or nonimmigrant visa issued before the applicable effective date of this proclamation shall be revoked pursuant to this proclamation.

(d) This proclamation shall not apply to an individual who has been granted asylum by the United States, to a refugee who has already been admitted to the United States, or to an individual granted withholding of removal or protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment of Punishment (CAT). Nothing in this proclamation shall be construed to limit the ability of an individual to seek asylum, refugee status, withholding of removal, or protection under the CAT, consistent with the laws of the United States.

Sec. 7. *Severability.* It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the national security, foreign policy, and counterterrorism interests of the United States. Accordingly:

(a) if any provision of this proclamation, or the application of any provision of this proclamation to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) if any provision of this proclamation, or the application of any provision of this proclamation to any person or circumstance, is held to be invalid because of the lack of certain procedural requirements, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

Sec. 8. *Effective Date.* This proclamation is effective at 12:01 a.m. eastern daylight time on June 9, 2025.

Sec. 9. *General Provisions.* (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable by law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this fourth day of June, in the year of our Lord two thousand twenty-five, and of the Independence of the United States of America the two hundred and forty-ninth.

[FR Doc. 2025–10669
Filed 6–9–25; 11:15 am]
Billing code 3395–F4–P

CAR000064

# Presidential Documents

Proclamation 10998 of December 16, 2025

## Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States

**By the President of the United States of America**

**A Proclamation**

During my first Administration, I restricted the entry of certain foreign nationals into the United States to prevent national security and public safety threats from reaching our borders. The Supreme Court upheld these restrictions. I reinstated these successful policies in Executive Order 14161 of January 20, 2025 (Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats), and Proclamation 10949 of June 4, 2025 (Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats).

It is the policy of the United States to protect its citizens from foreign nationals who intend to commit terrorist attacks, threaten our national security and public safety, incite hate crimes, or otherwise exploit the immigration laws for malevolent purposes.

The United States must exercise extreme vigilance during the visa-issuance and immigration processes to identify, prior to their admission or entry into the United States, foreign nationals who intend to harm Americans or our national interests. The United States Government must ensure that admitted aliens do not intend to threaten its citizens; undermine or destabilize its culture, government, institutions, or founding principles; or advocate for, aid, or support designated foreign terrorists or other threats to our national security.

In order to protect our Nation, as directed in Executive Order 14161, the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, identified countries throughout the world for which screening and vetting information was so deficient as to warrant a full or partial suspension of the admission of nationals from those countries pursuant to section 212(f) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f). Accordingly, in Proclamation 10949, I restricted the entry of foreign nationals into the United States from countries with deficient screening and vetting information to protect the national security and public safety of the United States and its people. The proclamation also directed the United States Government to immediately engage countries identified in the proclamation on measures that must be taken to comply with the screening, vetting, immigration, and security requirements of the United States.

Despite those engagements, most of the countries identified in Proclamation 10949, as well as others, continue to exhibit woeful inadequacies in screening, vetting, and provision of information. At least one country lacks mechanisms in hospitals to ensure births are reported, and widespread corruption, combined with a general lack of vetting and poor recordkeeping, result in any non-citizen being able to obtain any civil document from that country, particularly if that person is willing to pay a fee or engage an individual that specializes in assisting in such fraud. In that same country, law enforcement records are not maintained with the accuracy or consistency necessary to provide representations of individuals' criminal histories to the United

States Government. In another country, civil documents like marriage licenses and birth certificates are handwritten and stamped on regular paper, making them highly susceptible to alteration, and there is a fraudulent document market that produces all types of falsified records, making written corroboration of any visa application practically impossible. In yet another country, criminal records are widely unreliable and inaccessible. And in another, United States visas are used as a tool for illicit transborder movement of assets by corrupt government officials and organized criminal groups. Corruption in another country even extends to the national school system, which has provided falsified diplomas and grade information in the past to fraudsters who have tried to obtain student visas and eligibility for large athletic scholarships. The government of another country refuses to provide passport exemplars, undermining the United States Government's ability to detect fraudulent documents. In another country, the population, for the most part, does not formally document life events. This makes effective verification of basic biographical data such as birthdates, marriages, and parentage exceedingly difficult, if not impossible. Such countries warrant continued or new travel restrictions.

Further, after continuing their review, and in light of the experience gained since the issuance of Proclamation 10949 and the reaction of foreign countries to the issuance of that proclamation, the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence have identified additional countries that cannot meet basic criteria for identifying their nationals and residents who pose national security and public safety threats and for sharing information with the United States. For example, only 40 percent of one country's territory is under complete government control, and officials there have noted that their ability to securely process, house, or monitor non citizens is constrained. In another country, corruption in various forms is pervasive. Other countries have been subject to successful efforts to overthrow or undermine their governments, with the result that radical terrorist groups operate with minimal, if any, interference from law enforcement, engaging in forced labor, sex trafficking, illegal drug manufacturing and distribution, and other activities that destabilize such countries. And, because of the poor documentation practices and corrupt governments in these countries, there can be little assurance that the foreign nationals from these countries who seek to come to America on immigrant or nonimmigrant visas are not bringing these criminal enterprises with them to the United States.

According to United States law enforcement reporting, foreign nationals from countries named in this proclamation have been involved with crimes that include murder, terrorism, embezzling public funds, human smuggling, human trafficking, and other criminal activity. Many of these countries are ranked in the top third of countries for criminality, and widely unreliable foreign civil documents and lack of authoritative criminal information make it extremely difficult for United States screening and vetting authorities to assess prior criminal activity and other grounds of inadmissibility.

Finally, some of these countries have offered Citizenship by Investment (CBI) without residency, which poses challenges for screening and vetting purposes. As an example, a foreign national from a country that is subject to travel restrictions could purchase CBI from a second country that is not subject to travel restrictions, obtain a passport in the citizenship of that second country, and subsequently apply for a United States visa for travel to the United States, thus evading the travel restrictions on his or her first country. Additionally, United States law enforcement and the Department of State have found that, historically, CBI programs have been susceptible to several risks. These risks include allowing an individual to conceal his or her identity and assets to circumvent travel restrictions or financial or banking restrictions.

Foreign nationals from the countries described above have also exploited the historic generosity of the United States and violated our Nation's immigration laws by not adhering to the terms of their nonimmigrant or immigrant visas. As cited in the Department of Homeland Security (DHS) Entry/Exit Overstay Report, foreign nationals from many countries have high nonimmigrant visa overstay rates. These visa overstays and other abuses flagrantly violate United States immigration laws, despite generous incentives offered by my Administration—for example, the ability to self-deport using the CBP Home app. To faithfully uphold United States immigration law, the flow of foreigners from countries with high overstay rates or significant fraud must stop.

In addition, the implementation of Proclamation 10949 counsels narrowing the categorical exceptions described in that proclamation to prevent exploitation by foreign nationals. For example, immigrant visas for family members of individuals in the United States will no longer be a broad categorical exception. As described above, the countries to which this proclamation applies have persistent, chronic vetting deficiencies that impede conclusive admissibility determinations and that are readily exploitable to threaten United States national security and public safety. These deficiencies include poor civil documentation and recordkeeping practices, widespread corruption and fraud, unreliable or inaccessible criminal records, and unreliable government travel documents. These pervasive risks concerning nationals from the covered countries apply with at least equal force to family-based visa applications—which comprise most of the immigrant visa applications from such countries—and potentially with even greater force. Familial ties can serve—and, in the past, have in fact served, based on concrete information provided by United States law enforcement and the Department of State— as unique vectors for fraudulent, criminal, or even terrorist activity through means such as the domestic or international financing of such activity. Broadly excepting most immigrant visa applicants from the countries whose risks and deficiencies most gravely threaten America is inconsistent with protecting our national security and with the purpose of driving greater cooperation and vetting improvements by these specific countries. This is particularly true in light of the large numbers of individuals granted United States immigration status during the prior administration without sufficient documentation and vetting mechanisms in place, whose family members might take advantage of such an exception, just as criminals have taken advantage of family-based visas in the past. Accordingly, I have determined that the risks from the classes of aliens covered by this proclamation cannot be satisfactorily mitigated absent resolution of the predominating country-specific concerns, and any extraordinary cases can be appropriately addressed through the national-interest exceptions provided for in this proclamation and Proclamation 10949.

As a result of these reviews and considerations, I have decided—as described in sections 2 and 3 of this proclamation—to continue to impose and modify the limitations set forth in sections 2 and 3 of Proclamation 10949 on the entry into the United States by certain classes of foreign nationals. Also, I have decided—as described in sections 4 and 5 of this proclamation— to impose the limitations set forth below on the entry into the United States by certain other classes of foreign nationals.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in this proclamation, the immigrant and nonimmigrant entry into the United States of persons described in sections 2, 3, 4, and 5 of this proclamation would be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

CAR000067

**Section 1**. *Policy and Purpose.* (a) It is the policy of the United States to protect its citizens from terrorist attacks and other national security and public safety threats. Screening and vetting protocols and procedures associated with visa adjudications and other immigration processes play a critical role in implementing that policy. These protocols and procedures enhance our ability to detect foreign nationals who may commit, aid, or support acts of terrorism, or otherwise pose a safety threat, and they aid our efforts to prevent such foreign nationals from entering the United States.

(b) Identity-management and information-sharing standards and practices of foreign governments impact the effectiveness of the screening and vetting protocols and procedures of the United States. Foreign governments manage the identity and travel documents of their nationals and residents. They also control the circumstances under which they provide information about their nationals and residents to other governments, including information about known and suspected terrorists and criminals.

It is, therefore, the policy of the United States to take all necessary and appropriate steps to encourage foreign governments to improve their identity-management and information-sharing protocols and procedures and to regularly share their identity and threat information with the screening and vetting systems of the United States.

(c) Proclamation 10949 directed the United States Government to fully restrict and limit the entry of nationals of the following 12 countries: Afghanistan, Burma, Chad, Republic of the Congo, Equatorial Guinea, Eritrea, Haiti, Iran, Libya, Somalia, Sudan, and Yemen. The proclamation directed the United States Government to partially restrict and limit the entry of nationals of the following 7 countries: Burundi, Cuba, Laos, Sierra Leone, Togo, Turkmenistan, and Venezuela. Additionally, the proclamation directed the Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to immediately engage each of the countries identified in the proclamation on measures that must be taken to comply with United States screening, vetting, immigration, and security requirements.

(d) Proclamation 10949 directed the Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to submit a report to the President, through the Assistant to the President for Homeland Security, describing his assessment and recommending whether any suspensions and limitations imposed by the proclamation should be continued, terminated, modified, or supplemented.

(e) The Secretary of State, with the Assistant to the President for Homeland Security, presented the report described in subsection (d) of this section, recommending that entry restrictions and limitations continue to apply to foreign nationals of several countries. The report also identified additional countries for which vetting and screening information is so deficient as to warrant a full or partial suspension of admission. These recommendations follow the engagement with foreign countries that I directed in Proclamation 10949.

(f) In evaluating the recommendations from the Secretary of State and determining whether and to what extent to impose, or continue to impose, restrictions for each country, I consulted with the Secretary of State, the Secretary of War, the Attorney General, the Secretary of Homeland Security, the Director of National Intelligence, appropriate Assistants to the President, and the Director of the Central Intelligence Agency. I considered foreign policy, national security, and counterterrorism goals. I further considered various factors, including each country's screening and vetting capabilities, information-sharing policies, and country-specific risk factors, including whether each country has a significant terrorist presence within its territory, its visa-overstay rate, and its cooperation with accepting back its removable nationals. Each of these factors, including visa-overstay rates, was just one of the factors considered in making the determinations in this proclamation, and the determinations in this proclamation are based on the totality of

CAR000068

the circumstances with respect to each country after a review of all relevant factors.

I also considered the different risks posed by aliens admitted on immigrant visas and those admitted on nonimmigrant visas. Persons admitted on immigrant visas are, or can become, lawful permanent residents of the United States. Such persons admitted on immigrant visas may present national security or public safety concerns that may be distinct from those admitted as nonimmigrants. The United States affords lawful permanent residents more enduring rights than it does to nonimmigrants. Lawful permanent residents are more difficult to remove than nonimmigrants, even after national security or public safety concerns arise, which increases the costs and aggravates the dangers of errors associated with admitting such individuals. And although immigrants are generally subject to more extensive vetting than nonimmigrants, such vetting is far less reliable when the country from which someone seeks to emigrate maintains inadequate identity-management or information-sharing policies or otherwise poses risks to the national security or public safety of the United States.

I reviewed these factors and assessed these goals, with a particular focus on crafting country-specific restrictions. This approach was designed to encourage cooperation with the relevant countries in recognition of each country's unique circumstances. The restrictions and limitations imposed by this proclamation are, in my judgment, necessary to prevent the entry or admission of foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States. The restrictions and limitations imposed by this proclamation are necessary: to garner cooperation from foreign governments, including as to reducing overstay rates of their nationals; enforce our immigration laws; and advance other important foreign policy, national security, and counterterrorism objectives. Under the current circumstances, without the restrictions and limitations imposed in this proclamation, the entry or admission of such foreign nationals is detrimental to the national interest.

(g) After reviewing the report described in subsection (d) of this section, and after accounting for the foreign policy, national security, and counterterrorism objectives of the United States, I have determined to continue to fully restrict and limit the entry of nationals of the following 12 countries: Afghanistan, Burma, Chad, Republic of the Congo, Equatorial Guinea, Eritrea, Haiti, Iran, Libya, Somalia, Sudan, and Yemen. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants.

(h) After reviewing the report described in subsection (d) of this section, and after accounting for the foreign policy, national security, and counterterrorism objectives of the United States, I have determined to fully restrict and limit the entry of nationals of 7 additional countries: Burkina Faso, Laos, Mali, Niger, Sierra Leone, South Sudan, and Syria. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants. I have also determined to fully restrict and limit the entry of individuals using travel documents issued or endorsed by the Palestinian Authority (PA).

(i) After reviewing the report described in subsection (d) of this section, and after accounting for the foreign policy, national security, and counterterrorism objectives of the United States, I have determined to continue to partially restrict and limit the entry of nationals of the following 4 countries: Burundi, Cuba, Togo, and Venezuela. I have also decided to modify the partial restriction and limitation on the entry of nationals of Turkmenistan. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants.

(j) After reviewing the report described in subsection (d) of this section, and after accounting for the foreign policy, national security, and counterterrorism objectives of the United States, I have determined to partially restrict and limit the entry of nationals of the following 15 countries: Angola, Antigua and Barbuda, Benin, Cote d 'Ivoire, Dominica, Gabon, The Gambia,

Malawi, Mauritania, Nigeria, Senegal, Tanzania, Tonga, Zambia, and Zimbabwe. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants.

(k) Sections 4 and 5 of this proclamation describe some of the identity-management and information-sharing inadequacies that led me to impose, or continue to impose, the restrictions described in this proclamation. These inadequacies are sufficient to justify my finding that unrestricted entry of nationals from the named countries would be detrimental to the interests of the United States. Publicly disclosing additional details on which I relied in making these determinations, however, would cause serious damage to the national security of the United States, and many such details are classified.

Sec. 2. *Continued Full Suspension of Entry for Nationals of Countries of Identified Concern.* The entry into the United States of nationals of the following countries continues to be suspended and limited as set forth in Proclamation 10949 and herein, subject to the categorical exceptions and case-by-case waivers described in section 6 of this proclamation:

(a) Afghanistan;

(b) Burma;

(c) Chad;

(d) Republic of the Congo;

(e) Equatorial Guinea;

(f) Eritrea;

(g) Haiti;

(h) Iran;

(i) Libya;

(j) Somalia;

(k) Sudan; and

(l) Yemen.

Sec. 3. *Continued Partial Suspension of Entry for Nationals of Countries of Identified Concern.* The entry into the United States of nationals of the following countries continues to be suspended and limited as set forth in Proclamation 10949 and herein, subject to the categorical exceptions and case-by-case waivers described in section 6 of this proclamation:

(a) Burundi;

(b) Cuba;

(c) Togo; and

(d) Venezuela.

Sec. 4. *Full Suspension of Entry for Nationals of Countries of Identified Concern.* The entry into the United States of nationals of the following countries is hereby suspended and limited, as follows, subject to the categorical exceptions and case-by-case waivers described in section 6 of this proclamation:

(a) Burkina Faso

(i) According to the Department of State, terrorist organizations continue to plan and conduct terrorist activities throughout Burkina Faso. According to the Fiscal Year 2024, Department of Homeland Security (DHS) Entry/Exit Overstay Report ("Overstay Report"), Burkina Faso had a B–1/B–2 visa overstay rate of 9.16 percent and a student (F), vocational (M), and exchange visitor (J) visa overstay rate of 22.95 percent. Additionally, Burkina Faso has historically refused to accept back its removable nationals.

(ii) The entry into the United States of nationals of Burkina Faso as immigrants and as nonimmigrants is hereby fully suspended.

(b) Laos

(i) According to the Overstay Report, Laos had a B–1/B–2 visa overstay rate of 28.34 percent and an F, M, and J visa overstay rate of 11.41 percent. According to the Fiscal Year 2023, Department of Homeland Security (DHS) Entry/Exit Overstay Report (''2023 Overstay Report''), Laos had a B–1/B–2 visa overstay rate of 34.77 percent and an F, M, and J visa overstay rate of 6.49 percent. Additionally, Laos has historically failed to accept back its removable nationals.

(ii) The entry into the United States of nationals of Laos as immigrants and as nonimmigrants is hereby fully suspended.

(c) Mali

(i) According to the Department of State, armed conflict between the Malian government and armed groups is common throughout the country. Terrorist organizations operate freely in certain areas of Mali.

(ii) The entry into the United States of nationals of Mali as immigrants and as nonimmigrants is hereby fully suspended.

(d) Niger

(i) According to the Department of State, terrorists and their supporters are active in planning kidnappings in Niger, and they may attack anywhere in the country. According to the Overstay Report, Niger had a B–1/B–2 visa overstay rate of 13.41 percent and an F, M, and J visa overstay rate of 16.46 percent.

(ii) The entry into the United States of nationals of Niger as immigrants and as nonimmigrants is hereby fully suspended.

(e) Sierra Leone

(i) According to the Overstay Report, Sierra Leone had a B–1/B–2 visa overstay rate of 16.48 percent and an F, M, and J visa overstay rate of 35.83 percent. According to the 2023 Overstay Report, Sierra Leone had a B–1/B–2 visa overstay rate of 15.43 percent and an F, M, and J visa overstay rate of 35.83 percent. Additionally, Sierra Leone has historically failed to accept back its removable nationals.

(ii) The entry into the United States of nationals of Sierra Leone as immigrants and as nonimmigrants is hereby fully suspended.

(f) South Sudan

(i) According to the Overstay Report, South Sudan had a B–1/B–2 visa overstay rate of 6.99 percent and an F, M, and J visa overstay rate of 26.09 percent. Additionally, South Sudan has historically failed to accept back its removable nationals.

(ii) The entry into the United States of nationals of South Sudan as immigrants and as nonimmigrants is hereby fully suspended.

(g) Syria

(i) Syria is emerging from a protracted period of civil unrest and internal strife. While the country is working to address its security challenges in close coordination with the United States, Syria still lacks an adequate central authority for issuing passports or civil documents and does not have appropriate screening and vetting measures. According to the Overstay Report, Syria had a B–1/B–2 visa overstay rate of 7.09 percent and a F, M, and J visa overstay rate of 9.34 percent.

(ii) The entry into the United States of nationals of Syria as immigrants and nonimmigrants is hereby fully suspended.

(h) Palestinian Authority Documents

(i) Several United States-designated terrorist groups operate actively in the West Bank or Gaza Strip and have murdered American citizens. Also, the recent war in these areas likely resulted in compromised vetting and screening abilities. In light of these factors, and considering the weak or nonexistent control exercised over these areas by the PA, individuals attempting to travel on PA-issued or endorsed travel documents cannot currently be properly vetted and approved for entry into the United States.

CAR000071

(ii) The entry into the United States of foreign nationals who seek to travel on any travel documents issued or endorsed by the PA, as immigrants and nonimmigrants, is hereby fully suspended.

**Sec. 5**. *Partial Suspension of Entry for Nationals of Countries of Identified Concern.* The entry into the United States of nationals of the following countries is hereby suspended and limited, as follows, subject to the categorical exceptions and case-by-case waivers described in section 6 of this proclamation:

(a) Angola

(i) According to the Overstay Report, Angola had a B–1/B–2 visa overstay rate of 14.43 percent and an F, M, and J visa overstay rate of 21.92 percent.

(ii) The entry into the United States of nationals of Angola as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Angola to the extent permitted by law.

(b) Antigua and Barbuda

(i) Antigua and Barbuda has historically had CBI without residency.

(ii) The entry into the United States of nationals of Antigua and Barbuda as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Antigua and Barbuda to the extent permitted by law.

(c) Benin

(i) According to the Overstay Report, Benin had a B–1/B–2 overstay rate of 12.34 percent and an F, M, and J visa overstay rate of 36.77 percent.

(ii) The entry into the United States of nationals of Benin as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Benin to the extent permitted by law.

(d) Cote d'Ivoire

(i) According to the Overstay Report, Cote d'Ivoire had a B–1/B–2 visa overstay rate of 8.47 percent and an F, M, and J visa overstay rate of 19.09 percent.

(ii) The entry into the United States of nationals of Cote d'Ivoire as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Cote d'Ivoire to the extent permitted by law.

(e) Dominica

(i) Dominica has historically had CBI without residency.

(ii) The entry into the United States of nationals of Dominica as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Dominica to the extent permitted by law.

(f) Gabon

(i) According to the Overstay Report, Gabon had a B–1/B–2 visa overstay rate of 13.72 percent and an F, M, and J visa overstay rate of 17.77 percent.

(ii) The entry into the United States of nationals of Gabon as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Gabon to the extent permitted by law.

(g) The Gambia

(i) According to the Overstay Report, The Gambia had a B–1/B–2 visa overstay rate of 12.70 percent and an F, M, and J visa overstay rate of 38.79 percent. Additionally, The Gambia has historically refused to accept back its removable nationals.

(ii) The entry into the United States of nationals of The Gambia as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of The Gambia to the extent permitted by law.

(h) Malawi

(i) According to the Overstay Report, Malawi had a B–1/B–2 visa overstay rate of 22.45 percent and an F, M, and J visa overstay rate of 31.99 percent.

(ii) The entry into the United States of nationals of Malawi as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Malawi to the extent permitted by law.

(i) Mauritania

(i) According to the Overstay Report, Mauritania had a B–1/B–2 visa overstay rate of 9.49 percent. According to the Department of State, the Government of Mauritania has little presence in certain parts of the country, which creates substantial screening and vetting difficulties.

(ii) The entry into the United States of nationals of Mauritania as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Mauritania to the extent permitted by law.

(j) Nigeria

(i) Radical Islamic terrorist groups such as Boko Haram and the Islamic State operate freely in certain parts of Nigeria, which creates substantial screening and vetting difficulties. According to the Overstay Report, Nigeria had a B–1/B–2 visa overstay rate of 5.56 percent and an F, M, and J visa overstay rate of 11.90 percent.

(ii) The entry into the United States of nationals of Nigeria as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Nigeria to the extent permitted by law.

(k) Senegal

(i) According to the Overstay Report, Senegal had a B–1/B–2 visa overstay rate of 4.30 percent and an F, M, and J visa overstay rate of 13.07 percent.

(ii) The entry into the United States of nationals of Senegal as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Senegal to the extent permitted by law.

(l) Tanzania

(i) According to the Overstay Report, Tanzania had a B–1/B–2 visa overstay rate of 8.30 percent and an F, M, and J visa overstay rate of 13.97 percent.

(ii) The entry into the United States of nationals of Tanzania as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Tanzania to the extent permitted by law.

(m) Tonga

(i) According to the Overstay Report, Tonga had a B–1/B–2 visa overstay rate of 6.45 percent and an F, M, and J visa overstay rate of 14.44 percent.

(ii) The entry into the United States of nationals of Tonga as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Tonga to the extent permitted by law.

(n) Turkmenistan

(i) Since the issuance of Proclamation 10949, Turkmenistan has engaged productively with the United States and demonstrated significant progress in improving its identity-management and information-sharing procedures. As a result, the restrictions imposed on Turkmenistan in this proclamation modify and supersede those set forth in section 3(f) of Proclamation 10949.

(ii) The suspension of entry into the United States of nationals of Turkmenistan as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is lifted. Because some concerns remain, the entry into the United States of nationals of Turkmenistan as immigrants remains suspended.

(o) Zambia

(i) According to the Overstay Report, Zambia had a B–1/B–2 visa overstay rate of 10.73 percent and an F, M, and J visa overstay rate of 21.02 percent.

(ii) The entry into the United States of nationals of Zambia as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Zambia to the extent permitted by law.

(p) Zimbabwe

(i) According to the Overstay Report, Zimbabwe had a B–1/B–2 visa overstay rate of 7.89 percent and an F, M, and J visa overstay rate of 15.15 percent.

(ii) The entry into the United States of nationals of Zimbabwe as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Zimbabwe to the extent permitted by law.

**Sec. 6**. *Scope and Implementation of Suspensions and Limitations.* (a) Scope. Subject to the exceptions set forth in subsection (b) of this section and any exceptions made pursuant to subsections (c) and (d) of this section, the suspensions of and limitations on entry pursuant to sections 2, 3, 4, and 5 of this proclamation shall apply only to foreign nationals of the designated countries who:

(i) are outside the United States on the applicable effective date of this proclamation; and

(ii) do not have a valid visa on the applicable effective date of this proclamation.

(b) Exceptions. The suspension of and limitation on entry pursuant to sections 2, 3, 4, and 5 of this proclamation shall not apply to:

CAR000074

(i) any lawful permanent resident of the United States;

(ii) any dual national of a country designated under sections 2, 3, 4, or 5 of this proclamation when the individual is traveling on a passport issued by a country not so designated;

(iii) any foreign national traveling with a valid nonimmigrant visa in the following classifications: A–1, A–2, C–2, C–3, G–1, G–2, G–3, G–4, NATO–1, NATO–2, NATO–3, NATO–4, NATO–5, or NATO–6;

(iv) any athlete or member of an athletic team, including the coaches, persons performing a necessary support role, and immediate relatives, traveling for the World Cup, Olympics, or other major sporting event as determined by the Secretary of State;

(v) Special Immigrant Visas for United States Government employees under 8 U.S.C. 1101(a)(27)(D); and

(vi) immigrant visas for ethnic and religious minorities facing persecution in Iran.

(c) The exceptions in subsection (b) of this section amend and supersede the exceptions set forth in section 4(b) of Proclamation 10949 with respect to any countries listed in section 2 or 3 of Proclamation 10949 from and after the date of this proclamation.

(d) Exceptions to the suspension of and limitation on entry pursuant to sections 2, 3, 4, and 5 of this proclamation may be made on a case-by-case basis for individuals for whom the Attorney General finds, in her discretion, that the travel by the individual would advance a critical United States national interest involving the Department of Justice, including when individuals must be present to participate in criminal proceedings as witnesses. These exceptions shall be made only by the Attorney General, or her designee, in coordination with the Secretary of State and the Secretary of Homeland Security.

(e) Exceptions to the suspension of and limitation on entry pursuant to sections 2, 3, 4, and 5 of this proclamation may be made on a case-by-case basis for individuals for whom the Secretary of State finds, in his discretion, that the travel by the individual would serve a United States national interest. These exceptions shall be made by only the Secretary of State or his designee, in coordination with the Secretary of Homeland Security or her designee.

(f) Exceptions to the suspension of and limitation on entry pursuant to sections 2, 3, 4, and 5 of this proclamation may be made on a case-by-case basis for individuals for whom the Secretary of Homeland Security finds, in her discretion, that the travel by the individual would serve a United States national interest. These exceptions shall be made by only the Secretary of Homeland Security or her designee, in coordination with the Secretary of State or his designee.

**Sec. 7**. *Adjustments to and Removal of Suspensions and Limitations.* (a) Within 180 days of the date of this proclamation, and every 180 days thereafter, the Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall submit a report to the President, through the Assistant to the President for Homeland Security, recommending whether any suspensions and limitations imposed by sections 2, 3, 4, and 5 of this proclamation should be continued, terminated, modified, or supplemented.

(b) The Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall continue to engage each of the countries identified in sections 2 and 3 of this proclamation—and shall immediately engage each of the countries identified in sections 4 and 5 of this proclamation—on measures that must be taken to comply with screening, vetting, immigration, and security requirements of the United States.

**Sec. 8**. *Enforcement.* (a) The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall consult with appropriate domestic and international partners, including countries and organizations, to ensure efficient, effective, and appropriate implementation of this proclamation.

(b) In implementing this proclamation, the Secretary of State, the Attorney General, and the Secretary of Homeland Security shall comply with all applicable laws and regulations.

(c) No immigrant or nonimmigrant visa issued before the applicable effective date of this proclamation shall be revoked pursuant to this proclamation.

(d) This proclamation shall not apply to an individual who has been granted asylum by the United States or to a refugee who has already been admitted to the United States. Nothing in this proclamation shall be construed to limit the ability of an individual to seek asylum, refugee status, withholding of removal, or protection under the Convention Against Torture, consistent with the laws of the United States.

**Sec. 9**. *Severability.* It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the national security, foreign policy, and counterterrorism interests of the United States. Accordingly:

(a) if any provision of this proclamation, or the application of any provision of this proclamation to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) if any provision of this proclamation, or the application of any provision of this proclamation to any person or circumstance, is held to be invalid because of the lack of certain procedural requirements, the relevant executive branch official shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 10**. *Effective Date.* This proclamation is effective at 12:01 a.m. eastern standard time on January 1, 2026.

**Sec. 11**. *General Provisions.* (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable by law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) The costs for publication of this proclamation shall be borne by the Department of State.

CAR000076

IN WITNESS WHEREOF, I have hereunto set my hand this sixteenth day of December, in the year of our Lord two thousand twenty-five, and of the Independence of the United States of America the two hundred and fiftieth.

[FR Doc. 2025–23570
Filed 12–18–25; 11:15 am]
Billing code 4710–05–P

CAR000077

## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2026, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will provide electronic notice and an electronic link to this document to all attorneys of record.

By: */s/ Bronwyn Nayci*
BRONWYN NAYCI
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation