# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| AKMURAT O. DOE *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DONALD J. TRUMP, *in his official capacity as* | ) | No. 1:25-cv-13946-JEK |
| *President of the United States*, UNITED STATES | ) | |
| DEPARTMENT OF HOMELAND SECURITY, | ) | |
| SECRETARY MARKWAYNE MULLIN, *in his* | ) | |
| *official capacity as Secretary of the U.S.* | ) | |
| *Department of Homeland Security*, UNITED | ) | |
| STATES CITIZEN AND IMMIGRATION | ) | |
| SERVICES, JOSEPH B. EDLOW, *in his official* | ) | |
| *capacity as Director of the United States Citizen* | ) | |
| *and Immigration Services*, and DOROTHY | ) | |
| MICHAUD, *in her official capacity as Director of* | ) | |
| *the Boston Field Office of United States Citizen* | ) | |
| *and Immigration Services*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND STAY OF ADMINISTRATIVE ACTION

**KOBICK, J.**

This case concerns two United States Citizenship and Immigration Services ("USCIS") policies affecting the adjudication of discretionary benefit requests made by noncitizens living in the United States. Following a series of presidential proclamations declaring that certain countries have inadequate systems for vetting and screening noncitizens for admission into the United States, USCIS adopted a policy in November 2025 that treats an individual's nationality as a "significant negative factor" in the adjudication of their benefit application if they come from one of the countries listed in the proclamations. This decision refers to that policy as the "significant negative

1

factor" policy. Soon after, in December 2025 and January 2026, USCIS issued Policy Memoranda announcing an indefinite hold on the adjudication of benefit applications submitted by individuals from the identified countries, and all asylum applications, subject to certain exceptions. This policy is referred to as the "adjudicative hold" policy.

The approximately 200 plaintiffs in this case have various benefit applications pending before USCIS, including applications for asylum, naturalization, adjustment of status to that of a permanent resident, and work authorization. They have sued USCIS, the Department of Homeland Security, and four individuals in their official capacities—Donald J. Trump, as President of the United States; Markwayne Mullin, as Secretary of Homeland Security[1]; Joseph B. Edlow, as Director of USCIS; and Dorothy Michaud, as Field Office Director of USCIS in Boston—claiming that the policies are ultra vires, arbitrary and capricious, and contrary to law, in violation of the Administrative Procedure Act ("APA"); were adopted in violation of the APA's notice-and-comment rulemaking requirements; and violate the due process and equal protection rights safeguarded by the Fifth Amendment to the United States Constitution. The plaintiffs have moved for an administrative stay of both policies or a preliminary injunction requiring the defendants to lift the adjudicative hold and cease applying the significant negative factor policy to their benefit applications. They assert that they are likely to succeed on the merits of their claims that the policies are contrary to law or arbitrary and capricious. The government argues that the Court lacks jurisdiction over certain of the plaintiffs' claims, that its policies are not final agency action or constitute matters committed to agency discretion, and that the plaintiffs have not demonstrated a likelihood of success on the merits, irreparable harm, or a favorable balance of the equities.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the current Secretary of Homeland Security, Markwayne Mullin, is substituted for former Secretary of Homeland Security Kristi Noem as a defendant in this action.

The plaintiffs' motion for a preliminary injunction will be granted in part and denied in part. The Court concludes that the adjudicative hold and significant negative factor policies are final agency action subject to judicial review, that it has jurisdiction to consider challenges to those policies, and that the policies are not committed to agency discretion. On the merits, the Court concludes that the plaintiffs are likely to succeed on their claim that the adjudicative hold policy is contrary to law and arbitrary and capricious, and on their claim that the significant negative factor policy is contrary to law insofar as it applies to applications for adjustment of status and work authorization. By submitting declarations attesting to the harm they are experiencing because of USCIS's policies, certain plaintiffs have demonstrated that they are likely to be irreparably harmed absent preliminary injunctive relief and that the balance of the equities tips in their favor. The parties will be ordered to confer regarding whether the remaining plaintiffs are likewise entitled to injunctive relief on the basis of facts contained in declarations not yet submitted to the Court and the reasoning that follows.

## BACKGROUND

### I.    Presidential Proclamations and USCIS Policies.

President Trump issued Executive Order 14161, titled "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," on January 20, 2025. The Order directed the Secretary of State to enhance vetting and screening of "all aliens who intend to be admitted, enter, or are already inside the United States, particularly those aliens coming from regions or nations with identified security risks." ECF 33-1, at 20, § 2(a)(iv); *see id.* §§ 1-2. It instructed the Secretary of State to "re-establish a uniform baseline for screening and vetting standards and procedures . . . that will be used for any alien seeking a visa or immigration benefit of any kind." *Id.* § 2(a)(iii). It also gave the Secretary of State, Attorney General, Secretary of

3

Homeland Security, and Director of National Intelligence 60 days to submit a report to the President "identifying countries throughout the world for which vetting and screening information is so deficient as to warrant a partial or full suspension of the admission of nationals from those countries." *Id.* § 2(b)(i).

Invoking Sections 212(f) and 215(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1182(f) and 1185(a), the President issued Presidential Proclamation 10949 on June 4, 2025 to restrict entry into the United States by foreign nationals from 19 countries that the Secretary of State identified as "deficient with regards to screening and vetting." ECF 33-1, at 23. The proclamation, titled "Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats," fully suspended the entry of immigrants and nonimmigrants from 12 countries,[2] subject to certain categorical exceptions and case-by-case waivers. *Id.* §§ 1 (f)-(h), 2(a)-(*l*), 4(a)-(d).[3] It also partially restricted the entry of immigrants and nonimmigrants from another seven countries,[4] fully suspending entry on B-1, B-2, B-1/B-2, F, M, and J visas and directing consular officers to otherwise "reduce the validity for any other nonimmigrant visa issued to nationals of [those countries] to the extent permitted by law." *Id.* §§ 1(g), 3(a)-(g). The partial restrictions, like the full restrictions, were

---

[2] Afghanistan, Burma (Myanmar), Chad, Republic of the Congo, Equatorial Guinea, Eritrea, Haiti, Iran, Libya, Somalia, Sudan, and Yemen. ECF 33-1, at 25, §§ 1(f) and 2(a)-(*l*).

[3] Section 4(b) lists certain exceptions from Proclamation 10949's suspension of and limitation on entry, including exceptions for lawful permanent residents of the United States. ECF 33-1, at 29 § 4(b). Section 4(c) excepts individuals whose travel the Attorney General, in coordination with the Secretaries of State and Homeland Security, finds would advance a critical United States national interest involving the Department of Justice. *Id.* § 4(c). Section 4(d) likewise excepts immigrants whose travel the Secretary of State, in coordination with the Secretary of Homeland Security, finds would serve a United States national interest. *Id.* § 4(d).

[4] Burundi, Cuba, Laos, Sierra Leone, Togo, Turkmenistan, and Venezuela. ECF 33-1, at 25 §§ 1(g), 3(a)-(g).

4

subject to certain categorical exceptions and case-by-case waivers. *Id.* §§ 4(a)-(d). Proclamation 10949 directed the Secretary of State to, within 90 days and every 180 days thereafter, "submit a report to the President . . . describing his assessment [of] and [offering recommendations on] whether any suspensions and limitations imposed by [the Proclamation] should be continued, terminated, modified, or supplemented." *Id.* § 5(a).

On November 27, 2025, USCIS, a component of the Department of Homeland Security ("DHS"), issued the first of two policies challenged in this lawsuit. Policy Alert ("PA") 2025-26 announced that, "[e]ffective immediately" and pursuant to new controlling guidance in the USCIS Policy Manual, "USCIS will consider relevant country-specific facts and circumstances," such as the vetting and screening deficiencies identified in Proclamation 10949, as "significant negative factors" in the adjudication of discretionary benefit requests. ECF 7-1, at 1-2; *see Volume 1 - General Policies and Procedures, Part E - Adjudications, Chapter 8 - Discretionary Analysis*, USCIS Policy Manual, https://perma.cc/7KLV-VPZR (listing "a high rate of overstay" as another country-specific factor USCIS may consider). Exempted from PA 2025-26's significant negative factor policy are those individuals who fit the exceptions to Proclamation 10949's restrictions on entry. *See id.* n. 74; *but see Presidential Proclamation 10998*, 90 Fed. Reg. 59717 (Dec. 19, 2025) (narrowing and superseding Proclamation 10949's list of exceptions).

The second USCIS policy challenged in this lawsuit, the adjudicative hold policy, is set forth in two Policy Memoranda. The first, Policy Memorandum ("PM") 602-0192, was issued on December 2, 2025. It directs USCIS personnel to immediately (1) place a hold on any applications for asylum and for withholding of removal, regardless of the applicant's country of nationality, pending a comprehensive review; (2) place a hold on any pending benefit requests made by noncitizens from countries listed in Proclamation 10949, regardless of entry date, pending a

5

comprehensive review; and (3) conduct a comprehensive re-review of already approved benefit requests for noncitizens from countries listed in Proclamation 10949 who entered the United States on or after January 20, 2021. ECF 33-1, at 6.[5] The term "benefit request" includes, among other things, applications to register as a permanent resident or adjust status and applications to preserve residence for naturalization purposes, but it does not include USCIS screening activities such as credible fear and reasonable fear interviews. ECF 33-1, at 6 nn.2 & 4. The adjudicative hold required by the policy allows benefit applications to proceed through processing but prevents issuance of a final decision on a case. ECF 35-1, at 1 n.2. PM 602-0192 is to "remain in effect until lifted by the USCIS Director through a subsequent memorandum." ECF 33-1, at 7-8. The Policy Memorandum instructed USCIS to, within 90 days, "prioritize a list for review, interview, re-interview, and referral to [U.S. Immigration and Customs Enforcement ("ICE")] and other law enforcement agencies as appropriate, and . . . issue operational guidance." *Id.* at 8.

On December 16, 2025, President Trump issued Presidential Proclamation 10998, titled "Restricting and Limiting the Entry of Foreign Nationals to Protect the Security of the United States," which expanded the entry restrictions from Proclamation 10949 to 20 additional countries. 90 Fed. Reg. 59717. In accordance with that Proclamation, 19 countries are now subject to full restrictions and 20 are subject to partial restrictions. *Id.* at 59722-26, §§ 2-5.[6] The Proclamation

---

[5] PM 602-0192 also required that "all aliens meeting these criteria undergo a thorough re-review process, including a potential interview and, if necessary, a re-interview, to fully assess all national security and public safety threats along with any other related grounds of inadmissibility or ineligibility." ECF 33-1, at 6.

[6] Proclamation 10998 maintains full suspension of entry by immigrants and nonimmigrants from the 12 countries identified in Proclamation 10949, as well as Burkina Faso, Laos, Mali, Niger, Sierra Leone, South Sudan, Syria, and "individuals attempting to travel on [Palestinian Authority]-issued or endorsed travel documents." 90 Fed. Reg. at 59722-24, §§ 2, 4. It continues partial restrictions and limitations on entry for immigrants and nonimmigrants from Burundi, Cuba, Togo, Turkmenistan (immigrants only), and Venezuela, and expands those restrictions to Angola,

6

also narrowed the categorical exceptions set forth in Proclamation 10949, including by removing the exception for immigrant visas for family members of individuals in the United States. *See id.* at 59726-27, § 6 (explaining that Proclamation 10998's exceptions "amend and supersede the exceptions set forth in . . . Proclamation 10949").

USCIS issued the second Policy Memorandum, PM 602-0194, on January 1, 2026. PM 602-0194 leaves PM 602-0192 in place but extends the adjudicative hold policy to all 39 countries listed in Proclamation 10998 and specifies certain exceptions to that hold. *See* ECF 35-1, at 1, 4-5; ECF 41, at 32-33.[7] Thus, like PM 602-0192, PM 602-0194 directs all USCIS personnel to (1) place a hold on pending benefit applications from noncitizens from countries listed in Proclamation 10998, regardless of entry date, pending a comprehensive review; and (2) conduct a comprehensive re-review of approved benefit requests implicated in Proclamation 10998 that were approved on or after January 20, 2021. ECF 35-1, at 1. Also like PM 602-0192, PM 602-0194

---

Antigua and Barbuda, Benin, Côte d'Ivoire, Dominica, Gabon, The Gambia, Malawi, Mauritania, Nigeria, Senegal, Tanzania, Tonga, Zambia, and Zimbabwe. *Id.* at 59722, § 3; *id.* at 59724-26, § 5.

[7] The following are exceptions to the adjudicative hold: "1. Form I-90, Application to Replace Permanent Resident Card (Green Card); 2. Form N-565, Application for Replacement Naturalization/Citizenship Document; 3. Form N-600, Application for Certificate of Citizenship; 4. Form I-765, Application for Employment Authorization filed under the (c)(8), limited (c)(11), and limited (c)(14) categories; 5. Form I-910, Application for Civil Surgeon Designation (only for physicians that are citizens or nationals of the United States); 6. Benefit requests filed by any alien who is an athlete or member of an athletic team, including the coaches, persons performing a necessary support role, and immediate relatives for the purpose of participating in the World Cup, Olympics, or other major sporting event as determined by the Secretary of State; 7. Benefit requests that are a priority for law enforcement and where ICE has requested USCIS take adjudicative action to uphold public safety or national security; 8. Benefit requests filed by aliens whose entry would serve a United States national interest; 9. Benefit requests, as well as the associated underlying benefits, for any programs that are terminated or discontinued as a result of an Executive Order, Proclamation, Federal Register Notice, or Directive issued by the President, the Secretary of Homeland Security, or the USCIS Director; and 10. Automatic termination decisions for ancillary or related benefit requests when an alien is granted Legal Permanent Resident status or becomes a naturalized citizen." ECF 35-1, at 4-5 (footnoted caveats to exceptions omitted).

explains that the hold "will remain in effect until lifted or modified by the USCIS Director through a subsequent memorandum or memorandum attachment," and it requires USCIS "to prioritize a list for review, interview, re-interview, and referral to ICE and other law enforcement agencies as appropriate" and "issue operational guidance" within 90 days. *Id.* at 3, 5. Those applicants who fall into the exceptions listed in PM 602-0194 remain subject to the significant negative factor policy. *See* ECF 41, at 33-36 (explaining ongoing application of the policy). That is, even if their application proceeds to a final decision, their nationality remains a significant negative factor in USCIS's consideration of their benefit request.

## II.    Factual and Procedural Background.

The approximately 200 plaintiffs in this case are noncitizens and family members of noncitizens from 20 countries subject to an adjudicative hold pursuant to PM 602-0192 and PM 602-0194. ECF 15, at 2.[8] Among the plaintiffs are applicants for asylum, adjustment of status to that of a permanent resident (i.e., obtain a green card), naturalization, and work authorization. *Id.* Asserting six claims, the amended complaint alleges that PA 2025-26, PM 602-0192 and PM 602-0194 constitute ultra vires executive action, are contrary to law, and are arbitrary and capricious in violation of the APA, 5 U.S.C. §§ 706(2)(A) and (C) (Counts I, II, and III); were adopted without the requisite notice-and-comment rulemaking in violation of the APA, 5 U.S.C. §§ 553 and 706(2)(D) (Count IV); and violate the plaintiffs' rights to equal protection and due process guaranteed by the Fifth Amendment (Count V and VI). ECF 7, at 112-17.

---

[8] Over half of the plaintiffs are from Iran. Four plaintiffs are from an unspecified country. The rest are from Afghanistan, Burkina Faso, Burundi, the Republic of the Congo, Cuba, Haiti, Kazakhstan, Kenya, Libya, Mexico, Myanmar, Nigeria, Russia, Sudan, Syria, Togo, Turkmenistan, and Venezuela.

On January 12, 2026, the plaintiffs moved for a stay under 5 U.S.C. § 705 and sought a preliminary injunction that would bar the government defendants from enforcing PA 2025-26, PM 602-0192, and PM 602-0194 during this litigation. ECF 8, at 1. After receiving the parties' briefs, the Court held a hearing on February 13, 2026 and took the motion under advisement. At that hearing, the government argued that the adjudicative holds implemented by the Policy Memoranda do not constitute reviewable final agency action because further operational guidance would be released within 90 days of their respective publications: by March 2, 2026 for PM 602-0192 and by April 1, 2026 for PM 602-0194. ECF 41, at 37-39; *see also* ECF 46, ¶ 4 (government's motion indicating the same). The Court thus ordered the parties to submit a status report by March 3, 2026, attaching the updated guidance document, and it granted the parties leave to file supplemental memoranda addressing the pending motion in light of that further guidance. ECF 47.

The government filed a status report on March 3, 2026, but it did not attach a revised policy memorandum or an updated guidance document. *See* ECF 49. Instead, it attached a declaration from Andrew Good, Chief of USCIS's Office of Policy and Strategy, detailing various policies USCIS was developing or implementing. ECF 49-1. The declaration did not purport to modify or rescind the adjudicative hold put in place by the Policy Memoranda, nor did it represent that the adjudicative hold had been lifted as to any of the plaintiffs. On April 1, 2026, the government further informed the Court that it had updated its screening and vetting practices and established an internal process for lifting holds on individual or group cases. ECF 70 (citing USCIS, *Update on USCIS' Strengthened Screening and Vetting* (March 30, 2026), https://perma.cc/A9K7-PFK3). Again, the government's status report did not attach a revised policy memorandum or guidance document, and it did not represent that the adjudicative hold had been lifted as to any of the plaintiffs. Thus, notwithstanding the representations in PM 602-0192 and PM 602-0194 that

USCIS would "issue operational guidance" by March 2, 2026 and April 1, 2026, respectively, USCIS has made no meaningful change to the adjudicative hold affecting the plaintiffs' benefit applications.

**STANDARD OF REVIEW**

"'A preliminary injunction is an extraordinary and drastic remedy . . . that is never awarded as of right." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (quotation marks omitted). To secure a preliminary injunction, the plaintiffs bear the burden to demonstrate: "'(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest.'" *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020) (quoting *Nieves-Márquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003)). The third and fourth factors "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009), and the first factor "normally weighs heaviest in the decisional scales," *Coquico, Inc. v. Rodríguez-Miranda*, 562 F.3d 62, 66 (1st Cir. 2009).

**DISCUSSION**

**I.    Likelihood of Success on the Merits.**

The plaintiffs contend that they are likely to succeed on the merits of their claims that the significant negative factor and adjudicative hold policies are contrary to law, and that the adjudicative hold policy is arbitrary and capricious, in contravention of Section 706(2)(A) of the APA.[9] The government responds that USCIS's policies are not final agency actions subject to APA

---

[9] The plaintiffs do not rely on their ultra vires claim or constitutional claims in seeking preliminary injunctive relief. They also do not move for a preliminary injunction on their claim that the significant negative factor policy is arbitrary and capricious. *See* ECF 15, at 17-19 (section of plaintiffs' brief addressing arbitrary and capricious not mentioning significant negative factor policy). Although the plaintiffs reference their notice-and-comment claim in the motion, they

10

review, that the Court lacks jurisdiction over some of the plaintiffs' claims, that the claims are unreviewable because they concern matters committed to agency discretion, and that the claims are otherwise unlikely to succeed. The Court addresses the government's three threshold arguments first before turning to the merits of the plaintiffs' claims.

A.     Final Agency Action.

The government asserts that the adjudicative hold and significant negative factor policies are not subject to judicial review under the APA because they do not constitute final agency actions. The APA authorizes courts to "hold unlawful and set aside" final agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see id.* § 704 (to be reviewable under the APA, challenged action must constitute "final agency action"). For an agency action to be "final," the action "must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (citing *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). Additionally, the action "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (citing *Bennett*, 520 U.S. at 177-78).

An agency action marks the consummation of the agency's decisionmaking process if it represents the agency's "final determination" and "last word on the matter." *Omnipoint Holdings,*

---

devote only one sentence to the subject, so the Court does not consider the issue fairly before it. *See* ECF 15, at 16; *Rodríguez v. Municipality of San Juan*, 659 F.3d 168, 175 (1st Cir. 2011) ("[W]e deem waived . . . claims adverted to in a cursory fashion, unaccompanied by developed argument."). The plaintiffs' opening and reply briefs do repeatedly reference Section 706(1) of the APA, which permits courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). But the amended complaint does not assert a claim under Section 706(1), and the plaintiffs' counsel confirmed at the hearing that "[t]his is not" a Section 706(1) action. ECF 41, at 8:21-24. Thus, the Court does not address whether the plaintiffs are likely to succeed on a Section 706(1) claim, as that claim is not present in this case.

*Inc. v. City of Cranston*, 586 F.3d 38, 46 (1st Cir. 2009) (quotation marks omitted); *accord Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 478 (2001). The government insists that neither the adjudicative hold nor the significant negative factor policy represents USCIS's last word because the Policy Alert and Policy Memoranda represent that they are temporary guidance, and that more permanent guidance will be forthcoming. But PA 2025-26 contains no such language. Instead, it states that the significant negative factor policy is "[e]ffective immediately" and will be reflected as new guidance in the USCIS Policy Manual, "controlling and supersed[ing] any related prior guidance." ECF 7-1, at 1. Nor does the Policy Alert suggest that it will be subject to revision on any particular timeline. Accordingly, PA 2025-26 is USCIS's final word on its significant negative factor policy.

The two Policy Memoranda establishing the adjudicative hold policy, for their part, similarly represent that the adjudicative holds "will remain in effect until lifted [or modified] by the USCIS Director through a subsequent memorandum or memorandum attachment." ECF 33-1, at 7-8; *see* ECF 35-1, at 3, 5. On its face, that language indicates that the adjudicative hold policy has been implemented and that there is no timeline for rescinding or meaningfully modifying the policy. But the government contends that the Policy Memoranda are not the consummation of USCIS's decisionmaking process, because both memoranda require the government to "issue operational guidance within 90 days" of publication. ECF 33-1, at 8; ECF 35-1, at 5. This language, the government asserts, indicates that the adjudicative hold was merely tentative and that additional operational guidance would clarify the policy within 90 days.

The problem with the government's argument is that the 90-day period following both Policy Memoranda—ending on March 2, 2026 and April 1, 2026, respectively—came and went without USCIS substantively modifying the adjudicative hold policy. Instead, the government

12

submitted the Good declaration, which attests that "[o]ver the past 90 days, USCIS has implemented and reviewed several changes to screening and vetting practices" and lists those changes,[10] and a link to a USCIS website published on March 30 providing further information on USCIS's continued implementation of the adjudicative hold. ECF 49-1, ¶¶ 6-11; ECF 70, at 1. Absent from either submission is any mention of an end to the adjudicative hold at issue in this case.[11] Neither purports to adjust or replace PM 602-0192 or PM 602-0194, nor do they give any indication of when the adjudicative hold on the plaintiffs' benefit applications—now nearly five months old—will be lifted or when more substantial guidance will be released.

The Court may not review a tentative agency position that represents an interim step in the agency's decisionmaking process. *See Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024) (agency's issuance of a summons is not a final action). But at a certain point, an agency's ongoing characterization of its action as "temporary" rings hollow. *See Massachusetts v. Trump*, 790

---

[10] Among the changes listed are reductions to the maximum validity periods for certain Employment Authorization Documents, limitations on the reuse of photographs for identity documents, and additional background checks, re-interviews, and merit reviews of refugees in the Minnesota area. Good attests that work to develop additional guidance remains "underway." *See* ECF 49-1, ¶¶ 10-11 (USCIS is "analyzing risk factors" it has identified within each of the countries listed within Presidential Proclamations 10949 and 10998, "has actively engaged to outline an enhanced vetting plan," and "is developing guidance to assist adjudicators in aligning interview resources to the specific risks identified for each country.").

[11] The government contends that USCIS's decision to lift holds for certain adjudications not at issue in this case "establishes that USCIS has created a formal, institutionalized process for reviewing and lifting holds," and therefore demonstrates that the adjudicative holds on the plaintiffs' applications are not final. ECF 57, at 10; *see* ECF 49-1, ¶ 8 (lifting holds for aliens vetted through Operation PARRIS, on certain family-based petitions filed by U.S. citizens, intercountry adoption forms, and particular forms filed by South African citizens/nationals); ECF 70, at 1. But "[t]he possibility of revision 'is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal.'" *POET Biorefining, LLC v. Env'tl Prot. Agency*, 970 F.3d 392, 404-05 (D.C. Cir. 2020) (quoting *Hawkes Co.*, 578 U.S. at 598); *see also Natural Res. Def. Council v. Wheeler*, 955 F.3d 68, 79 (D.C. Cir. 2020) ("[I]f an agency's indication of an intent to reconsider an interim (or other) action sufficed to render the action non-final, agencies could evade judicial review of their actions.").

F. Supp. 3d 8, 26 (D. Mass. 2025) (concluding that agency's "temporary" pause was final after months had passed and where the defendants provided the court with no "reasonable timeframe for, or indeed any end on the horizon" to the pause); *New York v. Trump*, 811 F. Supp. 3d 215, 234 (D. Mass. 2025) (similar). And here, USCIS's adjudicative hold policy has remained in place for five months, the government has offered no timeline for further revisions or an end to the policy, and the plaintiffs' benefits applications remain subject to an indefinite hold. In light of the "strong presumption that Congress intends judicial review of administrative action," *Rhode Island Dep't of Env'tl Mgmt. v. United States*, 304 F.3d 31, 41 (1st Cir. 2002) (quotation marks omitted); USCIS's representation that the adjudicative hold "will remain in effect until lifted or modified," ECF 35-1, at 3, 5; *see* ECF 33-1, at 7-8; and USCIS's decision not to lift or meaningfully modify that policy at the 90-day mark despite the language in the Policy Memoranda, the adjudicative hold policy represents the consummation of the agency's decisionmaking process. *See Sw. Airlines Co. v. United States Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016) (because an agency's labeling of its action as interim or temporary is not dispositive, courts "have looked to the way in which the agency subsequently treats the challenged action").

The next question is whether the agency action has "direct and appreciable legal consequences" on—or determines the rights or obligations of—the relevant actors or regulated bodies. *Hawkes Co.*, 578 U.S. at 598-600. This is a pragmatic inquiry. *Id.* at 599. The government does not dispute that USCIS employees are prohibited from issuing final decisions on benefit applications under both Policy Memoranda. ECF 35-1, at 1 n.2. And the government acknowledges that USCIS is actively applying the significant negative factor policy to those applications exempted from the adjudicatory hold. *See* ECF 41, at 33-36 (explaining ongoing application of the policy). Further, the plaintiffs are suffering the consequences of the policies. Those plaintiffs

14

subject to the adjudicative hold are in indefinite limbo with respect to their applications for naturalization, work authorization, permanent resident status, and asylum, affecting all manner of life plans. And any applications subject to the significant negative factor policy are now viewed with enhanced suspicion based on country of origin. At present, both policies are dictating the actions of USCIS employees and affecting the rights of the plaintiffs. *See Bennett*, 520 U.S. at 178 (second factor met because agency action "alter[ed] the legal regime" to which the agency was subject). Both policies are therefore final agency actions subject to review under the standards set forth in the APA.

      B.      <u>Jurisdiction Stripping Provisions.</u>

The government next contends that two jurisdiction stripping statutes, 8 U.S.C. §§ 1252(a)(2)(B)(i) and (ii), prevent this Court from considering the claims involving some plaintiffs' applications for adjustment of status and work authorization. Section 1252(a)(2)(B) generally prohibits courts from reviewing certain judgments, decisions, and actions concerning discretionary relief. 8 U.S.C. § 1252(a)(2)(B). Its first subsection, Section 1252(a)(2)(B)(i), provides, in pertinent part, that "no court shall have jurisdiction to review . . . any judgment regarding the granting of relief under . . . section . . . 1255 of this title," which governs applications to adjust a person's status to that of permanent resident. Its second subsection, Section 1252(a)(2)(B)(ii), bars courts from reviewing "any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title," which concerns asylum applications. The phrase "this subchapter" refers to subchapter II in Chapter 12 of Title 8 of the United States Code, which contains, as relevant here, Section 1255, governing adjustment of status, and Section 1324a,

concerning the employment of noncitizens. The government argues that Section 1252(a)(2)(B)(i) bars the Court from reviewing the plaintiffs' adjustment of status claims, and that Section 1252(a)(2)(B)(ii) precludes review of their adjustment of status and work authorization claims.

1. Section 1252(a)(2)(B)(i).

The government first argues that the Supreme Court's expansive construction of Section 1252(a)(2)(B)(i) in *Patel v. Garland*, 596 U.S. 328 (2022), precludes review of the application of the significant negative factor and adjudicative hold policies to adjustment of status applications. In *Patel*, the Court considered whether Section 1252(a)(2)(B)(i) deprives courts of jurisdiction to review fact determinations made in connection with Immigration Judges' discretionary decisions to adjust the status of eligible noncitizens who enter the United States unlawfully to a lawful permanent resident status. *See* 596 U.S. at 336, 347. Construing Section 1252(a)(2)(B)(i) in that context, the Court concluded that the statute strips courts of jurisdiction to review facts found and preliminary decisions made as part of discretionary relief proceedings under Section 1255. *Id.* at 343-344, 347. The Court read Section 1252(a)(2)(B)(i) to "prohibi[t] review of *any* judgment *regarding* the granting of relief under § 1255 and the other enumerated provisions," including any factual findings "*relating to* the granting of [discretionary] relief." *Id.* at 338-39, 347.

In the government's view, the Court's broad interpretation of Section 1252(a)(2)(B)(i) encompasses, and thus prohibits, judicial review of collateral challenges to agency policies that bear on adjustment of status applications. This argument overreads *Patel*. *Patel* did not address whether Section 1252(a)(2)(B)(i) bars jurisdiction over claims challenging agency policies of general applicability concerning adjustment of status applications, as opposed to judgments made in connection with individual applications for discretionary relief. *See Nakka v. U.S. Citizenship & Immigr. Servs.*, 111 F.4th 995, 999 (9th Cir. 2024). And in discussing Section 1252(a)(2)(B)(i)

16

after *Patel*, the Court has characterized the statute as removing jurisdiction over discretionary decisions in individual cases, not policy-based decisions that apply to a class of people. *See Bouarfa v. Mayorkas*, 604 U.S. 6, 14-15 (2024) (describing the types of individualized discretionary decisions covered by Section 1252(a)(2)(B)(i)). Unlike the plaintiffs in *Patel*, the plaintiffs here have not challenged—and cannot challenge—factual findings or decisions made on their individual adjustment of status applications, because no final adjudication has occurred.

The text of Section 1252(a)(2)(B)(i) does not support expanding *Patel* to cover claims challenging generally applicable policies and procedures. The provision concerns "the granting [or denying] of relief" under the enumerated provisions. 8 U.S.C. § 1252(a)(2)(B)(i); *see Patel*, 596 U.S. at 337. As the Ninth Circuit explained in *Nakka*, that language is most naturally read to describe "a single act of granting or denying an individual application for relief," rather than an agency policy or procedure, which "would not typically 'grant' relief without case-specific adjudication." 111 F.4th at 1004. In addition, and unlike neighboring statutory provisions, Section 1252(a)(2)(B)(i) does not expressly foreclose jurisdiction over policies and procedures adopted by the Attorney General. *See id.* at 1005-06 (noting that another sub-section of Section 1252(a)(2), "enacted at the same time as the current version of § 1252(a)(2)(B)(i)," expressly forecloses judicial review of "'procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1) of this title'" (quoting 8 U.S.C. § 1252(a)(2)(A)(iv)). When, as here, "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Nken*, 556 U.S. at 430.

Thus, although Section 1252(a)(2)(B)(i)'s sweep is broad, its text and context demonstrate that it does not extend to collateral attacks on agency policies and procedures. Section

17

1252(a)(2)(B)(i) does not, accordingly, deprive this Court of jurisdiction over the plaintiffs' claims challenging USCIS's adjudicative hold and significant negative factor policies.

    2.  Section 1252(a)(2)(B)(ii).

The government also contends that Section 1252(a)(2)(B)(ii) bars this Court's review of the plaintiffs' adjustment of status and work authorization claims because the challenged policies qualify as "any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in [their] discretion." 8 U.S.C. § 1252(a)(2)(B)(ii). Relying on cases holding that Section 1252(a)(2)(B)(ii) precluded review of a USCIS policy to hold adjudications on adjustment of status applications in abeyance pending visa availability, the government argues that Section 1252(a)(2)(B)(ii)'s "any other decision or action . . . in the discretion of the Attorney General or the Secretary of Homeland Security" language encompasses the plaintiffs' challenge to USCIS's policies here.

The First Circuit has not addressed the breadth of Section 1252(a)(2)(B)(ii) in the context of a collateral challenge to an agency policy concerning the provisions of subchapter II. *See Gupta v. Jaddou*, 118 F.4th 475, 482 (1st Cir. 2024) (declining to address whether "pre-adjudication policies are 'decision[s]' that are 'specified' to be in the DHS Secretary's discretion—and thus unreviewable"—under 8 U.S.C. § 1252(a)(2)(B)(ii)). But the Supreme Court has described Section 1252(a)(2)(B)(ii) as "a 'catchall' provision" meant to cover other decisions "of the same genre" as those covered by Section 1252(a)(2)(B)(i), meaning other decisions made discretionary by statute. *Kucana v. Holder*, 558 U.S. 233, 246-47 (2010). "Read harmoniously," the Court explained, "both clauses convey that Congress barred court review of discretionary decisions only when Congress itself set out the Attorney General's discretionary authority in the statute." *Id.* at 247.

18

The question, then, is whether Congress conferred discretionary authority to adopt, via the Policy Memoranda and Policy Alert, the adjudicative hold and substantial negative factor policies as to noncitizens applying for adjustment of status and work authorization. The government contends that two provisions of subchapter II—8 U.S.C. §§ 1255(a) and 1324a—specify such authority. ECF 37-1, at 14-16. Section 1255(a) provides that "[t]he status of an alien who was inspected and admitted or paroled into the United States . . . may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence." 8 U.S.C. § 1255(a). And Section 1324a makes it unlawful to hire for employment "an unauthorized alien," defined to mean an alien who has not been "lawfully admitted for permanent residence" or "authorized to be so employed by this chapter or by the Attorney General." *Id.* §§ 1324a(a) and (h)(3).[12]

Neither statute, by its terms, confers discretion to issue policies placing on hold all applications for adjustment of status or work authorization by noncitizens from particular countries, or viewing all such applications negatively based on the applicant's country of origin. Section 1255(a) does afford the Attorney General significant discretion to adjust the status of "*an alien who was inspected and admitted or paroled into the United States*," but that language refers to a particular alien, not *all* noncitizens from an entire country. 8 U.S.C. § 1255(a) (emphasis added). And Section 1255(a) likewise confers authority to promulgate regulations regarding adjustment of status, but the adjudicative hold and significant negative factor policies were not

---

[12] Although Sections 1255(a) and 1324a as enacted vest the Attorney General with the authority to adjudicate adjustment of status and work authorization applications, Congress has since transferred the authority over these matters, immigrant visa petitions, naturalization petitions, asylum petitions, and all other adjudications originally performed by the Immigration and Naturalization Service under the Attorney General to the Secretary of Homeland Security and USCIS. *See* 6 U.S.C. § 271(b); 8 U.S.C. 1103(a); *Gupta*, 118 F.4th at 477 n.1.

19

promulgated as regulations that underwent notice-and-comment rulemaking. As for Section 1324a, the government offers no argument as to how that statute specifies discretion to indefinitely put on hold all work authorization applications or view such applications negatively based on country of origin.

The government has not identified any sound basis on which to conclude that "Congress itself set out [USCIS's] discretionary authority" for the adjudicative hold and significant negative factor policies "in the statute[s]" that govern adjustment of status and work authorization. *Kucana*, 558 U.S. at 247. Instead, the government relies on decisions holding a different USCIS regulatory policy unreviewable under Section 1252(a)(2)(B)(ii). Those cases concern regulations that govern the process for adjudicating adjustment of status applications. Eligibility for adjustment of status requires the immediate availability of an immigrant visa, 8 U.S.C. § 1255(a), and certain visas are subject to annual statutory caps, *see id.* §§ 1151(d), 1152, 1153. To address the problem that demand for such visas frequently exceeds supply, USCIS promulgated regulations specifying that an applicant is ineligible for adjustment of status "unless an immigrant visa is immediately available to him or her at the time the application is filed," and that applications for permanent resident status "shall not be approved until an immigrant visa number has been allocated by the Department of State." 8 C.F.R. §§ 245.1(g)(1), 245.2(a)(5)(ii). When a visa is not available, applications for adjustment of status are held in abeyance until the visa becomes available. *See Thigulla v. Jaddou*, 94 F.4th 770, 772 (8th Cir. 2024). This approach, known as the retrogression policy, is outlined in 8 C.F.R. § 245.2(a)(5)(ii). *Id.*

Several courts of appeals have held that Section 1252(a)(2)(B)(ii) removes jurisdiction over challenges to the retrogression policy, because that policy is committed to agency discretion by Section 1255(a). *See Kale v. Alfonso-Royals*, 139 F.4th 329, 334-36 (4th Cir. 2025); *Kanapuram*

20

*v. Dir., USCIS*, 131 F.4th 1302, 1306-08 (11th Cir. 2025); *Geda v. Dir., USCIS*, 126 F.4th 835, 844 (3d Cir. 2025); *Cheejati v. Blinken*, 106 F.4th 388, 394-95 (5th Cir. 2024); *Thigulla*, 94 F.4th at 774-77. These courts reason that Section 1255(a) expressly grants the executive branch discretion to promulgate "such regulations as [it] may prescribe" regarding adjustment of status applications, and the retrogression policy, embodied in USCIS's regulations, is the exercise of that discretion conferred by Congress. *See, e.g.*, *Thigulla*, 94 F.4th at 772, 775-76; *Cheejati*, 106 F.4th at 394-95. That same reasoning does not, however, insulate the adjudicative hold or significant negative factor policy from judicial review, because those policies were not issued as regulations promulgated by USCIS. Further, unlike in the retrogression policy cases, the adjudicative hold and significant negative factor policies are not an exercise of discretion compelled by visa limits set by Congress in the statutory scheme. Nothing in Section 1255(a) or any other provision of the INA specifies that USCIS has discretion to cease adjudicating adjustment of status applications altogether, or to view those applications with suspicion, as to all applicants from particular countries. Consequently, Section 1255(a) does not "set out [USCIS's] discretionary authority" to issue the adjudicative hold or significant negative factor policies. *Kucana*, 558 U.S. at 247.

The Court accordingly concludes that the adjudicative hold and significant negative factor policies do not constitute a "decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in [their] discretion." 8 U.S.C. § 1252(a)(2)(B)(ii). Section 1252(a)(2)(B)(ii), like 1252(a)(2)(B)(i), does not deprive the Court of jurisdiction to consider the plaintiffs' claims challenging those policies.

C.    Committed to Agency Discretion.

The government next contends that the plaintiffs' claims challenging the adjudicative hold policy are unreviewable because, under Section 701(a)(2) of the APA, that policy is a matter

21

committed to agency discretion.[13] In general, "the APA establishes a basic presumption of judicial review [for] one suffering legal wrong because of agency action." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16-17 (2020) (quotation marks omitted). But the government can rebut that presumption by showing that the challenged "action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see Regents of the Univ. of California*, 591 U.S. at 17; *New York v. Trump*, 171 F.4th 1, 19 (1st Cir. 2026). This exception to the presumption of reviewability is "quite narrow" and applies only "when the agency action is of a kind traditionally regarded as committed to agency discretion, . . . or when the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 17 (1st Cir. 2020) (quotation marks omitted); *see Lincoln v. Vigil*, 508 U.S. 182, 191-92 (1993); *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

The government does not contend that the adjudicative hold policy is the "rare" kind of decision traditionally regarded as committed to agency discretion. *Regents of the Univ. of California*, 591 U.S. at 17.[14] Rather, it appears to argue that the policy is committed to USCIS's

---

[13] The government does not mention the significant negative factor policy in the portion of its brief concerning matters committed to agency discretion, and it has therefore forfeited any argument that the significant negative factor policy is not reviewable under Section 701(a)(2) of the APA. *See* ECF 23, at 16-20; *Rodríguez*, 659 F.3d at 175.

[14] The government does argue that the adjudicative hold policy is not reviewable and not justiciable because it relates to matters of national security. *See* ECF 23, at 5-6. But it cites no case supporting the broad proposition that all administrative decisions implicating national security are beyond the reach of judicial review. Courts, of course, regularly review executive action that touches on matters of national security. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 677 (2018) (reviewing Presidential Proclamation that "placed entry restrictions on the nationals of eight foreign states whose systems for managing and sharing information about their nationals the President deemed inadequate"). And here, the adjudicative hold policy imposes a sweeping and indefinite halt on the adjudication of domestic benefit requests by thousands of noncitizens currently residing in the United States. It is not the sort of rare executive action involving foreign affairs or national security concerns that is wholly insulated from judicial review.

discretion because the relevant statutes are "drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Commerce v. New York*, 588 U.S. 752, 772 (2019) (quotation marks omitted). To determine if the relevant statutes are so drawn, the Court must carefully examine each "statute on which the claim of agency illegality is based" and the challenged regulatory framework. *Webster v. Doe*, 486 U.S. 592, 600 (1988); *see Haoud v. Ashcroft*, 350 F.3d 201, 206 (1st Cir. 2003); *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 719 (9th Cir. 2011). Because the plaintiffs challenge USCIS's adjudicative hold policy as applied to four different benefit pathways governed by unique statutory and regulatory frameworks, the Court will address each in turn.

1. Adjustment of Status Applications.

The INA provides that a noncitizen is eligible for adjustment of status if (1) she applies for an adjustment, (2) she is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) there is an immigrant visa available to her at the time she applies. 8 U.S.C. § 1255(a). The Attorney General "may" adjust the status of an eligible applicant to that of an alien lawfully admitted for permanent residence in accordance with the restrictions in Section 1255 and "in his discretion and under such regulations as he may prescribe." *Id.* Detailed regulations govern the adjustment of status process. Among other things, those regulations permit noncitizens to file applications seeking adjustment of status, 8 C.F.R. § 245.2(a)(2), and provide that "[t]he applicant shall be notified of the decision of the director," *id.* § 245.2(a)(5)(i).

In view of the comprehensive statutory and regulatory scheme governing the adjustment of status process, this is not one of "those rare circumstances where" there is "no meaningful standard against which to judge the agency's exercise of discretion." *New York*, 588 U.S. at 772 (quotation marks omitted). Congress, through the INA, granted the Attorney General authority to

23

process applications for adjustment of status and provided clear parameters for determining applicant eligibility. *See* 8 U.S.C. § 1255(a). USCIS, in turn, promulgated regulations outlining the application process and requiring that applicants "be notified of the decision of the director and . . . the reasons for [any] denial." 8 C.F.R. 245.2(5)(a)(i). The regulations contemplate that USCIS will accept, review, and adjudicate adjustment of status applications. Accordingly, the INA and USCIS's "own regulation[s] provid[e] more than enough 'law' by which a court could review" its decision to halt adjudications. *Haoud*, 350 F.3d at 206. Further, as the plaintiffs argue, Section 555(b) of the APA, which requires that agencies conclude matters presented to them "within a reasonable time," likewise affords a standard against which the Court can judge the agency's exercise of discretion. 5 U.S.C. § 555(b); *see New York*, 811 F. Supp. 3d at 241 (Section 555(b) "'imposes a general but nondiscretionary duty upon an administrative agency to pass upon a matter presented to it within a reasonable time'" (quoting *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1099 (D.C. Cir. 2003))). Because there is ample law to apply, the application of the adjudicative hold policy to adjustment of status applications is not a matter committed to agency discretion.

### 2. Work Authorization Applications.

The INA prohibits the hiring of "unauthorized aliens" and lays out requirements for employers seeking to lawfully employ aliens with the requisite authorization as well as penalties for those who fail to comply with these mandates. 8 U.S.C. § 1324a. Pursuant to the INA, a noncitizen is authorized to work if she is either lawfully admitted for permanent residence (i.e., holds a green card) or is otherwise "authorized to be so employed by this chapter or by the Attorney General." *Id.* § 1324a(h). Regulations govern which classes of noncitizens are authorized to accept employment, *see* 8 C.F.R. § 274a.12, and the processes for applying for employment authorization

24

and receiving a decision on an application, *see id.* § 274a.13. Among other things, the regulations require that work authorization applicants "be notified" of the decision on their application, *id.* §§ 274a.13(b), (c), and specify timelines for adjudicating work authorization applications made by applicants for asylum, *id.* § 208.7. This is "more than enough law" to facilitate judicial review of USCIS's decision to halt work authorization adjudications. *Haoud*, 350 F.3d at 206 (quotation marks omitted).

Ignoring this regulatory framework, the government points to Sections 1184(a) and 1103(a) of the INA in support of its argument that the adjudication of work authorization applications is committed to agency discretion and thus unreviewable pursuant to the APA. Section 1103(a) deals generally with the "[p]owers and duties" of the Secretary of Homeland Security and Attorney General, while Section 1184(a) authorizes the Attorney General to prescribe the "time and . . . conditions" for nonimmigrant admission. 8 U.S.C. §§ 1103(a), 1184(a). While these statutes vest the government with certain discretionary powers, they do not negate the statutory and regulatory framework that provides a meaningful standard against which the Court can assess USCIS's exercise of discretion in applying the adjudicative hold policy to work authorization applicants.

3.  Asylum Applications.

The INA permits any "alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status . . . [to] apply for asylum." 8 U.S.C. § 1158(a)(1). The Secretary of Homeland Security and the Attorney General are vested with the authority to grant those applications in accordance with certain procedures and requirements. *Id.* § 1158(b)(1)(A). For example, asylum may not be granted until the applicant's identity "has been checked against all appropriate records or databases . . . to determine any grounds on which the alien may be inadmissible to or deportable from the United States, or ineligible to apply for or be

25

granted asylum." *Id.* § 1158(d)(5)(A)(i). Pursuant to those procedures, final administrative adjudication of any asylum application, "in the absence of exceptional circumstances" and "not including administrative appeal, shall be completed within 180 days after the date an application is filed." *Id.* § 1158(d)(5)(A)(iii).

The government claims that the plaintiffs' asylum claims are unreviewable because Congress "imposed no mandatory timeline for asylum adjudications." ECF 23, at 16. But Section 1158(d)(5)(A)(iii) does just that: It requires adjudication of asylum claims within 180 days of the filing of the application, absent exceptional circumstances. The government nevertheless argues that Section 1158(d)(7)—which instructs that "[n]othing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party"— reveals Congress's intent to commit the timing and sequencing of asylum adjudications to agency discretion. 8 U.S.C. § 1158(d)(7). This language simply states that Section 1158 does not itself provide a private right of action; it does not make the agency's conduct with respect to asylum applications unreviewable under the APA. *See, e.g.*, *Celebi v. Mayorkas*, 744 F. Supp. 3d 100, 105-07 (D. Mass. 2024) (reviewing claim under Section 706(1) of APA that delay in adjudicating asylum application was unreasonable); *Washington v. Mayorkas*, No. 24-cv-10318-RGS, 2024 WL 3835029, at *2-3 (D. Mass. Aug. 15, 2024) (same). The government has not rebutted the presumption that the application of the adjudicative hold policy to asylum applications is subject to judicial review.

4.  Naturalization Applications.

The INA vests the Attorney General with the authority to naturalize persons as citizens of the United States and defines the naturalization process. 8 U.S.C. § 1421(a); *see id.* §§ 1421-1458. Section 1427(a) permits naturalization where the applicant satisfies minimum residency

26

requirements and "during all periods referred to in this subsection has been and still is a person of good moral character, attached to the principles of the Constitution of the United States." *Id.* § 1427(a). Unless the Attorney General waives it, any applicant for naturalization must undergo a "personal investigation." *Id.* § 1446(a). The Attorney General "shall designate employees of [USCIS] to conduct examinations upon applications for naturalization," and those employees "shall," in turn, "make a determination as to whether the application should be granted or denied, with reasons therefor." *Id.* §§ 1446(b), (d). If no such determination is made "before the end of the 120-day period after the date on which the examination is conducted," the applicant may seek a hearing in a federal district court, which "has jurisdiction over the matter and may either determine . . . or remand the matter." *Id.* § 1447(b). And a person whose application is denied may, after a hearing before an immigration officer, seek review of such denial in court. *Id.* § 1421(c).

This statutory scheme provides a meaningful standard against which to judge the government's exercise of discretion in freezing adjudication of any application for naturalization by a plaintiff from the countries specified in PM 602-0192 and PM 602-0194. Disagreeing, the government contends that because naturalization applicants must "establis[h] good moral character" "during all periods referred to in this subsection," 8 U.S.C. §§ 1427(a)(3), (e), USCIS has discretion "to complete whatever investigations are necessary, including enhanced security checks for applicants from countries with documented vetting challenges, before granting naturalization," ECF 23, at 20. But USCIS's authority to conduct an investigation in advance of naturalization does not displace the other sections of the INA that provide a meaningful standard against which to judge the lawfulness of USCIS's decision to halt adjudications altogether. There

is ample law to apply in determining whether the application of the adjudicative hold policy to applicants for naturalization comports with the APA.[15]

D.    Contrary to Law.

On the merits, the plaintiffs contend that they are likely to succeed on their claim that the adjudicative hold and significant negative factor policies are contrary to law. The APA instructs courts to "hold unlawful and set aside" agency action found to be "not in accordance with law." 5 U.S.C. § 706(2)(A). In the plaintiffs' view, the adjudicative hold policy conflicts with statutory and regulatory directives requiring adjudication of benefit applications, and the significant negative factor policy impermissibly imposes a nationality-based presumption where individualized consideration is required. Reprising its claim of broad discretion, the government

---

[15] The government also argues that plaintiffs' naturalization claims fail under 5 U.S.C. § 701(a)(1) because Congress, in creating a comprehensive remedial scheme for naturalization disputes with specific judicial review provisions, intended to preclude "general APA review." ECF 23, at 16-17. Section 701(a)(1) of the APA applies when Congress has "expressed an intent to preclude judicial review." *Heckler*, 470 U.S. at 830. This standard is met where Congress's intent to preclude judicial review is "fairly discernible in the statutory scheme." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984) (quotation marks omitted). Pointing to the INA provisions for judicial review of post-examination processing delays, 8 U.S.C. § 1447(b), and application denials, *id.* § 1421(c), the government maintains that Congress sought to foreclose this Court's review of the plaintiffs' naturalization claims. Courts have found judicial review precluded where a statute provides a detailed mechanism for a particular claim and has intended a specified remedy to be the exclusive remedy. *See Cmty. Nutrition Inst.*, 467 U.S. at 346-48 (consumer suits challenging Secretary's "milk market orders" precluded where statute contemplated cooperative venture among the Secretary, producers, and handlers, but not consumers); *Brown v Gen. Servs. Admin.*, 425 U.S. 820, 833-34 (1976) (statute's specific remedial scheme provided exclusive judicial remedy for claims of discrimination in federal employment). But that is not the case here. Even assuming that the INA provides the exclusive remedy for applicants seeking judicial review of a processing delay or of the denial of a naturalization application, the plaintiffs bring no such claims here. Their claims, asserted under Section 706(2)(A) of the APA, are that the adjudicative hold policy is contrary to law and arbitrary and capricious. And the government offers no convincing argument for why this Court should read the INA's provisions on individual application delays or denials to preclude a challenge under Section 706(2) to a general USCIS policy that prevents final decisions on thousands of naturalization applications. Accordingly, Section 701(a)(1) does not preclude judicial review of the plaintiffs' naturalization claims.

28

asserts that USCIS's policies are compatible with the laws and regulations governing naturalization, asylum, adjustment of status, and work authorization applications.

### 1. Adjudicative Hold Policy.

The plaintiffs' challenge to the adjudicative hold policy is straightforward: They argue that the policy conflicts with statutes and regulations that require USCIS to issue decisions on each category of benefit applications at issue in this case. With respect to applications for naturalization and asylum, they point to provisions of the INA specifying that USCIS "shall" adjudicate those applications. Under the INA, the Attorney General must designate USCIS employees to conduct naturalization examinations, and those employees, in turn, "shall make a determination as to whether the application should be granted or denied." 8 U.S.C. §§ 1446(b), (d). The statute also permits applicants to seek relief in court if their applications remain unadjudicated 120 days after their examination. *Id.* § 1447(b). With respect to asylum applications, the INA provides that final adjudications "shall be completed within 180 days after the date an application is filed," absent "exceptional circumstances." *Id.* § 1158(d)(5)(A)(iii).

In the context of statutory interpretation, "the word 'shall' usually creates a mandate, not a liberty." *Murphy v. Smith*, 583 U.S. 220, 223 (2018); *see SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 362 (2018) ("The word 'shall' generally imposes a nondiscretionary duty."). The plaintiffs argue, and the Court agrees, that when Congress directed that USCIS "shall" make a decision on applications for naturalization and asylum on a particular timeline, it imposed a "nondiscretionary duty to perform." *Murphy*, 583 U.S. at 223. The adjudicative hold policy, which indefinitely halts USCIS's adjudication of all asylum applications and all naturalization applications by noncitizens from the identified countries, is contrary to Congress's command that the agency issue decisions on such applications. And the government does not contend that the "exceptional circumstances"

exception in Section 1158(d)(5)(A)(iii) applies to any of the plaintiffs in this case with pending applications for asylum.

With respect to applications for adjustment of status and work authorization, the plaintiffs contend that USCIS's regulations require adjudication of those applications, and that Section 555(b) of the APA also imposes a nondiscretionary duty to decide those applications in a reasonable period of time. *See* 5 U.S.C. § 555(b) ("each agency shall proceed to conclude a matter presented to it" "within a reasonable time"). For purposes of review under Section 706(2), an agency acts contrary to law if it does not comply with its own regulations. *See Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 65 (2004) (the term "law" under Section 706 of the APA "includes, of course, agency regulations that have the force of law"); *Bradley v. Weinberger*, 483 F.2d 410, 414 n.2 (1st Cir. 1973) (same); *Presidents' All. on Higher Educ. & Immigr. v. Noem*, No. 25-cv-11109-PBS, 2026 WL 788185, at *18 (D. Mass. Mar. 20, 2026) (same).

For adjustment of status applications, USCIS's regulations permit noncitizens to file applications seeking an adjustment of status, 8 C.F.R. § 245.2(a)(2), and then specify that "[t]he applicant shall be notified of the decision of the director," *id.* § 245.2(a)(5)(i). The latter requirement—that the applicant be notified of the final decision—makes clear that a "decision" must be issued. The government protests that the statute governing adjustment of status does not, by its terms, require adjudication of adjustment of status applications, and it provides that the Attorney General "may" adjust the status of certain aliens, "in his discretion and under such regulations as he may prescribe." 8 U.S.C. § 1255(a); *see Gupta*, 118 F.4th at 483. This language gives the Attorney General significant discretion over whether to grant or deny adjustment of status, but it does not authorize a categorical refusal to issue decisions on applications by noncitizens from dozens of countries. Instead, the "regulations . . . prescribe[d]" by USCIS require

30

a final decision to issue. 8 U.S.C. § 1255(a); *see* 8 C.F.R. § 245.2(a)(5)(i). Nor does the First Circuit's holding that USCIS's retrogression policy comports with Section 1255(a) compel the conclusion that the adjudicative hold policy is permissible. *See Gupta*, 118 F.4th at 487. In response to complexities occasioned by statutory caps on visas, the retrogression policy temporarily delays adjudication of adjustment of status applications until a visa becomes available. *See id.* at 483, 487. The adjudicative hold policy, in contrast, delays adjudication of adjustment of status applications indefinitely, in violation of USCIS's regulations and Section 555(b) of the APA.

The regulations governing work authorization similarly require adjudication of such applications. Noncitizens seeking an employment authorization document "must apply" to USCIS. 8 C.F.R. §§ 274a.12(a), (c). By regulation, USCIS specifies that if "the application is granted, the alien shall be notified of the decision and issued an employment authorization document," and if "the application is denied, the applicant shall be notified in writing of the decision and the reasons for the denial." *Id.* §§ 274a.13(b), (c). A separate regulation requires that work authorization applications made in conjunction with asylum applications be adjudicated within a specified time. *See id.* § 208.7. Like the adjustment of status regulations, these regulations contain an implicit requirement that work authorization applications be decided. The adjudicative hold policy—which prohibits decisions on such applications—is fundamentally inconsistent with that regulatory command. And it is also incompatible with the APA's requirement that agency action, including USCIS's consideration of adjustment of status applications and work authorization applications, "conclude" "within a reasonable time." 5 U.S.C. § 555(b).

The government does not meaningfully dispute that 8 U.S.C. §§ 1446(b) and (d); 8 U.S.C. § 1158(d)(5)(A)(iii); 8 C.F.R. § 245.2(a)(5)(i); and 8 C.F.R. §§ 274a.13(b) and (c) impose a mandatory duty on USCIS to adjudicate, respectively, naturalization, asylum, adjustment of status,

31

and work authorization applications. Instead, it points to other INA provisions requiring investigations in advance of USCIS's decision on naturalization applications, *see* 8 U.S.C. §§ 1427(a)(3), 1446(a); 8 C.F.R. § 335.2(b), and requiring agencies to share information related to internal and border security, *see* 8 U.S.C. §§ 1105(a)-(b). This is a non sequitur. USCIS's obligation to conduct investigations before issuing a decision on benefit applications can coexist, and until recently has coexisted, with its duty to issue a decision on those applications. Nor does 8 C.F.R. § 103.2(b)(18), which authorizes withholding of adjudication for individual benefit requests at specified intervals pending an ongoing investigation, confer authority to adopt a generally applicable policy withholding adjudication indefinitely. *See* 8 C.F.R. § 103.2(b)(18) ("USCIS may authorize withholding adjudication of *a visa petition or other application* if USCIS determines that an investigation has been undertaken . . . in connection with *the benefit request*" (emphases added)); *Dong v. Chertoff*, 513 F. Supp. 2d 1158, 1168 (N.D. Cal. 2007) (Section 103.2(b)(18) "allows for the withholding of adjudication, for specified intervals, upon compliance with specific procedural requirements"; it "is not a blanket authority to indefinitely withhold adjudication of an application"); *Saghafi v. Edlow*, No. 26-cv-100-GLR, 2026 WL 1127468, at *5 (D. Md. Apr. 24, 2026) (same); *Varniab v. Edlow*, No. 25-cv-10602-SVK, 2026 WL 485490, at *10 (N.D. Cal. Feb. 20, 2026) (same). By statute and regulation, Congress and USCIS have specified that, at a certain point, investigations must end and a decision must be made. The charge to conduct investigations does not give USCIS authority to perpetually delay adjudication of applications, where Congress required USCIS to make such decisions and the agency has, by regulation, committed itself to making such decisions.

Trying another tack, the government contends that the adjudicative hold policy is required by Presidential Proclamations 10949 and 10998. But there is nothing in those proclamations that

32

requires or even anticipates the adjudicative hold policy. As reflected in their titles and throughout their text, those proclamations involve restrictions on "the entry" of noncitizens "into the United States" from other countries, not the consideration of benefit applications from noncitizens already within the United States. *See* ECF 33-1, at 23; *id.* at 24-29, §§ 1 (c)-(d), (f)-(h), 2-4; 90 Fed. Reg. at 59717-24. Consistent with that scope, Proclamations 10949 and 10998 rely on 8 U.S.C. §§ 1182(f) and 1185(a), provisions of the INA that concern entry of noncitizens into the United States, as authority. *See* 8 U.S.C. § 1182(f) (authorizing the President to "suspend the entry" of "any class of aliens into the United States" when he finds that such entry "would be detrimental to the interests of the United States"); *id.* § 1185(a)(1) (making it unlawful "for any alien to depart from or enter . . . the United States except under such rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe"). As other courts have recognized, "the adjudicatory hold extends far beyond" the proclamations' restrictions on "*entry* of aliens from . . . countries deemed to be high-risk," because "it applies to nearly all pending benefit requests from applicants such as Plaintiffs *who have already been admitted to the United States*." *Varniab*, 2026 WL 485490, at *19.

For these reasons, the plaintiffs are likely to succeed on their claim that, as applied to the plaintiffs' applications for naturalization, asylum, adjustment of status, and work authorization, the adjudicative hold policy is not in accordance with law.

### 2.  Significant Negative Factor Policy.

The plaintiffs also challenge the lawfulness of USCIS's policy instructing officials to consider the nationality-based vetting and screening deficiencies identified in Proclamations 10949 and 10998 as a significant negative factor in the adjudication of benefit requests. This

policy, the plaintiffs argue, effectively puts a thumb on the scale against any immigrant from one of the 39 countries identified as "high risk" by Proclamation 10998.

The plaintiffs contend that the significant negative factor policy violates the INA's command that, unless Congress specifically authorizes it, "no person shall . . . be discriminated against in the issuance of an immigrant visa because of the person's . . . nationality." 8 U.S.C. § 1152(a)(1)(A). There is no dispute between the parties that this statute bears on the plaintiffs' applications for adjustment of status and work authorization, because those applications depend on visa availability, but does not apply to applications for naturalization or asylum.[16] And there is no dispute that the significant negative factor policy draws distinctions on the basis of nationality. The government nevertheless contends that, as applied to adjustment of status and work authorization applicants, the significant negative factor policy comports with Section 1152(a)(1)(A), because that statute must be "read in harmony" with Sections 1182(a)(3) and (f) of the INA. ECF 23, at 23. Sections 1182(a)(3) and (f) concern *entry* of noncitizens into the United States and permit the government to make nationality-based distinctions regarding the admissibility of individuals on security grounds. *See* 8 U.S.C. §§ 1182(a)(3) and (f); *Trump v. Hawaii*, 585 U.S. 667, 683-84 (2018) ("By its plain language, § 1182(f) grants the President broad discretion to suspend the entry of aliens into the United States."). Those statutes are inapposite where, as here, the challenged policy concerns domestic processing of benefit applications by noncitizens already admitted into the United States. *See Hawaii*, 585 U.S. at 695 (explaining that admissibility and entry "operate in [a] different spher[e]" than the allocation of visas). The government has no convincing argument that the significant negative factor policy can be

---

[16] In particular, the government does not dispute that Section 1152(a)(1)(A)'s application to "immigrant visa[s]" covers those work authorization applications at issue in this case. 8 U.S.C. § 1152(a)(1)(A).

reconciled with Section 1152(a)(1)(A). The plaintiffs are, accordingly, likely to succeed on their claim that the significant negative factor policy, as applied in the processing of adjustment of status and work authorization applications, runs afoul of Section 1152(a)(1)(A)'s prohibition on nationality-based discrimination.

The plaintiffs also argue that the history of the INA makes clear that the significant negative factor policy exceeds USCIS's statutory authority. Congress, they maintain, did not intend to vest USCIS with the authority to discriminate against applicants for benefits on the basis of nationality. But in this part of their brief, the plaintiffs cite no law whatsoever—no statutory text, legislative history, case law, or other source of law—and simply declare that the INA does not authorize "a nationality-based presumption of suspicion." ECF 15, at 21. This claims too much. Certain provisions of the INA—namely, Section 1182(f)—do permit nationality-based distinctions. *See Hawaii*, 585 U.S. at 688. While a more nuanced argument may emerge as this case develops, the plaintiffs have not carried their burden at this stage to demonstrate a likelihood of success on the merits of a claim that the significant negative factor policy, as applied to applicants for asylum and naturalization, is contrary to the INA writ large.[17] Nor have the plaintiffs sought preliminary injunctive relief as to the significant negative factor policy on the basis of their equal protection claim or their arbitrary and capricious claim under Section 706(2)(A) of the APA.

\*       \*       \*

To summarize, the plaintiffs are likely to succeed on their claim under Section 706(2)(A) that the adjudicative hold policy is not in accordance with the INA and USCIS regulations. They are also likely to succeed on their claim that the significant negative factor policy, as applied to

---

[17] The Court granted the parties leave to file supplemental briefing on this issue, but no party did so. ECF 41, at 22:25-23:16.

those plaintiffs with adjustment of status and work authorization applications, is contrary to the INA. But they have not demonstrated a likelihood of success on their claim that the significant negative factor policy is contrary to the INA insofar as it applies to plaintiffs with asylum and naturalization applications.

E.    Arbitrary and Capricious.

The plaintiffs also assert they are likely to succeed in demonstrating that the adjudicative hold policy is arbitrary and capricious because USCIS did not provide a reasoned explanation for the policy and failed to meaningfully consider the reliance interests of the applicants affected by it.[18] The APA authorizes courts to "hold unlawful and set aside" final agency actions found to be arbitrary and capricious. 5 U.S.C. § 706(2)(A). In reviewing a claim of arbitrary agency action, a court's review is narrow and deferential, and the court must not "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Still, it must examine whether the "'agency action [is] reasonable and reasonably explained.'" *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 98 (1st Cir. 2025) (quoting *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). "An agency action is arbitrary and capricious when the agency 'relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise.'" *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (quoting *Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997)).

---

[18] The portion of the plaintiffs' brief concerning their arbitrary and capricious claim makes no argument about the significant negative factor policy. *See* ECF 15, at 17-19. The plaintiffs have therefore forfeited that argument in support of their preliminary injunction motion. *See Rodríguez*, 659 F.3d at 175.

The plaintiffs argue that the memoranda adopting the adjudicative hold policy, PM 602-0192 and PM 602-0194, fail to provide a reasoned explanation for prohibiting final decisions on all asylum applications and on applications for other benefits by individuals from the 39 countries listed in the Presidential Proclamations 10949 and 10998. Disputing this characterization, the government points to two factual bases for the adjudicative hold policy: (1) the reference in PM 602-0192 to an unsuccessful terrorist attack planned for Election Day 2024, and a November 2025 terrorist attack that killed one National Guard member and critically injured another, each by an individual from Afghanistan; and (2) the statement in PM 602-1094 that the countries identified in the proclamations "demonstrate significant deficiencies in screening, vetting, and information sharing" with the United States. ECF 31-1, at 7; ECF 35-1, at 2. The government also asserts that the factual findings in the two Presidential Proclamations substantiate the adjudicative hold policy.

These are thin reeds on which to rest an assertion of reasoned decisionmaking. With respect to the criminal acts planned or committed by Afghan nationals, the government makes no argument as to how two serious, but isolated, violent crimes planned by two people from one country is rationally connected with a policy stopping adjudication of benefit applications by people from 39 different countries, as well as applications for asylum by people from every country in the world. Extrapolating the criminal conduct of two noncitizens to thousands of other noncitizens, from dozens of countries around the world, does not rank as reasoned decisionmaking. *Cf. E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 980, 982-83 (9th Cir. 2020) (finding rule arbitrary and capricious where "the agencies ha[d] not justified the Rule's assumption that an alien who has failed to apply for asylum in a third country is, for that reason, not likely to have a meritorious asylum claim"); *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 588 (4th Cir.

2012) ("An unjustified leap of logic or unwarranted assumption . . . can erode any pillar underpinning an agency action.").

Nor do the Presidential Proclamations' factual findings regarding vetting and screening reasonably explain the adjudicative hold on domestic benefit adjudications. PM 602-0194 states that the adjudicative hold policy is necessary because the President has identified 39 countries that lack "adequate screening and vetting information" and are "unable to meet basic criteria for identifying their nationals and residents who may pose national security and public safety risks." ECF 35-1, at 2. The Presidential Proclamations, on which that statement relies, include factual findings that support the President's decision to suspend or limit the entry of persons from those 39 countries into the United States. *See* ECF 33-1, at 23; *id.* §§ 1 (c)-(d), (f)-(h), 2-4; 90 Fed. Reg. at 59717-26. But nothing in the Presidential Proclamations or Policy Memoranda explain why deficiencies in a country's screening of its nationals in advance of entry into the United States has any bearing on discretionary benefit adjudication for applicants who have already been admitted into the United States—in some cases, decades ago. Domestic benefit adjudication and consideration of noncitizens for admission into the United States are, of course, different processes governed by different statutory and regulatory provisions. There is nothing in the Policy Memoranda linking the findings from the Presidential Proclamations regarding entry of foreign nationals into the United States to a decision to suspend adjudication of benefit applications by foreign nationals already admitted into the United States. Nor are there factual findings suggesting a reasoned basis for concern about public safety or national security risks by individuals from the 39 identified countries living in the United States today. And there is certainly nothing in the proclamations' country-specific findings that reasonably explains USCIS's decision to cease adjudicating asylum applications from *all countries*. The plaintiffs are, accordingly, likely to

38

succeed on their claim that USCIS failed to provide a reasoned explanation for its adjudicative hold policy. *See State Farm*, 463 U.S. at 43 ("[T]he agency must examine the *relevant data* and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made." (emphasis added) (quotation marks omitted)).

The plaintiffs separately argue that USCIS failed to adequately consider reliance interests before promulgating the adjudicative hold policy. "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). But when adopting a new policy, an agency is required to "assess whether there were reliance interests" in the prior policy, "determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents of the Univ. of California*, 591 U.S. at 33. The agency must also show consideration of "alternatives . . . within the ambit of the existing policy." *Id.* at 30 (quotation marks omitted).

The government maintains it has done so here. It points to language in PM 602-0194 explaining that USCIS "has considered that this direction may result in delay to the adjudication of some pending applications and has weighed that consequence against the urgent need for the agency to ensure that aliens are vetted and screened to the maximum degree possible," and ultimately concluding that "the burden . . . which will fall on some aliens is necessary and appropriate." ECF 35-1, at 4. This language is entirely conclusory, and it "provides no indication that the agency actually considered the consequence[s] of indefinitely delaying final adjudication of pending applications." *Varniab*, 2026 WL 485490, at \*19. The plaintiffs have significant reliance interests in the prior policy of allowing adjudications to reach final decisions. They reasonably expected that the government would tell them whether their benefits requests have been granted or denied, which would, in turn, allow them to make professional and personal life plans.

There is no indication that USCIS meaningfully considered the consequences of throwing thousands of benefit applicants into indefinite limbo and perpetual uncertainty about whether they will be granted asylum, become a United States citizen, receive work authorization, or obtain a green card. Nor do the Policy Memoranda indicate that USCIS considered alternatives to the adjudicative hold, including, among other options, increasing investigatory scrutiny as appropriate but permitting final adjudications to occur. *See id.* at *20 (describing remedies for the government if it learns that applicants previously granted adjustment of status pose a national security threat, including rescinding the grant of residency, instituting removal proceedings, or arresting the individual).

The Court cannot, on this record, conclude that USCIS meaningfully considered whether reliance interests existed, weighed the significance of those interests against competing policy concerns, and evaluated reasonable alternatives to the adjudicative hold policy. *See Regents of the Univ. of California*, 591 U.S. at 30, 33. For this reason, too, the plaintiffs are likely to succeed on their claim that the adjudicative hold policy is arbitrary and capricious, in violation of the APA.

## II.   <u>Irreparable Harm.</u>

Preliminary injunctive relief is available only where the moving party can "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis omitted). Irreparable harm is "an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy," *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005), and it is measured on "a sliding scale, working in conjunction with a moving party's likelihood of success on the merits," *Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009).

Twenty-two of the approximately 200 plaintiffs in this case submitted declarations attesting to the harm they will face absent preliminary injunctive relief. *See* ECF 16 through 16-22. [19] Each is from one of the countries affected by USCIS's adjudicative hold and significant negative factor policies, and each awaits adjudication of an application for asylum, naturalization, adjustment of status, or work authorization. Of those plaintiffs, two have applied for asylum,[20] four for naturalization,[21] five for work authorization,[22] five for adjustment of status,[23] and six for work authorization and adjustment of status.[24] Eleven plaintiffs attest that, absent injunctive relief, they will be unable to work, resulting in serious financial consequences, loss of health insurance, or housing insecurity.[25] Seven further attest that they are likely to lose critical professional opportunities and job offers.[26] Seven plaintiffs will have to miss family weddings or cancel or significantly delay trips to see elderly or ill family members.[27] Two plaintiffs fear the risk of unlawful detention by ICE, which has recently arrested individuals lawfully present in the country.[28] Three plaintiffs fear being forced to return to countries where they will be unsafe.[29] Due

---

[19] Twenty-three affidavits were submitted. ECF 16-5 and 16-21 are duplicates.

[20] *See* ECF 16-15, ECF 16-20.

[21] *See* ECF 16-16, ECF 16-17, ECF 16-19, and ECF 16-22.

[22] *See* ECF 16, ECF 16-1, ECF 16-3, ECF 16-5, and ECF 16-6.

[23] *See* ECF 16-7, ECF 16-9, ECF 16-10, ECF 16-11, and ECF 16-18.

[24] *See* ECF 16-2, ECF 16-4, ECF 16-8, ECF 16-12, ECF 16-13, and ECF 16-14.

[25] *See* ECF 16, ¶¶ 4-5; ECF 16-1, ¶¶ 5-7; ECF 16-2, ¶ 5; ECF 16-3, ¶ 7; ECF 16-4, ¶ 5; ECF 16-5, ¶¶ 5-6; ECF 16-6, ¶ 7; ECF 16-8, ¶ 4; ECF 16-12, ¶¶ 4-5; ECF 16-13, ¶ 6; ECF 16-14, at 1.

[26] *See* ECF 16-1, ¶¶ 5-6; ECF 16-7, ¶¶ 6-7; ECF 16-9, ¶ 4; ECF 16-11, ¶ 6; ECF 16-14, at 1; ECF 16-18, at 1; ECF 16-22, ¶ 6.

[27] *See* ECF 16-9, ¶ 6; ECF 16-10, ¶ 5; ECF 16-11, ¶ 6; ECF 16-14, at 1; ECF 16-17, ¶ 7; ECF 16-19, ¶¶ 5-6; ECF 16-22, ¶ 6.

[28] *See* ECF 16-9, ¶ 3; ECF 16-20, ¶ 5.

[29] *See* ECF 16-10, ¶ 3; ECF 16-15, at 1-2; ECF 16-20, ¶ 3.

to the stress from the prolonged uncertainty in the naturalization process, one plaintiff has experienced suicidal ideation and will continue to face severe mental illness absent injunctive relief.[30]

These sorts of harms are not measurable and not adequately compensable by money damages. *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996) ("If the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel."). The plaintiffs are not merely facing the loss of a single job, which often does not constitute irreparable injury because it may be remedied with money damages. *See Gillan v. Town of Carver*, No. 24-cv-12212-AK, 2025 WL 1836609, at *2 (D. Mass. July 2, 2025). Rather, the plaintiffs are facing the prospect of financial ruin from the inability to obtain *any* job, coupled with the inability to travel and the legitimate risk of unlawful detention while they await adjudication of their benefit applications. The government contends that the plaintiffs' injuries are speculative, but that ignores that each of the 22 plaintiffs have attested, with specificity, to the concrete harms they have experienced, and will continue to experience, as a result of USCIS's challenged policies. *See Bowser v. Noem*, 26-cv-10382-AK, 2026 WL 555624, at *9 (D. Mass. Feb. 27, 2026) (finding that the adjudicative hold policy inflicted irreparable harm on the plaintiff); *Nat'l Educ. Ass'n-New Hampshire v. NH Attorney General*, 806 F. Supp. 3d 166, 208 (D.N.H. 2025) ("Loss of the ability to practice one's chosen profession is irreparable harm." (citing *Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1165 (9th Cir. 2011))). Nor, as the government argues, do these plaintiffs rely only on the fact of delay in support of their assertion of irreparable harm. Each of these 22 plaintiffs has,

---

[30] *See* ECF 16-16, ¶ 7.

42

accordingly, demonstrated that they are likely to face irreparable harm absent preliminary injunctive relief.

The remaining plaintiffs have not submitted declarations in support of the preliminary injunction motion and therefore have not made any showing that they will experience irreparable harm absent injunctive relief. At the hearing on the plaintiffs' motion, however, counsel for the plaintiffs indicated that he had declarations for each plaintiff in this action but had not submitted them all to the Court. In light of this representation, the parties will be ordered to confer regarding which of the remaining plaintiffs is likewise entitled to injunctive relief given the facts in those unfiled declarations and the reasoning of this decision.

## III.    Balance of Equities and Public Interest.

The balance of equities considers "the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues." *Ross-Simons*, 102 F.3d at 15. Where, as here, the government is the nonmovant, the balance of the equities and public interest analyses merge. *Nken*, 556 U.S. at 435. Twenty-two of the plaintiffs, as discussed, have demonstrated that they are likely to face significant hardships without preliminary injunctive relief. The government responds that these hardships are outweighed by the national security concerns warranting the adjudicative hold and significant negative factor policies.

National security is, as the government contends, "an urgent objective of the highest order." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010). But the government has failed to explain how enjoining application of the adjudicative hold and significant negative factor policies as to the plaintiffs inhibits the government's ability to protect national security. The plaintiffs seek an injunction as to their own pending benefit applications, not universal relief. *See* ECF 28, at 15 (plaintiffs requesting "only the relief necessary to prevent irreparable harm to the named Plaintiffs

43

while this case proceeds"). The government has offered no evidence, and made no argument, that it has national security concerns about any of the approximately 200 plaintiffs in this case. The requested relief would not interfere with USCIS's pre-adjudication investigations of the plaintiffs. Nor do the plaintiffs request an injunction that would impose a timeline on USCIS's adjudications.[31] USCIS would remain free to conduct thorough background checks, take security measures supported by individualized findings, deny applications, and reconsider already approved benefit requests where appropriate. Any harm the government may experience without application of the adjudicative hold and significant negative factor policies to the plaintiffs is, accordingly, outweighed by the harm to the plaintiffs absent injunctive relief.[32]

### CONCLUSIONS AND ORDERS

For the foregoing reasons, the motion for a preliminary injunction and administrative stay, ECF 8, is GRANTED in part and DENIED in part. The Court ORDERS as follows:

(1)    The defendants are ENJOINED from enforcing the adjudicative hold policy, set forth in PM 602-0192 and PM 602-0194, to the pending benefit applications of the 22 plaintiffs who submitted declarations. The defendants are ORDERED to immediately lift the adjudicative hold as to those plaintiffs.

(2)    The defendants are ENJOINED from enforcing the significant negative factor policy, set forth in PA 2025-26, to pending applications for adjustment of status and work authorization of any of the 22 plaintiffs who submitted declarations. The defendants are

---

[31] USCIS's adjudication does, of course, remain subject to the APA's requirement that the adjudication conclude "within a reasonable time." 5 U.S.C. § 555(b).

[32] In light of the Court's conclusions that certain of the plaintiffs are entitled to a preliminary injunction under Federal Rule of Civil Procedure 65(a), and that the remaining plaintiffs may likewise be entitled to preliminary injunctive relief upon review of their declarations, this Court need not consider the plaintiffs' separate request for a stay of agency action under Section 705 of the APA, 5 U.S.C. § 705.

ORDERED to cease applying the significant negative factor policy to the adjudication of those plaintiffs' applications for adjustment of status and work authorization.

(3)    The parties are ORDERED to confer regarding whether this Order should likewise apply to the plaintiffs who have not filed declarations with the Court. The parties are further ORDERED to file a status report by May 7, 2026 identifying which plaintiffs have demonstrated irreparable harm, and thus may be covered by this Order, in accordance with the Court's determinations concerning the 22 plaintiffs whose declarations it reviewed. If the parties are unable to reach agreement, the plaintiffs are ORDERED to submit the contested declarations to the Court, with appropriate redactions, by May 11, 2026.

(4)    No security under Federal Rule of Civil Procedure 65(c) is necessary or warranted in the circumstances of this case.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
Dated: April 30, 2026              UNITED STATES DISTRICT JUDGE